# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Carolyn Cole and Molly Hennessy-Fiske,

                             Plaintiffs,

v.

John Does 1, 2 and 3, acting in their individual
capacities as troopers or other sworn officers
of the Minnesota State Patrol; Joseph Dwyer,
acting in his individual capacity as a Captain of
the Minnesota State Patrol; and Timothy Salto,
acting in his individual capacity as a Lieutenant
of the Minnesota State Patrol,

                             Defendants.

Case No. _____

**COMPLAINT**
**Jury Trial Demanded**
**Under FRCP 38(b)**

_____

For their Complaint, Carolyn Cole ("Carolyn") and Molly Hennessy-Fiske ("Molly"), state and allege as follows:

1.       The First Amendment to the United States Constitution sets forth the most fundamental liberties in the Bill of Rights, the inclusion of which the founding fathers insisted before ratifying the Constitution. One of the most sacrosanct of those liberties is the freedom of the press. As the Supreme Court has stated, "A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

2.       Carolyn and Molly are two members of this free press. They bring this action for violations of their First Amendment rights, and other constitutional rights, on May 30, 2020, by Defendants John Does 1, 2, and 3, officers of Minnesota's highest law-enforcement agency, and their supervisors Defendants Joseph Dwyer ("Dwyer") and Timothy Salto

("Salto").  The conduct of these Defendants violated Carolyn's and Molly's clearly established federal civil rights, all while acting under color of state law.

3.     Carolyn is, and was at all times material herein, a citizen of the United States and a resident of the State of California.  She graduated from the University of Texas with a degree in photojournalism and went on to earn her Master of Arts degree from the School of Visual Communication within the Scripps College of Communication at Ohio University.

4.     Carolyn started her career as a photographer in 1986 and has been a staff photographer for the *Los Angeles Times* since 1994.  She has covered stories across the world, including in dangerous areas of Kosovo, Liberia, Iraq, and Afghanistan.  In 2004, she won a Pulitzer Prize for her coverage of the siege of Monrovia, Liberia.  Also in 2004, Carolyn was named Journalist of the Year and won Newspaper Photographer of the Year from "Picture of the Year International" – making her the first person to win all three of America's top photojournalism awards in the same year.

5.     Molly is, and was at all times material herein, a citizen of the United States and a resident of the State of Texas.  She graduated from Harvard College with a degree in social studies.

6.     Molly has reported for newspapers in Boston, Miami, Raleigh, Schenectady, Syracuse, Washington, and West Palm Beach.  She is a staff writer for the *Los Angeles Times*, where she has spent the last fifteen years; she is currently the paper's Houston bureau chief.  Like Carolyn, Molly has covered stories across the word, including dangerous areas in Afghanistan, Egypt, and Iraq, and she has been recognized for her impressive journalism

work – winning the Overseas Press Club award in 2015 and a DART award from Columbia University in 2014, and she was a finalist for the Livingston Awards and Casey Medal.

7.     Both Carolyn and Molly have also covered police protests domestically.

8.     The Minnesota State Patrol is composed of 886 employees, of which 591 are uniformed personnel or sworn officers.  Structurally, many of the sworn officers appear to be troopers, while the sergeants generally hold investigative roles.  There are also lieutenants and captains, who maintain supervisory responsibility over the troopers and sergeants.  All of the State Patrol personnel ultimately report to Colonel Matt Langer, Chief of the Minnesota State Patrol.

9.     Defendants John Does 1, 2, and 3, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as troopers with the Minnesota State Patrol.  They are sued in their individual capacities for misconduct occurring under color of state law.

10.     Defendant Joseph Dwyer, upon information and belief, was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly appointed and acting as a Captain with the Minnesota State Patrol, charged with command and supervision of a Mobile Response Team ("MRT") when it encountered demonstrators and, later, Carolyn and Molly on May 30, 2020.  Dwyer is sued in his individual capacity for misconduct occurring under color of state law.

11.     Defendant Timothy Salto, upon information and belief, was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly appointed and acting as a Lieutenant with the Minnesota State Patrol, charged with

- 3 -

command and supervision of a Special Response Team ("SRT") when it encountered demonstrators and, later, Carolyn and Molly on May 30, 2020. Salto is sued in his individual capacity for misconduct occurring under color of state law.

