UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| CAROLYN COLE and MOLLY HENNESSY-FISKE, | Case No. 21-CV-1282 (PJS/JFD) |
| Plaintiffs, | |
| v. | |
| | ORDER |
| JOHN DOES 1, 2, and 3, acting in their individual capacities as troopers or other sworn officers of the Minnesota State Patrol; JOSEPH DWYER, acting in his individual capacity as a Captain of the Minnesota State Patrol; and TIMOTHY SALTO, acting in his individual capacity as a Lieutenant of the Minnesota State Patrol, | |
| Defendants. | |

---

Robert Bennett, Andrew J. Noel, Kathryn H. Bennett, and Marc Betinsky, ROBINS KAPLAN LLP, for plaintiffs.

Joseph Weiner, MINNESOTA ATTORNEY GENERAL'S OFFICE, for defendants Joseph Dwyer and Timothy Salto.

Plaintiffs Carolyn Cole and Molly Hennessy-Fiske are journalists employed by the *Los Angeles Times*.  In May 2020, Cole and Hennessy-Fiske traveled to Minnesota to cover the civil unrest that followed the death of George Floyd.  Cole and Hennessy-Fiske were injured on the evening of May 30, 2020, by state troopers who were using pepper spray and projectiles to disperse protestors.

Cole and Hennessy-Fiske bring this action against three unidentified troopers—designated as "John Does 1, 2, and 3"—claiming that the troopers used excessive force against them.  Cole and Hennessy-Fiske also bring claims against Major[1] Joseph Dwyer and Lieutenant Timothy Salto, seeking to hold them liable for the actions of the three troopers.

Dwyer and Salto move to dismiss the claims against them.  Dwyer and Salto argue that they cannot be held liable for the actions of the Doe defendants because the claims against the Doe defendants are barred by the doctrine of qualified immunity.  Dwyer and Salto argue in the alternative that, even if the claims against the Doe defendants are not barred by qualified immunity, the complaint fails to plead a plausible supervisory-liability claim.  The Court agrees with the latter argument and thus dismisses the claims against Dwyer and Salto without prejudice.

## I.  FACTS

The complaint alleges the following facts:

### A.  Protests and Curfew Order

On May 25, 2020, George Floyd was killed by Minneapolis Police Officer Derek Chauvin, and protestors quickly took to the streets of Minneapolis and other cities.

---

[1]At the time of the events alleged in the complaint, defendant Dwyer was a Captain with the Minnesota State Patrol.  *See* Compl. ¶ 10 [ECF No. 1].  Dwyer has since been promoted to the rank of Major.  *See* Def. Memo. at 1 [ECF No. 11].

After some of the protests metastasized into arson, looting, and violence, Minnesota

Governor Tim Waltz declared a peacetime emergency, activated the Minnesota

National Guard, and imposed an 8:00 pm curfew in the cities of Minneapolis and

St. Paul for the nights of May 29 and 30, 2020.  Compl. ¶ 20.  Governor Walz's executive

order explicitly exempted members of the "news media" from the curfew.  *Id*. ¶ 21.

### B. *Assaults on Plaintiffs*

At the time of Floyd's murder, Cole and Hennessy-Fiske were working as

journalists for the *Los Angeles Times*.  *Id*. ¶¶ 4, 6.  Cole and Hennessy-Fiske traveled to

Minnesota to report on the civil unrest.  *Id*. ¶¶ 36, 39.

On the night of May 30, 2020, both Cole and Hennessy-Fiske were part of a

group of about 20 journalists who were covering protests outside of the headquarters of

the Fifth Precinct of the Minneapolis Police Department.  *Id*. ¶¶ 43–44.  The Fifth

Precinct is located on Nicollet Avenue, across the street from a large garage used by

Metro Transit.  As the 8:00 pm curfew drew near, Cole, Hennessy-Fiske, and the other

journalists donned curfew gear—including clothing bearing the word "PRESS" and

clearly visible press credentials—so that they would be readily identifiable as members

of the press.  *Id*. ¶¶ 44–45.  The group of journalists was positioned along the eastern

wall of the Metro Transit garage, across Nicollet Avenue from the Fifth Precinct and the

crowd of protestors.  *Id*. ¶¶ 49–50.

