UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Carolyn Cole and Molly Hennessy-Fiske,

          Plaintiffs,

v.

Benjamin Lockman and Michael Eck,
acting in their individual capacities as
troopers or other sworn officers of the
Minnesota State Patrol; and Joseph Dwyer
and Jason Engeldinger, acting in their
individual capacities as Captains of the
Minnesota State Patrol,

          Defendants.

Case No. 21-cv-1282-PJS-JFD

**SECOND AMENDED COMPLAINT**
**Jury Trial Demanded**
**Under FRCP 38(b)**

For their Complaint, Carolyn Cole ("Carolyn") and Molly Hennessy-Fiske

("Molly") state and allege as follows:

1.      The First Amendment to the United States Constitution sets forth the most

fundamental liberties in the Bill of Rights, the inclusion of which the founding fathers

insisted on before ratifying the Constitution.  One of the most sacrosanct of those liberties

is the freedom of the press.  As the Supreme Court has stated, "A free press stands as one

of the great interpreters between the government and the people.  To allow it to be

fettered is to fetter ourselves."  *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

2.      Carolyn and Molly are two members of this free press.  They bring this

action for violations of their First Amendment rights, and other constitutional rights,

perpetrated on May 30, 2020, by members of Minnesota's highest law-enforcement

agency and directed by then-Captain of the Minnesota State Patrol, Defendant Joseph Dwyer. Defendants violated Carolyn's and Molly's clearly established federal civil rights, in part, by using unreasonable and unnecessary force against them. Carolyn and Molly posed no threat to officers, violated no laws, and as a result, were suppressed in their ability to report on any other events that night in Minneapolis—the city that, at that time, held the attention of the Nation.

3.      Carolyn is, and was at all times material herein, a citizen of the United States and a resident of the State of California. She graduated from the University of Texas with a degree in photojournalism and went on to earn her Master of Arts degree from the School of Visual Communication within the Scripps College of Communication at Ohio University.

4.      Carolyn started her career as a photographer in 1986 and has been a staff photographer for the *Los Angeles Times* since 1994. She has covered stories across the world, including as a war correspondent in dangerous areas of Kosovo, Liberia, Iraq, and Afghanistan. In 2004, she won a Pulitzer Prize for her coverage of the siege of Monrovia, Liberia. Also in 2004, Carolyn was named Journalist of the Year and won Newspaper Photographer of the Year from "Picture of the Year International" – making her the first person to win all three of America's top photojournalism awards in the same year.

5.      Molly is, and was at all times material herein, a citizen of the United States and a resident of the State of Texas. She graduated from Harvard College with a degree in social studies.

2

6.      Molly has reported for newspapers in Boston, Miami, Raleigh, Schenectady, Syracuse, Washington, and West Palm Beach.  She is a staff writer for the *Los Angeles Times*, where she has spent the last sixteen years; she is currently the paper's Houston bureau chief.  Like Carolyn, Molly has covered stories across the world, including dangerous areas in Afghanistan, Egypt, and Iraq, and she has been recognized for her impressive journalism – winning the Overseas Press Club award in 2015 and a DART award from Columbia University in 2014, and she was a finalist for the Livingston Awards and Casey Medal.

7.      Both Carolyn and Molly have also covered police protests domestically.

8.      The Minnesota State Patrol is composed of 886 employees, of which 591 are uniformed personnel or sworn officers.  Structurally, many of the sworn officers appear to be troopers, while the sergeants generally hold investigative roles.  There are also lieutenants and captains, who maintain supervisory responsibility over the troopers and sergeants.  All of the State Patrol personnel ultimately report to Colonel Matt Langer, Chief of the Minnesota State Patrol.

9.      Defendant Joseph Dwyer was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly appointed and acting as a Captain with the Minnesota State Patrol, charged in part with overall command and supervision of a Mobile Response Team ("MRT") when it encountered demonstrators and, later, Carolyn and Molly on May 30, 2020.  Dwyer is sued in his individual capacity for misconduct occurring under color of state law.

10.     Defendant Jason Engeldinger was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly appointed and acting as a Captain with the Minnesota State Patrol, charged in part with overall command and supervision of a Mobile Response Team ("MRT") when it encountered demonstrators and, later, Carolyn and Molly on May 30, 2020.  Engeldinger is sued in his individual capacity for misconduct occurring under color of state law.

11.     Defendant Michael Eck was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly appointed and acting as a Lieutenant in charge of the MRT "Squad 3" Team when it encountered demonstrators and, later, Carolyn and Molly on May 30, 2020.  Eck is sued in his individual capacity for misconduct occurring under color of state law.

12.     Defendant Benjamin Lockman was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly appointed and acting as a line Trooper on the MRT "Squad 3" Team when it encountered demonstrators and, later, Carolyn and Molly on May 30, 2020.  Lockman is sued in his individual capacity for misconduct occurring under color of state law.

13.     Defendant Dwyer identified the MRT "MSP 1" Team as the group of troopers depicted in a video assaulting a press group, including Carolyn and Molly, on May 30, 2020.  According to Dwyer, Jason Engeldinger, Eric Micek, Mike Eck, Brett Hayes, Karla Bearce, Steven Fischer, and Kevin Sklasky—all ranked Captain or Lieutenant at the time—were supervising the MRT "MSP 1" Team on May 30, 2020.

14.     According to information provided by Defendant Dwyer and the State Patrol, some of the MRT troopers were armed with chemical and "riot control" weapons, including Mark-9 "pepper spray."  Defendants Lockman and Eck used their Mark-9 pepper spray on Carolyn and Molly and the nearby press group on May 30.