12. Carolyn and Molly bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of the Court over this matter. State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil-rights lawsuit.

13. The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper in this Court under 28 U.S.C. § 1391(b)(2).

## THE BACKDROP – THE MURDER OF GEORGE FLOYD BY MINNEAPOLIS POLICE OFFICERS, FOLLOWED BY HARSH CRITIQUES OF FREY AND WALZ

14. On May 25, 2020, George Floyd was killed by former Minneapolis Police Officer Derek Chauvin while three fellow officers stood by and refused to intervene.

15. Video of the murder sparked worldwide outrage and many protests ensued as a call to finally change systemic racism in our nation's police departments.

16. Some of the protests nationwide, including in Minnesota and Minneapolis in particular, caused severe destruction.

17. Both Minnesota Governor Tim Walz and Minneapolis Mayor Jacob Frey were heavily criticized for their initial responses to the civil unrest in the wake of Floyd's murder

- 4 -

and, in particular, after the destruction of the Minneapolis Police Department's Third Precinct.

18.     Then-President Donald Trump tweeted some of his own criticism, calling Frey "very weak" and describing what he saw as a "total lack of leadership."

19.     President Trump's tweet from May 29, 2020, spelled out the action plan moving forward:



20.     In response to the ongoing civil unrest, on May 29, 2020, Governor Walz enacted Emergency Executive Order 20-65 – a peacetime emergency was declared, the Minnesota National Guard was activated, and a nighttime curfew (beginning at 8:00 p.m. CDT) was imposed for Minneapolis and Saint Paul on May 29 and 30, 2020.

21.     Section 3 of the Emergency Executive Order 20-65 outlined those **exempt from the curfew**:  "All law enforcement, fire, medical personnel, and members of the **news media**."  (emphasis added).

22.     While the curfew would be extended by additional Executive Orders, the same exemption for the press **always** applied.  The Executive Orders did not create a hierarchy. They gave the press the same rights to be out as other critical groups.

23.     These Executive Orders and, particularly, the portions pertaining to the lawful enforcement of the curfew, were well-known and disseminated to, and became part of the rules of engagement for, each responding law-enforcement agency or military troop, including each of the Defendants herein.

24.     Carolyn and Molly were not the only members of the press targeted during their coverage of the protests and police response in the wake of Floyd's murder.

25.     Indeed, on May 29, 2020, a CNN reporter, producer, and photojournalist were arrested by Minnesota State Patrol troopers while broadcasting on live television.  The arrests were widely condemned and Governor Walz quickly recognized their impropriety, announcing there was "absolutely no reason" for them and that he would work to quickly secure the journalists' release, which occurred approximately an hour later.

26.     Further, Jared Goyette's Second Amended Class Action Complaint, Civ. No. 20-1302 (WMW/DTS) (D. Minn.), details other members of the press being targeted by the Minnesota State Patrol, including press from the Minneapolis *Star Tribune* and WCCO, among others.  The incident at issue in *Goyette* occurred on May 27, 2020.

27.     Supervisory Defendants Dwyer and Salto were aware of the above incidents, including that involving the CNN journalists.

28.     All of the Defendants understood that members of the media were exempt from the curfew imposed by the Executive Orders and were therefore permitted to be on the streets of Minneapolis after 8:00 p.m.

## THE UNDERLYING WRONGS PROMPTING THE PROTESTS

29.     The protests that erupted following George Floyd's death were not surprising. Policing in Minnesota, and Minneapolis in particular, has long been troubled, and citizens have watched for decades as nothing has been done to correct these injustices.

30.     On April 20, 2021, a Hennepin County jury found Chauvin guilty of all three criminal charges leveled against him in connection with the murder of George Floyd.

31.     On May 6, 2021, a federal grand jury in the District of Minnesota returned an Indictment in Case Number 21-CR-108 (PAM/TNL), charging Chauvin and fellow former MPD officers Tou Thao, J. Alexander Kueng, and Thomas Lane with criminal civil-rights violations in connection with their treatment, and the death, of George Floyd.

32.     Also on May 6, 2021, a federal grand jury in the District of Minnesota returned an Indictment in Case Number 21-CR-109 (WMW/HB), charging that on September 4, 2017, Chauvin deprived then-Juvenile 1 of the right, secured by the Constitution of the United States, to be free from an unreasonable search and seizure, which includes the right to be free from the use of unreasonable force.