Shortly after the curfew went into effect, a contingent of Minnesota State Patrol troopers emerged from the Fifth Precinct and ordered the protestors to disperse, advising them that they were in violation of the curfew order and would be arrested if they did not leave. *Id.* ¶¶ 53, 54, 62. The troopers then began walking down Nicollet Avenue to disperse the protestors. *Id.* ¶ 53. The troopers later reported that the protestors hurled rocks, bricks, fireworks, and other items at them. *Id.* ¶ 60.

As the troopers made their way down Nicollet Avenue, a few troopers—including defendants John Does 1, 2, and 3—broke off from the main group and headed directly toward the group of journalists gathered near the Metro Transit garage. *Id.* ¶ 71. As the troopers advanced, Hennessy-Fiske and other journalists held up their press credentials, loudly identified themselves as journalists, and otherwise alerted the advancing troopers that they were members of the press. *Id.* ¶¶ 74–77. The troopers said nothing in response but instead began to spray the journalists with pepper spray and shoot them with blunt-impact projectiles. *Id.* ¶¶ 78–79.

As the journalists fled north along the wall of the Metro Transit garage, the troopers pursued them, eventually trapping them in a corner. *Id.* ¶¶ 84–85. During the pursuit, Cole was sprayed directly in her face with pepper spray, and Hennessy-Fiske "was struck at least five times in the left leg by blunt-impact projectiles and a tear-gas cannister." *Id.* ¶¶ 82, 86. After the troopers moved on past the group of journalists, a

-4-

Good Samaritan drove Cole and Hennessy-Fiske to a hospital, where they were treated for their injuries. *Id.* ¶ 116.

### C. Dwyer and Salto's Involvement

On May 30, 2020, Dwyer commanded the Minnesota State Patrol's Mobile Response Team ("MRT"), while Salto commanded the State Patrol's Special Response Team ("SRT"). *Id.* ¶¶ 10-11. Dwyer and Salto were in command of the troopers who injured Cole and Hennessy-Fiske. *Id.* ¶¶ 56–57. Dwyer and Salto each later wrote reports regarding the events that occurred on May 30; those reports confirmed that "[m]unitions were deployed . . . includ[ing] CS, blast balls, stinger balls, direct impact rounds and triple chasers." *Id.* ¶¶ 55, 64. Neither report specifically mentioned the use of force against the group of journalists. *Id.* ¶ 68. John Does 1, 2, and 3 did not write reports regarding their use of force that night. *Id.* ¶ 69.

## II. LEGAL STANDARD

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiffs' favor, *Du Bois v. Bd. of Regents*, 987 F.3d 1199, 1202 (8th Cir. 2021), but the Court "need not consider legal conclusions that are couched as factual allegations," *Viewpoint Neutrality Now! v. Regents of Univ. of Minn.*, 516 F. Supp. 3d 904, 914 (D. Minn. 2021) . A claim will survive a motion to dismiss pursuant to Rule 12(b)(6)

only if the claimant has alleged "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the claim should be dismissed.  *Iqbal*, 556 U.S. at 679.

The *Iqbal*/*Twombly* standard has been applied by federal courts in countless cases, and, for the most part, its contours are well understood.  Unfortunately, however, some confusion about the *Iqbal*/*Twombly* standard has arisen in this District because of two orders:  one addressing the application of the *Iqbal*/*Twombly* standard in civil-rights cases, and the other addressing the application of the *Iqbal*/*Twombly* standard to claims supported by facts alleged on "information and belief."  Because the parties to this action rely on both of these orders, the Court takes this opportunity to address the confusion that the orders have created.

### A.  Gearin v. Rabbett

As noted, the Supreme Court held in *Twombly*—and reiterated in *Iqbal*—that a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678.  The Supreme Court specifically warned in *Twombly*—and warned again in *Iqbal*—that "a formulaic

recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

Following *Twombly* and *Iqbal*, some confusion in the case law arose because in a decision that preceded *Twombly* and *Iqbal*—*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)—the Supreme Court had appeared to hold that a claim against a municipality for failing to adequately train police officers who violated the plaintiff's civil rights was adequately pleaded, even though the claim provided nothing more than what *Twombly* described as "a formulaic recitation of the elements of a cause of action." Despite the apparent tension between *Leatherman*, on the one hand, and *Twombly* and *Iqbal*, on the other, *Iqbal* did not even mention *Leatherman*, and *Twombly* cited it only once in a footnote (with no hint of disapproval). *See Twombly*, 550 U.S. at 569 n.14.