15.     Upon information and belief, Lockman and Eck also provided cover to other members of the MRT, SRT, and CART Teams as they formed a line, marched forward, and thereafter approached and assaulted Carolyn and Molly on May 30, 2020.

16.     Lockman and Eck were aware of, and collaborated in, the assault on Carolyn and Molly because they had a clear vantage point of the attack on the press group and watched it unfold, yet failed to intervene despite the opportunity and ability to do so.  Rather than stop the onslaught, Lockman and Eck facilitated the assault by providing cover to other MSP Troopers.

17.     On May 30, 2020, the captains and lieutenants of the MRT, SRT, and CART Teams were the supervisors on the scene when Lockman and Eck violated Carolyn's and Molly's clearly established rights.  According to Defendant Dwyer, "the captain or the lieutenant of [MSP] would be the person who is actually directing the activities of [MSP]" on the ground while MSP was coordinating with other law-enforcement agencies following the murder of George Floyd.

18.     The on-scene supervisors, including Defendants Dwyer and Engeldinger, sanctioned and commanded the coordinated effort to clear the Fifth Precinct area using chemical agents and riot control weapons.

93943443.1

19.    Dwyer and Engeldinger personally observed the troopers under their command using excessive force against Carolyn and Molly, and failed to intervene to halt it.

20.    Carolyn and Molly bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of the Court over this matter.  State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil-rights lawsuit.

21.    The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper in this Court under 28 U.S.C. § 1391(b)(2).

### THE BACKDROP – THE MURDER OF GEORGE FLOYD BY MINNEAPOLIS POLICE OFFICERS AND THE UNDERLYING WRONGS PROMPTING THE PROTESTS

22.    On May 25, 2020, George Floyd was murdered by former Minneapolis Police Officer Derek Chauvin.  Three fellow officers stood by and refused to intervene while Chauvin murdered Floyd by pressing a knee into Floyd's neck for over nine minutes.

23.    Video of the murder sparked worldwide outrage and many protests ensued as a call to finally address the systemic racism permeating our nation's police departments.

93943443.1

24.    The protests that erupted following George Floyd's death were not surprising.  Policing in Minnesota, and Minneapolis in particular, has long been troubled, and citizens had watched for decades as nothing was done to correct these injustices.

25.    Going all the way back to 2015, Chauvin previously used neck or head and upper body restraints seven times, including in at least two instances where Chauvin pressed his knee into the necks of his victims after they had been handcuffed or prone to the ground.

26.    For example, a federal grand jury in the District of Minnesota returned an Indictment in Case Number 21-CR-109 (WMW/HB), charging that on September 4, 2017, Chauvin held Juvenile 1 by the throat, struck Juvenile 1 multiple times with a flashlight, and "held his knee on the neck and upper back of Juvenile 1 even after Juvenile 1 was lying prone, handcuffed and unresisting." Chauvin pleaded guilty to these charges on December 15, 2021.

27.    Up until his murder of George Floyd, Chauvin was not disciplined or terminated by the MPD; rather, he was promoted by MPD to training officer.

28.    Within a few hours of the medical pronouncement of Floyd's death, MPD released a statement referring to the murder as a "medical incident," further cementing the callous lens of disregard with which MPD had viewed Chauvin's victims.  MPD's and Chauvin's track records—along with MPD's contemporaneous minimization of what the public witnessed to be a killing of a Black man in broad daylight by an officer who appeared to believe he acted with impunity—prompted public outcries for justice and demands that the persons responsible for Floyd's murder be held accountable.

7

29.     Some of the protests that followed in Minnesota, and Minneapolis in particular, caused severe destruction.

30.     In response to the ongoing civil unrest, on May 29, 2020, Minnesota Governor Tim Walz enacted Emergency Executive Order 20-65 – a peacetime emergency was declared, the Minnesota National Guard was activated, and a nighttime curfew (beginning at 8:00 p.m. CDT) was imposed for Minneapolis and Saint Paul on May 29 and 30, 2020.

31.     Section 3 of the Emergency Executive Order 20-65 outlined those **exempt from the curfew**:  "All law enforcement, fire, medical personnel, and members of the **news media**." (emphasis added).

32.     While the curfew would be extended by additional Executive Orders, the same exemption for the press **always** applied.  The Executive Orders did not create a hierarchy.  They gave the press the same rights to be out as other critical groups.

33.     These Executive Orders and, particularly, the portions pertaining to the lawful enforcement of the curfew, were well-known by, and became part of the rules of engagement for, each responding law-enforcement agency or military troop, including each of the Defendants herein.

## THE PRESS COVERAGE WORK OF CAROLYN AND MOLLY

34.     George Floyd's murder, along with the protests that followed, quickly became matters of national import and conversation.

35.     Molly flew from Houston to Minneapolis on Thursday, May 28, 2020, three days after Floyd's murder.

93943443.1

36.     After arriving in Minneapolis, Molly drove to park her rental car on Minnehaha Avenue, and walked up to the MPD's Third Precinct.  For the next two days, Molly covered various portions of the protests and civil unrest around the city.

37.     As the protests continued, Carolyn flew to Minneapolis to join Molly on Friday, May 29, 2020.  Like Molly, Carolyn hit the ground running, covering stories beginning on the evening of her arrival.

38.     Throughout her coverage of the protests in Minneapolis, Molly was always clearly and easily identifiable as press with her press credentials worn on a lanyard around her neck (depicted below):



39.     Like Molly, at all times while covering the protests in Minneapolis, Carolyn was clearly and easily identifiable as press with her own press credentials. In addition, Carolyn's gear included a flak jacket with "TV" in large, white letters, which she had originally taped to her jacket during her time in Iraq (depicted below):

93943443.1



40.     Despite their clear and visible markings, Carolyn and Molly became targets of the Defendants' chemical and "less lethal" weapons while they were covering the events unfolding outside of MPD's Fifth Precinct building on May 30, 2020.