33.     That second Indictment charged, in Count I, that Chauvin, without legal justification, held Juvenile 1 by the throat and struck him multiple times with a flashlight, a dangerous weapon.

91600266.1

34.     That second Indictment also charged, in Count II, that Chauvin, "held his knee on the neck and upper back of Juvenile 1 even after Juvenile 1 was lying prone, handcuffed and unresisting."

35.     For these actions, Chauvin was not disciplined or terminated by the MPD and continued to conduct such unlawful acts until he was arrested for the murder of George Floyd.

## THE ASSAULTS ON CAROLYN AND MOLLY

36.     Shortly after the protests following George Floyd's death began, the decision was made that Molly would travel to Minneapolis.  She flew from Houston to Minneapolis, a city that she was familiar with, on Thursday, May 28, 2020, three days after Mr. Floyd's murder.

37.     After arriving in Minnesota, Molly drove to Minneapolis, parked her rental car off Minnehaha Avenue, and walked up to the Third Precinct.

38.     For the next two days, Molly covered various portions of the protests and civil unrest around the city – while always clearly and easily identifiable as press with her press credentials (shown below) worn on a lanyard around her neck:



39.    As the protests continued, Carolyn joined Molly in Minneapolis on Friday, May 29, 2020.

40.    Like Molly, Carolyn hit the ground running, covering stories the evening of May 29.

41.    Both Carolyn and Molly were back at it again on Saturday, May 30 – covering damage at the George Floyd memorial site, street gatherings, and clean-up efforts, among other stories.

42.    Before curfew on May 30, Carolyn was covering a sit-in at the Minneapolis Police Department's Fifth Precinct, located at 3101 Nicollet Ave.

91600266.1

43.     Throughout the day, Carolyn and Molly were in communication.  Before curfew, Molly walked over to the area of the Fifth Precinct, where she met up with Carolyn and other members of the press.

44.     As the curfew drew closer, Carolyn and Molly and a group of approximately 20 other members of the press – reporters, photographers, and cameramen (the "press group") – began donning their curfew gear to ensure they would be clearly, easily and quickly identifiable as press.

45.     Notably, the press group's gear included many items of clothing bearing the word "Press," press credentials, notebooks, and large, professional cameras and lenses – all of which clearly differentiated the press from the protesters.

46.     Specifically, Carolyn's gear included a flak jacket with "TV" in large, white letters, which she had originally taped to her jacket during her time in Iraq, depicted below:



47.     Carolyn also wore press credentials on a lanyard around her neck (similar to Molly's pictured above) and was carrying her larger camera, lenses, and camera bag.

48.     Molly wore her press credentials, as noted above, and had her notebook in her hands – telltale signs of a member of the press.

49.     The press group, including Carolyn and Molly, were on a portion of grass on the eastern side of Metro Transit's Nicollet Garage, which is located on the corner of Nicollet Avenue and 31st Street and across from the Fifth Precinct, shown below:



50.     The press group was on the **opposite** side of the street from the protesters.

51.    Carolyn and Molly were near the Metro Transit Garage parking lot that was

surrounded by a block wall, depicted below:



91600266.1



52.     While Carolyn and Molly remained on the grassy portion at the edge of the

indentation of the un-scalable wall, they observed a group of Minneapolis Police officers

emerge out of a gate surrounding the Fifth Precinct, encounter a protester and then retreat.

53.     Shortly thereafter, and after 8:00 p.m., the Minnesota State Patrol – *en masse* –

emerged and began walking northbound on Nicollet Ave, as depicted below:



- 13 -



54.     State Patrol officers created a tactical blue smoke screen ahead of them, which can be seen in the photographs above.

55.     Supervisory Defendants Dwyer and Salto authored almost identical reports regarding the events that took place that evening.

56.     Dwyer was in command of the MRT, including some or all of John Does 1-3, and had responsibility to ensure that the rules of engagement were communicated to and followed by those under his supervision.

57.     Salto was in command of the SRT, including some or all of John Does 1-3, and had responsibility to ensure that the rules of engagement were communicated to and followed by those under his supervision.

58.     Dwyer and Salto reported:  "After 2000 curfew, the Mobile Response Team (including DNR1 & DNR2), along with Minnesota State Patrol response units responded to a report of a large demonstration near the Fifth Precinct in Minneapolis."