In the aftermath of *Twombly* and *Iqbal*, the federal courts took two positions regarding the continued viability of *Leatherman*. Some courts read *Leatherman* narrowly to hold only that the lower court had erred in applying a heightened pleading standard to *Monell* claims, but to express no opinion as to whether the complaint at issue was adequate under the correct ("un-heightened") pleading standard. Other courts read *Leatherman* more broadly to hold that the complaint at issue was *adequate*. Because

*Leatherman* had not been overturned, these courts applied *Leatherman* in finding that formulaic *Monell* claims passed muster.

The undersigned took the latter view in *Gearin v. Rabbett*, No. 10–CV–2227 (PJS/AJB), 2011 WL 317728 (D. Minn. Jan. 28, 2011), which declined to dismiss a *Monell* claim premised on the deliberate indifference of municipal policymakers to the unconstitutional conduct of an official named Kantrud. *Gearin* explained:

> Gearin has not identified the policymakers in question nor alleged any facts to support her allegation that these unnamed policymakers knew of Kantrud's actions or knew of his allegedly improper motives. In this Court's view, Gearin's allegations fall far short of the pleading standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). But, as noted earlier, *Leatherman* rejected any heightened pleading requirement for *Monell* claims, and it was apparently sufficient for the *Leatherman* plaintiff merely to allege inadequate training—without specifying what was inadequate about the training or who was responsible for those inadequacies. . . .

> Although it is difficult for this Court to understand how this aspect of *Leatherman* could survive *Twombly* and *Iqbal*, the Supreme Court cited *Leatherman* in *Twombly* and specifically disavowed any intent to create a heightened pleading standard under Rule 8. . . . In light of that fact, this Court cannot hold that *Leatherman* was overruled sub silentio by *Twombly* and *Iqbal*. . . . The Court therefore denies defendants' motions to the extent they seek judgment on Gearin's *Monell* claims against the City.

Understandably, Cole and Hennessy-Fiske have cited this Court's order in *Gearin* in arguing that a lenient *Leatherman* pleading standard—rather than a stricter *Iqbal/Twombly* pleading standard—should apply to supervisory-liability claims brought under 42 U.S.C. § 1983 (claims that are similar, although not identical, to *Monell* claims). *See* Pl. Memo. at 27 n.12 [ECF No. 15].  On reflection, however, the Court concludes that it erred in *Gearin*, and that there is no "civil rights" exception to the *Iqbal/Twombly* standard.  In the more than 10 years since *Gearin* was decided, numerous appellate and trial courts have applied the *Twombly/Iqbal* pleading standard to *Monell* and supervisory-liability claims.  *See, e.g.*, *Ratliff v. Aransas Cty.*, 948 F.3d 281, 284 (5th Cir. 2020); *Hoefling v. City of Miami*, 811 F.3d 1271, 1280–81 (11th Cir. 2016); *Cook v. Howard*, 484 F. App'x 805, 810 (4th Cir. 2012); *Mackie v. Cty. of Santa Cruz*, 444 F. Supp. 3d 1094, 1112–13 (N.D. Cal. 2020); *Hoskin v. City of Milwaukee*, 994 F. Supp. 2d 972, 977 (E.D. Wis. 2014); *Plair v. City of New York*, 789 F. Supp. 2d 459, 463–64, 469 (S.D.N.Y. 2011).  In reconciling *Leatherman* with *Twombly* and *Iqbal*, these courts have persuasively argued that *Leatherman* did not hold that the bare-bones complaint at issue in that case was adequate.  Rather, *Leatherman* simply held that *Monell* claims should be evaluated under the Rule 8 pleading standard—whatever that standard requires—and not under a heightened pleading standard.  Accordingly, the Court will apply the *Twombly/Iqbal* standard to plaintiffs' claims again Dwyer and Salto.