41.     Carolyn and Molly were not the only members of the press targeted during their coverage of the protests and police response in the wake of Floyd's murder.

42.     Indeed, on May 29, 2020, a CNN reporter, producer, and photojournalist were arrested by Minnesota State Patrol troopers while broadcasting on live television. The arrests were widely condemned and Governor Walz quickly recognized their impropriety, announcing there was "absolutely no reason" for them and that he would work to quickly secure the journalists' release, which occurred approximately an hour later.

43.     Further, Jared Goyette's Second Amended Class Action Complaint, Civ. No. 20-1302 (WMW/DTS) (D. Minn.), details how other members of the press were

93943443.1

targeted by the Minnesota State Patrol soon after the murder of George Floyd, including

press from the Minneapolis *Star Tribune* and WCCO.

### LAW ENFORCEMENT'S CHANGE IN "POSTURE" TOWARD PROTESTERS AND IMPLEMENTATION OF THE STATE PATROL'S "OFFENSIVE" STRATEGY

44.    According to the August 2020 written testimony of former-MPD

Commander Scott Gerlicher, MPD "was quickly overwhelmed" by the eruption of

protests around the City of Minneapolis that followed Floyd's murder.

45.    About two days into the protests, during the evening of May 27, 2020,

Minneapolis Mayor Jacob Frey announced that the City would receive assistance from

the State Patrol.

46.    According to Commissioner John Harrington of the Minnesota Department

of Public Safety, every State Patrol trooper who was able and ready was mobilized and

brought into the Twin Cities after Frey's request.

47.    On May 28, 2020, officers were ordered to evacuate the MPD Third

Precinct building, which had been a focal point of clashes between the public and the

police over the several days prior.  The world watched as the Third Precinct building was

destroyed that day, and harsh critiques of this "defensive" posture came pouring in.

48.    Both Governor Walz and Mayor Frey were heavily criticized for the initial

"defensive" response to the civil unrest.

49.    Then-President Donald Trump tweeted some of his own criticism, calling

Frey "very weak" and describing what he saw as a "total lack of leadership."

50.    President Trump's tweet from May 29, 2020, spelled out the action plan moving forward:



51.    On or around May 28, 2020, after the Third Precinct building was abandoned, law enforcement officers in the area started operating out of a Multi-Agency Command Center (MACC), which, according to former-Commander Gerlicher, was a "unified command center for all public safety resources and National Guard."

52.    Soon after and following the then-President's Tweet, local law-enforcement officers, with the assistance of the National Guard and State Patrol, began taking an "offensive" posture toward the protesters.

53.    In the words of one State Patrol Lieutenant, as stated in an email sent to Defendant Dwyer, "[a]fter the first two days of battling these evil people and allowing them to win, I made the decision it is time to change some things . . . [and I] began to draft a plan to take over the city."

54.    This State Patrol Lieutenant "credits" his "Chief" for convincing the Governor to approve this "plan to take over the city," because, admittedly, this plan

"would mean that [law enforcement] will look very aggressive and not so nice to the

protestors."  But, according to the same Lieutenant, once State Patrol received the clear

from the Governor, this "plan" was implemented and "the cops went on the offensive,

deploy[ing] several thousand rounds of munitions 'tear gas' [*sic*] and went after the

dangerous protestors."

55.    According to this Lieutenant, the approval of the State Patrol's "offensive"

plan came about on May 30, 2020—just before the MRT "MSP 1" Team/SRT

encountered Molly and Carolyn and other nearby journalists outside of the Fifth Precinct

building.

56.    In the *Goyette* matter, Dwyer testified he was informed of this change in

"posture" that the State Patrol would be implementing.

57.    As a result, he hatched a plan to "execute a mass arrest" on the night of

May 30.  Dwyer testified he had "prior knowledge" of "the crowd" in that area, and

decided to order the mass arrest "based on the curfew violation."

58.    According to Dwyer, this "mass arrest" tactic was part of the larger

"strategy that was discussed . . . to bring just the events of the week that were

unprecedented and unpredictable . . . to a close, [and] to restore some sort of order to a

chaotic environment that had infected the city."

59.    Dwyer testified the "intent" of his plan was "to clear the entire landscape,"

regardless of whether the media was considered exempt from the curfew order.

60.    Details of Dwyer's plan were discussed at the "command level"—including with Engeldinger—and then communicated "from the captains to the lieutenants," including to Lieutenant Eck.

61.    The plan was also discussed with troopers during a briefing conducted right before law enforcement personnel were deployed to the area of the Fifth Precinct on May 30, 2020.  On that day, Dwyer had overall command over the State Patrol troopers, and other law enforcement members of the MRT, who were deployed to the area of the Fifth Precinct on May 30 to execute Dwyer's plan.

62.    Dwyer traveled with the MRT "MSP 1" Team / SRT via Metro Transit bus to the area of the Fifth Precinct on May 30.  Dwyer also personally observed the events and unconstitutional conduct that followed Defendants' arrival at the intersection of 32nd Street and Nicollet Avenue (south of the Fifth Precinct building) during the evening of May 30.

63.    Dwyer and Engeldinger issued orders to the troopers under their command, including Lockman and Eck, to use force to execute the plan.

64.    At the time of the attempted "mass arrest" executed at Dwyer's direction, the Defendants disregarded the exemption that applied to media.