59.     Dwyer and Salto further reported:  "The teams deployed at East 32nd Street and Nicollet Avenue."  This intersection is immediately south of Twin City Tattoo (to the

- 14 -

right of Twin City Tattoo pictured above in Paragraph 53. The throng of troopers moving from south to north (right to left of the photograph) were under Dwyer's and Salto's command and supervision.

60. Dwyer and Salto reported that the MRT was taking on large amounts of various projectiles from the demonstrators, including rocks, bricks and fireworks.

61. No members of the easily identifiable press group, including Carolyn and Molly, were part of this activity, which was coming from the demonstrators to the north of where the press group was assembled next to the transit garage.

62. Per Dwyer's and Salto's reports: "A dispersal order was given and the crowd was advised they were in violation of Minneapolis' curfew and if they did not leave, they would be arrested."

63. Any such order was not applicable to the press group, including Carolyn and Molly, who were expressly exempted from the curfew.

64. Dwyer and Salto authorized the use of a cadre of munitions for deployment in that area before the MRT and SRT deployed the same: "Munitions were deployed in this area to drive the crowd back and create a safe operating zone. Munitions deployed included CS, blast balls, stinger balls, direct impact rounds and triple chasers." Many of the MRT/SRT members were also equipped with pepper spray, including Doe 1 who used it against Carolyn and Molly.

65. Dwyer and Salto knew that members of the press, including Carolyn and Molly, were not in violation of the curfew and had well-established constitutional rights to be present to cover the demonstrations.

- 15 -

66.     But Dywer and Salto and their subordinates John Does 1-3 had no interest in ensuring protection of the press group from dangerous and deadly munitions.

67.     John Does 1-3 treated the readily identifiable press group, which was lawfully covering the demonstrations, the same way they treated the unlawful assembly—by firing on them.

68.     The only mention of the press in the publicly available reports by Dwyer and Salto is the following general statement:  "Several reporters were encountered in the protest group – many of them with credentials were identified and released once they were confirmed who they were."  This statement is proof positive that the Defendants – having seized members of the press and then releasing them – were targeting the press and violating the Constitution by acting first and asking questions later.

69.     The publicly available reports included no reporting from the troopers who used force against the reporters, including Carolyn and Molly.

70.     Minnesota State Patrol policies require its officers to write reports after  using force on subjects.   Proper use-of-force reporting includes a summary of the circumstances faced by the trooper that support the level of force employed and obviously provides the identity of the trooper(s) who used force.

71.     The MRT/SRT continued past Twin City Tattoo when a group of troopers, including Defendants John Does 1, 2, and 3, headed directly for the press group – traversing the boulevard and sidewalk to get to them.

72.     The press group positioned itself in a manner that allowed it to cover matters of public concern, avoid injury by the demonstrators *and* allow law enforcement to move

91600266.1

right by them on Nicollet Avenue.  But the troopers would have none of that route and decided to veer off and engage the press.

73.     The press group was stuck with their backs up against the block wall of the transit center across from the Fifth Precinct.

74.     Molly held up her press credentials to the advancing troopers.

75.     Molly yelled that they were press.

76.     Molly waved her notebook at the advancing troopers.

77.     Upon information and belief, other members of the press group performed similar actions to further alert the advancing troopers that they were heading for press – a group **exempt** from the curfew.

78.     The press group received no verbal answer.

79.     Instead, the troopers, including Defendants John Does 1, 2, and 3, continued to advance on the press group and then started firing – spraying members of the press with pepper spray and shooting them with 40 millimeter blunt-impact projectiles.

80.     None of the Defendants or any other officers issued any warnings to the press group that forced would be used before they started firing.

81.     Molly was at the back of the press group, pressed against the wall.  Her location within the group partially shielded her from the chemical irritants being fired.

82.     Carolyn had remained near the front of the press group and was essentially the first point of contact with the advancing troopers.  She was intentionally sprayed with pepper spray directly into her left eye and ear by Defendant John Doe 1.  The spray also entered her right eye, blinding her.

83.   Carolyn caught some of the violence against the press group on camera – and possibly Defendant John Doe 1's use of excessive force against her, shown below:



84.    The troopers did not stop firing.  Molly asked the still-advancing troopers where the press should go, but received no answer.  Molly realized the group needed to flee.