*B.* Kampschroer v. Anoka County

In *Kampschroer v. Anoka County*—a case involving numerous claims against numerous defendants—Judge Susan Richard Nelson issued a lengthy order that ruled on over a dozen motions to dismiss.  57 F. Supp. 3d 1124 (D. Minn. 2014).  In a single sentence in that order, Judge Nelson said:  "In the post-*Twombly* and *Iqbal* era . . . the Court finds that merely pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim."  *Id.* at 1143.  Defendants in this District—including the defendants in this case[2]—routinely cite *Kampschroer* for the proposition that a claim that rests on allegations pleaded on information and belief is categorically insufficient under the *Iqbal*/*Twombly* standard.  But that is not what *Kampschroer* said, and that is most certainly not the law.

The Eighth Circuit has squarely held that a claim that is based on facts alleged on information and belief can meet the heightened pleading standard of Rule 9(b).  In *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783–84 (8th Cir. 2009), the Eighth Circuit explained that when a plaintiff has alleged fraud, and "[w]hen the facts constituting the fraud are peculiarly within the opposing party's knowledge, . . . such allegations may be pleaded on information and belief."  *See also Select Comfort Corp. v. Sleep Better Store,*

---

[2]In their brief, defendants, citing *Kampschroer*, attack at least one of plaintiffs' allegations because it was made "upon information and belief."  ECF No. 11 at 12 n.4 ("The allegation itself is insufficient because it is made only upon information and belief.").

*LLC*, 796 F. Supp. 2d 981, 984–85 (D. Minn. 2011) (denying motion to dismiss fraud claim based in part on facts pleaded on information and belief).  Obviously, if allegations pleaded on information and belief can satisfy the heightened pleading standard of Rule 9(b), such allegations can satisfy the lower pleading standard of Rule 8.  Other circuits agree that "[t]he *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged upon information and belief . . . ."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations and quotation marks omitted); *see also GSAA Home Equity Tr. 2006-2 ex. rel. LL Funds LLC v. Wells Fargo Bank, N.A.*, 133 F. Supp. 3d 1203, 1221 (D.S.D. 2015) ("Although [defendant] takes issue with paragraph 36 of the Complaint being based on 'information and belief,' plaintiffs may plead in this manner in certain situations, even after the Supreme Court's decisions in *Iqbal* and *Twombly*.")

Moreover, any categorical rule regarding information-and-belief pleading would be impossible to administer because there is no common understanding among judges and lawyers as to what it means to plead something on "information and belief."  On one extreme, lawyers sometimes use "information and belief" to mean something like "I hope this is true, but I really have no idea."  On the other extreme, lawyers sometimes use "information and belief" to mean "I have a lot of evidence that this is true, but I'm not absolutely certain."  Most information-and-belief pleading falls between these

extremes.  It is simply not possible to ground a categorical rule on such a chameleonic phrase.

*Kampschroer* is not to the contrary.  The language in *Kampschroer* on which defense attorneys so often rely appears in *Kampschroer*'s discussion of the plaintiffs' § 1983 claim, which Judge Nelson dismissed under Rule 12(b)(6).  The plaintiffs (a television news reporter and a digital media director) had alleged that various police officers and others had violated their constitutional right to privacy by accessing their driver's-license records without a proper purpose.  The plaintiffs alleged that their driver's-license records included their "home address, color photograph or image, date of birth, eye color, height, weight, [and] driver identification number," but Judge Nelson found that the plaintiffs had "no reasonable expectation of privacy" in that information.  57 F. Supp. 3d at 1143.  The plaintiffs further alleged "upon information and belief" that their driver's-license records included "medical and social security information."  *Id.*  Judge Nelson seemed willing to assume—at least for the sake of argument—that the plaintiffs might have a reasonable expectation of privacy in their medical information and Social Security numbers, but nevertheless dismissed the claim because "[t]he Second Amended Complaint contains no factual support underlying the allegation that Defendants viewed Plaintiffs' medical and social security information." *Id.*