65.    Each of the Defendants personally participated in the execution of Dwyer's plan to "clear" the area where Carolyn and Molly were peacefully engaged in their constitutionally protected press-coverage activities on May 30, 2020.  *See Burbridge v. City of St. Louis*, 2 F.4th 774, 782 (8th Cir. 2021) ("To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged

14

violation. That does not mean however that a § 1983 excessive force plaintiff must be able to personally identify his assailants to avoid summary judgment.").

## THE ASSAULTS ON CAROLYN AND MOLLY

66.    Both Carolyn and Molly were hard at work on Saturday, May 30, covering damage at the George Floyd memorial site, street gatherings, and clean-up efforts, among other stories.

67.    Before curfew on May 30, Carolyn was covering a sit-in at the Minneapolis Police Department's Fifth Precinct, located at 3101 Nicollet Ave.

68.    Throughout the day, Carolyn and Molly were in communication.  Before curfew, Molly walked over to the area of the Fifth Precinct, where she met up with Carolyn and other members of the press.

69.    Notably, the press group's gear included many items of clothing bearing the word "Press," press credentials, notebooks, and large, professional cameras and lenses – all of which clearly differentiated the press from the protesters.

70.    Carolyn wore her press credentials and flak jacket with "TV" in large, white letters, and was carrying her large camera, lenses, and camera bag.

71.    Molly also wore her press credentials around her neck and had her notebook in her hands – telltale signs of a member of the press.

72.    The press group, including Carolyn and Molly, were on a portion of grass on the eastern side of Metro Transit's Nicollet Garage, which is located on the corner of Nicollet Avenue and 31st Street and across from the Fifth Precinct, shown below:

93943443.1



73.    The press group was on the **<u>opposite</u>** side of the street from the protesters.

74.    Carolyn and Molly were near the Metro Transit Garage parking lot that was surrounded by a block wall, depicted below:

93943443.1





17

75.     While Carolyn and Molly remained on the grassy portion at the edge of the indentation of the un-scalable wall, they observed a group of Minneapolis Police officers emerge out of a gate surrounding the Fifth Precinct, encounter a protester and then retreat.

76.     Shortly thereafter, and after 8:00 p.m., the MRT "MSP 1" Team and SRT emerged and began walking northbound on Nicollet Ave, as depicted below:





18

77.    The officers created a tactical blue smoke screen ahead of them, which can be seen in the photographs above.

78.    Defendant Dwyer and Lieutenant Timothy Salto, who was co-commanding the SRT outside the Fifth Precinct on May 30, 2020, authored almost identical reports regarding the events that took place that evening.

79.    Dwyer was in command of the troopers marching north on Nicollet at this time, including Lockman and Eck, and had responsibility to ensure that the rules of engagement were communicated to and followed by those under his supervision.

80.    Dwyer and Salto reported:  "After 2000 curfew, the Mobile Response Team (including DNR1 & DNR2), along with Minnesota State Patrol response units responded to a report of a large demonstration near the Fifth Precinct in Minneapolis."

81.    Dwyer and Salto further reported:  "The teams deployed at East 32nd Street and Nicollet Avenue."  This intersection is immediately south of Metro Transit Garage depicted above in Paragraphs 75 and 77.  The throng of troopers moving from south to north (right to left of the photograph) were under the command of Dwyer and Engeldinger, and were executing on Dwyer's "mass arrest" plan that he communicated to them before they arrived at the scene.

82.    No members of the easily identifiable press group, including Carolyn and Molly, were part of any protest activity, which was coming from the demonstrators to the north of where the press group was assembled next to the transit garage.

19

83.    Per Dwyer's and Salto's reports:  "A dispersal order was given and the crowd was advised they were in violation of Minneapolis' curfew and if they did not leave, they would be arrested."

84.    Any such order was not applicable to the press group, including Carolyn and Molly, who were expressly exempted from the curfew.

85.    As part of Dwyer's plan to "clear the entire landscape," Dwyer and Engeldinger authorized the use of a cadre of munitions for deployment in that area before the MRT and SRT deployed the same:  "Munitions were deployed in this area to drive the crowd back and create a safe operating zone.  Munitions deployed included CS, blast balls, stinger balls, direct impact rounds and triple chasers."  Many of the MRT "MSP 1" Team/SRT members were also equipped with pepper spray, including Lockman and Eck who used it against Carolyn and Molly.

86.    Dwyer and Engeldinger knew that members of the press, including Carolyn and Molly, were not in violation of the curfew and had well-established constitutional rights to be present to cover the demonstrations.

87.    But the Defendants had no interest in ensuring protection of the press group from dangerous and deadly munitions.

88.    Lockman and Eck treated the readily identifiable press group, which was lawfully covering the demonstrations, the same way they treated the unlawful assembly—by advancing on them and assaulting them.

89.    The only mention of the press in the publicly available reports by Dwyer and Salto is the following general statement:  "Several reporters were encountered in the

20

protest group – many of them with credentials were identified and released once they were confirmed who they were." This statement is proof positive that the Defendants – having seized members of the press and then releasing them – were targeting the press and violating the Constitution by acting first and asking questions later.

90.    The publicly available reports included no reporting from Lockman and Eck, two of the troopers who actually used force against Carolyn and Molly.

91.    Minnesota State Patrol policies require its troopers to write reports after using force on subjects. Proper use-of-force reporting includes a summary of the circumstances faced by the trooper that support the level of force employed and obviously provides the identity of the trooper(s) who used force.

92.    However, according to Defendant Dwyer, the MACC decided troopers and officers were not required to complete use-of-force reports starting around May 30, 2020. In addition, Dwyer testified that immediately after the State Patrol response to the Twin Cities area, "there was a purge of e-mails and text messages."

93.    Lockman and Eck, acting at the direction of Defendants Dwyer and Engeldinger, acted with impunity; knowing that evidence of their excessive force would either never come into existence or never surface.