85.    The troopers, including Defendants John Does 1, 2, and 3, chased the press group north along the walls of the Transit Center, herding them into a corner, while continuing to fire on them.

86.    Molly was struck at least five times in the left leg by blunt-impact projectiles and a tear-gas canister fired by Defendants John Does 2 and 3, and also suffered the effects of John Doe 1's pepper spraying

87.    John Does 1-3 felt free to engage in an assault on the nonviolent lawfully present members of the press, including Carolyn and Molly.

88.    This is evidenced by the aforementioned incidents involving other members of the press and, upon information and belief, the lack of discipline levied against the offending troopers including John Does 1-3, who were under Dwyer's and Salto's command.

89.    Defendants Dwyer and Salto failed to require adherence to the curfew orders—expressly exempting the press—and the constitutional mandates of the First and Fourth Amendments.

90.    Defendants Dwyer and Salto acted with deliberate indifference to the First and Fourth Amendment rights of Carolyn and Molly by failing to supervise John Does 1-3 to ensure that the press was afforded the rights established by these amendments and the curfew orders in place at the time.

91.    Dwyer and Salto were causally and directly involved in the violation of Carolyn's and Molly's constitutional rights.

92.     Neither Carolyn nor Molly had committed any crime.  Neither was charged with one.

93.     Neither Carolyn nor Molly had displayed any aggression.

94.     Neither Carolyn nor Molly was armed.

95.     No one else in the press group had committed a crime or was charged with any.

96.     No one else in the press group had displayed any aggression.

97.     No one else in the press group was armed.

98.     Neither Carolyn, Molly, nor anyone else in the press group posed any threat to the Defendants or others.

99.     Many of the press group were forced into a small area enclosed by fencing and a block-wall buffer containing mechanical equipment, located on the corner of the Metro Transit Garage off West 31st Street and Nicollet Ave, depicted below:



91600266.1



100.    Carolyn, still blinded, unknowingly captured footage of members of the press group, as they were trapped by the wall, fence and troopers:



101.    The below image shows Carolyn's boot on some piping within the small enclosure *and* that she had nowhere to go:

91600266.1



102.   The press group was trapped.

103.   They were bloodied and screaming.

104.   They were injured.

105.   They were blinded.

106.   The only way to escape the troopers was to scale the wall.

107.   Molly made it over – an event that was captured by KSTP:



108.   Carolyn, with her heavy photography equipment, could not do so on her own.  She was "helped" over by a trooper.  She fell to the ground, crying, and crawled down the street – still blinded from the pepper spray – until somebody came to her aid.

109.   The below photograph was taken some time after Carolyn retreated from the troopers.  Her pain is palpable:



110.   Meanwhile, Molly had run to the nearest open door – a senior apartment complex.  There, she posted about the event on Twitter as troopers prowled outside, still chasing others.

111.   After their assault on the press, the MRT and John Does 1-3 moved farther north on Nicollet Avenue, toward a K-Mart parking lot a couple blocks past 31st Street East.

112.   The injured media members were left in their wake.  Notably, Defendants Dwyer and Salto both reported that arrests were made on people who violated curfew.

Neither Molly nor Carolyn were arrested because all the Defendants knew they had done nothing illegal.

113.    Molly called Carolyn's phone.  Someone else answered.

114.    Eventually, Molly learned Carolyn's location and was given a ride there.

115.    A Good Samaritan who had taken in Carolyn sought to drive her and Molly to a hospital outside of Minneapolis, believing it was a safer option.  On their way out of the City, another officer fired at them, striking the Good Samaritan's passenger window and leaving a trail of red paint.

116.    The Good Samaritan drove Carolyn and Molly into Edina, where they were waved through a police checkpoint and arrived at M Health Fairview Southdale.

### CAROLYN'S PHYSICAL INJURIES

117.    At the hospital, Carolyn was put in a shower to wash off the irritants fired into her eyes and ear by Defendant John Doe 1.  Her bruising and scrapes on her left arm were examined.

118.    Contact lenses and an irrigation system were placed in both of Carolyn's eyes – a process which lasted for hours.  She was diagnosed with a chemical burn to her skin and chemical exposure to her eyes.