True, Judge Nelson did say that "[i]n the post-*Twombly* and *Iqbal* era . . . merely pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim." *Id.* at 1143.  But the key words in that sentence are "merely" and "without more."  The problem was not that the plaintiffs pleaded on information and belief that the defendants had illegally accessed their medical and Social Security information; the problem was that they failed to identify the *basis* for that belief.  In the words of the Eighth Circuit, the plaintiffs' statement of belief was not "accompanied by a statement of facts on which the belief [was] founded."  *Drobnak*, 561 F.3d at 784.  As *Twombly* and *Iqbal* explained, "the pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Lest there be any doubt about *Kampschroer*'s holding, it is important to note that in that very case Judge Nelson *declined* to dismiss another claim that was based on facts alleged on information and belief.  *See Kampschroer*, 57 F. Supp. 3d at 1141 ("Because Plaintiffs sufficiently plead that their personal information was knowingly obtained for a purpose not permitted under the [Driver Privacy Protection Act, 18 U.S.C. §§ 2721–25], dismissal of the DPPA claims against the remaining defendants is [] inappropriate."); Second Am. Compl. ¶ 179, *Kampschroer v. Anoka Cty*, 57 F. Supp. 3d 1124 (D. Minn. 2014) (No. 13-CV-2512 (SRN/TNL)) ("Each line of Exhibits A and B,

incorporated herein, reflect the audit of each time Plaintiffs' information, *upon information and belief,* was obtained or used by an Individual Defendant without a permissible purpose." (emphasis added)); *id.* ¶ 344 ("*Upon information and belief,* some of the Individual Defendants . . . used the Private Data to monitor Plaintiffs for reasons that were not related to any legitimate law-enforcement purpose." (emphasis added)). Clearly, then, Judge Nelson did not hold that information-and-belief pleading can *never* meet the *Iqbal/Twombly* standard; to the contrary, she held in *Kampschroer* that a claim pleaded on information and belief *did* meet that standard.

Having hopefully dispelled some confusion about application of the *Iqbal/Twombly* standard, the Court now turns to Cole and Hennessy-Fiske's claims against Dwyer and Salto.

## III.  ANALYSIS

Dwyer and Salto argue that the claims against them should be dismissed for two reasons.  First, Dwyer and Salto contend that they cannot be held liable for the actions of John Does 1, 2, and 3 because the claims against those defendants are barred by the doctrine of qualified immunity.  Second, Dwyer and Salto argue that, even if the claims against John Does 1, 2, and 3 are not barred by the doctrine of qualified immunity, the complaint nevertheless fails to plead a plausible supervisory-liability claim against either Dwyer or Salto.  The Court will address these arguments in turn.

-14-

*A. Qualified Immunity*

"Qualified immunity protects public officials from § 1983 damage actions if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  At oral argument, the Court explained why it believes that the allegations in the complaint are sufficient to overcome a qualified-immunity defense with respect to the Doe defendants.  To briefly summarize:  If Cole's and Hennessy-Fiske's allegations about the events of May 30, 2020 are true, then the Doe defendants pepper sprayed a group of journalists and shot at them with blunt-force projectiles, even though (1) the journalists were readily identifiable as journalists; (2) the journalists were exempt from the curfew order; (3) the journalists were not violating or giving the appearance of violating any other law or order; (4) the journalists were not in any way interfering with the State Patrol's activities; and (5) the journalists were clearly separated from—i.e., not intermixed with—the protestors who were defying the curfew and attacking the troopers.  Under those circumstances, no reasonable trooper in the position of John Does 1, 2, or 3 could have believed that his actions were lawful under the Fourth Amendment.  *See Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009) ("It [i]s clearly established that the use of this type of gratuitous force against a suspect who is handcuffed, not resisting, and fully

subdued is objectively unreasonable under the Fourth Amendment."); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) ("[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."); *cf. Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012) (concluding arrests were not clearly unlawful where officers reasonably believed that plaintiffs were "acting as a unit" with unruly protestors).

Of course, this ruling is not binding on the Doe defendants, who have not been identified, much less served with the complaint, much less given the opportunity to argue that they are indeed entitled to qualified immunity. But solely for purposes of ruling on Dwyer and Salto's motion to dismiss—and based solely on the allegations in the complaint (which the Court must accept as true)—the Court finds that John Does 1, 2, and 3 are not entitled to qualified immunity.

### B. Supervisory Liability

"[N]either municipalities nor government officials may be held liable for unconstitutional conduct under a theory of respondeat superior." *Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

-16-

There are two ways for a plaintiff to show that a supervisor's "own individual actions" violated the plaintiff's constitutional rights.  First, a supervisor can be held liable "if he directly participated in the constitutional violation" committed by someone he supervised.  *See Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted). Second, a supervisor can be held liable "if his failure to train or supervise the offending actor caused the deprivation."  *Id.*  Cole and Hennessy-Fiske pursue both theories against Dwyer and Salto.