94.    Against this backdrop, and after their arrival at the intersection of Nicollet Avenue and 32nd Street, Lockman and Eck, along with other MSP troopers, broke off from other officers and headed directly for the press group – traversing the boulevard and sidewalk to get to them.

21

93943443.1

95.    The press group positioned itself in a manner that allowed it to cover matters of public concern, avoid injury by the demonstrators and allow law enforcement to move right by them on Nicollet Avenue.  But Lockman and Eck would have none of that and decided to veer off and engage the press.

96.    The press group was stuck with their backs up against the block wall of the transit center across from the Fifth Precinct.

97.    Molly held up her press credentials to Lockman and Eck.

98.    Molly yelled that they were press.

99.    Molly waved her notebook at Lockman and Eck.

100.    Upon information and belief, other members of the press group performed similar actions to further alert the advancing troopers that they were heading for press – a group **exempt** from the curfew.

101.    The advancing troopers simply yelled "*move!*" at the press group.

102.    Lockman and Eck continued to advance on the press group and then started spraying them with pepper spray.

103.    None of the Defendants or any other officers issued any warnings to the press group that force would be used before they started attacking.

104.    None of the Defendants did anything to stop Lockman and Eck from advancing on the clearly-identified press group, nor did any of the Defendants stop the Lockman and Eck from targeting the press group with chemical agents.

93943443.1

105.    Molly was at the back of the press group, pressed against the wall. Her location within the group partially shielded her from the chemical irritants sprayed by Lockman and Eck.

106.    Carolyn had remained near the front of the press group and was essentially the first point of contact with Lockman and Eck. She was intentionally sprayed with pepper spray directly into her left eye and ear by Lockman and Eck. The spray also entered her right eye, temporarily blinding her.

107.    Carolyn caught some of the violence, including Lockman and Eck pepper-spraying the press group, on camera:



 

108.    Even when the press group was backed up and trapped against the wall without any obvious place to go, Lockman and Eck did not stop their onslaught.  Molly asked where the press should go, but received no answer.  Molly realized the group needed to flee.

109.    MSP Troopers, including Lockman and Eck, chased the press group north along the walls of the Transit Center, herding them into a corner, while continuing to use their chemical agents on them.  One member of the press group testified in the *Goyette* matter that he was pepper-sprayed in the face and struck in the forehead with a blunt-impact projectile, causing an injury that was still visible in the form of a scar more than one year later.

110.    In addition to using their pepper-spray, Lockman and Eck personally observed the onslaught of the trapped press group.  Engeldinger and Dwyer also stood within view of the assault.

111.    Despite their clear view of the unconstitutional assault on the press group, Defendants failed to intervene to prevent the use of excessive force.

93943443.1

112.    Molly was struck at least five times in the left leg by blunt-impact projectiles and a tear-gas canister, and also suffered the effects of Lockman's and Eck's use of pepper-spray against the press group.

113.    Many of the press group were forced into a small area enclosed by fencing and a block-wall buffer containing mechanical equipment, located on the corner of the Metro Transit Garage off West 31st Street and Nicollet Avenue, depicted below:





114.    Carolyn, still blinded, unknowingly captured footage of members of the press group, as they were trapped by the wall, fence and troopers:

93943443.1



115.    The below image shows Carolyn's boot on some piping within the small

enclosure *and* that she had nowhere to go:



116.    The press group was trapped.

117.    They were bloodied and screaming.

118.    They were injured.

119.    They were blinded.

120.    The only way to escape the troopers was to scale the wall.

93943443.1

121.    Molly made it over – an event that was captured by KSTP:



122.    Carolyn, with her heavy photography equipment, could not do so on her own.  She was pushed over by a trooper.  She fell to the ground and crawled down the street – still blinded from the pepper spray – until somebody came to her aid.

123.    The below photograph was taken some time after Carolyn retreated from the troopers. Her pain is palpable:

93943443.1



124.    Meanwhile, Molly had run to the nearest open door – a senior apartment complex.  There, she posted about the event on Twitter as troopers prowled outside, still chasing others.

125.    After their assault on the press, the troopers moved farther north on Nicollet Avenue, toward a K-Mart parking lot a couple blocks past 31st Street East.

126.    The injured media members were left in their wake.  Notably, Defendant Dwyer and Lieutenant Salto both reported that arrests were made on people who violated curfew.  Neither Molly nor Carolyn was arrested.

127.    Molly called Carolyn's phone.  Someone else answered.

128.    Eventually, Molly learned Carolyn's location and was given a ride there.

129.    A Good Samaritan who had taken in Carolyn sought to drive her and Molly to a hospital outside of Minneapolis, believing it was a safer option.  On their way out of

93943443.1

the area, another law enforcement officer fired at them, striking the Good Samaritan's passenger window and leaving a trail of red paint.

130.    The Good Samaritan drove Carolyn and Molly into Edina, where they were waved through a police checkpoint and arrived at M Health Fairview Southdale.

131.    Lockman and Eck felt free to engage in their assault on the nonviolent, lawfully present members of the press, including Carolyn and Molly.

132.    This is evidenced by the aforementioned incidents involving other members of the press and the lack of discipline levied against the offending troopers.  Specifically, Commissioner Harrington testified in the *Goyette* matter that he is not aware of a single trooper who has been disciplined for any use of chemical agents against a member of the press.  Defendant Dwyer also testified he has no knowledge of any such discipline ever taking place.

133.    Rather than being disciplined for his role in this attempted "mass arrest," Dwyer was promoted in June 2021 to the rank of Major.

134.    Dwyer's and Engeldinger's orders to "clear the area" regardless of whether the curfew order exempted press was in contravention of the constitutional mandates of the First and Fourth Amendments.