119.    The next day, Carolyn's eyes were painful and swollen, with only a sliver of an opening of her right eye.  Her eyes remained this way for three days.

120.     Carolyn was referred to the McCannel Eye Clinic for follow-up care.  There she was seen by Dr. Adam Moss, who diagnosed her with: 1) chemical burn – pepper spray

in both eyes and 2) corneal abrasion left eye.  She was prescribed Vigamox, artificial tears, and prednisolone acetate.  The hope was that her cornea would grow back.

121.     Carolyn flew home to Los Angeles on June 2, 2020.  Shortly thereafter, she began having pain in her lower left back.  She visited an acupuncturist, with some relief, but by June 14 the sharp pain returned.

122.     On June 14, 2020, Carolyn followed up at Brentwood Urgent Care, where she was seen by Dr. Derek Hsu and was diagnosed was a lumbosacral sprain and left elbow contusion.

123.     Carolyn was prescribed a back brace and pain medication.  She also began physical therapy.

124.     Carolyn's providers instructed her that she could return to work in a limited capacity from June 14 to 21, but she was restricted from climbing, bending or stooping – activities that are vital to her profession.

## MOLLY'S PHYSICAL INJURIES

125.     As for Molly, she sustained injuries to her left leg (shown in the reversed photograph below) when she was struck by the multiple projectiles fired at her by Defendants John Does 2 and 3:

- 25 -



126.    Molly also suffered effects from Defendant John Doe 1's use of pepper spray on Carolyn and the press group.

127.    Despite her own injuries, Molly turned her focus to helping Carolyn.  Molly received a ride to her rental car from the Good Samaritan so that she could pick Carolyn up from Fairview Southdale and get her to their hotel.

128.    Later, while at the hotel, Molly obtained first-aid supplies and began addressing multiple wounds on her body – she would use a majority of the hotel's first-aid supplies.

129.    Over the next few days, Molly continued working – as the only remaining boots on the ground in Minneapolis for the *Los Angeles Times* – despite her injuries.

130.    But, due to the May 30 attack, Molly no longer went out into the field after curfew to cover ongoing protests and actions by law enforcement.

91600266.1

131.    The below photographs show the status of Molly's physical injuries from the projectiles on June 5, 2020, nearly a week after she was shot:

 

132.    Molly first received medical treatment at the Baylor Family Clinic after she traveled back home to Texas.  There, she was bandaged and prescribed a topical antibiotic.

## THE CHILLING EFFECTS OF THE EXCESSIVE FORCE

133.    Carolyn, Molly, and the press group were visibly separate and across the street from the protesters at the Fifth Precinct.

134.    Carolyn, Molly, and the press group were clearly, easily and quickly identifiable as members of the press due to the gear they carried as necessities for their jobs (notebooks, cameras, lenses, microphones) and the special gear they donned as to not be confused with protesters or rioters (described above).

- 27 -

135.    Carolyn, Molly, and the press group had a right to be out on the streets after curfew under the First Amendment and Governor Walz's Emergency Executive Orders.

136.    On the evening of May 30, 2020, Carolyn and Molly were engaged in the constitutionally mandated freedom of the press.

137.    Both photojournalism and written or spoken words play vital roles in the freedom of the press, particularly in such a tumultuous time in our nation's history with regard to police excessive use of force and unauthorized use of deadly force.

138.    As Governor Walz noted in his press briefing following the arrest of the CNN reporters, on the day before Carolyn and Molly were attacked: "we have got to ensure that there is a safe spot for journalism to tell the story" and "the protection and security and safety of the journalists covering this is a top priority."

139.    Carolyn and Molly were in what should have been a safe spot for them.  Yet, they received anything *but* protection, security or safety.

140.    The actions by Defendants John Does 1, 2, and 3 targeted Carolyn, Molly and the others in the press group for *doing their jobs*.

141.    The actions by Defendants John Does 1, 2, and 3, and the State Patrol mass – using a smoke screen, heading directly at the obvious and identified press group, shooting members of the press without warning, chasing and herding the press group while continuing to fire, and leaving them to scale walls and fend for themselves while blinded, bleeding and scared – all while they continued to "patrol" around them, would chill any person of ordinary firmness from continuing to engage in the protected activities of the press and did in fact chill Carolyn's and Molly's exercise of their First Amendment rights.