### 1.  Direct Participation

In order to hold a supervisor liable under the "direct participation" theory, a plaintiff must prove that the supervisor was personally involved in the constitutional violation.  *See Buckley v. Hennepin Cty.*, 9 F.4th 757, 764 (8th Cir. 2021); *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995); *see also Marsh v. Phelps Cty.*, 902 F.3d 745, 754 (8th Cir. 2018) (where defendants neither "ordered or directed" an inferior officer to violate the plaintiff's rights, "their alleged liability cannot be based on direct participation"); *Parrish*, 594 F.3d at 1002 (same).  Here, Cole and Hennessy-Fiske make three allegations in support of their direct-participation claim:

*First*, Cole and Hennessy-Fiske allege that "Dwyer and Salto directly participated in the [constitutional] violation . . . by failing to supervise Defendants John Does 1–3." Compl. ¶ 178.  But this allegation confuses the two theories of supervisory liability.

-17-

A failure to supervise an officer who commits a constitutional violation is not the same thing as being personally involved in that constitutional violation. If it were, then the two distinct grounds for supervisory liability—direct participation and failure to train/supervise—would merge into one. *See Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) ("While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action *or* his failure to properly supervise and train the offending employee caused the constitutional violation at issue." (emphasis added) (quotation marks and citation omitted)); *cf. Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997) (after concluding that the claimant had not alleged that the supervisor-defendant had directly participated in the constitutional violation, the court outlined the four elements necessary to establish liability on a "failure to supervise" theory).

*Second*, Cole and Hennessy-Fiske allege that Dwyer and Salto "creat[ed] an environment where indiscriminate use of force against demonstrators and the free press was allowed to occur without proper force reporting and without consequence." Compl. ¶ 178. The Court questions whether fostering an "environment" in which "use of force . . . was allowed to occur . . . without consequence" is the same as directly participating in the use of force. *See, e.g., Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) ("The liability of a supervisor under § 1983 can be shown [by] . . . actual direct

participation in the constitutional violation . . . [*or*] creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue."); *cf. Jackson*, 747 F.3d at 543–45 (acknowledging that "personal involvement may be found [where a supervisor] is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions" but "personal involvement may be assessed differently depending on the alleged constitutional violation at issue";  highlighting the difference between supervisory liability in the context of prison violence on the one hand and a treatment program that violated the Establishment Clause on the other).

Even if it is, however, Cole and Hennessy-Fiske's claims still fail, as the complaint does not identify a single occasion prior to May 30, 2020, on which Dwyer or Salto failed to require a subordinate to report a use of force or failed to hold a subordinate accountable for the improper use of force against a protestor or journalist. The complaint does briefly mention two incidents of alleged misconduct perpetuated by the Minnesota State Patrol against journalists in the aftermath of the Floyd killing, *see* Compl. ¶¶ 25-26, but the complaint does not allege that Dwyer or Salto had any connection to either of those incidents.

*Third*, Cole and Hennessy-Fiske allege in a conclusory way that Dwyer and Salto expressly authorized or approved the Doe defendants' use of force.  *See* Compl. ¶ 64

("Dwyer and Salto authorized use of a cadre of munitions for deployment"); *id.* ¶ 142

("Defendants John Does 1–3 [were] acting with the approval of supervisory Defendants

Dwyer and Salto"); *id.* ¶ 183 (alleging that Dwyer and Salto "expressly approv[ed] the

use of force against press members, including Carolyn and Molly").  Although ordering

or directing an inferior officer to commit an unconstitutional act would likely constitute

direct participation in that act by a supervisor, *see Marsh*, 902 F.3d at 754, the problem

for Cole and Hennessy-Fiske is that their complaint does not plead any factual basis for

their allegation.

The Supreme Court addressed similarly sparse supervisory-liability allegations

in *Iqbal*.  556 U.S. at 680–81.  In that case, the respondent alleged that he had been

detained under harsh conditions pursuant to an unconstitutional policy.  He sought to

hold the former U.S. Attorney General and the Director of the FBI liable for the violation

of his rights based on allegations that the two officials were the "principal architect" of

the policy and "'instrumental' in adopting and executing it."  *Id.*  The Court held that

such "bald allegations" were not sufficient to survive a motion to dismiss because they

"amount[ed] to nothing more than a 'formulaic recitation of the elements' of a

constitutional discrimination claim."  *Id.* at 681 (quoting *Twombly*, 550 U.S. at 555).