135.    Dwyer and Engeldinger were causally and directly involved in the violation of Carolyn's and Molly's constitutional rights.

136.    Neither Carolyn nor Molly had committed any crime.  Neither was charged with one.

137.    Neither Carolyn nor Molly had displayed any aggression.

93943443.1

138.    Neither Carolyn nor Molly was armed.

139.    No one else in the press group had committed a crime or was charged with any.

140.    No one else in the press group had displayed any aggression.

141.    No one else in the press group was armed.

142.    Neither Carolyn nor Molly posed any threat to the Defendants or others.

## CAROLYN'S PHYSICAL INJURIES

143.    At the hospital, Carolyn was put in a shower to wash off the irritants fired into her eyes and ear by Lockman and Eck pepper-spraying her.  Her bruising and scrapes on her left arm were examined.

144.    Contact lenses and an irrigation system were placed in both of Carolyn's eyes – a process which lasted for hours.  She was diagnosed with a chemical burn to her skin and chemical exposure to her eyes.

145.    The next day, Carolyn's eyes were painful and swollen, with only a sliver of an opening of her right eye.  Her eyes remained this way for three days.

146.     Carolyn was referred to the McCannel Eye Clinic for follow-up care. There she was seen by Dr. Adam Moss, who diagnosed her with: 1) chemical burn – pepper spray in both eyes, and 2) corneal abrasion left eye.  She was prescribed Vigamox, artificial tears, and prednisolone acetate.  The hope was that her cornea would grow back.

147.    Carolyn flew home to Los Angeles on June 2, 2020.  Shortly thereafter, she began having pain in her lower left back.  She visited an acupuncturist, with some relief, but by June 14 the sharp pain returned.

93943443.1

148.    On June 14, 2020, Carolyn followed up at Brentwood Urgent Care, where she was seen by Dr. Derek Hsu and was diagnosed was a lumbosacral sprain and left elbow contusion.

149.    Carolyn was prescribed a back brace and pain medication.  She also began physical therapy.

150.    Carolyn's providers instructed her that she could return to work in a limited capacity from June 14 to 21, but she was restricted from climbing, bending or stooping – activities that are vital to her profession.

## MOLLY'S PHYSICAL INJURIES

151.    As for Molly, she sustained injuries to her left leg (shown in the reversed photograph below) when she was struck by the multiple projectiles:



93943443.1

152.    Molly also suffered effects from Lockman's and Eck's use of pepper spray.

153.    Despite her own injuries, Molly turned her focus to helping Carolyn.  Molly received a ride to her rental car from the Good Samaritan so that she could pick Carolyn up from Fairview Southdale and get her to their hotel.

154.    Later, while at the hotel, Molly obtained first-aid supplies and began addressing multiple wounds on her body – she would use a majority of the hotel's first-aid supplies.

155.    Over the next few days, Molly continued working – as the only remaining boots on the ground in Minneapolis for the *Los Angeles Times* – despite her injuries.

156.    But, due to the May 30 attack, Molly no longer went out into the field after curfew to cover ongoing protests and actions by law enforcement.

157.    The below photographs show the status of Molly's physical injuries from the projectiles on June 5, 2020, nearly a week after she was shot:

93943443.1

 

158.    Molly first received medical treatment at the Baylor Family Clinic after she traveled back home to Texas.  There, she was bandaged and prescribed a topical antibiotic.

## THE CHILLING EFFECTS OF THE EXCESSIVE FORCE

159.    Carolyn, Molly, and the press group were visibly separate and across the street from the protesters at the Fifth Precinct.

160.    Carolyn, Molly, and the press group were clearly, easily and quickly identifiable as members of the press due to the gear they carried as necessities for their jobs (notebooks, cameras, lenses, microphones) and the special gear they donned as to not be confused with protesters or rioters (described above).

161.    Carolyn, Molly, and the press group had a right to be out on the streets after curfew under the First Amendment and Governor Walz's Emergency Executive Orders.

33

162.    On the evening of May 30, 2020, Carolyn and Molly were engaged in the constitutionally mandated freedom of the press.

163.    Both photojournalism and the written or spoken word are essential to free public discourse, particularly in tumultuous times where the public seeks to keep in check abuses of power, excessive uses of force, or the unauthorized use of deadly force.

164.    As Governor Walz noted in his press briefing following the arrest of the CNN reporters on the day before Carolyn and Molly were attacked: "we have got to ensure that there is a safe spot for journalism to tell the story" and "the protection and security and safety of the journalists covering this is a top priority."

165.    Carolyn and Molly were in what should have been a safe spot for them. Yet, they received anything *but* protection, security or safety.

166.    The actions by Lockman and Eck targeted Carolyn, Molly and the others in the press group for *doing their jobs*; jobs that protect "the very foundation of constitutional government" the Defendants swore to serve. *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

167.    The actions by Lockman and Eck– using a smoke screen, heading directly at the obvious and identified press group, deploying chemical agents, chasing and herding the press group, and leaving them to scale walls and fend for themselves while blinded, bleeding and scared – all while they continued to "patrol" around them, would chill any person of ordinary firmness from continuing to engage in the protected activities of the press and did in fact chill Carolyn's and Molly's exercise of their First Amendment rights.

93943443.1

168.    At all times relevant to the attack on Carolyn, Molly, and other members of the press, Lockman and Eck acted with the approval and at the direction Dwyer and Engeldinger.

169.    As Molly reported on Twitter in the moments after being shot, she had to take shelter in a random building while troopers, and possibly Minneapolis police, circled – not letting her leave the building.  This experience, along with the assault that preceded it, caused Molly to view law enforcement as a potential threat while doing her job.