- 28 -

142.    At all times relevant to the attack on Carolyn, Molly, and other members of the press, Defendants John Does 1-3 acting with the approval of supervisory Defendants Dwyer and Salto.

143.    As Molly reported on Twitter in the moments after being shot, she had to take shelter in a random building while State Patrol, and possibly Minneapolis police, circled – not letting her leave the building.

144.    This experience caused Carolyn to question whether she wants to cover other situations similar to what occurred in Minneapolis, for example, the insurrection at the United States Capitol.

145.    This experience caused Molly to view law enforcement as a potential threat while doing her job.

146.    Carolyn and Molly, through their extensive and impressive careers, have covered domestic protests and foreign war zones.  But, neither of them had ever been fired at by police *until* they reported in Minneapolis in May 2020.

147.    The unlawful targeting of journalists and press members has not abated in the months following Carolyn's and Molly's assaults at the hands of the State Patrol.

148.    In April 2021, members of the press reported on demonstrations following yet another police killing of a Black man, Daunte Wright, by Minnesota law-enforcement officers.

149.    During those protests, the State Patrol once again unlawfully seized and used excessive force against media members, necessitating United States District Judge

91600266.1

Wilhelmina M. Wright to issue a Temporary Restraining Order ("TRO") in the *Goyette* case in an attempt to stop this unconstitutional misconduct.

150.    Yet even a federal court order did not halt the State Patrol's unlawful practices.  Upon information and belied, State Patrol troopers continued to arrest members of the media and subject them to excessive force in violation of the TRO.

151.    The foregoing amply demonstrates that the State Patrol does not care about the First and Fourth Amendment rights of the media and the general public.

152.    Carolyn and Molly sustained injuries by the unconstitutional actions of State Patrol officers Defendants Dwyer, Salto, and John Does 1-3.

153.    Carolyn and Molly demand a trial by jury on all issues so triable.

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AND
### FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendant John Doe 1*

154.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

155.    By the actions described above, Defendant John Doe 1, under color of state law, violated and deprived Carolyn and Molly of their clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

156.    Defendant John Doe 1 subjected Carolyn and Molly to these deprivations of their rights either maliciously or by acting with reckless disregard for whether their rights would be violated.

157.    As a direct and proximate result of the acts and omissions of Defendant John

Doe 1, Carolyn and Molly suffered injuries, were forced to endure great pain and mental

suffering, and were damaged in an amount to be determined by the jury.

158.    Punitive damages in an amount to be determined by the jury are available

against Defendant John Doe 1 and are hereby claimed as a matter of federal common law

under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading

requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

159.    Carolyn and Molly are entitled to fully recover their costs, including

reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### 42 U.S.C. § 1983 – FOURTH AND
### FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff Molly Hennessy-Fiske v. Defendants John Does 2 and 3*

160.    Plaintiffs reallege and incorporate by reference herein each and every

allegation contained in each paragraph above as though fully set forth herein.

161.    By the actions described above, Defendants John Does 2 and 3, under color

of state law, violated and deprived Molly of her clearly established and well-settled civil rights

to be free from excessive force under the Fourth and Fourteenth Amendments to the

United States Constitution.

162.    Defendants John Does 2 and 3 subjected Molly to these deprivations of her

rights either maliciously or by acting with reckless disregard for whether her rights would be

violated.

91600266.1

163.    As a direct and proximate result of the acts and omissions of Defendants John Does 2 and 3, Molly suffered injuries, was forced to endure great pain and mental suffering, and was damaged in an amount to be determined by the jury.

164.    Punitive damages in an amount to be determined by the jury are available against each of Defendants John Does 2 and 3 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

165.    Molly is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### 42 U.S.C. § 1983 – FIRST AND
### FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendants John Does 1-3*

166.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

167.    Carolyn and Molly, as members of the press, engaged in constitutionally protected activity on May 30, 2020, in Minneapolis, Minnesota.  Specifically, they exercised their First Amendment rights to free press, speech and peaceably assemble.

168.    Carolyn and Molly were reporting on matters of public concern, including the protests and law enforcement's response.

169.    Due to their exercise of their First Amendment rights as members of the press, Defendants John Does 1-3 deliberately targeted Carolyn and Molly and retaliated against them by using excessive force.