Like the allegations at issue in *Iqbal*, Cole and Hennessy-Fiske's allegation that

Dwyer and Salto authorized or approved the Doe defendants' use of force against the

-20-

journalists is a "'naked assertion[]' devoid of 'further factual enhancement.'"  *Id*. at 678

(quoting *Twombly*, 550 U.S. at 557).  Nowhere in their complaint do Cole and Hennessy-

Fiske explain how they know what Dwyer and Salto said to the Doe defendants or

provide any details about when or how Dwyer and Salto authorized and approved of

the Doe defendants' use of force against the journalists.  As a result, the Court cannot

find that Cole and Hennessy-Fiske have satisfied their burden to plead "enough facts to

state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

### 2.  Failure to Train or Supervise

Even when a supervising official did not directly participate in a constitutional

violation committed by his inferior officers, he may still be held liable under § 1983

when his "failure to properly supervise and train the offending employee[s] caused a

deprivation of constitutional rights."  *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir.

2019) (citation omitted).  In order to recover for a failure to train or supervise, however,

a plaintiff must establish four elements: (1) the supervisor was on "notice of a pattern of

unconstitutional acts committed by subordinates;" (2) the supervisor "was deliberately

indifferent to or tacitly authorized" the pattern of unconstitutional acts; (3) the

supervisor failed to take "sufficient remedial action" to address the pattern of

unconstitutional acts; and (4) the supervisor's failure to remedy the pattern of

unconstitutional acts proximately caused the plaintiff's injury.  *Id*.

Cole and Hennessy-Fiske have not adequately pleaded even the first of these four elements.  During the hearing, the Court questioned the parties about what, exactly, Dwyer and Salto would have to know in order to be on "notice of a pattern of unconstitutional acts committed by subordinates."  *Id.*  For example, is it sufficient if they knew that *any* state trooper had engaged in a pattern of unconstitutional acts?  Or must they have known that a trooper *under their command* had engaged in such a pattern?  Or must they have known that *John Does 1, 2, and 3* had engaged in such a pattern?  And what type of conduct must have come to their attention?  Is it sufficient if they were aware of *any* type of unconstitutional conduct?  Or must they have been aware of instances of *excessive force*?  Or must they have been aware of instances of excessive force *against journalists*?

With respect to the "who" question, both sides agreed that it is not sufficient that Dwyer or Salto knew of unconstitutional acts by just any state trooper; Dwyer and Salto argued that they had to know of unconstitutional acts committed by John Does 1, 2, and 3, while Cole and Hennessy-Fiske argued that they had to know of unconstitutional acts committed by troopers under their command (even if those troopers were not John Does 1, 2, or 3).  With respect to the "what" question, Dwyer and Salto argued that they had to know of the prior use of excessive force against members of the press, while Cole and Hennessy-Fiske argued that knowledge of *any* use of excessive force—including,

-22-

say, excessive force against a suspect or detainee—could suffice.  Neither side, however, was able to cite case law that directly supported their positions.

For purposes of this motion, the Court will assume, without deciding, that plaintiffs are correct as to both questions.  In other words, the Court will assume that Cole and Hennessy-Fiske must plausibly allege that Dwyer and Salto knew that one or more troopers under their command had engaged in a pattern of excessive force (against anyone).  Even if this is a correct application of the law—and the Court has its doubts[3]—Cole and Hennessy-Fiske have not pleaded a plausible failure-to-train or failure-to-supervise claim, because their complaint does not identify a single instance of excessive force committed by a state trooper under the command of Dwyer and Salto, much less a *pattern* of excessive force, much less a pattern of excessive force of which Dwyer or Salto was *aware*.