170.    Carolyn also now distrusts the police as a result of this assault.

171.    In addition, the assault cost Carolyn years of utilizing her gifts as a renowned conflict photographer.  Despite the global recognition Carolyn has received for her images captured in war-torn countries and under incredibly high-pressure situations, the trauma of having been temporarily blinded by Lockman and Eck took her off of the front lines for almost two years.

172.    The professional and emotional impacts of Carolyn's and Molly's injuries are steep, but the public's loss of Carolyn's lens and Molly's voice from documenting the fallout following the murder of George Floyd can never be measured.

173.    Carolyn and Molly, through their extensive and impressive careers, have covered domestic protests and foreign war zones.  But, neither of them had ever been fired at by police until they reported in Minneapolis in May 2020.

174.    The unlawful targeting of journalists and press members did not abate in the months following Carolyn's and Molly's assaults.

175.    In April 2021, members of the press reported on demonstrations following yet another police killing of a Black man, Daunte Wright, by Minnesota law-enforcement officers.

176.    During those protests, the State Patrol once again unlawfully seized and used excessive force against media members, necessitating United States District Judge Wilhelmina M. Wright to issue a Temporary Restraining Order ("TRO") in the *Goyette* case in an attempt to stop this unconstitutional misconduct.

177.    Yet even a federal court order did not halt the State Patrol's unlawful practices.  State Patrol troopers continued to arrest members of the media and subject them to excessive force in violation of the TRO, ultimately leading Judge Wright to issue a *stipulated* permanent injunction in yet another attempt to halt the misconduct of the State Patrol.

178.    The foregoing amply demonstrates that the State Patrol does not care about the First and Fourth Amendment rights of the media and the general public, and the State of Minnesota has recognized as much by stipulating to the federal court injunction against it.

179.    Carolyn and Molly sustained injuries by the unconstitutional actions of the Defendants.

180.    Carolyn and Molly demand a trial by jury on all issues so triable.

93943443.1

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AND
### FOURTEENTH AMENDMENT VIOLATIONS
***Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendants Benjamin Lockman
and Michael Eck***

181.    Plaintiffs reallege and incorporate by reference herein each and every

allegation contained in each paragraph above as though fully set forth herein.

182.    By the actions described above, Defendants Benjamin Lockman and

Michael Eck, under color of state law, violated and deprived Carolyn and Molly of their

clearly established and well-settled civil rights to be free from excessive force under the

Fourth and Fourteenth Amendments to the United States Constitution.

183.    Lockman and Eck subjected Carolyn and Molly to these deprivations of

their rights either maliciously or by acting with reckless disregard towards whether their

rights would be violated.

184.    As a direct and proximate result of the acts and omissions of Lockman and

Eck, Carolyn and Molly suffered injuries, were forced to endure great pain and mental

suffering, and were damaged in an amount to be determined by the jury.

185.    Punitive damages in an amount to be determined by the jury are available

against Lockman and Eck and are hereby claimed as a matter of federal common law

under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading

requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

186.    Carolyn and Molly are entitled to fully recover their costs, including

reasonable attorneys' fees, under 42 U.S.C. § 1988.

93943443.1

## COUNT II

### 42 U.S.C. § 1983 – FOURTH AND
### FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendants Benjamin Lockman and Michael Eck*

187.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

188.    By the actions described above, Defendants Benjamin Lockman and Michael Eck, under color of state law, deprived Carolyn and Molly of their clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

189.    Lockman and Eck knew of the plan to "clear" the landscape where Carolyn and Molly and other members of the press were engaged in their constitutionally-protected activity, and with reckless disregard for whether their rights would be violated, failed to intervene.

190.    Lockman and Eck observed the assault on Carolyn and Molly, and had realistic opportunities to prevent the assault, but failed to do so.

191.    As a direct and proximate result of Lockman's and Eck's failure to intervene, Carolyn and Molly suffered injuries, were forced to endure great pain and mental suffering, and were damaged in an amount to be determined by the jury.

192.    Punitive damages in an amount to be determined by the jury are available against Lockman and Eck and are hereby claimed as a matter of federal common law

93943443.1

under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

193.    Carolyn and Molly are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### <u>COUNT III</u>

**42 U.S.C. § 1983 – FIRST AND
FOURTEENTH AMENDMENT VIOLATIONS**
***Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendants Benjamin Lockman
and Michael Eck***

194.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

195.    Carolyn and Molly, as members of the press, engaged in constitutionally protected activity on May 30, 2020, in Minneapolis, Minnesota.  Specifically, they exercised their First Amendment rights to free press and speech, and to peaceably assemble.

196.    Carolyn and Molly were reporting on matters of public concern, including the protests and law enforcement's response.

197.    Due to their exercise of their First Amendment rights as members of the press, Lockman and Eck deliberately targeted Carolyn and Molly and retaliated against them by using excessive force.

198.    The actions of Lockman and Eck caused both physical and emotional injuries to the Plaintiffs and would chill persons of ordinary firmness from continuing to

39

engage in their reporting activities and constitutionally protected activities, and did in fact chill Carolyn and Molly from continuing to engage in such activities.

199.    Lockman and Eck subjected Carolyn and Molly to these deprivations of their rights either maliciously or by acting with reckless disregard for whether their rights would be violated.

200.    As a direct and proximate result of the aforementioned unconstitutional conduct, Carolyn and Molly were each damaged in an amount to be determined by the jury.