- 32 -

170.    Defendants John Does 1-3's actions caused both physical and emotional injuries to the Plaintiffs and would chill persons of ordinary firmness from continuing to engage in their reporting activities and constitutionally protected activities, and did in fact chill Carolyn and Molly from continuing to engage in such activities.

171.    Defendants John Does 1-3 subjected Carolyn and Molly to these deprivations of their rights either maliciously or by acting with reckless disregard for whether their rights would be violated.

172.    As a direct and proximate result of the aforementioned unconstitutional conduct, Carolyn and Molly were each damaged in an amount to be determined by the jury.

173.    Punitive damages in an amount to be determined by the jury are available against each of Defendants John Does 1-3 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

174.    Plaintiffs are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

91600266.1

## COUNT IV

### 42 U.S.C. § 1983 – SUPERVISORY LIABILITY
*Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendants Joseph Dwyer and Timothy Salto, in their individual capacities*

175.     Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

176.     Defendants Dwyer and Salto at all times material hereto were members of the Minnesota State Patrol with supervisory responsibilities over Defendants John Does 1-3.

177.     Defendants Dwyer and Salto had direct command and control over Defendants John Does 1-3 in preparation for and in the execution of the incident at issue.

178.     Defendants Dwyer and Salto directly participated in the violation of Carolyn's and Molly's constitutional rights by failing to supervise Defendants John Does 1-3 and by creating an environment where indiscriminate use of force against demonstrators and the free press was allowed to occur without proper force reporting and without consequence.

179.     Defendants Dwyer and Salto knew that members of the press, including Carolyn and Molly, had well-established First and Fourth Amendment rights to cover the events on May 30, 2020 following the murder of George Floyd without being subjected to unprovoked attacks by Defendants John Does 1-3.

180.     Defendants Dwyer and Salto were aware of the unlawful detention of the CNN crew one day prior to Carolyn's and Molly's assault.

181.     Defendants Dwyer and Salto knew that members of the press, including Carolyn and Molly, were exempt from the curfew orders in place on May 30, 2020.

- 34 -

Therefore, the nonviolent and easily identifiable press group had an unfettered right to be present where the events at issue occurred.

182.     Defendants Dwyer and Salto knew that many members of the press would be present virtually at all times during the demonstrations.

183.     Defendants Dwyer and Salto failed to supervise Defendants John Does 1-3 either by not ensuring that the press was not attacked for lawfully covering the events or expressly approving the use of force against press members, including Carolyn and Molly.

184.     Defendants John Does 1-3 showed no hesitation in engaging the press group next to the transit station and immediately began subjecting the group, including Carolyn and Molly, to objectively unreasonable force.  This evidences deliberate indifference by Dwyer and Salto in the violation of Carolyn's and Molly's First and Fourth Amendment rights.

185.     Defendants Dwyer and Salto had actual knowledge of the improper reporting by Defendants John Does 1-3 regarding this incident and other similar incidents, further supporting the troopers' ability to use force without fear of accountability.

186.     Defendants Dwyer and Salto, under color of state law, acted with deliberate indifference to, authorized or acquiesced in the violation of Carolyn's and Molly's constitutional rights by Defendants John Does 1-3.

187.     As a direct and proximate result of the acts and omissions of Defendants Dwyer and Salto, Carolyn and Molly suffered injuries, were forced to endure great pain and mental suffering and were damaged in an amount to be determined by a jury.

188.     Punitive damages in an amount to be determined by a jury are available against Defendants Dwyer and Salto and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

189.     Carolyn and Molly are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Carolyn Cole and Molly Hennessy-Fiske pray for judgment as follows:

1.     That this Court find that the Defendants committed acts and omissions violating the First, Fourth, and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.     As to Count I, a money judgment against Defendant John Doe 1 for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.     As to Count II, a money judgment against Defendants John Does 2 and 3 for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.     As to Count III, a money judgment against Defendants John Does 1 through 3 for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

- 36 -

5.     As to Count IV, a money judgment against Defendants Joseph Dwyer and Timothy Salto for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest; and

6.     For such other and further relief as this Court may deem just and equitable.


Dated:  May 25, 2021               **ROBINS KAPLAN LLP**

<u>s/Robert Bennett</u>
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com

*Attorneys for Plaintiffs Carolyn Cole and Molly Hennessy-Fiske*