The only specific allegation of a prior instance of misconduct by a state trooper made in the complaint is that "on May 29, 2020, a CNN reporter, producer, and photojournalist were arrested by Minnesota State Patrol troopers while broadcasting on live television."  Compl. ¶ 25.  But the complaint gives no hint that Dwyer and Salto were in command of the troopers who arrested the CNN crew.  More importantly, the CNN incident involved an unlawful arrest, not an unlawful use of force.  Therefore,

---

[3] *See S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) ("[O]ther misconduct must be very similar to the conduct giving rise to liability." (citation omitted)).

even if the troopers who arrested the CNN crew had been under the command of Dwyer and Salto, those troopers did not commit even a *single* act of excessive force, much less a *pattern* of such conduct. *See Davis v. Buchanan Cty., Mo.*, 11 F.4th 604, 624 (8th Cir. 2021) (discussing the "rigorous standard" for establishing a supervisor's notice).

Cole and Hennessy-Fiske's complaint also refers to allegations made in a complaint filed in a different lawsuit—*Goyette v. City of Minneapolis*—to support their contention that Dwyer and Salto were on notice of prior unconstitutional acts by state troopers.[4] *See id.* ¶ 26. But the allegations in the *Goyette* complaint do not make the supervisory-liability claims against Dwyer and Salto any more plausible. The *Goyette* complaint alleges five incidents of unlawful behavior by law-enforcement officers that (1) involved state troopers and (2) occurred prior to May 30, 2020.[5] Of those five incidents, only one involved the use of excessive force.[6] Second Amended Class Action

---

[4]Defendants object to plaintiffs' incorporation by reference of the allegations in the *Goyette* complaint. *See* Def. Reply at 8 n.3 [ECF No. 20]. But the Court need not rule on that objection because, even if those allegations are considered, Cole and Hennessy-Fiske have failed to plead a plausible failure-to-supervise claim against Dwyer and Salto.

[5]Events occurring *after* Cole and Hennessy-Fiske suffered their alleged injuries obviously could not have put Dwyer and Salto on notice of a pattern of unconstitutional acts that they had a duty to remedy.

[6]The other four incidents involved unlawful arrests, not excessive force. *See*

(continued...)

Complaint & Demand for a Jury Trial ¶¶ 57–58, *Goyette v. City of Minneapolis*, No. 20-CV-01302 (WMW/DTS) (D. Minn. July 30, 2020), ECF No. 53 [hereinafter *Goyette* Compl.].  And even as to that incident, the *Goyette* complaint does not make clear whether the state troopers who were present at the scene perpetrated the excessive force.  *Id.* (describing a May 29, 2020, incident during which "a group of law enforcement officers—Minneapolis Police and Minnesota State Patrol . . . fired tear gas canisters and rubber bullets" at a group of journalists and an unidentified officer shot a "less-lethal projectile" directly into one photographer's chest).

There are at least two reasons why the *Goyette* allegations—even if true—do not make plausible the claim that Dwyer or Salto had notice that troopers under their command had engaged in a pattern of excessive force.  First, the *Goyette* complaint does not allege that the troopers who may have been involved in the excessive-force incident on May 29, 2020 were under the command of Dwyer or Salto.  And second, the *Goyette* complaint at most alleges that state troopers were involved in *one* incident of excessive force—an incident that occurred on May 29, just one day before Cole and Hennessy-Fiske were injured, and in the midst of rioting that was so severe and so unusual that reporters such as Cole and Hennessy-Fiske flew to Minnesota to cover it.  A single incident of excessive force occurring during the chaos following the death of George

---

[6](...continued)
*Goyette* Compl. ¶¶ 40, 44, 148, 151.

Floyd did not give Dwyer or Salto notice of a *pattern* of unconstitutional acts that they had a duty (or perhaps even an opportunity) to remedy.  *Cf. Perkins*, 915 F.3d at 524–25 (concluding that plaintiff had not presented sufficient evidence of an unconstitutional pattern of conduct where the inferior officer been the subject of three "Early Intervention System" alerts and one citizen complaint in the three years prior to the incident alleged in the complaint).

For these reasons, Cole and Hennessy-Fiske have failed to allege a plausible failure-to-train or failure-to-supervise claim against either Dwyer or Salto.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendants' motion to dismiss [ECF No. 8] is GRANTED, and Count IV of the complaint is DISMISSED WITHOUT PREJUDICE.

Dated:  December 1, 2021                          s/Patrick J. Schiltz
                                                  Patrick J. Schiltz
                                                  United States District Judge

-26-