201.    Punitive damages in an amount to be determined by the jury are available against Lockman and Eck and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

202.    Plaintiffs are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### COUNT IV

**42 U.S.C. § 1983 – FOURTH AMENDMENT CLAIMS UNDER**
***BAUDE V. LEYSHOCK***
***Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendants Joseph Dwyer and***
***Jason Engeldinger, in their individual capacities***

203.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

204.    Defendants Joseph Dwyer and Jason Engeldinger, at all times material hereto were members of the Minnesota State Patrol with supervisory responsibility over

the MSP trooper present at the Fifth Precinct on May 30, 2020, including Lockman and

Eck .

205.    By the actions described above, Dwyer and Engeldinger, acting under color

of state law, observed or intended the use of excessive force set forth in Count I, but none

intervened to halt it.  *See Baude v. Leyshock*, 23 F.4th 1065, 1074 (8th Cir. 2022).

206.    Dwyer and Engeldinger knew of, and deliberately executed, the plan to

"clear" the landscape where Carolyn and Molly and other members of the press were

engaged in their constitutionally-protected activity, and with reckless disregard for

whether their rights would be violated, failed to intervene.

207.    Dwyer and Engeldinger observed, and had the realistic opportunity to

prevent, the MSP's use of unlawful levels of force against the easily identifiable press

group while the press group was physically separated from the protest activity in the area

and engaged in the constitutionally protected activity of covering the protests and the

police response to the protests.  Yet, Dwyer and Engeldinger failed to intervene and

prevent the assault.

208.    Dwyer and Engeldinger issued orders allowing their subordinates to use

excessive force against the press group.

209.    In addition to Defendant Dwyer's testimony that he commanded the MSP

to "clear the area," the coordinated effort—displayed by the troopers' tactical line, use of

a smoke screen, and systemic discharge of chemical agents— confirm Lockman and Eck

were following the commands of senior officials like Dwyer and Engeldinger.

41

210.    The coordinated and systemic effort also demonstrates that Dwyer and Engeldinger were not only on notice of, but sanctioned, the conduct of Lockman and Eck.

211.    As a direct and proximate result of the acts and omissions of Dwyer and Engeldinger, Carolyn and Molly suffered injuries, were forced to endure great pain and mental suffering and were damaged in an amount to be determined by a jury.

212.    Punitive damages in an amount to be determined by a jury are available against Dwyer and Engeldinger and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

**213.**    Carolyn and Molly are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT V

### 42 U.S.C. § 1983 – SUPERVISORY LIABILITY
*Plaintiffs Carolyn Cole and Molly Hennessy-Fiske v. Defendant Joseph Dwyer,*
*in his individual capacity*

214.    Plaintiffs reallege and incorporate by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

215.    Defendant Dwyer at all times material hereto was a member of the Minnesota State Patrol with overall supervisory responsibility over the Minnesota State Patrol on scene at the Fifth Precinct, including Lockman and Eck.

216.    By the actions described above, Defendant Dwyer, under color of state law, directly participated in the constitutional violations set forth in Counts I, II, and III and deprived Carolyn and Molly of their clearly established and well-settled civil rights to be

93943443.1

free from excessive force under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

217.    Defendant Dwyer had direct command and control over Lockman and Eck in preparation for, and in the execution of, his plan to "clear" the area at issue.

218.    Defendant Dwyer knew that members of the press, including Carolyn and Molly, were exempt from the curfew orders in place on May 30, 2020. Therefore, the nonviolent and easily identifiable press group had an unfettered right to be present where the events at issue occurred.

219.    Defendant Dwyer knew that many members of the press would be present virtually at all times during the demonstrations.

220.    Defendant Dwyer observed the members of the press present in the area where troopers were executing his order to "clear" the landscape.

221.    Defendant Dwyer also allowed and facilitated his subordinates' use of excessive force against the peaceful press group. He directly participated in the violation of Carolyn's and Molly's constitutional rights by commanding Lockman and Eck to "clear" the area with the use of chemical munitions, which resulted in the unconstitutional use of force against demonstrators and the free press.

222.    Defendant Dwyer directly participated in the violation of Carolyn's and Molly's constitutional rights by facilitating such unconstitutional use of force; knowing the force would not be subject to proper force reporting or disciplinary action, and that e-mail and text-message records of the force would be "purged" shortly thereafter.

93943443.1

223.    Defendant Dwyer knew that members of the press, including Carolyn and Molly, had well-established First and Fourth Amendment rights to cover the events on May 30, 2020 following the murder of George Floyd without being subjected to unprovoked attacks by Lockman and Eck.

224.    Lockman and Eck showed no hesitation in engaging the press group and immediately began subjecting the group, including Carolyn and Molly, to objectively unreasonable force.

225.    As a direct and proximate result of the acts and omissions of Defendant Dwyer, Carolyn and Molly suffered injuries, were forced to endure great pain and mental suffering and were damaged in an amount to be determined by a jury.

226.    Punitive damages in an amount to be determined by a jury are available against Defendant Dwyer and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

227.    Carolyn and Molly are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Carolyn Cole and Molly Hennessy-Fiske pray for judgment as follows:

1.    That this Court find that the Defendants committed acts and omissions violating the First, Fourth, and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

93943443.1

2.      As to Count I, a money judgment against Defendants Benjamin Lockman and Michael Eck for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against Defendants Benjamin Lockman and Michael Eck for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendants Benjamin Lockman and Michael Eck for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendants Joseph Dwyer and Jason Engeldinger for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against Defendant Joseph Dwyer for compensatory and punitive damages in amounts to be determined by the jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest; and

7.      For such other and further relief as this Court may deem just and equitable.

93943443.1

Dated: June 9, 2023

ROBINS KAPLAN LLP

By: *s/Robert Bennett*
Robert Bennett, #0006713
Andrew J. Noel, #0322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
Greta Wiessner, #0401130
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com
gwiessner@robinaskaplan.com
ATTORNEYS FOR PLAINTIFFS

46