1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

------------------------------------------------------

Case No. 21-cv-1282(PJS/DLM)

Carolyn Cole and
Molly Hennessy-Fiske,

Plaintiffs,

vs.

Ben Lockman and Michael Eck,
acting in their individual capacities
as troopers or other sworn officers
of the Minnesota State Patrol; and
Joseph Dwyer and Jason Engeldinger,
acting in their individual capacities
as Captains of the Minnesota State Patrol,

Defendants.

------------------------------------------------------

VIDEOTAPED DEPOSITION OF TESA JOHNSON

VOLUME I

The following is the videotaped deposition of

TESA JOHNSON, VOLUME I, taken pursuant to Notice of

Taking Deposition, at the Jessie F. Hallett Memorial

Library, 101 First Street Southeast, Crosby,

Minnesota, on December 20, 2023, commencing at

approximately 10:30 a.m.


Reporter:  Amanda K. Grover
For Doby Professional Reporting, Inc.
DobyReporting.com
952.943.1587

Tesa Johnson (Vol. 1)
12/20/2023

**2**

1  APPEARANCES:
2
3    On behalf of the Plaintiffs:
     Greta A. Wiessner
     Andrew J. Noel
4    Robins Kaplan LLP
     800 LaSalle Avenue
5    Suite 2800
     Minneapolis, Minnesota 55402
6
7    On behalf of the Defendants:
     Joseph Weiner
8    Minnesota Attorney General's Office
     445 Minnesota Street
     Suite 1400
9    St. Paul, Minnesota 55101-2131
10   Kim Parker
     Minnesota Department of Public Safety
11   445 Minnesota Street
     Suite 1000
12   St. Paul, Minnesota 55101
13
     Videographer: Jayme Hogan, Envision Video.
14
15        I N D E X
16   EXAMINATION BY:              PAGE:
17   Ms. Wiessner                    4
     Mr. Weiner                    214
18
     OBJECTIONS BY:
19
20   Mr. Weiner    17, 18, 20, 33, 34, 35, 39, 44,
                   45, 47, 52, 54, 55, 56, 58, 59,
                   60, 61, 63, 65, 66, 73, 74, 79,
21              81, 90, 91, 92, 95, 96, 97, 99,
                101, 104, 108, 112, 113, 114, 115,
22              117, 118, 119, 120, 121, 123, 130,
                131, 137, 139, 144, 148, 149, 160,
23              162, 164, 165, 166, 171, 175, 176,
                183, 184, 188, 189, 200, 207, 208
24
25   Ms. Wiessner                223, 249, 267

**3**

1    DEPOSITION EXHIBITS:              PAGE:
2    Number 1 - Notice of Deposition        5
3    Number 2 - Photographs              36
4    Number 3 - Google album photographs       48
5    Number 4 - Court Filing Docket 168       72
6    Number 5 - Termination papers          77
7    Number 6 - Email to Carolyn Cole       84
8    Number 7 - List of members of Google album  122
9    Number 8 - MRT Deployment Roster       122
10   Number 9 - Amended Complaint Document 37   219
11   Number 10 - Still photographs from video    270
12
13   REQUESTS:                        PAGE:
14   Voicemail or text from Engeldinger         22
15   Photographs from personal phone         196
16   Text messages re: George Floyd operation   197
17   Text messages with Engeldinger          197
18   Search for written agreement with AG       203
19   Emails with plaintiff lawyers           217
20   Email or text re: WeTransfer           345
21
22
23              *****
24
25

**4**

1         P R O C E E D I N G S
2
3        VIDEOGRAPHER:  This is the video deposition
4    of Tesa Johnson.  Today's date is December 20, 2023,
5    the time is approximately 10:31 a.m.
6        Would each attorney state their name for the
7    record, please.
8        MS. WIESSNER:  Greta Wiessner for the
9    plaintiffs.
10       MR. NOEL:  Andrew Noel, plaintiffs.
11       MR. WEINER:  Joe Weiner for the defendants.
12       MS. PARKER:  Kim Parker, general counsel
13   for the defendants.
14       VIDEOGRAPHER:  Thank you.  Would the court
15   reporter please administer the oath.
16       (Oath administered.)
17       THE WITNESS:  Yes.
18       TESA JOHNSON,
19   being first duly sworn, was examined
20   and testified as follows:
21       EXAMINATION
22   BY MS. WIESSNER:
23   Q.  Good morning, Ms. Johnson.
24   A.  Good morning.
25   Q.  Do you prefer that I call you Tesa or

**5**

1    Ms. Johnson?
2    A.  Tesa is fine.
3    Q.  Tesa, okay.  You may remember me.  I'm
4    Greta Wiessner, one of the counsel for the
5    plaintiffs in this case, and I met you briefly on
6    your last Zoom deposition.
7    A.  Yes.
8    Q.  I don't think you've met Andy Noel, who's
9    also counsel for the plaintiffs.  I know you've met
10   Joe Weiner, counsel for the defendants.
11   A.  Mm-hmm.
12   Q.  And he represents Joseph Dwyer, Jason
13   Engeldinger, Michael Eck and Ben Lockman in this
14   case.
15   A.  Mm-hmm.
16   Q.  I'd like to show you your Notice of Taking
17   a Video Deposition.
18       (Exhibit Number 1 marked.)
19       MR. WEINER:  And are we marking this as 1?
20       MS. WIESSNER:  Sure, we can mark this as 1.
21   BY MS. WIESSNER:
22   Q.  Do you recognize this document, Tesa?
23   A.  Yes.
24   Q.  So this was the notice we sent you to take
25   your deposition today; right?

2 (Pages 2 to 5)

**Page 6**

1     A. Yes.
2     Q. And you see your name on this document?
3     A. I do.
4     Q. And that's you, Tesa Johnson?
5     A. Yes.
6     Q. And you understand why you're here today?
7     A. Yes.
8     Q. That we'll be taking your deposition today
9  under oath and on video?
10    A. Yes.
11    Q. And you understand that you have the right
12 to have an attorney here today?
13    A. Yes.
14    Q. You understand that you also have the right
15 to appear without an attorney?
16    A. Yes.
17    Q. And you have freely chosen not to be
18 represented by counsel today; right?
19    A. Correct.
20    Q. And importantly, you understand that
21 neither I nor Andy are your attorneys?
22    A. Yes.
23    Q. Joe is not your attorney?
24    A. Yes.
25    Q. No one is representing you here today --

**Page 7**

1     A. Correct.
2     Q. -- for any purpose?
3     A. Correct.
4     Q. And you understand that I represent Carolyn
5  Cole and Molly Hennessy-Fiske, who are the
6  plaintiffs in this case?
7     A. Yes.
8     Q. And you understand that I cannot provide
9  you any legal advice?
10    A. Yes.
11    Q. And do you understand that your interests
12 and the interests of my clients may be adverse or
13 different from each other?
14    A. Yes.
15    Q. I say they are or may be because we don't
16 know what your interests are; okay?
17    A. Correct.
18    Q. I understand that you have a pending
19 workers' compensation claim against the State Patrol
20 for PTSD disability benefits; is that correct?
21    A. Correct.
22    Q. And when did that claim start or arise?
23    A. Started, I believe it was January of 2022
24 or '1.
25    Q. And you are represented for purposes of

**Page 8**

1  that claim; right?
2     A. Correct.
3     Q. And who is your attorney for that claim?
4     A. Josh Harrison.
5     Q. Okay. And you understand that you have the
6  right to have Mr. Harrison present today?
7     A. Correct.
8     Q. And I advised you about that right via
9  email last week; right?
10    A. You did.
11    Q. And you let him know you're being deposed;
12 right?
13    A. I did.
14    Q. And you've chosen to come today without
15 Mr. Harrison present?
16    A. Yes.
17    Q. And you understand he's not representing
18 you for purposes of this deposition?
19    A. Correct.
20    Q. And I'm going to be careful not to ask you
21 questions that would intrude on your conversations
22 with Mr. Harrison. If I ask you something and it
23 inadvertently would cause you to reveal privileged
24 or confidential information, let me know and don't
25 answer. But we'll try to avoid those topics; okay?

**Page 9**

1     A. Okay.
2     Q. And are you represented by any other
3  attorney in any other matter --
4     A. No.
5     Q. -- at this point? And besides February 22,
6  2023 when my colleague, Marc Betinsky, deposed you
7  in this case, have you been deposed before?
8     A. Other than what you just mentioned, no.
9     Q. And you do recall that deposition; right?
10    A. Yes.
11    Q. It was over Zoom?
12    A. Yes.
13    Q. You understand that you were under oath?
14    A. Yes.
15    Q. And Joe Weiner from the Attorney General's
16 Office represented you in that deposition?
17    A. Yes.
18    Q. So we've been over the rules, but I'll
19 review them just one more time so today can go
20 smoothly.
21       The first one is trying not to talk over each
22 other so that our court reporter is able to get both
23 of our answers. So while I'm asking a question,
24 please wait until I finish, and I'll try to do the
25 same and not interrupt you; okay?

Tesa Johnson (Vol. 1)
12/20/2023

10

1   A.  Understood.
2   Q.  Try to use yeses and noes, instead of hand
3   gestures or mm-hmms and uh-uhs.  That might be hard
4   to transcribe; okay?
5   A.  Okay.
6   Q.  Listen to my full question before you
7   answer.
8   A.  Okay.
9   Q.  And if you don't understand my question or
10  it's not clear, which I'm sure will happen at least
11  once today, just let me know.  I can clarify it or
12  repeat it.
13  A.  Okay.
14  Q.  But if you answer it, I'll assume it's
15  because you understood it; okay?
16  A.  Yes.
17  Q.  And also, you can always ask for a break.
18  We'll probably need breaks today.  Just try to
19  answer a pending question before we go on a break.
20  Sound good?
21  A.  Yes.
22  Q.  All right.  How did you prepare for today's
23  deposition?
24  A.  I did review my -- probably about half of
25  the deposition from previous.  I didn't get through

11

1   the whole thing, but that's it.
2   Q.  Okay.  You didn't review the Complaint in
3   this case?
4   A.  No.
5   Q.  Or anyone else's testimony?
6   A.  No.
7   Q.  Any filings in this case?
8   A.  No.
9   Q.  Did you look through any emails or text
10  messages about either your previous deposition or
11  events of May 30, 2020?
12  A.  No.
13  Q.  Did you look at any social media posts
14  about the incidents in May or your last deposition?
15  A.  No.
16  Q.  Did you review the photos in the Google
17  shared album to prepare for today?
18  A.  Not to prepare for today, no.
19  Q.  When was the last time you reviewed those?
20  A.  When I had sent them over.
21  Q.  And when you say, "When I had sent them
22  over," are you referring to sending them to Carolyn
23  Cole?
24  A.  Correct.
25  Q.  And that was earlier this month; right?

12

1   A.  Correct, yes.
2   Q.  And besides Mr. Harrison, and don't tell me
3   about conversations with him, did you talk to anyone
4   about your deposition today?
5   A.  No.
6   Q.  How old are you, Tesa?
7   A.  Forty-one.
8   Q.  Do you currently work for the Minnesota
9   State Patrol?
10  A.  No, I do not.
11  Q.  When did your employment end?
12  A.  April 14, 2022, I believe it was.
13  Q.  Is it possible that was 2021?
14  A.  It is.  I would -- I mean -- we're at 2023,
15  it -- maybe, yeah.  It's all a jumble, unless I'm
16  looking at, you know -- it's been a long couple of
17  years.
18  Q.  Yeah, and we'll look at something later.  I
19  just wanted to clarify.
20  A.  Mm-hmm.
21  Q.  And without getting into details, how did
22  your employment end?  Meaning, did you quit, retire,
23  were you terminated?
24  A.  I had a policy violation which resulted in
25  me being terminated, and I have since retired.

13

1   Q.  Okay, thank you.  When did you start
2   working for the State Patrol?
3   A.  I was hired by the State Patrol in January
4   of 2014 and went through training, and then was
5   placed on the road in May of 2014.
6   Q.  And where were you stationed when you were
7   placed on the road?
8   A.  3100.
9   Q.  Where is 3100?
10  A.  That is the Virginia station -- or the
11  Virginia -- not a station.  I was stationed in
12  Hibbing, but it's the same -- I'm drawing a blank of
13  what the 3100 is called with the separate --
14  Q.  District?
15  A.  Yes, thank you.
16  Q.  It was a good guess.  And your rank was
17  trooper when you were stationed at 3100?
18  A.  Correct.
19  Q.  And you remained a trooper for your entire
20  time with the State Patrol?
21  A.  Yes.
22  Q.  Did you ever move districts from 3100 to
23  another district?
24  A.  No.
25  Q.  So you spent your career with the State

4 (Pages 10 to 13)

Tesa Johnson (Vol. 1)
12/20/2023

**14**

1  Patrol at 3100?
2      **A.  Yes.**
3      Q.  Who were your supervisors at 3100?
4      **A.  I -- in the beginning -- Like from**
5  **beginning to end?**
6      Q.  Yeah, let's start with in 2014, who were
7  your supervisors?
8      **A.  2014, my supervisors would have been Murray**
9  **-- he was the captain.  I can't -- his name escapes**
10 **me, but he was only there for a couple months.  And**
11 **then it was Captain Ron Silcox, and then when Ron**
12 **retired, then Jason Engeldinger was promoted to**
13 **captain.**
14     Q.  And when was he promoted to captain?
15     **A.  It was March of -- I don't -- I don't**
16 **recall what year.**
17     Q.  Was it before 2019?
18     **A.  I believe, yes, I believe so.**
19     Q.  It was before the pandemic, is maybe a good
20 marker.  Was it before the pandemic?
21     **A.  Yes.**
22     Q.  We're going to be talking about the State
23 Patrol's operation during the George Floyd protests,
24 so I'd like to define a term that might be helpful
25 so that I'm not saying a whole mouthful.

**15**

1      You understand that George Floyd was killed by
2  a Minneapolis Police Department officer, Derek
3  Chauvin, in May of 2020?
4      **A.  I am.**
5      Q.  And that was on May 25, 2020.  Does that
6  sound right?
7      **A.  Sounds right.**
8      Q.  And video of that event went viral and
9  spread around the world?
10     **A.  Yes.**
11     Q.  And protests then started in Minneapolis;
12 right?
13     **A.  Yes.**
14     Q.  And the State Patrol responded to those
15 protests; correct?
16     **A.  Yes.**
17     Q.  And stayed for about two weeks, from May
18 until June of 2020; right?
19     **A.  Correct.**
20     Q.  I'll refer to that period or deployment as
21 the George Floyd operation or the George Floyd
22 operation period, so you know what I mean when I say
23 that.
24     **A.  Okay.**
25     Q.  On May 30, 2020, what was your rank and

**16**

1  position with the State Patrol?
2      **A.  Trooper.**
3      Q.  And I understand you were also on the
4  Mobile Response Team; is that correct?
5      **A.  Correct.**
6      Q.  Can you tell me about that team?
7      **A.  The team was volunteer based and we were**
8  **trained specially for responding to civil unrest and**
9  **-- civil unrest, crowd control, you know, what**
10 **civilians would refer to as, say, riots.**
11     Q.  Were you also trained on the First
12 Amendment?
13     **A.  Yes.**
14     Q.  When did you join the MRT?
15     **A.  I believe it was 2015.**
16     Q.  Was anyone else from 3100 on the MRT with
17 you?
18     **A.  I don't recall.**
19     Q.  Who were your supervisors on the MRT during
20 the George Floyd operation?
21     **A.  My direct -- well, for my squad, it was**
22 **Lieutenant Eck, and I believe for a time Joe Brod --**
23 **Bordwell.**
24     Q.  And when you say Lieutenant Eck, that's
25 Mike Eck?

**17**

1      **A.  Correct.**
2      Q.  Did you work with Lieutenant Eck outside of
3  the MRT?
4      **A.  Yes.**
5      Q.  Was he stationed at 3100?
6      **A.  He was.**
7      Q.  How often did you work with Lieutenant Eck?
8          MR. WEINER:  Objection, vague.
9          THE WITNESS:  Specifically work, are you
10 referring to patrolling or --
11 BY MS. WIESSNER:
12     Q.  I'll clarify.  How often at 3100, outside
13 of the MRT, were you working directly with
14 Lieutenant Mike Eck?
15     **A.  Not often.**
16     Q.  Did you work with him often in the MRT
17 outside of the George Floyd operation?
18     **A.  No.**
19     Q.  But you do recall having him supervise you
20 during the George Floyd operation?
21     **A.  Correct.**
22     Q.  What was your relationship with Lieutenant
23 Eck like?
24          MR. WEINER:  Objection, vague.
25          THE WITNESS:  Working relationship or --

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

18

1    BY MS. WIESSNER:
2        Q.   Let's start with working relationship.
3        A.   Okay.
4        Q.   What was your working relationship like?
5        A.   Fine.
6        Q.   Would you say you're friendly?
7        A.   Friendly seems appropriate.
8        Q.   Did you speak to him outside of work at
9    all?
10           MR. WEINER:  Objection, vague.
11           THE WITNESS:  Not often.
12   BY MS. WIESSNER:
13       Q.   Do you have his phone number in your phone?
14       A.   Probably.
15       Q.   Have you spoken to him since the George
16   Floyd operation?
17       A.   I said hello to him at a wedding.
18       Q.   When was that wedding?
19       A.   September 8th of this year.
20       Q.   Whose wedding was that?
21       A.   Abigail Burch.
22       Q.   Is that someone you served on the State
23   Patrol with?
24       A.   It is.
25       Q.   Is that someone who was at the George Floyd

19

1    operation with you?
2        A.   Yes.
3        Q.   Someone who's on the MRT then?
4        A.   Correct.
5        Q.   Is she also in your station or district at
6    3100?
7        A.   She does work out of that station.
8        Q.   So this might help you remember some of the
9    people who are at your home station and at the MRT.
10   So thinking about her wedding, for example, can you
11   think of any more people that were both at your home
12   station and on the MRT with you?
13       A.   During the George Floyd period of time?
14       Q.   Yeah, let's go with during the George Floyd
15   operation.
16       A.   I'm just going through in my head who was
17   with -- or who was in my station.  Travis Pearson
18   would have been on MRT, Al Ryan, Abigail
19   Burch-Dumont is her name now, and then Lieutenant
20   Eck, Captain Engeldinger.  And I believe there could
21   have been more, but that's what I can recall at this
22   moment.
23       Q.   Sure.  And the best of your recollection is
24   all I'm asking for.
25       A.   Okay.

20

1        Q.   You mentioned Captain Engeldinger as being
2    both at your home station and on the MRT; is that
3    right?
4        A.   Correct.
5        Q.   He was one of the co-commanders of the MRT
6    during the George Floyd operation; right?
7        A.   Correct.
8        Q.   How often did you work with him at your
9    home station or at 3100?
10       A.   Occasionally.
11       Q.   Was that both before and after the George
12   Floyd operation?
13       A.   Yes.
14       Q.   What kinds of things would you interact or
15   work with Captain Engeldinger on?
16       A.   Occasionally he would be out patrolling,
17   and other -- if we interacted for any other work
18   purposes, it could have been reviewing paperwork, it
19   could have been discussing other troopers, but
20   nothing -- nothing incredibly substantial that I can
21   recall.
22       Q.   Sure.  What was your relationship with
23   Captain Engeldinger like?
24           MR. WEINER:  Objection, vague.
25           THE WITNESS:  We were friends.

21

1    BY MS. WIESSNER:
2        Q.   You said, "We were friends"?
3        A.   Yes.
4        Q.   Are you no longer friends?
5        A.   No.
6        Q.   Can you explain why that is?
7        A.   I can.  I believe that -- I believe that I
8    -- How do I put this?  We're not -- We don't see eye
9    to eye.
10       Q.   When did you stop being friends?
11       A.   When I was placed on administrative leave.
12       Q.   And that was after the George Floyd
13   operation; correct?
14       A.   Correct.
15       Q.   So during the George Floyd operation, when
16   he was the co-commander, you were still friends?
17       A.   Correct.
18       Q.   When was the last time you spoke to Captain
19   Engeldinger?
20       A.   A brief hello at the wedding, at Abigail's
21   wedding.
22       Q.   And I can tell it's hard to talk about.  I
23   don't want to press you too hard.  But when you say
24   you don't see eye to eye, was there a specific event
25   or catalyst for the unraveling of that relationship?

6 (Pages 18 to 21)

Tesa Johnson (Vol. 1)
12/20/2023

---

**Page 22**

1    A.  Yes.
2    Q.  What was that?
3    A.  It was the in -- the policy violation that
4  resulted in my termination.
5    Q.  So was he involved in the decision to
6  terminate you?
7       MR. WEINER:  Objection.
8       THE WITNESS:  I don't know.
9       MR. WEINER:  Calls for speculation.
10      THE WITNESS:  I don't know.
11  BY MS. WIESSNER:
12    Q.  In your last deposition, you mentioned that
13  Jason Engeldinger had called or texted you to let
14  you know that the Attorney General's Office would be
15  calling you about this case.  Do you recall that
16  testimony?
17    A.  Yes.
18    Q.  Do you recall whether it was a voicemail or
19  a text that he sent?
20    A.  No, I don't recall.
21    Q.  Is it something you might have preserved or
22  could check and see if you've preserved?
23    A.  I can check.  I don't know if it's been
24  preserved.
25    Q.  I'll likely have you check and see if it

---

**Page 23**

1  has been preserved.  But we'll save that for later;
2  okay?
3    A.  Okay.  If it was a voicemail, it's not
4  preserved.  I'm unsure if a text message would be
5  preserved.
6    Q.  Do you recall what it said?
7    A.  No.
8    Q.  Did you speak to him in-person --
9    A.  No.
10    Q.  -- or did you call him back if it was a
11  voicemail or text him back if it was a text?
12    A.  No.
13    Q.  You also said, "I don't talk to Captain
14  Engeldinger," in that deposition.  Do you recall
15  that?
16    A.  No, but it sounds appropriate.
17    Q.  And it sounds like we've covered this.  So
18  there's some bad blood there.  Is that fair to say?
19    A.  Yes.
20    Q.  Did you work with now Major Joseph Dwyer at
21  your home station at 3100?
22    A.  No.
23    Q.  Do you recall working with him during the
24  George Floyd operation period?
25    A.  Not directly, but he was a commander.

---

**Page 24**

1    Q.  How did you work with him indirectly?
2    A.  How would I work with him?
3    Q.  Yeah, how would you describe -- You said
4  not directly, so does that mean you did work with
5  him indirectly?
6    A.  During MRT operations, we followed whatever
7  direction we had from commanders or a supervisor
8  underneath those commanders, so what we were told to
9  do is what we did.  So when I refer to, say, he and
10  I worked indirectly together, that would be
11  referring to what orders we were given, if they were
12  from him.
13    Q.  So through the chain of command.  Is that a
14  fair characterization?
15    A.  Correct.
16    Q.  Did you ever receive direct orders from
17  Joseph Engeldinger?
18    A.  From Joseph Dwyer?
19    Q.  Yes, from Joseph Dwyer.  Thank you.
20    A.  I don't recall.
21    Q.  Do you recall ever being at a briefing that
22  Major Dwyer was leading, then Captain Dwyer?
23    A.  Yes.
24    Q.  Do you recall multiple briefings that he
25  led during the George Floyd operation?

---

**Page 25**

1    A.  Yes.
2    Q.  Can you tell me, just starting generally,
3  tell me about what those briefings were like.  What
4  was the purpose of them?
5    A.  The briefings and the purpose would be
6  during the George Floyd period of -- period of time,
7  I'm sorry, the chosen term or -- what we're
8  referring to it escapes me.
9    Q.  That's totally fine.  I think we all know
10  what you're referring to.
11    A.  Okay.  Our briefings or debriefs would have
12  taken place as a group, and it would be any
13  information that would be pertinent to give to the
14  MRT team or debriefing of what we had accomplished
15  or not accomplished during whatever -- whatever
16  portion that we were going through.
17    Q.  When you say as a group, you mean as all of
18  the State Patrol?
19    A.  As the entire MRT team.  I don't -- It was
20  not the entire State Patrol.
21    Q.  So the group you're referring to is the
22  MRT?
23    A.  Correct.
24    Q.  Do you recall any of those briefings being
25  outside?

---

7 (Pages 22 to 25)

Tesa Johnson (Vol. 1)
12/20/2023

26

1    A. Yes.
2    Q. And those outside briefings, were they at
3 Arden Hills or Shoreview?
4    A. Correct.
5    Q. Do you know Trooper Ben Lockman?
6    A. No. Not that I recall, excuse me.
7    Q. You don't recall being on an MRT squad with
8 Trooper Lockman?
9    A. No, because I don't recall who that is.
10 Not saying that I wasn't. I just don't -- I don't
11 know who that is.
12    Q. Sure, totally fair, so I will not ask you
13 any more questions about him.
14    I'd like to ask you some questions about your
15 experience as a member of the MRT on May 30, 2020.
16    A. Okay.
17    Q. I'm not asking you questions about your
18 previous deposition answers or what you said in
19 February. I'm just asking to the best of your
20 recollection today: okay?
21    A. Okay.
22    Q. Do you recall being deployed to a protest
23 outside of the Minneapolis Police Department Fifth
24 Precinct on May 30, 2020?
25    A. I thought it was the Third, but maybe my --

27

1 that could have gotten jumbled in my brain, but yes,
2 we were deployed to one of the precincts.
3    Q. What do you recall about that event or
4 deployment?
5    A. It was we -- it was day -- it was the
6 second time that we had gone down that week and we
7 were -- the sense of urgency during any deployment
8 is pretty high, so it's get to the muster point. As
9 you arrive at the muster point, you check in.
10 Whoever is manning the table checks off your name,
11 tells you what to do next.
12    So in the beginning it was check in, get your
13 stuff on, let's go (snapping fingers). So that's
14 the initial of what would have happened, and then we
15 were placed wherever they put us.
16    Q. What were your orders on May 30th for this
17 deployment?
18    A. Specifically orders like -- Can you be more
19 specific?
20    Q. Sure. What were you going to the Fifth
21 Precinct to do on May 30th?
22    A. Guard it.
23    Q. Guard it from what?
24    A. The individuals that were part of that
25 civil unrest.

28

1    Q. Do you recall any orders to execute a mass
2 arrest that day?
3    A. I don't recall.
4    Q. Do you recall any orders or directions
5 about herding people into the Kmart parking lot?
6    A. I apologize. I'm sorry, I -- my brain was
7 on day one of the George Floyd incident, so when you
8 -- when I questioned the Fifth Precinct, that's
9 where I was thinking. Can we back up to that
10 question and --
11    Q. Yes, of course.
12    A. -- start again? I apologize. I really am
13 a little bit nervous, so I was at day one when we
14 were sent down. And you were discussing the 30th,
15 which was Saturday; correct?
16    Q. Ooh, that's a good question. I believe it
17 was Saturday.
18    A. Okay.
19    Q. And just to pause just for a minute, thank
20 you for clarifying. If you realize you've gotten
21 confused or said something that needs to be
22 corrected, you should feel free to do that.
23    A. Okay.
24    Q. I want the most accurate information, so if
25 something I say confuses you or, you know, you get

29

1 turned around, feel free to let me know and we can
2 back up and clarify: okay?
3    A. Thank you.
4    Q. So I'm talking about May 30th at the
5 Minneapolis Police Department Fifth Precinct.
6    A. Yes.
7    Q. And now, do you recall being deployed to
8 the Fifth Precinct on May 30, 2020?
9    A. I wasn't deployed specifically to the Fifth
10 Precinct, but I was part of that deployment, yes.
11    Q. Sure. And what was the purpose of that
12 deployment to the Fifth Precinct?
13    A. That purpose was to -- from what we were
14 instructed, was to end it.
15    Q. And what do you mean by, "to end it"?
16    A. Make the rioting stop.
17    Q. Were you told how to make the rioting stop?
18    A. We -- they had procedures in place of
19 arrests. We had a curfew, and if my memory serves
20 me correctly, I believe it was 8:30 p.m. That's not
21 necessarily what the time was, but that's a time
22 that's sticking into my head.
23    So at the time of the curfew, everybody was
24 supposed to be gone off of their porches, in their
25 homes, in -- wherever they were supposed to be.

8 (Pages 26 to 29)

Tesa Johnson (Vol. 1)
12/20/2023

30

1  They were not supposed to be outside.
2     Q.  So you were enforcing the curfew; right?
3     A.  Correct.
4     Q.  And you were told that you would make
5  arrests; is that right?
6     A.  Yes.
7     Q.  Do you recall being told to herd people --
8  (Pause in proceedings for clock chiming.)
9  BY MS. WIESSNER:
10    Q.  I'll repeat my question.  Do you recall
11 being told that people would be herded into the
12 Kmart parking lot for arrests?
13    A.  I don't recall specifically.
14    Q.  Sure.  And when you say, "we were told to
15 end it," who told you that?
16    A.  I don't recall.  It was something that was
17 told to us perhaps at a briefing.
18    Q.  So perhaps at one of these briefings at
19 Arden Hills or Shoreview?
20    A.  Correct.
21    Q.  Do you recall if you staged at Shoreview
22 that day, on May 30th?
23    A.  We did.
24    Q.  Do you --
25    A.  I believe.  I'm sorry.  I believe that is

31

1  where we were.  We did have -- we did have a few
2  muster points, and one -- we typically would utilize
3  a MnDOT building, so it could have been there, but I
4  believe it was Shoreview.
5     Q.  You said you were told to make the rioting
6  stop.  Did I get that right?
7     A.  It was a comment that wasn't the -- that
8  wasn't a general instruction towards everybody.  It
9  was very -- our directions were precise on what each
10 squad would be doing.
11    Q.  And what would your squad be doing?
12    A.  We would -- were part of the group that
13 would, for lack of a better term, whoever was in
14 violation of the curfew would have been gathered and
15 herded into an area where a mass arrest would
16 happen.
17    Q.  Sure, thank you.  So you were familiar with
18 the curfew on May 30, 2020?
19    A.  Yes.
20    Q.  Were you familiar with any exemptions to
21 the curfew?
22    A.  Yes.
23    Q.  And what exemptions were you familiar with?
24    A.  Press.
25    Q.  And what was the exemption for press?  Can

32

1  you explain that?
2     A.  I will explain it to the best of my
3  abilities of what I understand it to be.
4     Q.  Sure.
5     A.  Because at the beginning we -- weren't
6  aware that there was an exception, and when I say
7  we, I mean myself and potentially some troopers.  I
8  can only speak for myself, and I was not aware that
9  there was an exception for press.  And my
10 understanding was they were -- if they identified as
11 press, they were allowed to be behind the lines and
12 did not have to adhere to the curfew.
13    Q.  So they would not be arrested; is that
14 right?
15    A.  From what I recall.
16    Q.  You said you weren't initially aware.  When
17 did you become aware of the press exemption?
18    A.  I believe it was one of the first -- it
19 would have been, say, the second or third day.  It
20 was right in the beginning, because we had had some
21 -- and I don't know what troopers, but I know that
22 there was some incidents with some media that had
23 gotten arrested because we were unaware of the
24 exemption.
25    Q.  Was that before May 30th?

33

1     A.  Yes.
2     Q.  So on May 30th, you were aware of the press
3  exemption?
4     A.  Yes.
5     Q.  And your understanding is that other
6  troopers were aware of or familiar with the press
7  exemption?
8        MR. WEINER:  Objection, foundation.
9        THE WITNESS:  I can't speak for any other
10 troopers.
11 BY MS. WIESSNER:
12    Q.  You mentioned that some media had been
13 arrested; is that right?
14    A.  Yes.
15    Q.  And did you talk about those arrests with
16 other troopers?
17    A.  After the fact, yes.
18    Q.  But before May 30th, did you talk about
19 those arrests?
20    A.  Possibly in conversation, but nothing that
21 I could say with whom or where.
22    Q.  And because of those arrests, someone made
23 you aware not to arrest press or that they were
24 exempt from the curfew; is that fair?
25    A.  Yes.

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

34

1      Q. And made just you aware or other people on
2 the MRT as well?
3      MR. WEINER: Objection, foundation.
4      THE WITNESS: I would assume it would be
5 more than just myself.
6 BY MS. WIESSNER:
7      Q. So your understanding is that other
8 troopers also knew about the exemption for the press
9 by May 30th?
10      MR. WEINER: Objection, calls for
11 speculation, foundation.
12      THE WITNESS: I would assume that they
13 would know that press would be exempt, yes.
14 BY MS. WIESSNER:
15      Q. Why would you assume that?
16      **A. Because I held no standing other than an**
17 **MRT trooper, so typically the information that would**
18 **be given to myself would have been given to other**
19 **people, generally at the briefings or debriefings.**
20      Q. Sure. And so is it fair to say that there
21 was some negative reaction or blowback about those
22 media arrests before May 30th?
23      MR. WEINER: Objection, calls for
24 speculation.
25      THE WITNESS: Yes.

35

1 BY MS. WIESSNER:
2      Q. And that got around to the rest of the
3 troopers that there was a negative reaction or
4 blowback about media being arrested; right?
5      **A. I believe so.**
6      Q. And for that reason, you were instructed to
7 protect the media's rights or not to arrest media?
8      MR. WEINER: Objection, calls for
9 speculation.
10      THE WITNESS: Not to arrest.
11 BY MS. WIESSNER:
12      Q. I want to go back to the specific
13 deployment to the Fifth Precinct on May 30th. Do
14 you recall how you got to the Fifth Precinct?
15      **A. By Metro Transit bus.**
16      Q. Did you take those buses often during the
17 George Floyd operation?
18      **A. That was our transportation generally.**
19 **Occasionally we might have -- if we just had -- I**
20 **don't recall ever using a squad for transportation**
21 **of myself or any other MRT members, but I would say**
22 **it was all bus.**
23      Q. Sure.
24      MS. WIESSNER: And I'm going to introduce
25 an exhibit for this next set of questions that we'll

36

1 mark as Exhibit 2.
2      (Exhibit Number 2 marked.)
3 BY MS. WIESSNER:
4      Q. I'll represent to you that this was
5 Exhibit 34 of a previous set of depositions, but
6 we've marked it as Exhibit 2 for purposes of this
7 deposition. Do you recognize these photos?
8      **A. The first two?**
9      Q. Go ahead and page through the whole thing.
10      **A. (Reviewing document). I believe these are**
11 **the photos that I was shown at the first deposition.**
12      Q. You might have been shown these. I'm
13 asking more generally.
14      **A. Okay.**
15      Q. So I guess I'll just be more specific. Is
16 this the operation at the Fifth Precinct?
17      **A. I don't know.**
18      Q. When you arrived at the Fifth Precinct, did
19 the troopers line up across the street?
20      **A. For that particular time, I don't -- so we**
21 **would be broken up into squads in different areas,**
22 **so specifically across the street from the Fifth**
23 **Precinct, I can't -- I can't speak for that. So I**
24 **don't know if this was across from the precinct. I**
25 **was not at -- that wasn't where I --**

37

1      Q. And Tesa, not to interrupt, but I asked a
2 terrible question that is very confusing. I just
3 meant, when you arrived on May 30th, did the
4 troopers form a line?
5      **A. Yes.**
6      Q. Does this look like the line that was
7 formed?
8      **A. That is typical to the way that we would**
9 **stage.**
10      Q. And I'll represent to you, these are video
11 stills pulled from a news story, KSTP local news
12 story that was covering May 30th at the Fifth
13 Precinct.
14      **A. Okay.**
15      Q. Looking at this line of troopers, is it
16 possible you were lined up in this line on May 30th?
17      **A. It's possible.**
18      Q. Do you see a Metro Transit bus in the
19 background of the first two photos?
20      **A. Yes.**
21      Q. Does that look like the kind of bus that
22 you took to get to the Fifth Precinct?
23      **A. Yes.**
24      Q. Do you recall where you were in this line
25 of troopers?

10 (Pages 34 to 37)

Tesa Johnson (Vol. 1)
12/20/2023

**Page 38**

1     A.  No.
2     Q.  Did you typically line up with your squads,
3  by squad?
4     A.  Yes.
5     Q.  I'll also represent to you that Carolyn and
6  Molly were to the west, or if you're looking at the
7  photos, to the right, with a group of journalists
8  near the Metro Transit Center garage wall.  Carolyn
9  appears in these first two photos.  Do you see a
10  person with a pink gas mask and a helmet on?
11     A.  Yes.
12     Q.  Have you seen Carolyn Cole in-person ever?
13     A.  No.
14     Q.  I'll represent to you that that is Carolyn
15  Cole.  Are you familiar with the area that I'm
16  referring to when I say near the Metro Transit
17  Center garage wall?
18     A.  No.
19     Q.  So if you are in the line of troopers
20  facing the crowd, I'll represent to you it's to the
21  left, which is the west.  Does that make sense?
22     A.  In the photo is what we're --
23     Q.  So I would say actually in-person, if
24  you're standing in the line of troopers, Carolyn and
25  Molly were to the left or the west.  Does that make

**Page 39**

1  sense?
2     A.  Yes.
3     Q.  Do you recall, when you lined up on May 30,
4  2020, seeing that area to the left or the west?
5     A.  Not specifically, no.
6     Q.  Carolyn and Molly testified that they were
7  with other journalists.  Did you know that there was
8  a group of journalists present on May 30, 2020?
9     A.  No.
10     Q.  You said you were given orders not to
11  arrest media or journalists before this operation;
12  right?
13     A.  Yes.
14     Q.  Were you told how to identify media or
15  journalists?
16     A.  From what I recall, it was if they had
17  something that identified them as press.  It could
18  have been a lanyard and identification card or a
19  T-shirt, but from what I recall and my understanding
20  was if they appeared to be press, we're not checking
21  -- we're not checking ID.  If they look like press,
22  they're press.
23     Q.  Sure.  Would professional equipment help
24  you identify press?
25     MR. WEINER:  Objection, calls for

**Page 40**

1  speculation.
2     THE WITNESS:  I don't know.
3  BY MS. WIESSNER:
4     Q.  For example, if someone had a large network
5  television camera, would that help you identify them
6  as press?
7     A.  I think that's a fair assumption, that I
8  would think that that would be a member of the
9  press.
10     Q.  If someone had professional cameras and a
11  camera bag, would that help you identify them as
12  press?
13     A.  Yeah.  Yes.
14     Q.  And if someone said media, press or
15  journalist, would that help you identify them as
16  press?
17     A.  Yes.
18     Q.  Did you discuss that media or journalists
19  would be present on May 30th before or during your
20  deployment to the Fifth Precinct?
21     A.  I can't recall specifically, but the
22  assumption would be that there was press.
23     Q.  And why would that be the assumption?
24     A.  Because it was a world-changing event and
25  there was press everywhere and people wanted to be

**Page 41**

1  informed of what was going on.
2     Q.  And you had seen press at other events you
3  had been deployed to during the George Floyd
4  operation period?
5     A.  Yes.
6     Q.  And how did you know they were press in
7  those instances?
8     A.  It would be the common, you know,
9  indicators of the say identification cards or
10  identification around their neck, or if they had
11  some sort of -- something that would identify them
12  as press, CNN on a shirt maybe or something that
13  would indicate to a reasonable person that that
14  person would be press.
15     Q.  Sure.  And when you lined up on May 30th,
16  you don't recall one way or the other if you saw
17  people who were press?
18     A.  I don't recall one way or the other, no.
19  Our job was to follow the instruction that we were
20  given from whoever was leading that squad or that
21  platoon.
22     Q.  Do you know that members of the MRT used
23  force on media or journalists near the Metro Transit
24  Center garage on May 30, 2020?
25     A.  For your question, are -- do you mean after

11 (Pages 38 to 41)

Tesa Johnson (Vol. 1)
12/20/2023

|  | 42 |
|---|---|
| 1 | the fact or during that incident? |
| 2 | Q. As you sit here today, have you come to |
| 3 | understand or know that the MRT used force on media |
| 4 | or journalists near the Metro Transit Center garage |
| 5 | on May 30th? |
| 6 | A. I have been told that there -- that there |
| 7 | was force used on press by the MR -- members, |
| 8 | unknown members, of the MRT. |
| 9 | Q. Who told you that? |
| 10 | A. I think that I kind of gathered it from the |
| 11 | beginning of the -- from the -- prior to the first |
| 12 | deposition. |
| 13 | Q. So you know that because of this lawsuit or |
| 14 | a part of this lawsuit? |
| 15 | A. Right. I don't recall any specific other |
| 16 | -- specific conversations in regards to that. |
| 17 | Q. Sure. Did you know on May 30th or shortly |
| 18 | thereafter that members of the MRT used force on |
| 19 | journalists or the media on May 30th? |
| 20 | A. I don't recall. |
| 21 | Q. Did you discuss journalists being injured |
| 22 | or having force used on them at the Fifth Precinct, |
| 23 | either that day or in the following days? |
| 24 | A. I -- sorry, my chair is squeaking. I don't |
| 25 | recall about the day of or the following days. It |

|  | 43 |
|---|---|
| 1 | would be more from news stories, I would say. We |
| 2 | were pretty out of touch with -- we were -- excuse |
| 3 | me, let me -- we were very focused on what our task |
| 4 | was at hand. |
| 5 | Typically, as troopers, we work individually |
| 6 | and we're self initiated. But when we transfer over |
| 7 | to the MRT team, it's a completely different -- you |
| 8 | don't do anything unless you're instructed to do |
| 9 | something, period. You wait for commands and then |
| 10 | you move on those commands. |
| 11 | Q. So when you say news stories, you saw news |
| 12 | stories about press or media having force used on |
| 13 | them. Is that what you're saying? |
| 14 | A. I don't recall specific news stories, but |
| 15 | if it were, you know, say if -- I recall vaguely |
| 16 | there was a reporter who had -- there was a |
| 17 | projectile that had, I believe, hit a reporter in |
| 18 | the eye, and I believe that was from a news -- a |
| 19 | news story or something. It wasn't anything that I |
| 20 | witnessed or knew how that happened or if it was |
| 21 | even tied into our MRT team, but, you know, other |
| 22 | than that, I don't recall any specific conversations |
| 23 | in regards to force used on the press. |
| 24 | Q. What was your reaction to a news story |
| 25 | about a journalist being hit in the head or the eye? |

|  | 44 |
|---|---|
| 1 | A. I -- I don't -- I don't recall |
| 2 | specifically. I'm -- it's unfortunate. |
| 3 | Q. Do you recall overhearing anyone discussing |
| 4 | journalists or media having force used on them on |
| 5 | May 30th? |
| 6 | A. I don't recall any specific conversations. |
| 7 | Q. Did people laugh about the media being |
| 8 | injured or having force used on them on May 30th? |
| 9 | MR. WEINER: Objection, vague. You can |
| 10 | answer. |
| 11 | THE WITNESS: It's possible. |
| 12 | BY MS. WIESSNER: |
| 13 | Q. Do you recall telling Carolyn Cole that |
| 14 | people were laughing about journalists having force |
| 15 | used on them or getting injured on May 30th? |
| 16 | A. Yes, and I -- I don't hesitate on that |
| 17 | answer for any other reason than I can't specify |
| 18 | where, how or when that was heard. When Carol and I |
| 19 | were discussing it, of course we're having a |
| 20 | conversation and I was not giving a deposition, |
| 21 | where I feel comfortable saying yes or no very |
| 22 | confidently, if that makes sense. |
| 23 | Q. Yes, that makes total sense. |
| 24 | A. Okay. |
| 25 | Q. What I'll ask is, just to the best of your |

|  | 45 |
|---|---|
| 1 | recollection, what were you referring to when you |
| 2 | said people were laughing? Were you referring, for |
| 3 | example, to the MRT laughing? |
| 4 | A. Most likely, yeah. There was -- there was |
| 5 | -- those potential conversations with people who |
| 6 | maybe didn't have as much professionalism and lacking |
| 7 | empathy for other human beings as those of us who were not |
| 8 | discussing those things or behaving in a manner as |
| 9 | such. |
| 10 | Q. So generally, without naming names, you |
| 11 | recall people on the MRT laughing and lacking |
| 12 | empathy towards journalists who were injured or had |
| 13 | force used on them; is that -- |
| 14 | A. Yes. |
| 15 | MR. WEINER: Objection, vague. |
| 16 | THE WITNESS: Yes. |
| 17 | BY MS. WIESSNER: |
| 18 | Q. Do you recall that being specific to |
| 19 | May 30th where journalists were injured or had force |
| 20 | used on them? |
| 21 | A. I don't recall the specifics. Excuse me. |
| 22 | Q. Did you discuss other incidents where the |
| 23 | State Patrol used force on the media with other |
| 24 | members of the MRT? |
| 25 | A. Force -- I would say -- there was an |

12 (Pages 42 to 45)

Tesa Johnson (Vol. 1)
12/20/2023

46

1 incident I know that a CNN reporter had gotten
2 arrested, and I believe that was day one when we
3 were -- on Wednesday, prior to anybody being aware
4 of -- that the press was not -- they don't fall
5 under the umbrella of civilians in a civil unrest.
6    Q.   Sure.  And is that CNN reporter Omar
7 Jimenez?  Do you recall his name?
8    A.   I do not recall his name.  I do -- Oh, I'm
9 sorry.
10    Q.   No, you go ahead.
11    A.   I do believe that it was two -- it was --
12 it was Jason Engeldinger and Jason Hanson from --
13 Jason Hanson is, or was when I departed the patrol,
14 a lieutenant in Duluth.  I don't recall -- or I
15 don't know his current position.  But I believe
16 those were the two.  I mean you can see it online,
17 it's right on camera, they arrested him.
18    Q.   And you recall that those two were involved
19 in that arrest?
20    A.   Yes.
21    Q.   How did you find out about that arrest?
22    A.   Because troopers were discussing it.
23    Q.   What were troopers saying about it?
24    A.   That they arrested somebody right on camera
25 and it was -- it was during the -- the day, not

47

1 necessarily like the briefing or debriefing, but it
2 was during the time that we were informed that media
3 was not to be interfered with.
4    Q.   Sure.  Were troopers laughing about that
5 arrest?
6    A.   Yes.
7    Q.   What was the general reaction to Omar
8 Jimenez being arrested?
9    A.   It was more so -- more like how did that
10 happen, how did the -- how did they -- how did we
11 not know that that was not something that should
12 have happened.
13    Q.   Were troopers angry about it?
14       MR. WEINER:  Objection, vague.
15       THE WITNESS:  I am sure that there were
16 troopers that thought how did this happen, like now
17 we look dumb.  But I can't tell you specifically.
18 BY MS. WIESSNER:
19    Q.   Do you recall putting up a photo of that
20 arrest in the shared Google album?
21    A.   I don't remember if it was my photo or if
22 it was somebody else's photo, to be perfectly honest
23 with you.  It might have been something I put on
24 there or someone else.  I do not know.
25    Q.   Sure.

48

1       MS. WIESSNER:  I'm going to introduce a new
2 exhibit, then, so this will be Exhibit 3.
3       (Exhibit Number 3 marked.)
4 BY MS. WIESSNER:
5    Q.   I'll represent to you these are a
6 collection of photos from the shared Google photo
7 album that you sent to Carolyn Cole.
8    A.   Okay.
9    Q.   I'll have you turn to photos 12 and 13.
10 You'll see numbers at the bottom of the page.
11       MR. WEINER:  Counsel, what's the file
12 number or file name of this photo?
13       MS. WIESSNER:  I don't have the file number
14 or file name.
15       MR. WEINER:  Okay, we're going to need
16 that, so during the next break, if you could get
17 that for us, that would be great.
18       MS. WIESSNER:  Sure.
19       MR. WEINER:  For all of these photos.
20 BY MS. WIESSNER:
21    Q.   If you could turn to photo 13.  Do you see
22 the small version of the photo of Omar Jimenez being
23 arrested?
24    A.   Yes.
25    Q.   Do you see that it is labeled at the

49

1 bottom, "Tesa Johnson"?
2    A.   Yes.
3    Q.   And that means that you put up this photo;
4 right?
5    A.   It does.
6    Q.   If we turn to photo 12, the larger version
7 of this photo, is this the CNN arrest you were
8 referring to?
9    A.   Yes, it was.
10    Q.   And you can see that it has a news chyron
11 on the bottom; right?
12    A.   The -- Are you referring to what I would
13 think of as like a ticker?
14    Q.   Yes, the ticker.
15    A.   Okay, yes.
16    Q.   So this was on TV; correct?
17    A.   Yes.
18    Q.   And this photo was added to the shared
19 album; is that correct?
20    A.   It was, yes.
21    Q.   Do you know when you added this photo?
22    A.   I do not.
23    Q.   Why did you put this photo up in the group?
24    A.   I put all of the photos that I had up in
25 the group.

13 (Pages 46 to 49)

Tesa Johnson (Vol. 1)
12/20/2023

---

50

1    Q.  Does anything stand out to you about this
2  one or this incident?
3    A.  Well, yeah, they're arresting a reporter
4  that they shouldn't have been.
5    Q.  What makes you say that they shouldn't have
6  been?
7    A.  As we found out afterwards, we were told
8  that media was exempt from the -- media was exempt
9  from the curfew, media was exempt from -- they were
10  -- they had a right to be there.
11    Q.  Were you putting this photo up because you
12  thought the arrest was funny?
13    A.  I would say it more so how did a captain
14  and lieutenant arrest a member of the media without
15  knowing.
16    Q.  I'd like to return to your recollection of
17  the operation on May 30th.  Did you use force on
18  May 30th outside the Fifth Precinct?
19    A.  There was -- and I don't know if it was
20  outside of the Fifth Precinct because we were -- my
21  squad was part of the squads that were, again,
22  herding people from the areas into -- whoever was
23  still there, we had different squads in different
24  areas, and we marched in our lines and pushed
25  everybody to where they needed to be.

---

51

1    Q.  Do you recall using force to push people to
2  where they need to be?
3    A.  I would say that -- absolutely, because
4  just even our presence is the base of -- you know,
5  more of a just a base level of force, just the
6  uniform.  But as we would march, you know, if
7  somebody was in front of us, we didn't stop.  That
8  was our training.
9    Q.  So the force you recall using was physical
10  presence; is that right?
11    A.  Mm-hmm (nodding head).
12    Q.  Did you use your baton to push people?
13    A.  It's a distinct possibility.
14    Q.  Did you use your Mark 9 or pepper spray?
15    A.  No.
16    Q.  Do you know anyone who did use their Mark 9
17  or pepper spray?
18    A.  I don't -- I can't say whether specifically
19  anybody did.
20    Q.  You don't recall seeing anyone using their
21  Mark 9 or pepper spray?
22    A.  I -- only one Minneapolis officer I recall
23  see -- and that was a different day, and it wasn't
24  anything related to the -- or related to this day.
25    Q.  So on May 30th, you didn't see anyone use

---

52

1  their Mark 9 or pepper spray?
2    A.  Correct.
3    Q.  Do you know that Lieutenant Mike Eck pepper
4  sprayed journalists outside of the Fifth Precinct on
5  May 30, 2020?
6      MR. WEINER:  Objection, assumes facts not
7  in evidence.
8      THE WITNESS:  I don't -- I cannot testify
9  whether or not he did.
10  BY MS. WIESSNER:
11    Q.  Are you aware that as part of this lawsuit,
12  it is alleged Mike Eck used pepper spray on our
13  clients outside of the Fifth Precinct on May 30,
14  2020?
15    A.  I am aware of that, yes.
16    Q.  You did not see that happen?
17    A.  Correct.
18    Q.  Did you speak to Lieutenant Eck about using
19  pepper spray on journalists?
20    A.  Not that I recall, no.
21    Q.  Did you speak to anyone else about
22  Lieutenant Eck using pepper spray on journalists?
23    A.  Not that I recall.
24    Q.  Do you know that it is alleged in this
25  lawsuit that Ben Lockman pepper sprayed journalists

---

53

1  outside of the Fifth Precinct on May 30, 2020?
2    A.  I am not.
3    Q.  And you wouldn't recognize him if he were
4  in this room; right?
5    A.  It's possible I might recognize his face,
6  but with it being over 600 troopers, sometimes it's
7  difficult to separate everybody.
8    Q.  But fair to say, you don't recall seeing
9  Trooper Lockman use pepper spray on journalists?
10    A.  No.
11    Q.  Did you speak to anyone about Trooper
12  Lockman using pepper spray on journalists?
13    A.  No.
14    Q.  Do you recall speaking to either Lieutenant
15  Eck or Trooper Lockman at all about the operation on
16  May 30th?
17    A.  Nothing -- I don't recall anything
18  specific.
19    Q.  And I know you said you didn't observe
20  anyone using Mark 9 on May 30th.  Are you aware of
21  anyone else outside of the Fifth Precinct using
22  their Mark 9 pepper spray on media or journalists?
23    A.  I am not aware.
24    Q.  Are you aware of anyone who had -- who was
25  pepper sprayed outside of the Fifth Precinct on

---

14 (Pages 50 to 53)

Tesa Johnson (Vol. 1)
12/20/2023

54

1  May 30th who's not a journalist?
2      MR. WEINER: Objection, vague as to
3  outside. Do you mean outside of the date or do you
4  mean physically outside of the Fifth Precinct?
5      MS. WIESSNER: Sure, I'll rephrase the
6  question.
7  BY MS. WIESSNER:
8      Q. Are you aware of anyone who is not a member
9  of the media or not a journalist who was pepper
10 sprayed on May 30, 2020, outside of the Fifth
11 Precinct?
12     **A. I do not recall.**
13     Q. So to the best of your knowledge, only
14 media or journalists were pepper sprayed that day?
15     **A. That --**
16     MR. WEINER: Objection, assumes facts not
17 in evidence and requires speculation, but go ahead.
18     THE WITNESS: I don't recall any other
19 conversation about anybody getting pepper sprayed
20 outside the Fifth Precinct that evening.
21 BY MS. WIESSNER:
22     Q. But you have come to understand that force
23 was used on journalists and that journalists were
24 pepper sprayed outside the Fifth Precinct on May 30,
25 2020; right?

55

1      **A. Correct.**
2      Q. And in preparation for your last
3  deposition, you watched videos of that incident;
4  right?
5      **A. Correct.**
6      Q. So you've seen videos of journalists or
7  media being pepper sprayed outside of the Fifth
8  Precinct; right?
9      **A. If that's what the video showed, then yes,**
10 **I am -- it was nearly a year ago and -- but I know I**
11 **did review videos before -- prior to the first**
12 **deposition.**
13     Q. Do you think, based on those videos, that
14 the force used on the journalists that day,
15 including pepper spraying them, was appropriate?
16     MR. WEINER: Objection, calls for a legal
17 conclusion.
18     THE WITNESS: If they were pepper sprayed,
19 as we were instructed that they were -- they were to
20 be allowed to move about, be behind the lines or
21 they were -- they had the right to be there, so --
22 I'm sorry, I got a little off track there for a
23 moment, but can you -- can you tell me the question
24 again?
25 BY MS. WIESSNER:

56

1      Q. Sure. Based on the videos and evidence
2  you've seen, do you think that the force used on
3  journalists, including pepper spraying them, was
4  appropriate?
5      MR. WEINER: Same objection.
6      THE WITNESS: No.
7  BY MS. WIESSNER:
8      Q. Why not?
9      **A. If we had instructions to allow press to be**
10 **where they felt they needed to be or behind the**
11 **lines, it was our job to allow that, not use force.**
12     Q. So your understanding of your orders or
13 instructions would include not pepper spraying
14 journalists?
15     **A. Correct.**
16     Q. And if a trooper pepper sprayed journalists
17 on May 30th, they were violating the orders they
18 were given?
19     **A. Yes.**
20     Q. Do you recall a whole group briefing before
21 deploying to the Fifth Precinct that day?
22     **A. I don't recall specifically.**
23     Q. But possibly that was at Shoreview or Arden
24 Hills?
25     **A. Yes.**

57

1      Q. You don't recall any specifics about that
2  briefing?
3      **A. Correct.**
4      Q. You do recall being told to end it; is that
5  correct?
6      **A. Fucking end it.**
7      Q. Do you recall when you were told to fucking
8  end it?
9      **A. It was prior -- I don't know if it was the**
10 **day of, but it was prior to that Sat -- the 30th.**
11     Q. So it was your understanding on May 30th
12 that one of your orders or part of your orders was
13 to fucking end it?
14     **A. Yes.**
15     Q. Do you recall who said to fucking end it?
16     **A. I do not.**
17     Q. Do you recall hearing the term shock and
18 awe?
19     **A. Yes.**
20     Q. What can you tell me about that term?
21     **A. That it had been used in reference to the**
22 **30th, but who or when, I don't recall.**
23     Q. What did you understand shock and awe to
24 mean?
25     **A. I would -- I would say it was probably in**

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

58

1  reference to ending the civil unrest. Shock and awe
2  perhaps in regards to the means that we would have
3  to go -- the means of what we were trained to do to
4  end the civil unrest. I don't specifically know,
5  but, you know, it could have been in reference to
6  less lethal munitions, our ability to or what we've
7  been trained to do in those sort of situations.
8      Q.  When you say means, are you referring to
9  using force?
10     A.  Well, again, the way that -- that we were
11 trained with the use of force continuum would be
12 just presence is going to be force. So it would --
13 I would say that, yeah, it would be in reference to
14 use of force because, again, just our presence is
15 the baseline of force.
16     Q.  Would you consider your presence to be a
17 shock and awe level of force?
18     A.  No.
19     Q.  So what is a shock and awe level of force?
20     A.  Maybe -- it could be something that
21 civilians wouldn't expect, maybe.
22     Q.  What wouldn't civilians expect?
23         MR. WEINER:  Objection, calls for
24 speculation.
25         THE WITNESS:  I think after the nights

59

1  previous, they -- the nights previous, there -- the
2  munitions and less lethal was used and -- but I
3  think more so with rounding those who were not
4  abiding by the curfew, rounding those individuals up
5  and having them arrested as they were expecting is
6  -- I can't -- I can't specifically say what was
7  meant by the shock and awe because I don't -- I
8  didn't say it, I don't recall exactly who said it,
9  so I don't know what their intention would have
10 been.
11     But that would be my assumption, would be shock
12 and awe is going to be we're going to -- this is
13 what we're going to do, we're going to round people
14 up, we got buses, they're going on the buses,
15 they're getting arrested. This is going to -- we're
16 going to, you know, calm things down so people are
17 safe.
18 BY MS. WIESSNER:
19     Q.  Sure, and I'm not trying to trick you. I'm
20 just trying to clarify, you know, does shock and awe
21 mean a lot of force?
22         MR. WEINER:  Objection, calls for
23 speculation.
24         THE WITNESS:  That, I don't know.
25 BY MS. WIESSNER:

60

1      Q.  I believe we've covered this somewhat, but
2  do you recall any specific discussions about the
3  media during the May 30th briefing?
4      A.  I don't recall specifically.
5      Q.  But you do recall at some briefing, you're
6  not sure which one, before May 30th, being given
7  instructions about the media?
8      A.  Yes.
9          MR. WEINER:  Objection, misstates
10 testimony.
11 BY MS. WIESSNER:
12     Q.  And those instructions included not using
13 force on or arresting journalists under the curfew;
14 right?
15     A.  Correct.
16     Q.  We've established you didn't see this on
17 May 30th, but on other days besides May 30th, did
18 you see members of the State Patrol or MIT (sic)
19 using force on members of the media, besides the
20 Omar Jimenez arrest?
21     A.  I don't recall.
22     Q.  Do you have a sense of any negative
23 feelings towards the media amongst troopers during
24 the George Floyd operation?
25         MR. WEINER:  Objection, calls for

61

1  speculation.
2          THE WITNESS:  I don't recall.
3  BY MS. WIESSNER:
4      Q.  Did you have negative feelings about the
5  media or journalists during the George Floyd
6  operation?
7      A.  Nothing that pops up in my -- in my mind.
8  I know that there, you know, was a sense of, okay,
9  we have extra people now that we have to be aware of
10 and that we have to make sure that are either --
11 that they don't get mixed up in the mess of what
12 else we were dealing with, but nothing -- nothing
13 negative in my head. We were just trying to not
14 watch the city burn down.
15     Q.  Did you or other troopers feel like the
16 media or journalists were getting in the way of you
17 stopping the city from burning down?
18         MR. WEINER:  Objection, calls for
19 speculation.
20         THE WITNESS:  I don't recall anything
21 specific like that that was discussed.
22 BY MS. WIESSNER:
23     Q.  Do you recall discussing or overhearing
24 anyone discuss the media coverage of the protests
25 being negative or biased?

16 (Pages 58 to 61)

Tesa Johnson (Vol. 1)
12/20/2023

---

**62**

1   A.  Oh, I'm sure there was conversations.  I
2   think that's a standard conversation that law
3   enforcement has back and forth on both sides.
4   Q.  Can you tell me what you mean by that?
5   A.  Because things can be reported differently
6   on either side, so, of course, you know, there was
7   -- there could have been news that was portrayed as,
8   you know, the law enforcement was power hungry,
9   aggressive, or you could switch on the same channel
10   to the same story and it was about the civilians who
11   were, you know, rioting.  So it's -- I think that's
12   more of an umbrella thing towards media.
13   Q.  So you recall discussions amongst troopers
14   about the media being biased in both directions; is
15   that fair?
16   A.  I would say that's fair.  I can't testify
17   to any specific conversations.
18   Q.  Do you recall any comments from troopers or
19   members of the State Patrol about the media?
20   A.  Nothing specific.
21   Q.  Do you recall if there were any other
22   photos of journalists being arrested or having force
23   used on them in your Google shared photo album
24   besides the photo of Omar Jimenez?
25   A.  I don't know.

---

**63**

1   Q.  We touched on this briefly, but do you
2   think the arrest of Omar Jimenez was appropriate?
3   A.  In hindsight, no.
4   Q.  Why not?
5   A.  Because in hindsight then, you know, we --
6   it was brought to the attention that media was
7   exempt.
8   Q.  So outside of the curfew, in a world in
9   which there was no curfew, would arresting Omar
10   Jimenez be appropriate?
11   MR. WEINER:  Objection, calls for
12   speculation.
13   THE WITNESS:  No, because he was press.
14   BY MS. WIESSNER:
15   Q.  And why is it inappropriate to arrest
16   press?
17   A.  Press is exempt.  They have the right to be
18   there to report.
19   Q.  Is it appropriate to use force on
20   journalists?
21   A.  If they're in the -- if they're in the
22   normal mode of their -- of what their job
23   description is, if they're just reporting, then no
24   because that's exempt.
25   If they are participating in some sort of civil

---

**64**

1   unrest or breaking the law, then that's a different
2   story.  But if we're talking just them in there
3   doing their job, then they're exempt.
4   Q.  Sure, and that's a good clarification.  You
5   know, I would agree.  If a reporter throws a bottle
6   at an officer, you can use force on that person and
7   arrest them; right?
8   A.  Yes.
9   Q.  But law-abiding media, it's not appropriate
10   to use force on them; right?
11   A.  Correct.
12   MS. WIESSNER:  What do we think about
13   taking a break now, Andy?
14   MR. NOEL:  Sure, yeah, I'm good for one.
15   MS. WIESSNER:  I think we're going to take
16   a quick break.
17   THE WITNESS:  Okay.
18   VIDEOGRAPHER:  Going off the video record
19   at 11:44 a.m.
20   (A break was taken.)
21   VIDEOGRAPHER:  This is File 2, we're on the
22   record at 11:52 a.m.
23   BY MS. WIESSNER:
24   Q.  So Tesa, after the Omar Jimenez arrest,
25   your understanding or orders were that the media

---

**65**

1   should be protected; is that right?
2   A.  Yes.
3   Q.  That would include protected from using
4   force?
5   A.  Yes.
6   Q.  And you gained that information in
7   briefings and debriefings?
8   A.  Yes.
9   Q.  And then the media is subjected to force
10   again on May 30th; correct?
11   A.  From what I have been --
12   MR. WEINER:  Objection, completely
13   misstates the facts, but you can answer.
14   THE WITNESS:  From what I've been told.
15   BY MS. WIESSNER:
16   Q.  And you recall people laughing about that;
17   is that right?
18   MR. WEINER:  I'm sorry.  Objection, vague.
19   BY MS. WIESSNER:
20   Q.  You recall people laughing about the media
21   being injured and subjected to force; right?
22   A.  Yes.
23   Q.  Does that indicate to you that some people
24   weren't interested in protecting the media?
25   A.  Yes.

---

17 (Pages 62 to 65)

Tesa Johnson (Vol. 1)
12/20/2023

66

1  Q. Does that indicate some people were
2  interested in purposely using force on the media?
3    **A. I don't know.**
4  Q. Was anyone disciplined for using force on
5  the media that you're aware of?
6    **A. Not that I'm aware of.**
7  Q. You mentioned that media could be pulled
8  behind the line; is that right?
9    **A. I don't know if I said specifically pulled**
10   **behind the line, but they were allowed to be behind**
11   **our line.**
12   Q. So they were allowed to be behind the line
13  either because they were pulled behind the line or
14  because they weren't in the way of the line; is that
15  fair?
16     MR. WEINER: Objection, compound.
17     THE WITNESS: The -- I guess a good way to
18  describe it would be generally we were set up in a
19  line and anybody behind us would have been our
20  supervisors, our platoon leaders, our squad leaders.
21     However, then when we were informed that the
22  media was not applicable to them, then they were
23  allowed to be behind us, which generally you don't
24  have. You wouldn't have anybody behind you that
25  wasn't part of MRT.

67

1  So if for some reason they were in front of the
2  line and they -- I don't know if it would have been
3  appropriate to pull them through the line or
4  instruct them to go around, because generally when
5  we pull somebody through the line, that's an arrest
6  maneuver.
7  BY MS. WIESSNER:
8  Q. Sure, that makes a lot of sense. Thanks
9  for clarifying. So the line can go around media;
10  right?
11    **A. I would assume -- I mean generally**
12   **speaking, but anybody that would have gone in**
13   **between -- So the protocol when we were set up in a**
14   **line would be anybody that would go in between**
15   **troopers or those that were on the line, that's an**
16   **arrest maneuver.**
17    **So they would have been -- the assumption would**
18   **have been that they were being arrested, if they**
19   **went in between troopers. And the only time anybody**
20   **went in between troopers is if we pulled them behind**
21   **us. So my answer, based on what our training was,**
22   **is that they would have been instructed to go**
23   **around.**
24   Q. Yeah.
25    **A. Rather than anybody -- because we had**

68

1  **multiple layers of people, so that second layer, if**
2  **somebody was being pulled through, they're going to**
3  **automatically just arrest those people because**
4  **that's what we were trained to do. So around or**
5  **just being behind, they would have -- that would**
6  **have been okay.**
7  Q. So if media is off to the side and out of
8  the way, the line can just pass them; right?
9    **A. Correct.**
10   Q. And if they're off to the side and out of
11  the way, they shouldn't be arrested or have force
12  used on them; right?
13    **A. That would be what my understanding would**
14   **be.**
15   Q. Do you recall telling Carolyn Cole that the
16  MRT knew that there were journalists present on
17  May 30th?
18    **A. Yes, because we did -- we did know that**
19   **there were -- journalists were there, we knew that.**
20   Q. And how did you know that?
21    **A. Because they had been there the entire**
22   **time, and like I had mentioned previously, we knew**
23   **that that was, you know, this was a big deal of what**
24   **we were dealing with, and of course the -- I mean**
25   **it's -- a reasonable person would know that the**

69

1  media was there.
2  Q. You also told Carolyn that the MRT knew the
3  media was by the Metro Transit Center garage. Do
4  you recall telling her that?
5    **A. No, but again, you know, knowing that there**
6  **is -- like I said previously, there's a difference**
7  **between what a person would say in a deposition**
8  **because it's, yes, you know, definite, or a**
9  **conversation. I can talk about a conversation that**
10  **I had with Carol. The knowledge was that, yes, the**
11  **general overall knowledge, so --**
12  Q. And I don't mean it as a gotcha question.
13    **A. I understand.**
14  Q. I do just want to clarify and have on the
15  record what you meant when you said the MRT knew
16  where the media was on May 30th.
17    **A. If you have eyeballs, you know where the**
18  **media is.**
19  Q. So it was obvious to the troopers where the
20  media was that day?
21     MR. WEINER: Objection, calls for
22  speculation.
23     THE WITNESS: If they were following the
24  instruction that they were given, then you would
25  know.

18 (Pages 66 to 69)

Tesa Johnson (Vol. 1)
12/20/2023

70

1   BY MS. WIESSNER:
2      Q.  You understand that we are here today
3   because we received permission from the Court to
4   depose you again; right?
5      A.  Yes.
6      Q.  And we asked the Court's permission because
7   discovery, which is the time when we can take
8   depositions, was over or had closed.  Does that make
9   sense?
10     A.  Yes.
11     Q.  So by the time you reached out to Carolyn,
12  we could no longer ask you questions.  You
13  understand that?
14     A.  So I -- I guess --
15     Q.  I can be much more specific.  Are you aware
16  that we filed a motion with the Court asking
17  permission to take your deposition today?
18     A.  Yes.
19     Q.  Are you aware that Mr. Weiner opposed that
20  motion on behalf of his clients, the State Patrol
21  defendants?
22     A.  No.
23     Q.  So you did not read any of the filings
24  related to that motion?
25     A.  I read the -- the letter that I was sent

71

1   via email, it was attached to the email, that I
2   wasn't being represented by this side because the
3   assumption was my intentions were possibly at -- not
4   lining with their clients'.
5      MS. WIESSNER:  I'll just wait for this.
6   (Pause in proceedings for clock chiming.)
7   BY MS. WIESSNER:
8      Q.  That was an email from Mr. Weiner?
9      A.  Correct.
10     Q.  When did you receive that email?
11     A.  Early this month.
12     Q.  Up until that point, was it your
13  understanding that Mr. Weiner still represented you?
14     A.  I don't know.
15     Q.  But as you sit here today, you're not aware
16  that Mr. Weiner opposed the motion on behalf of his
17  clients to redepose you today?
18     A.  I was not aware, no.
19     Q.  And you did not read the filings related to
20  that motion?
21     A.  If they were not sent to me, no, I did not
22  read that.
23     Q.  I want to --
24     A.  I'm sorry.
25     Q.  No, you go ahead.

72

1      A.  Just the email that was sent to me and then
2   the correspondence between myself and Marc, but that
3   -- that's it.
4      Q.  I want to take a look at that opposition.
5      MS. WIESSNER:  It's a court filing, so I
6   don't think we need to mark it as an exhibit since
7   it's Docket 168 in this case, if everyone's okay
8   with that.
9      MR. WEINER:  Actually, no, I think we do
10  need to mark it.  Apparently you've marked it up and
11  you've done things to it that are not in there, so
12  if that's the case, I would like it to be marked.
13     MS. WIESSNER:  Sure.  Let's mark it as an
14  exhibit.  This will be 4.
15  (Exhibit Number 4 marked.)
16  BY MS. WIESSNER:
17     Q.  Tesa, would you mind looking at the last
18  page of this, page 11?
19     A.  Sure.  Page 11.
20     Q.  Do you see that this document is signed
21  Joseph Weiner?
22     A.  Yes.
23     Q.  And he's with the assistant -- or he's an
24  Assistant Attorney General?
25     A.  That's what it lists.

73

1      Q.  So this is what I'm referring to as the
2   opposition to deposing you today; okay?
3      A.  Okay.
4      Q.  I want to take a look at some of the things
5   that Mr. Weiner included in this motion.  Do you see
6   on page 1 where I've highlighted --
7      MR. WEINER:  I'm going to stop for just a
8   second and interpose on objection that there is zero
9   relevance for this document or it has nothing to do
10  with this lawsuit or what's being used here.  But to
11  that extent, please go ahead and ask all of your
12  questions.
13     MS. WIESSNER:  Sure.
14  BY MS. WIESSNER:
15     Q.  Do you see that Mr. Weiner referred to you
16  as a disgruntled former State Patrol employee?
17     A.  Yes.
18     Q.  Are you surprised to hear that?
19     A.  No.
20     Q.  Why not?
21     A.  Well, being -- I mean it gives a good
22  argument of why he believes that this shouldn't be
23  -- I shouldn't be redeposed.  I can see why an
24  attorney would say that.
25     Q.  How do you feel about an attorney saying

Tesa Johnson (Vol. 1)
12/20/2023

74

1  that?
2      A.  You know, I've been through a lot in the
3  past couple years, I'm pretty numb to most anything.
4      Q.  Do you agree with the characterization that
5  you're here because you're a disgruntled former
6  State Patrol employee?
7      A.  I would --
8          MR. WEINER:  Objection, mischaracterizes
9  the document and misstates the document that's
10 there.  Go ahead, answer the question.
11         THE WITNESS:  I -- Can you ask the question
12 again?  I got distracted.
13 BY MS. WIESSNER:
14     Q.  Do you agree with the characterization that
15 you're a disgruntled former State Patrol employee?
16     A.  I -- I mean there's -- between myself and
17 the State Patrol, yeah, there is a -- there's I'd
18 say, some hard feelings, absolutely.  I don't
19 disagree with that.
20     Q.  Sure.  If you would turn to page 8.
21     A.  (Complies).
22     Q.  Do you see where I've highlighted, "Johnson
23 is a discredited former State Patrol employee"?
24     A.  I see that.
25     Q.  Do you agree with that characterization?

75

1      A.  I personally don't agree that I -- they may
2  have claimed -- the state may have claimed that I'm
3  discredited, but I would say that based on my
4  opinion and many others', I'm not discredited.
5      Q.  Let's take a look at page 9.  Do you see at
6  the top where I've highlighted, "She has been
7  diagnosed with PTSD and has indicated that her
8  experience covering the riots was so traumatizing
9  that she avoids the Twin Cities area.  In this
10 context, her deposition was stressful."  Did I read
11 that correctly?
12     A.  Yes.
13     Q.  Was your deposition in February stressful
14 because you were traumatized by the riots?
15     A.  There's more reasons why it -- my
16 deposition would be stressful.
17     Q.  So do you agree with that characterization?
18     A.  That my deposition was stressful based only
19 on the riots?
20     Q.  Yes.
21     A.  Based only on the riots, no, I don't agree.
22 There are many other reasons why a situation like
23 this or the previous deposition is stressful for me.
24     Q.  Is today stressful because we are talking
25 about the protests or riots in Minneapolis?

76

1      A.  Partially, yes.
2      Q.  Why else is today stressful?
3      A.  It's -- without -- without speaking of my
4  case that's almost finished, it's just about wrapped
5  up, it is difficult for me to discuss work-related
6  things because of what -- because of the things that
7  I've experienced and gone through.  It's not a
8  trigger, but it does bring back a lot of feelings
9  that have a tendency to cause me a lot of
10 discomfort.
11     Q.  And are you referring there to your pending
12 PTSD or disability claim when you say something is
13 almost wrapped up?
14     A.  Correct, yes.
15     Q.  I do want to talk briefly about your
16 termination from the State Patrol.
17     A.  Sure.
18     Q.  Are you represented by an attorney for
19 anything related to your termination?
20     A.  No.
21     Q.  So that is all wrapped up?
22     A.  The termination is wrapped up, there's no
23 -- there's no other cases or pending cases that are
24 going to come about.
25     Q.  Sure.  You didn't appeal your termination;

77

1  right?
2      A.  No.  The reason I did not appeal my
3  termination was because I couldn't do the job
4  anymore.
5      Q.  And the incidents that led up to your
6  termination took place in June to August of 2021;
7  right?
8      A.  May to June of 2021.
9      Q.  May to June of 2021.
10     A.  Yes.
11     Q.  So that was about a year after the George
12 Floyd operation and protests; right?
13     A.  Correct.
14         MS. WIESSNER:  We'll make this Exhibit 5
15 now.  We're going to take a look at your termination
16 papers.
17         (Exhibit Number 5 marked.)
18 BY MS. WIESSNER:
19     Q.  Do you recognize this document?
20     A.  Yes.
21     Q.  It's addressed to you; right?
22     A.  Yes.
23     Q.  Do you see it's signed by Colonel Langer?
24     A.  Yes.
25     Q.  Do you see the date is April 14, 2022?

20 (Pages 74 to 77)

Tesa Johnson (Vol. 1)
12/20/2023

---

**78**

1     A. Yes.
2     Q. So you were correct about the date; right?
3 2022?
4     A. Yes.
5     Q. You were right at the beginning of the
6 deposition.
7     Now, these are the -- this is the notice and
8 papers related to your termination; correct?
9     A. I believe so.
10     Q. Go ahead and take a look and confirm.
11     A. (Reviewing document). It appears so.
12     Q. Were you interviewed by internal affairs as
13 part of the investigation related to your
14 termination?
15     A. Yes.
16     Q. Do you recall who interviewed you?
17     A. The initial interview was Pete Goman.
18     Q. You say initial interview. Were there
19 multiple interviews?
20     A. I don't believe so. I believe that was the
21 only interview, and then it was the finalization was
22 the 14th.
23     Q. Do you know who else was interviewed as
24 part of the investigation?
25     A. I believe Chad Kucza. Koski, I'm trying to

---

**79**

1 -- I'm drawing a blank on the first name. Dave?
2 Dave Koski? And that's all -- well, I don't know if
3 -- that's all I can -- I can say that for sure was
4 interviewed. I don't know specifically who else was
5 interviewed.
6     Q. Sure. To the best of your knowledge, who
7 from the State Patrol was involved in the decision
8 to terminate you?
9     MR. WEINER: Objection, calls for
10 speculation.
11     THE WITNESS: I don't know.
12 BY MS. WIESSNER:
13     Q. Well, this is signed by Colonel Matthew
14 Langer; right?
15     A. Yes, it is.
16     Q. Does that indicate he was involved in the
17 decision to terminate you?
18     A. Yes.
19     MR. WEINER: Objection, calls for
20 speculation, document speaks for itself.
21     THE WITNESS: Yes.
22 BY MS. WIESSNER:
23     Q. Did you speak to him at all about your
24 termination?
25     A. Not that I recall.

---

**80**

1     Q. If you'd look at the last page of this
2 document, which is 5 of 5.
3     A. (Complies).
4     Q. Do you see that it's signed by Lieutenant
5 Colonel Rochelle Schrofer?
6     A. Yes.
7     Q. Did you speak to her about your
8 termination?
9     A. I don't believe -- I don't believe there
10 was a one-on-one conversation.
11     Q. Was there a group conversation?
12     A. There was a -- I believe it's called a
13 Lattimer, Loudemeer (sic) meeting, where it was
14 optional for me to be there, and I went and it was
15 -- they reviewed everything and I had an opportunity
16 to say something and that was -- that was that.
17     Q. And Lieutenant Schrofer was at that hearing
18 or meeting?
19     A. Honestly, I don't 100 percent recall. I
20 know that a union rep was there, Captain
21 Engeldinger, Major Erickson, and if it was the
22 colonel or the light colonel. From what I remember,
23 I believe only one of them was there, but I don't
24 remember who. It was very stressful.
25     Q. You mentioned Captain Engeldinger was

---

**81**

1 there; right?
2     A. He was.
3     Q. On the front or first page of this
4 document, do you see that Captain Engeldinger's name
5 appears at the bottom under cc?
6     A. Yes.
7     Q. To the best of your knowledge, was he
8 involved in the decision to terminate you?
9     MR. WEINER: Objection, asked and answered,
10 calls for speculation.
11     THE WITNESS: I don't know.
12 BY MS. WIESSNER:
13     Q. He was at the meeting discussing your
14 termination, though?
15     MR. WEINER: Objection, misstates the
16 meeting that was held.
17     THE WITNESS: He was present at the -- the
18 hearing where -- and I had -- I was already informed
19 that I was going to be terminated, but he was at
20 that final meeting where I had the opportunity to
21 speak my piece.
22 BY MS. WIESSNER:
23     Q. And you testified that it was the events
24 related to your termination after which you and
25 Captain Engeldinger ceased to be friends and no

---

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

82

1 longer see eye to eye; right?
2    A.  It was -- you're asking if it was this
3 situation why we do not -- why we don't have contact
4 anymore, is what your question is; correct?
5    Q.  Yes.
6    A.  Yeah, it would be this incident.
7    Q.  What is your understanding of what his role
8 was in this incident?
9    A.  Well, his specific role, I do not know, but
10 they -- I know that they -- Lieutenant Eck and
11 Captain Engeldinger were both aware of the photos
12 that were taken of that particular intersection,
13 that they were aware that they were -- that I had
14 used my phone.  They were aware that they were
15 shared, and nothing else was said about it until a
16 couple months later, and then all of a sudden the
17 rug was pulled out from under me, so --
18    Q.  Did you feel betrayed by them?
19    A.  I felt confusion why it was okay at one
20 point and then all of a sudden it wasn't okay.
21    Q.  You understand that Lieutenant Eck and
22 Captain Engeldinger are both defendants in this
23 case?
24    A.  I do, yes.
25    Q.  And that they're represented by Mr. Weiner?

83

1    A.  Yes, I do.
2    Q.  To the best of your knowledge, was Captain,
3 or now Major Dwyer, involved in your termination
4 process or decision?
5    A.  To the best of my knowledge, I don't
6 believe he was.
7    Q.  If we turn to -- let's see, I think it's
8 page 3 of this document, you'll see the third from
9 the bottom paragraph lists GO -- oh, second from
10 bottom paragraph, actually, lists General Order
11 12-20-017.  Do you see that?
12    A.  Yes.
13    Q.  And this says, "Requiring use of
14 state-owned equipment to take photos."  Did I read
15 that correctly?
16    A.  Yes.
17    Q.  Are you familiar with that rule?
18    A.  I am now.
19    Q.  When did you become familiar with that
20 rule?
21    A.  Well, when I signed the general order,
22 that's when I would have become familiar with that.
23    Q.  When you say when you signed the general
24 order, what do you mean by that?
25    A.  Well, when they have different policies or

84

1 at the beginning of, you know, when you're going
2 through training, you go through all the current
3 general orders and you read them and you sign off on
4 them.  So the assumption would be that a person who
5 signed that -- signed off on those general orders
6 are aware and knowledgeable about it.
7    Q.  Great, that's really helpful.  So troopers
8 learn about the general orders as part of their
9 training?
10    A.  Correct.
11    Q.  And their internal GOs or general orders
12 are internal rules or policies; right?
13    A.  Correct.
14    Q.  And it's part of your job to be familiar
15 with or know the GOs; is that fair?
16    A.  Correct.
17    Q.  And this general order says that you're not
18 supposed to take photos with your personal devices;
19 correct?
20    A.  Correct.
21    MS. WIESSNER:  I'm going to switch gears,
22 and I have an Exhibit 6.
23    (Exhibit Number 6 marked.)
24 BY MS. WIESSNER:
25    Q.  On November 27th of this year, you emailed

85

1 our client, Carolyn Cole; is that correct?
2    A.  Yes.
3    Q.  If you open this document to the first
4 page, do you recognize this email?
5    A.  Yes.
6    Q.  Is this the email that you sent to Carolyn
7 Cole?
8    A.  Yes.
9    Q.  Is that your name at the top, on the from
10 line?
11    A.  Yes.
12    Q.  Next to your email?
13    A.  Yes.
14    Q.  That's your personal email?
15    A.  That's my business email, yes.
16    Q.  Sure, good clarification.  That's your
17 business email.  Do you use it for personal emails
18 too?
19    A.  Occasionally, yes.
20    Q.  And this email was sent to Carolyn Cole;
21 right?
22    A.  Yes.
23    Q.  How did you get Carolyn's email address?
24    A.  Look up LA Times and they tell you how to
25 find them.

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

86

1  Q. Sure, that makes sense. She's a
2  journalist; right?
3  A. Correct.
4  Q. Her information is publicly available to
5  you; right?
6  A. Yes.
7  Q. What prompted you to reach out to her and
8  send this email?
9  A. You know, I -- nothing really specifically.
10  And I want to preface that by saying that
11  truthfully, and I don't know if Carolyn had -- I
12  thought the -- I thought this was over. I thought
13  that she would be interested in seeing them because
14  they were there. I didn't -- I fully didn't -- I
15  didn't expect this to be still being going on, but I
16  should have known better. It takes a long time.
17  Q. And what do you mean, you thought she would
18  like to see them? Do you mean the photos?
19  A. Mm-hmm. Yes.
20  Q. Why did you think she would like to see
21  them?
22  A. She's a reporter.
23  Q. And what about the photos seems relevant to
24  a reporter?
25  A. That maybe there would be something in

87

1  there that would interest her. One of the reasons
2  why I -- One of the reasons why I sent this was
3  perhaps there is something in there that would be a
4  story beneficial to her.
5  Q. And your deposition in this case was back
6  in February of 2023; right?
7  A. Correct.
8  Q. And you sent this email in November of
9  2023; right?
10  A. Correct.
11  Q. So why then? What made you, ten months
12  after your deposition, want to send this?
13  A. Well, I -- with my things almost being
14  wrapped up and there's a lot of -- how do you -- I'm
15  trying to -- just give me a second here, let me
16  figure out the proper wording.
17  There -- the state can be vindictive and -- the
18  state can be vindictive, and I've experienced it
19  myself, so the first deposition, I was really
20  scared. I'm in -- I was in the middle of a court
21  battle that, on top of the -- on top of all of the
22  incidents that I experienced and having loaded a
23  dear friend and partner onto a gurney and put her
24  into a ambulance dead and then treated the way I
25  was, I was scared when I did the first deposition

88

1  because I didn't know what was going to happen to me
2  or if I was going to be granted my retirement.
3  And a person can tell me a million times, oh,
4  no, it's a different department, it's different
5  people, it's different -- I don't believe it. I
6  believe that there are things that are undesirable
7  in a trooper and one of those is somebody that
8  speaks their mind.
9  Q. When you say the state can be vindictive,
10  who or what are you referring to?
11  A. Internal affairs and the people who make
12  the decisions to terminate people or punish or, you
13  know, discipline.
14  Q. And when you say you were in the midst of a
15  court battle during your last deposition, are you
16  referring to your PTSD disability claim?
17  A. Correct.
18  Q. And that's in an administrative court; is
19  that right?
20  A. Like not current --
21  Q. If you don't know, you don't know.
22  A. Yeah. (Shaking head).
23  Q. Totally fair. You said it's undesirable in
24  a trooper sometimes to speak your mind. Is that
25  your testimony?

89

1  A. Yes.
2  Q. Has anyone told you that it's undesirable
3  to speak your mind or not to speak your mind?
4  A. I don't recall any specific conversations,
5  but I've been told on several occasions I shouldn't
6  do or say -- I should keep my mouth shut.
7  Q. When were you told to keep your mouth shut?
8  A. I was told after another -- I was told
9  during an internal affairs investigation, when I
10  spoke my mind at the opportunity that I had to at
11  the end of the interview, when I said that -- and
12  it's a unrelated thing to this, but there was a
13  pursuit and I was told good job, patted on the back,
14  major, captain, lieutenant all signed off on the
15  pursuit that it was a -- that it was a job well
16  done.
17  And then the driver made a formal complaint and
18  a full investigation was opened after the fact, and
19  at the end of the internal affairs interview I had
20  just made mention that it was -- it sets a dangerous
21  precedence to troopers who believe that they've done
22  a good job and then all of a sudden they can be up
23  for punishment. And the internal affairs
24  interviewer had said to me, but you're not being
25  punished. And I said, well, could I be? And he

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

90

1    said yes. And I said, well, exactly then. And they
2    didn't like that, and I was told by Jason
3    Engeldinger to not do that.
4        Q. You were told by Jason Engeldinger not to
5    do that with respect to that incident?
6        A. Yep. Yes, for respect to that incident
7    was, you know, the don't speak your mind.
8        Q. When was that incident?
9        A. I believe it was 2018 or '19.
10       Q. Has anyone told you to keep your mouth shut
11   or say or not say things about this lawsuit?
12       A. No.
13       Q. But you've seen or experienced backlash
14   towards troopers who either disagree with the State
15   Patrol or refuse to give favorable testimony?
16       MR. WEINER: Objection, misstates
17   testimony.
18       THE WITNESS: Yes.
19   BY MS. WIESSNER:
20       Q. Including against yourself?
21       A. Been -- I've been told that?
22       Q. I'll ask a broader question. Have you seen
23   or experienced backlash against troopers who refuse
24   to give favorable testimony or disagree with the
25   State Patrol?

91

1        MR. WEINER: Objection, compound.
2        THE WITNESS: I would say that the backlash
3    isn't as obvious to somebody outside of the State
4    Patrol.
5    BY MS. WIESSNER:
6        Q. Are you familiar with the concept of the
7    blue wall of silence?
8        A. Yes.
9        Q. What does that term mean to you?
10       A. It means that there is -- there's a loyalty
11   for -- between officers and that we stay here and we
12   don't -- from what my understanding is, is that you
13   are not to go nark out, I guess for a lack of a -- I
14   mean, lack of a better term, to go against your
15   fellow officers or brass.
16       Q. Sure. Do you believe or have you
17   experienced a blue wall of silence at the State
18   Patrol?
19       MR. WEINER: Objection, vague.
20       THE WITNESS: Any specific incidences, I
21   don't recall any specific incidences of that at this
22   moment, I don't -- I don't know.
23   BY MS. WIESSNER:
24       Q. When Jason Engeldinger told you to keep
25   your mouth shut on something, does that indicate

92

1    there's a blue wall of silence to you?
2        MR. WEINER: Objection, vague. You can
3    answer.
4        THE WITNESS: No, I think that was more so
5    in reference to don't make waves.
6    BY MS. WIESSNER:
7        Q. When you wrote in your email the second
8    sentence -- or I believe it's the third sentence, "I
9    was deposed and made a statement under duress," do
10   you see that?
11       A. Yes.
12       Q. Okay, to break that down, it says you were
13   deposed and made a statement. Are those two
14   separate statements?
15       A. No, I was deposed, and what I meant in
16   regards to made a statement was my deposition.
17       Q. Sure, so the statement is your
18   February 2023 deposition?
19       A. Yes.
20       Q. You never gave a statement to internal
21   affairs about May 30th; correct?
22       A. No.
23       Q. What did you mean by under duress?
24       A. Felt that it was convenient that I had to
25   be deposed in the midst of my PTSD claim and it was

93

1    -- that I felt as though I'd better make people
2    happy.
3        Q. What do you mean by it was convenient? Did
4    I sense sarcasm in that answer?
5        A. No, I don't -- I believe that it was -- it
6    was convenient that I was giving a deposition while
7    I was in the middle of my PTSD case because they --
8    the state is who decided, you know, what was going
9    to happen to the rest of, you know, the trajectory
10   of my life.
11       Q. Sure, so it was convenient to the state;
12   correct?
13       A. Yes.
14       Q. It was not convenient to you; fair?
15       A. Correct.
16       Q. Did anyone say anything specific to you
17   related to your pending claim before or after your
18   February deposition?
19       A. No.
20       Q. Did anyone try to pressure or intimidate
21   you about what you could or couldn't say in your
22   February deposition?
23       A. No.
24       Q. No one threatened you directly or
25   indirectly?

24 (Pages 90 to 93)

Tesa Johnson (Vol. 1)
12/20/2023

94

1    A.  No.
2    Q.  What made you believe that your PTSD claim
3  was at risk of being denied?
4    A.  Previous -- the way I felt that I was
5  treated in previous situations with the state, that
6  there are certain ways that say an internal -- an
7  internal affairs investigation would operate, where
8  it would, for example, take months and months to
9  wrap up.
10    I received several calls from the lieutenant
11  colonel when I had an internal affairs investigation
12  that was happening and she called me a couple times
13  referencing her apologies that it was taking so
14  long, that the person that was taking care of
15  internal affairs was also involved in -- the other
16  portion of her job was affirmative action and other
17  things, so she was bogged down with her job at the
18  expense of everybody that was being -- that was
19  going through any sort of internal affairs.
20    And by the time -- the known thing is that by
21  the time your internal affairs investigation is
22  over, it's taken so long, you've given up.
23    Q.  So you were concerned that the state could
24  slow walk or deny your PTSD claim based on your
25  testimony in the February deposition?

95

1    A.  Yes.
2    Q.  Did that concern affect your testimony that
3  you were willing to give in February of this year?
4    A.  It -- yes.
5    Q.  How so?
6    A.  That my testimony was -- I wouldn't have
7  spoken on, say, I heard or had knowledge that the
8  troopers were indeed, say, amused by the injury of
9  somebody in the media, because that's -- I don't
10  know what the proper term is, but if I was, for
11  example, testifying in court, that's not something
12  that -- unless it was directly asked to me, it's not
13  something that I would necessarily offer because
14  it's not a definitive thing.
15    Q.  But your testimony today is that people in
16  the State Patrol and the MRT were amused by injuries
17  to the media; is that fair?
18    MR. WEINER:  Objection, foundation,
19  speculation.
20    THE WITNESS:  That's -- that's fair, yes.
21  BY MS. WIESSNER:
22    Q.  Did you feel like you could be totally
23  honest and forthcoming in your last deposition?
24    A.  It wasn't a -- it wasn't a matter of being
25  not honest or dishonest.  There's nothing in my

96

1  testimony that was dishonest.  But there was no
2  other information that would have -- I would have
3  offered.  I just -- I just answered questions, and
4  if it was something that I couldn't definitively
5  answer, then it was -- I just didn't because, again,
6  I felt as though I was under duress.
7    Q.  The testimony that you wouldn't give, are
8  you referring specifically to unfavorable testimony?
9  Unfavorable to the defendants or the State Patrol, I
10  mean.
11    MR. WEINER:  Objection, vague.
12    THE WITNESS:  I would say not necessary --
13  not necessarily unfavorable, but I did not testify
14  to anything of -- or I didn't feel like I was able
15  to testify on anything that I, for example, would
16  have overheard or had knowledge of but couldn't
17  specify who it came from or who said it.  I suppose
18  that would have potentially been unfavorable,
19  because then it -- I didn't feel -- I didn't feel
20  like it would have been a safe thing for me.
21  BY MS. WIESSNER:
22    Q.  So did the duress affect your ability to
23  testify accurately?  Is that a better
24  characterization than honestly?
25    A.  I believe --

97

1    MR. WEINER:  Objection, vague.  Also
2  leading, but it's okay, you can answer.
3    THE WITNESS:  Okay.  I don't -- it's a --
4  ask -- Can you ask me again, please?
5    MS. WIESSNER:  Sure.
6    THE WITNESS:  I just want to make sure I
7  understand it, or get it correct.
8  BY MS. WIESSNER:
9    Q.  Yes, and I want you to only answer
10  questions you understand.
11    A.  Mm-hmm.
12    Q.  I'm not trying to trick or trap you.  I'm
13  trying to understand how feeling like you're under
14  duress affected your testimony.  Did you feel like
15  you had to stop short of telling the whole story?
16    MR. WEINER:  Objection, vague.
17    THE WITNESS:  I felt as though I was unable
18  to testify on things that were said, overheard or I
19  had knowledge of that I wasn't able to specifically
20  say who they came from or from where during the time
21  of the George Floyd incident; that if I had said
22  that there was -- yes, indeed, there was troopers
23  that would have been -- would have found amusement
24  or whoever would have found amusement in somebody, a
25  part of the media, being injured, I didn't believe

25 (Pages 94 to 97)

Tesa Johnson (Vol. 1)
12/20/2023

98

1  that that -- I didn't believe that I could say that
2  because there -- that would come -- because it was
3  -- I suppose, yeah, because it was negative towards
4  the state and I was being represented by the state,
5  and because I had worked there at the time and I
6  didn't feel comfortable.
7      I was very surprised that I was -- I had --
8  that I was being represented by the State of
9  Minnesota because I was terminated and because I am
10  -- let's see here.  (Reviewing document).
11  BY MS. WIESSNER:
12     Q.  Let the record reflect that the deponent is
13  looking at Exhibit --
14     **A.  4.**
15     Q.  -- 4.
16     **A.  Well, I guess because I was considered a**
17  **disgruntled former member of -- former State Patrol**
18  **employee, that I don't -- it was all stressful and,**
19  **you know, when you're terminated from a job, a lot**
20  **of times there's -- it's not a -- it's not a great**
21  **feeling, it's not -- you don't leave on, you know,**
22  **high fives.**
23      **And then being called in and told we're going**
24  **to represent you, we need you to give a deposition**
25  **of what you know, and it's about -- mainly about**

99

1  **your two direct supervisors, and in the middle of a,**
2  **you know, PT -- or a medical retirement from the**
3  **job. Anybody, any reasonable person, I feel, would**
4  **be apprehensive.**
5      Q.  Were you afraid that negative testimony in
6  February of 2023 would come back to bite you?
7      **A.  Yes.**
8      Q.  And when you say your direct supervisors,
9  you're referring to Lieutenant Eck and Captain
10  Engeldinger; right?
11     **A.  Yes.**
12     Q.  Was there testimony -- Was your testimony
13  potentially incomplete in February?
14     MR. WEINER:  Objection, vague.
15     THE WITNESS:  I don't know if it was
16  necessarily incomplete or if I would refer to it as
17  incomplete. I would say more so it was just very
18  answer the questions, don't offer the I heard, I --
19  this conversation or that conversation, leaving out
20  any -- I didn't elude to -- I didn't elude to any
21  ill -- I mean I don't have ill will. I was
22  terminated, again, there was no high fives, but it
23  is what it is. I just didn't feel like I could
24  testify -- I would set myself up for something that
25  would affect me negatively.

100

1  BY MS. WIESSNER:
2      Q.  So there were things you decided not to say
3  or not to disclose in February, based on those
4  feelings?
5      **A.  If I was -- yes, I wouldn't have offered**
6  **any extra information or any extra potential**
7  **information or something that would have been**
8  **negative towards the state.**
9      Q.  Besides being aware that troopers were
10  amused by or laughing at injured media, can you
11  think of anything else that you decided not to say
12  or disclose because it was negative to the State
13  Patrol?
14     **A.  There was concern from people, again, I**
15  **don't know specifically who, that when we were using**
16  **the Metro Transit buses, they -- the Metro Transit**
17  **buses were -- and this is -- this is what I had**
18  **heard, but the cameras were running when we were --**
19  **when we were on the buses, and I know that there**
20  **were people, and I do not know if it was troopers or**
21  **admin or whoever, but there was concern about those**
22  **videos from the buses on what was said.**
23      **And then somebody had found out or was told**
24  **that it was like 30 or 90 days that the videos would**
25  **be kept, sort of like the Watch Guard videos in our**

101

1  squads, you know, being a digital copy. And I know
2  that there were people that were patiently waiting
3  for those videos to, I don't know, be deleted as a
4  standard or however you would refer to that. And
5  I'm sure that would have not shown highly on some
6  MRT members. I don't -- specifics, I don't know. I
7  know that there was concern about those videos.
8      Q.  But you don't recall what was said that
9  troopers were concerned about?
10     **A.  No.**
11     Q.  Possibly things about the media?
12     MR. WEINER:  Objection. She already
13  testified she doesn't know.
14     THE WITNESS:  I don't know.
15  BY MS. WIESSNER:
16     Q.  Do you recall who was concerned
17  specifically about those videos?
18     **A.  No.**
19     Q.  There was also a lot of things that you
20  couldn't recall in February. Is that fair to say?
21     **A.  Yes.**
22     Q.  Was your inability to recall related to
23  your duress?
24     **A.  I would have to look specifically at the**
25  **transcripts, but I can say that we -- when we were**

26 (Pages 98 to 101)

Tesa Johnson (Vol. 1)
12/20/2023

102

1  initially deployed and we didn't even get to think
2  about going home until, I believe it was, June 7th,
3  we were there the first handful of days, there was
4  no sleep, there was no food, there was no -- I mean
5  we were -- so there is a lot of things that I don't
6  recall because I don't want to testify on something
7  that I'm not a hundred percent sure of, and I find
8  -- because I'm not trying and was not trying to lead
9  any sort of investigation.  I can only testify from
10  what I know, so I -- I believe that the answers of
11  what I don't recall was accurate.
12      Q.  Sure.  Did anyone tell you to say I don't
13  remember or I don't recall to things in your last
14  deposition?
15      A.  Just -- only going over, when we had spoke
16  and it was if you don't recall, you don't recall,
17  typical of, you know, if you were testifying in
18  court.
19      Q.  Sure.  In your previous deposition you
20  said, "Depositions are a lot different than trials.
21  It's awkward for me not to be able to answer your
22  questions."  Do you recall that testimony?
23      A.  Yes.
24      Q.  What did you mean by that?
25      A.  Because when -- when we had gone over how

103

1  to testify at a deposition, because I had never had
2  a deposition --
3      MR. WEINER:  Now, I just want to stop for
4  just a second.
5      THE WITNESS:  Okay.
6      MR. WEINER:  So at the time I was
7  representing you.
8      THE WITNESS:  Yes.
9      MR. WEINER:  You have the right to talk
10  about what we discussed and you can waive that for
11  attorney/client privilege.
12      THE WITNESS:  Okay.
13      MR. WEINER:  I just want to let you know
14  that if you are going to discuss what we discussed,
15  then you are waiving that privilege.  So I just want
16  to make sure that that's clear on the record.
17      THE WITNESS:  Okay.
18      MR. WEINER:  Okay.
19      THE WITNESS:  I mean there's -- let's --
20      MS. WIESSNER:  For the record, I'd like to
21  clarify.  Neither I nor Joe can give you any legal
22  advice today.
23      THE WITNESS:  Right, no, I understand that.
24      MS. WIESSNER:  It is totally up to you as
25  the holder of a privilege whether you want to

104

1  answer.  So neither I nor Joe can object to nor
2  direct you that you have to answer that.  So it's up
3  to you whether or not you want to answer that
4  question.
5      THE WITNESS:  What that was referring to
6  the best way that I can describe it is not -- it's
7  -- when I said it's uncomfortable not being able to
8  answer your questions, meaning not being able to
9  elaborate on that, you know, I don't recall or that
10  yes or that no, because that wouldn't have been
11  something that would have been appropriate from my
12  understanding, and if I was, for example, testifying
13  in court.  If I was testifying in court, I wouldn't
14  offer any extra information.  I would just say yes,
15  no or I don't recall.
16  BY MS. WIESSNER:
17      Q.  So when you say it was awkward for you to
18  not be able to answer the questions, you were
19  holding something back that you were able to say but
20  felt that you shouldn't?
21      MR. WEINER:  Objection, misstates the
22  testimony.
23      THE WITNESS:  It's more referring to I --
24  yes, I know that there were members of MRT that were
25  amused by people's injuries, media's injuries,

105

1  whatever they were, but it wasn't something that I
2  was going to offer up and elaborate on.  Does that
3  make sense?
4  BY MS. WIESSNER:
5      Q.  Yes, but part of the reason you were not
6  going to elaborate on that was that you were given
7  an -- so maybe the answer is no.  I don't quite
8  understand your answer.  What does that have to do
9  with the difference between a deposition and a
10  trial?
11      A.  Well, I was never told not to elaborate, I
12  was never told anything like that, but I didn't feel
13  comfortable elaborating and I kept my answers very
14  just yes, no, I don't recall.  There was no offer
15  of, but I heard that there were troopers that
16  were -- you know, there were troopers that found
17  amusement with that.  I wouldn't have felt
18  comfortable offering that because I felt as though
19  that would -- that would not -- that could affect my
20  other case.
21      Q.  Sure, that makes a lot more sense.  Thanks
22  for clarifying.
23      A.  I apologize.  Sometimes my explanation is a
24  lot longer than it should be.
25      Q.  Or sometimes it was a bad question, so

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

106

1  don't be too hard on yourself.  I have one more set
2  of questions before we take a break, if you don't
3  mind.
4      The subject line of your email is, "pepper
5  spray assault," or includes, "pepper spray assault."
6  Do you see that?
7      **A.  Mm-hmm.  Yes, I do.**
8      Q.  What made you call what happened to Carolyn
9  an assault?
10     **A.  That what -- that was the -- that would be**
11 **my interpretation of what happened based on my**
12 **knowledge of the proceedings and what was in the**
13 **media.**
14     Q.  And you later repeat in the first sentence,
15 "My name is Tesa Johnson and I was a trooper who was
16 present during the assault of you and your
17 colleague, Molly Hennessy-Fiske."  Do you see that?
18     **A.  Yes, I do.**
19     Q.  So you called it an assault again.
20     **A.  Yes.**
21     Q.  What does an assault mean to you?
22     **A.  It -- what that would mean to me is a use**
23 **of force that is potentially not warranted.**
24     Q.  Did you think the pepper spraying of Molly
25 and Carolyn was not warranted?

107

1      **A.  I don't know.  If that -- I guess, let me**
2  **back that up.  Not I don't know, because I don't --**
3  **I don't -- to be perfectly honest, I don't even -- I**
4  **don't know the details, so I -- I mean I assume that**
5  **it was unwarranted, as they were press, they were**
6  **press from a large media outlet, and I -- I was**
7  **present, I never saw anything.  But I'm assuming**
8  **that the assault was not warranted because we had**
9  **been briefed on how we were to deal with the media.**
10     Q.  In preparation for your last deposition,
11 you watched videos; correct?
12     **A.  Yes.**
13     Q.  Do you recall seeing videos of MRT troopers
14 pepper spraying or using force on a group of people?
15     **A.  I don't -- to be honest with you, I would**
16 **have to watch those videos again.  I don't recall**
17 **specifically what was on those videos.**
18     Q.  And you're a trained law enforcement
19 officer; right?
20     **A.  Yes.**
21     Q.  You're familiar with police use of force
22 policies?
23     **A.  Yes.**
24     Q.  You've been trained on proper uses of
25 force?

108

1      **A.  Yes.**
2      Q.  You've used force in the field?
3      **A.  Yes.**
4      Q.  Would you call police using reasonable
5  force in compliance with their policies an assault?
6      **A.  No.**
7      Q.  If an officer uses reasonable force during
8  a lawful arrest, that's not an assault; right?
9      **A.  Correct.**
10     Q.  The word assault implies that it's not an
11 ordinary or proper use of force; right?
12     **A.  Correct.**
13     Q.  You're also trained on criminal law?
14     **A.  Yes.**
15     Q.  You know assault is a crime?
16     **A.  Yes.**
17     Q.  Have you ever arrested anyone for an
18 assault?
19     **A.  I can't say specifically.**
20     Q.  What is an assault under criminal law?
21     **A.  Yes, I have --**
22         MR. WEINER:  Objection, calls for a legal
23 conclusion.
24         THE WITNESS:  Yes, I have arrested somebody
25 on assault, if I can answer that now.  Can you

109

1  repeat the question again?
2          MS. WIESSNER:  Sure.
3  BY MS. WIESSNER:
4      Q.  What is an assault in criminal law?  Or in
5  your training as a law enforcement officer, I'll
6  say.  In your training as a law enforcement officer,
7  what's an assault?
8      **A.  Use of -- to injure or indicate -- to**
9  **invoke fear or injury in a person without -- I mean**
10 **just -- you can't do that, but when you're talking**
11 **the criminal law, between, you know, two, say,**
12 **civilians, would be violence without it being self**
13 **defense.**
14     Q.  Sure.  And you chose to call what happened
15 to Molly and Carolyn an assault in your email?
16     **A.  Yes.  Yeah.**
17     Q.  You also labeled yourself as a witness in
18 your email.
19     **A.  Yes.  And there -- I was eager to -- like I**
20 **said, I thought this was all finished and I was**
21 **eager to speak with her in hopes that perhaps she**
22 **would be able to have -- there would be some sort of**
23 **information that she might be able to run a story.**
24 **It wasn't -- it was more catch your eye, so to**
25 **speak.**

28 (Pages 106 to 109)

Tesa Johnson (Vol. 1)
12/20/2023

110

1   Q.  So it wasn't to influence this lawsuit?
2   A.  No.
3   Q.  You thought the lawsuit was over?
4   A.  And I said that to Carolyn, that I -- I was
5   shocked that it was still going.
6   Q.  Did you eventually speak to Carolyn?
7   A.  Yes.
8   Q.  How many times?
9   A.  Maybe three or four.  I don't -- I don't
10  recall the exact number.
11  Q.  What did you tell Carolyn?
12  A.  That I -- that this Google folder existed,
13  and we discussed the incident and she had informed
14  me that she -- she was not pepper sprayed, but Molly
15  was, I believe.  And then we -- of course, you know,
16  we discussed how this was still ongoing and it's
17  been, you know, going on into three years.  And
18  then, you know, we had just a couple normal
19  conversations about personal things and -- but I
20  wouldn't be able to tell you, you know, verbatim on
21  each conversation.
22  Q.  Sure.  And we've discussed that you're no
23  longer employed by the State Patrol; right?
24  A.  Correct, yes.
25  Q.  You said you didn't leave with high fives.

111

1   A.  No.
2   Q.  Do you have ill will towards the State
3   Patrol?
4   A.  No.  I don't like them.  Not the State
5   Patrol as a whole because I'm still friends with all
6   of the people that I was friends with prior to.  But
7   I'm not out for blood or anything.  I want to be
8   done.  I want to be done.  I don't ever want to deal
9   with anything having to do with any of this ever
10  again.  I want to try to get myself into a place
11  where I can wake up in the morning and not not want
12  to get out of bed.  That's where I'm at.
13  Q.  So fair to say, you didn't reach out to
14  Carolyn to get back at or punish the State Patrol?
15  A.  No.  Why would I wait until now?  It's
16  totally, you know -- it wasn't.  It was you're a
17  reporter from the LA Times, it's a big deal, and
18  here, maybe you see something in these that I don't.
19  I don't know.
20  But it wasn't because -- I was under the
21  understanding that this was completed.  This wasn't
22  to sway it one way or the other.  I don't have it in
23  me.  If I did, there -- I mean if I had it -- if I
24  wanted to, I would have gotten another attorney and
25  fought my termination.  I didn't.  I am -- like I

112

1   said, I just want to be finished with everything
2   because I just want to move on with my life.  And
3   until all of my things are done, I can't.  But this
4   was not to sway any criminal or court proceedings
5   either way.
6   MS. WIESSNER:  I think we're ready to take
7   a break for lunch.  We're ready to go off the
8   record.
9   VIDEOGRAPHER:  Off the video record at
10  12:58 p.m.
11  (A lunch break was taken.)
12  VIDEOGRAPHER:  This is File 3, we're on the
13  record at 1:31 p.m.
14  BY MS. WIESSNER:
15  Q.  So Tesa, in your previous deposition you
16  testified that after the Omar Jimenez arrest, there
17  were caveats for the press.  Do you recall that?
18  A.  Yes.
19  Q.  And you've testified similarly here today,
20  that there were carve-outs or caveats for the press;
21  correct?
22  A.  Yes.
23  Q.  What were those caveats or carve-outs?
24  MR. WEINER:  Objection, asked and answered
25  three times.  Go ahead.

113

1   THE WITNESS:  The press was -- they were
2   able to -- they were exempt from the -- from the
3   curfew and from -- they could be behind the line and
4   they could be reporting.
5   BY MS. WIESSNER:
6   Q.  Were you to look out or make an effort to
7   identify press or media to respect those rights?
8   A.  That was my interpretation of it.
9   Q.  Would those caveats include not using force
10  on law-abiding journalists?
11  MR. WEINER:  Objection, calls for
12  speculation.
13  THE WITNESS:  That would be my
14  interpretation of them having the exemption.
15  MS. WIESSNER:  Sure.
16  BY MS. WIESSNER:
17  Q.  As of May 30th, if someone was identifiable
18  as media, present and law abiding at the Fifth
19  Precinct, they didn't have to leave when the curfew
20  went into effect; right?
21  A.  Correct.
22  MR. WEINER:  Objection, calls for
23  speculation.
24  THE WITNESS:  Correct.  They -- my
25  interpretation is that they wouldn't have to leave.

29 (Pages 110 to 113)

Tesa Johnson (Vol. 1)
12/20/2023

114

1  BY MS. WIESSNER:
2      Q.   And the MRTs shouldn't tell journalists or
3  media to leave when the curfew goes into effect?
4          MR. WEINER:  Same objection.
5          THE WITNESS:  Correct.
6  BY MS. WIESSNER:
7      Q.   Because they had a First Amendment right
8  and a right under the curfew exemption to be there?
9      **A.   Correct.**
10     Q.   You also testified in your previous
11  deposition that if you received orders that violated
12  somebody's rights, that you wouldn't have a problem
13  questioning those.
14     **A.   Correct.**
15     Q.   Did you receive any orders that you thought
16  would violate someone's rights during the George
17  Floyd operation?
18     **A.   No.**
19     Q.   Did you see troopers or anyone you were
20  deployed with doing things that you believed
21  violated someone's rights?
22     **A.   Not that I recall, no.**
23     Q.   I'd like to turn back to the email that you
24  sent to Carolyn Cole.  I believe that's -- yep, it's
25  labeled as Exhibit A.

115

1      **A.   Okay.**
2      Q.   You referenced a Google photo account with
3  534 photos; correct?
4      **A.   Yes.**
5      Q.   And you included one of the photos in this
6  email to identify yourself; right?
7      **A.   Yes.**
8      Q.   And you included a screen shot of the album
9  cover as well in this email?  So on the second page.
10     **A.   Yes.**
11     Q.   The album is labeled, "2020 Riots State
12  Patrol"; right?
13     **A.   Yes.**
14     Q.   And it is labeled, "Shared"; correct?
15     **A.   Yes.**
16     Q.   Why did you want to share these photos with
17  Carolyn?
18     **A.   Because a different view of the photos, she
19  may have been able to see something that would have
20  piqued her interest in regards to new stories or
21  something that would interest her or interest, you
22  know, the public.**
23     Q.   What did the photos depict to you?
24         MR. WEINER:  Objection, vague.
25         THE WITNESS:  They -- a handful of them

116

1  were photos of other things that were pulled from
2  various media outlets, screen shots and what have
3  you, and then a lot of them were of when -- what was
4  happening, either behind the scenes or right up in
5  the front.
6  BY MS. WIESSNER:
7      Q.   And we confirmed it's labeled a shared
8  album; right?
9      **A.   Correct.**
10     Q.   What does it mean that it's a shared album?
11     **A.   It's not my album.**
12     Q.   Do you know whose album it is?
13     **A.   I believe that it's Kristie Hathaway's.**
14     Q.   Is Kristie Hathaway a member of the MRT?
15     **A.   I don't know.**
16     Q.   Is she a member of the State Patrol?
17     **A.   Yes.**
18     Q.   So it's not your album but you were invited
19  to join; right?
20     **A.   Correct.**
21     Q.   And a shared album means people can invite
22  more people and everyone who's invited can see the
23  contents; right?
24     **A.   I believe so.**
25     Q.   And when you're a member of the album, you

117

1  can add photos and videos to the album?
2          MR. WEINER:  Objection, calls for
3  speculation.
4          THE WITNESS:  As far as I am concerned --
5  or I know, yes, because I was able to upload those
6  photos.
7  BY MS. WIESSNER:
8      Q.   Can you comment on or like photos in a
9  shared album?
10         MR. WEINER:  Same objection.
11         THE WITNESS:  I believe you can.
12  BY MS. WIESSNER:
13     Q.   Do you know if in this shared album, 2020
14  Riots State Patrol, people were using the comment
15  and like features?
16     **A.   I don't recall.**
17     Q.   Can you just passively view the contents of
18  the album without adding anything?
19     **A.   Yes.**
20         MR. WEINER:  Objection, calls for
21  speculation.
22         THE WITNESS:  Yes, you can.
23  BY MS. WIESSNER:
24     Q.   And the photos are labeled with the person
25  who added them; right?

30 (Pages 114 to 117)

118

1    MR. WEINER:  Objection, calls for
2  speculation.
3    THE WITNESS:  Yes.
4  BY MS. WIESSNER:
5    Q.  Do you know if they're labeled with the
6  date they were added?
7    **A.  I don't know.  It does give you some**
8  **information on what type of phone, but that's**
9  **something that when you -- I don't know, you have to**
10  **touch like a button and it pops up just like you**
11  **would on your iPhone.  It gives you the information**
12  **of what model your phone is and things like that.**
13  **It's kind of gobbledegook to me.  I don't know**
14  **exactly.**
15    Q.  But when you click on a photo in the album,
16  you can see more information about that photo?
17    **A.  Yes.**
18    Q.  What happens when you leave the shared
19  album?
20    MR. WEINER:  Objection, vague.
21    THE WITNESS:  I have no idea.
22  BY MS. WIESSNER:
23    Q.  You don't know if, let's say, you leave the
24  shared album, if all of your photos stay or get
25  deleted?

119

1    **A.  Correct.**
2    Q.  Were you accessing this album on your
3  personal phone?
4    **A.  Yes.**
5    Q.  On your work phone?
6    **A.  I never had a work phone.**
7    Q.  And you used your personal email address to
8  join the group?
9    **A.  Yes, I believe so, because it was -- would**
10  **have been my Google email address.**
11    Q.  You're referring to your gmail address?
12    **A.  Correct, yes.**
13    Q.  Did you take pictures that you uploaded on
14  your personal phone?
15    **A.  Yes.**
16    Q.  And other troopers also took photos on
17  their personal phones to add to the album?
18    **A.  Yes.**
19    MR. WEINER:  Objection, calls for
20  speculation.
21    THE WITNESS:  What I assume was their
22  personal phones, yes.  Because at the time nobody
23  had iPhones unless you were in a specialty or admin.
24  Troopers would have had either a flip phone or
25  nothing.

120

1  BY MS. WIESSNER:
2    Q.  Do you know why Kristie Hathaway created
3  the album?
4    **A.  No.  I don't even know who she is.**
5    Q.  Why did you join the album?
6    **A.  For the photos, to see, again -- you know,**
7  **it's a big deal, and our ability to document it was**
8  **-- it was a -- I guess it was just -- it was a big**
9  **deal, being there, experiencing everything, seeing**
10  **everything that was happening, and that's not from**
11  **one side or another.  Just as a whole.  And then**
12  **being able to have those, those photos of seeing**
13  **everything and remembering it, it was -- it's --**
14  **you're a part of history.**
15    Q.  How was the photo album being used during
16  the George Floyd operation period?
17    MR. WEINER:  Objection, vague and calls for
18  speculation.
19    THE WITNESS:  As far as I know, it was just
20  people were just uploading photos.
21  BY MS. WIESSNER:
22    Q.  Was it common knowledge that this album
23  existed and you could join it or ask to join it?
24    MR. WEINER:  Objection, calls for
25  speculation.

121

1    THE WITNESS:  I don't know how common
2  knowledge it was.  I assume that most troopers would
3  have known about it.
4  BY MS. WIESSNER:
5    Q.  It wasn't a secret album?
6    **A.  No.**
7    MR. WEINER:  Objection, calls for
8  speculation.
9    THE WITNESS:  Not that I'm aware, it wasn't
10  secret.
11  BY MS. WIESSNER:
12    Q.  And what makes you think or assume that
13  most troopers knew about the album?
14    **A.  Because there's a lot of troopers that**
15  **shared on the album.**
16    Q.  Do you recall if at any point there were
17  more photos in the album than there are now?
18    **A.  I don't recall.**
19    Q.  Do you recall if there were ever more
20  members than there are now?
21    **A.  I don't recall.**
22    Q.  In your experience, do you create photo
23  albums to create and share memories; right?
24    **A.  Yes.**
25    Q.  Do you create photo albums of traumatic

Tesa Johnson (Vol. 1)
12/20/2023

122

1    events?
2        A.  I don't.
3        Q.  I want to look through the membership list,
4    which we'll make as a separate exhibit.  We'll have
5    two exhibits to make right now that I'll give you at
6    the same time.  So this will be 6 and 7?
7        COURT REPORTER:  7 and 8.
8        MS. WIESSNER:  7 and 8.
9    (Exhibit Numbers 7 and 8 marked.)
10   BY MS. WIESSNER:
11       Q.  If you don't mind, we'll actually start
12   with 8.
13       A.  Okay.
14       Q.  Which I'll represent to you is the MRT
15   Deployment Roster that was previously Exhibit 27 in
16   other depositions.  It's Bates stamped Engeldinger
17   000106.
18       Do you see the top of this is labeled, "MRT
19   Deployment Roster"?
20       A.  Yes.
21       Q.  I'll represent to you this is the roster
22   for May 30, 2020.  Do you see at the top who the MRT
23   commander is listed as?
24       A.  Jason Engeldinger.
25       Q.  Well, let's see.  That one says platoon

123

1    commander; right?
2        A.  Oh, I'm sorry, yes.  So MRT Commander
3    Captain Joe Dwyer, Car 25.
4        Q.  And to the best of your recollection, was
5    Captain Dwyer, now Major Dwyer, the MRT commander on
6    May 30th?
7        MR. WEINER:  Objection, asked and answered.
8        THE WITNESS:  Yes.
9    BY MS. WIESSNER:
10       Q.  And Jason Engeldinger was the platoon
11   commander or co-commander?
12       MR. WEINER:  Objection, asked and answered.
13       THE WITNESS:  Yes.
14   BY MS. WIESSNER:
15       Q.  Do you see MSP Squad 3 labeled here?
16       A.  Yes.
17       Q.  Do you see T. Johnson listed on that squad?
18       A.  Yes.
19       Q.  Would that refer to you, Tesa Johnson?
20       A.  Yes.
21       Q.  So you were on MSP Squad 3 on May 30, 2020?
22       A.  Yes.
23       Q.  And you'll see at the top of your squad,
24   Lieutenant Eck.  Do you see that?
25       A.  Yes.

124

1        Q.  Does that refer to Michael Eck?
2        A.  Yes.
3        Q.  To the best of your recollection, he was
4    your squad leader that day, on May 30th; right?
5        A.  Yes.
6        Q.  Do you recognize the names of other members
7    of your squad either from the George Floyd operation
8    period or from your home station?
9        A.  Yes.  And if I can clarify, the squad
10   leader, if you see the first gray box, it says SL,
11   and then the squad leader would be Travis Pearson.
12   So Lieutenant Eck -- and not to be critical.  I just
13   want to make sure -- that he would have -- he would
14   have been like the lieutenant overlooking it, so
15   just to clarify.
16       Q.  That is very helpful.  Don't worry about
17   criticizing me.  My husband does it all the time.
18   Is there anyone else on your squad that you know or
19   recognize?
20       A.  Yes.
21       Q.  Let's start at the top.  Travis Pearson?
22       A.  Yes.
23       Q.  Does he work at 3100 with you as well?
24       A.  Yes, he does.
25       Q.  Is DuPaul Sara DuPaul?

125

1        A.  Yes.
2        Q.  Do you recall being on a squad with her?
3        A.  Yes.
4        Q.  On May 30th?
5        A.  I don't think our squads changed really.
6    I'm -- I remember -- I remember when I interact with
7    people.  There wasn't a lot of interaction in
8    certain instances.  So the first day that we were
9    there, Sara and I, we interacted quite a bit.  If
10   this is what it lists for May 30th, then that's what
11   our squad would have been.
12       Q.  So you recall being on her squad multiple
13   days?
14       A.  Yes.
15       Q.  Do you recall being on a squad with, is it
16   Nigg or Nigg?
17       A.  Nigg, Chad Nigg.
18       Q.  Do you recall being on his squad?
19       A.  Yes.
20       Q.  Does he work at 3100?
21       A.  No.
22       Q.  Do you recall Roseberry?  I believe this
23   should be Rosenberry.
24       A.  Correct.
25       Q.  Do you recall being on a squad with

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

126

1  Rosenberry?
2  **A.  Yes.**
3  Q.  To the best of your knowledge, is there a
4  Roseberry?
5  **A.  No.**
6  Q.  Milless?
7  **A.  It might --**
8  Q.  Milless?
9  **A.  Milless or Millsness.  I don't -- I don't**
10 **know.  I believe his first name is Tyler.**
11 Q.  So you believe his first name is Tyler.  Do
12 you recall being on a squad with someone with this
13 name regardless of how it's pronounced?
14 **A.  Yes.**
15 Q.  Slagter or Slaughter?
16 **A.  Yes.**
17 Q.  Who is this?
18 **A.  I don't remember his first name, but he's**
19 **got brown hair, tall, real skinny.**
20 Q.  Do you recall being on a squad with
21 J. Brown?
22 **A.  Yes.**
23 Q.  What is the J for?
24 **A.  Jason.**
25 Q.  Jason Brown.  Is he at 3100?

127

1  **A.  No.**
2  Q.  Do you recall being on a squad with
3  Lockman?
4  **A.  I don't remember who that is.**
5  Q.  I'll represent to you that's Ben Lockman,
6  he's a defendant in this case.
7  **A.  Oh, okay.  Yeah, I do not remember who he**
8  **is.**
9  Q.  Sure, no problem.  Christianson?
10 **A.  Christianson.  Do we have a first name?**
11 Q.  I don't.
12 **A.  It'll come to me, but I don't remember that**
13 **one.**
14 Q.  Regardless of first name, you remember
15 being on a squad with someone named Christianson?
16 **A.  Yeah.  Yes.**
17 Q.  Do you know who Prokosch is?
18 **A.  Dale, yes.**
19 Q.  Is he at 3100?
20 **A.  No.**
21 Q.  You recall being on a squad with him?
22 **A.  Yes.**
23 Q.  Vanderport?
24 **A.  Yes.**
25 Q.  Who is Vanderport?

128

1  **A.  Steve.**
2  Q.  Do you recall being on a squad with Steve
3  Vanderport?
4  **A.  Yes.**
5  Q.  Is he at 3100?
6  **A.  No.**
7  Q.  K. Rock is Kendra Rock; right?
8  **A.  Yes.**
9  Q.  Is she at 3100?
10 **A.  No.**
11 Q.  Do you remember being on her squad?
12 **A.  I don't remember seeing her, either, but**
13 **she must -- I mean if she was there, she was there.**
14 **I didn't interact with her.**
15 Q.  Sure.  And Brian VanDenEinde; is that
16 right?
17 **A.  Yes.**
18 Q.  Do you recall being on his squad?
19 **A.  Yes.**
20 Q.  Was he at 3100?
21 **A.  No.**
22 Q.  All right, we're going to go through the
23 next exhibit.  Keep this one by you, because what
24 we're going to do is try and identify who from your
25 squad or the MRT was members of the group.

129

1  **A.  Okay.**
2  Q.  This Exhibit 7, does this look familiar to
3  you?
4  **A.  Yes.**
5  Q.  Is this the list of members of the Google
6  shared album that you sent to Carolyn Cole?
7  **A.  Yes.**
8  Q.  I believe you'll see at the top, it's
9  Kristie Hathaway's; is that right?
10 **A.  Yes.**
11 Q.  Is that how you know she's the owner?
12 **A.  Yes.**
13 Q.  Because it's listed as owner; right?
14 **A.  Yes.**
15 Q.  You see you're next, it says Tesa Johnson;
16 right?
17 **A.  Yes.**
18 Q.  Do you see the "Leave" button next to your
19 name?
20 **A.  Yes.**
21 Q.  So you could leave this album at any time;
22 right?
23 **A.  Yes.**
24 Q.  And you don't know if your photos would
25 leave with you?

33 (Pages 126 to 129)

Tesa Johnson (Vol. 1)
12/20/2023

130

1     **A. Correct.**
2     Q. Do you know who Ryan V. is?
3     **A. I don't.**
4     Q. Is it possible that Ryan V. is --
5     MR. WEINER: Objection. She said she
6 doesn't know.
7     MS. WIESSNER: Oh, actually, and I answered
8 my own question.
9 BY MS. WIESSNER:
10    Q. Your Vanderport was Steve.
11    **A. Correct.**
12    Q. So that's not Vanderport.
13    **A. Correct.**
14    Q. Okay. Is it possible that's Vereeken,
15 who's on Squad --
16    MR. WEINER: Objection, calls for
17 speculation.
18 BY MS. WIESSNER:
19    Q. Do you know a Vereeken?
20    **A. It's Vereeken.**
21    Q. Vereeken.
22    **A. And it's not him.**
23    Q. Okay. Do you see a Mike at the bottom of
24 this page?
25    **A. Yes.**

131

1     Q. Do you know who that Mike is?
2     **A. I do not.**
3     Q. Possible that's Mike Eck?
4     MR. WEINER: Objection, calls for
5 speculation. Already testified she doesn't know.
6     THE WITNESS: It's possible, but I don't
7 know.
8 BY MS. WIESSNER:
9     Q. Do you recall if Mike Eck was a member of
10 the album?
11    **A. I don't.**
12    Q. Do you recall ever talking to him about the
13 album?
14    **A. No.**
15    Q. Showing him the album?
16    **A. No.**
17    Q. If you were to click on this name in your
18 phone, would you be able to see more information
19 about that Mike?
20    **A. No. The only thing that pops up when you**
21 **touch a name is to block that individual, that's it.**
22    Q. No option to message that person?
23    **A. Correct.**
24    Q. Doesn't show their email?
25    **A. Correct.**

132

1     Q. Turn to page 2. Do you see Anthony Nelson
2 on this page, towards the middle?
3     **A. Yes.**
4     Q. Do you see a Nelson listed on CART on the
5 roster? Right in the red.
6     **A. Yes.**
7     Q. Do you know if that's Anthony Nelson?
8     **A. I do not.**
9     Q. Do you see a David F. listed on the
10 membership page?
11    **A. Yes.**
12    Q. Do you know who David F. is, what the F
13 stands for?
14    **A. I do not.**
15    Q. Do you know who Rick H. is, what the H
16 stands for?
17    **A. I do not.**
18    Q. There's a Lieutenant Hayes on Squad 1. Is
19 Lieutenant Hayes' first name Rick or Richard?
20    **A. I don't know.**
21    Q. That's just fine. Let's turn to page 3.
22 Do you see a Sara DuPaul listed here?
23    **A. Yes.**
24    Q. We confirmed she was on MRT Squad 3 with
25 you; right?

133

1     **A. Yes.**
2     Q. Do you know if she added photos to the
3 album?
4     **A. I believe so.**
5     Q. There's an A. Ryan.
6     **A. Yes.**
7     Q. Do you know if that is A. Ryan -- On Squad
8 4, there's a Ryan. Is that the same Ryan?
9     **A. I believe so.**
10    Q. There's an Eric Fischer on this page, and a
11 Fischer listed on the CART team. Is that Eric
12 Fischer from the CART team?
13    **A. I cannot confirm. I don't know.**
14    Q. Do you know any other Fischers in the State
15 Patrol?
16    **A. Not off the top of my head.**
17    Q. There's a Renee A. Do you see that name?
18    **A. Yes.**
19    Q. Is her last name Armstrong?
20    **A. I do not know.**
21    Q. Do you know who Renee A. is?
22    **A. No.**
23    Q. Page 4, the next page, there's a Megan
24 Brynell. Do you see that name?
25    **A. Yes.**

34 (Pages 130 to 133)

Tesa Johnson (Vol. 1)
12/20/2023

134

1    Q.  Is that Megan Brynell from Squad 2 on your
2  roster?
3    A.  Yes.
4    Q.  A Scott Smith on this page.  Yes, Scott
5  Smith on this page, do you see that?
6    A.  Yes.
7    Q.  Is that S. Smith from Squad 2?
8    A.  I can't confirm.  I don't know.
9    Q.  There's a Megan listed on this page with no
10  last name.  Do you know that Megan's last name?
11    A.  I don't.
12    Q.  Do you see that Megan has a photo there?
13    A.  Yes.
14    Q.  Is that a photo you added or any reason to
15  believe Megan is a contact you have?
16    A.  No.
17    Q.  See there's a Kevin Skalsky on this page.
18  Do you see that?
19    A.  Yes.
20    Q.  Is that Skalsky from the CART team on your
21  roster?
22    A.  I -- I would -- if I was -- if this was
23  during right now, I would assume that it would be
24  Kevin.
25    Q.  Do you know Kevin Skalsky?

135

1    A.  I do.
2    Q.  Do you know anyone else on the State Patrol
3  with the last name Skalsky?
4    A.  No, I don't.
5    Q.  But you're not sure that that CART person
6  is Skalsky?
7    A.  I'm -- I can't confirm.  I didn't -- but
8  there's nobody that I recall with the same last
9  name.
10    Q.  Yeah.  Do you recall if Kevin Skalsky from
11  the album put up photos in the album?
12    A.  Yes.
13    Q.  On the next page, we'll go to 5, do you see
14  that there's a Mike Hill listed here?
15    A.  Yes.
16    Q.  So obviously that's not Mike Eck; right?
17    A.  Correct.
18    Q.  Does having one less Mike help you deduce
19  if the previous Mike might be Lieutenant Eck?
20    A.  I don't have any way to be able to identify
21  if that's Mike Eck.
22    Q.  Do you see a Steven Fischer on this page?
23    A.  I see --
24    Q.  Steve Fischer?
25    A.  -- Steve Fischer, yes.

136

1    Q.  This might be a repeat because I think
2  we've already determined that we think that's Steve
3  Fischer on CART; right?
4    A.  I think we had a different Fischer because
5  -- Eric Fischer.
6    Q.  Ah, an Eric or Steve.  Do you know whether
7  the Fischer on CART is Eric, Steve or neither?
8    A.  I don't know who that is.
9    Q.  To the best of your knowledge, are Eric and
10  Steve Fischer related?
11    A.  To the best of my knowledge, they are not.
12  I don't think they are.
13    Q.  It's fine, you're probably not related to
14  every Johnson.  Do you see Joe Dellwo on the
15  membership page?
16    A.  Yes.
17    Q.  Is that Joe Dellwo on Squad 1?
18    A.  No.  That's his dad.
19    Q.  Ah, that's his dad.  Joe is the dad?
20    A.  Correct.
21    Q.  What position does father Joe Dellwo, in
22  the non-Catholic priest sense, what position does he
23  hold at the State Patrol?
24    A.  Retired.
25    Q.  What was he at the time of the George Floyd

137

1  operation?
2    A.  I think retired.
3    Q.  So there are members of this group who were
4  retired State Patrol folks?
5    A.  I can't verify.  I know that he's been
6  retired for a while.  I don't know if he was retired
7  during this time, but I feel like he was.
8    Q.  Sure.  To the best of your knowledge, were
9  there non-State Patrol members of this photo album?
10    A.  Not that I'm aware of.
11    Q.  Family members of State Patrol people who
12  are non-State Patrol?
13    A.  Other than the family member Joe to Kenny,
14  his son, I have -- I don't have any knowledge of
15  anybody on this list not being part of the State
16  Patrol.
17    Q.  Sure.  But you joined with your personal
18  email; right?
19    A.  Correct.
20    Q.  So there's no reason you couldn't join if
21  you weren't a member of the State Patrol; right?
22    A.  Correct.
23    MR. WEINER:  Objection, calls for
24  speculation.
25  BY MS. WIESSNER:

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

138

1  Q. Do you see Adam Schmidt listed on this
2  page?
3  A. I do.
4  Q. Is that -- oh, on Squad 1 there's an Aaron
5  Schmidt and then an A. Schmidt; is that right? Am I
6  making that up?
7  A. We've got a Schmidt without --
8  Q. Yes, we have an Aaron Schmidt on Squad 1.
9  Do you see that?
10  A. Yes.
11  Q. And then on Squad --
12  MR. WEINER: I think Squad 1 is about five
13  lines down.
14  BY MS. WIESSNER:
15  Q. There's another Schmidt with no letter. Do
16  you see that?
17  A. Correct.
18  Q. Is that Aaron Schmidt -- or Adam Schmidt
19  then?
20  A. Possibly.
21  Q. Because I see the only person on here with
22  a whole first name, not just a letter, is Aaron
23  Schmidt; right?
24  A. Right.
25  Q. So safe to assume that the other Schmidt is

139

1  Adam Schmidt?
2  MR. WEINER: Objection, calls for
3  speculation.
4  THE WITNESS: It's possible. There are
5  other Schmidts on the State Patrol, so I don't know.
6  MS. WIESSNER: Sure.
7  BY MS. WIESSNER:
8  Q. Next page, page 6. Do you see Kendra Rock
9  listed on this page?
10  A. Yes.
11  Q. And she was on your squad; right?
12  A. That's what it lists.
13  Q. John Thompson on this page?
14  A. Yes.
15  Q. Do you know if that's Thompson from Squad
16  4?
17  A. I don't.
18  Q. There's a JW listed. Do you know what
19  those initials stand for?
20  A. I don't.
21  Q. Totally fine. The name Michael
22  Fredrickson, do you see that?
23  A. Yes.
24  Q. Do you know if that's Fredrickson from
25  Squad 2?

140

1  A. Perhaps.
2  Q. Do you know who Justin S. is or what the S
3  stands for?
4  A. I don't.
5  Q. And I'm not trying to trick you. I'm
6  just --
7  A. No, I understand. I'm just trying to
8  recall if I know the individuals. A lot of times
9  it's last name or -- it's just a big department.
10  Sometimes I just don't know. But I don't know who
11  that one is.
12  Q. Do you see Nate Walton on this page?
13  A. Yes.
14  Q. Do you know if that is Walton from Squad 4?
15  A. I don't.
16  Q. And do you see a Kevin Wellens on this
17  page?
18  A. Yes.
19  Q. Do you know if that is Wellens from Squad
20  1?
21  A. I don't.
22  Q. The next page, page 7, do you know who
23  Chris F. is, what the F stands for?
24  A. No.
25  Q. We'll look at page 8 to 9. You'll see

141

1  about halfway down the page, it starts listing just
2  email addresses. Do you see that?
3  A. Yes.
4  Q. Do you know why some list names and some
5  list emails?
6  A. I don't.
7  Q. For Joe k-a-v-l-i-e, not sure if it's all
8  one last name, do you know who that is?
9  A. I don't.
10  Q. Do you know who Darren -- the one email
11  that starts with Darren, the next one, do you know
12  who that is?
13  A. No.
14  Q. Scott D. McCarty, do you know who that one
15  is?
16  A. No.
17  Q. Thomas Haugen, do you know who that is?
18  A. Yes.
19  Q. Who's Thomas Haugen?
20  A. He is a trooper.
21  Q. Is he on the MRT?
22  A. I don't know.
23  Q. Do you remember him being at the George
24  Floyd operation period?
25  A. I don't remember anything specific about

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

142

1  him there.
2      Q.  Is he at 3100 with you?
3      A.  He used to be, but he has since transferred
4  several years ago.
5      Q.  Sure.  Do you know who Jill Krause is?
6      A.  I've heard the name but I don't -- I don't
7  know who she is.
8      Q.  Heard the name in the context of a person
9  who's at the State Patrol?
10     A.  Yes.
11     Q.  Do you know who M. Sorenson is?
12     A.  Not off the top of my head, no.
13     Q.  Keep going to the next page, I'm going to
14  start out halfway down since the names have
15  repeated.  TD Shipma, maybe Shipman, do you know who
16  that is?
17     A.  No.
18     Q.  CM Weidell, do you know who that is?
19     A.  No.
20     Q.  BJ Englund, do you know who that is?
21     A.  No.
22     Q.  Do you recognize a badge number 573 or know
23  whose badge number might be 573?
24     A.  No.
25     Q.  Do you know whose email is 573 MSP?

143

1      A.  No.
2      Q.  Do you know who Newton J. is?
3      A.  No.
4      Q.  This is a more distinct one, so do you know
5  who Minnesota, or mnredneckbarbie is?
6      A.  Nope.
7      Q.  I think that's all of the names I had to
8  look at.
9         Taking another look at MSP 3, at your squad,
10  besides the ones we've identified already, which was
11  Sara DuPaul, you, Tyler Milless, or Milless, and
12  Kendra Rock, do you recall any of the members of
13  your squad using or looking at the shared album?
14     A.  No.
15     Q.  Do you recall talking to anyone on your
16  squad about the Google album?
17     A.  No.
18     Q.  Do you recall talking to anyone at all on
19  the MRT about the shared album?
20     A.  I don't recall specifically, no.
21     Q.  In your email, you say that the photos
22  "were taken by troopers/sergeants/lieutenants that
23  were all present and we all saved and shared the
24  photos."
25     A.  Yes.

144

1      Q.  Were those generic descriptions, when you
2  say troopers/sergeants/lieutenants, or do you mean
3  only troopers, lieutenants and sergeants added
4  photos?
5         MR. WEINER:  Objection, vague.
6         THE WITNESS:  Just as a general.
7  BY MS. WIESSNER:
8      Q.  So possible there are captains that are in
9  the group?
10     A.  It's possible.
11     Q.  Possible there are majors who are in the
12  group?
13     A.  Possible.
14     Q.  Do you recall which sergeants or did you
15  recognize anyone's name as a sergeant when we went
16  through the membership?
17     A.  I'd have to look again to recall any
18  sergeants.  Do you want me to just quickly --
19     Q.  It would be helpful if you would just
20  identify leadership as in a sergeant, lieutenant,
21  captain or major.
22     A.  Okay.
23     Q.  So anyone who's above the trooper level.
24     A.  (Reviewing document).  So in regards to
25  sergeant -- and just for clarification, State

145

1  Trooper sergeants, when -- this is how it was when I
2  left.  I assume it has not changed.  They don't hold
3  any sort of -- it's more of a ranking for scheduling
4  rather than any sort of -- they don't have any
5  authority, if that -- they don't -- they can't
6  correct or discipline or anything like that.  They
7  write a schedule.
8      Q.  Sure, I'd still like you to identify them,
9  but --
10     A.  Absolutely.
11     Q.  -- thank you for clarifying that.
12     A.  Al Ryan is a sergeant.  Kevin Skalsky, if
13  my memory serves me correctly, he is a lieutenant.
14  Steve Fischer, lieutenant.  Danielle is -- was --
15  she was a dispatcher.
16     Q.  What does dispatcher mean?
17     A.  She answered the calls, the 911 calls or
18  calls that would come in filtered through MSP and
19  then dispatched troopers too.
20     Q.  Sure.
21     A.  Tyler Milless, I believe he is a
22  lieutenant.  Tyler Uthe, he -- there's a possibility
23  he is a lieutenant.  And that's all I can give you
24  on that.
25     Q.  Do you recall if then Captain, now Major

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

146

1  Dwyer was ever a member of the photo album?
2  **A. I don't recall.**
3  Q. Do you recall if Captain Engeldinger was
4  ever a member of the photo album?
5  **A. I don't recall.**
6  Q. Do you recall talking to him about the
7  photo album?
8  **A. No.**
9  Q. Do you recall if Ben Lockman was ever a
10  member of the photo album?
11  **A. I don't recall.**
12  Q. Okay, let's turn back to the exhibit with
13  the photos that you have in front of you.
14  **A. There we go.**
15  Q. Exhibit 3. And actually, just to be
16  confusing, let's look at the email first, your
17  email, Exhibit 6, yeah. So you included a photo
18  with your email that's from the album; correct?
19  **A. Yes.**
20  Q. And this photo shows you second from the
21  left; right?
22  **A. Yes.**
23  Q. Do you recall where this photo was taken?
24  **A. This was at the initial muster point. I**
25  **want to say it was a MnDOT garage.**

147

1  Q. Do you recall when it was taken?
2  **A. It was either the Wednesday or Thursday.**
3  **It was like the first or second day -- or excuse me.**
4  **It was either the first day that we -- when we went**
5  **out, or the day prior when we were sent home. We**
6  **suited up, then we were sent home, and then we came**
7  **back down the next day. So it was either one of**
8  **those two days.**
9  Q. So it was early?
10  **A. Correct.**
11  Q. That's what you mean by initial muster, is
12  it was early in the operation?
13  **A. Yes.**
14  Q. You mentioned you are dressed for duty in
15  this photo?
16  **A. Yes.**
17  Q. That's what's often referred to as the
18  turtle suit?
19  **A. Yes.**
20  Q. This is the riot gear?
21  **A. Yes.**
22  Q. What was the atmosphere amongst the
23  troopers at the time this photo was taken early in
24  the George Floyd operation period?
25  **A. I would say that we were -- we were pretty**

148

1  **focused.**
2  Q. Do you recall how you were feeling when
3  this photo was taken?
4  **A. I mean we were -- we were ready to work.**
5  Q. And you'll also see the cover photo on your
6  same email.
7  **A. Yes.**
8  Q. And in this photo, do you recall where this
9  photo was taken?
10  MR. WEINER: Objection, calls for
11  speculation.
12  BY MS. WIESSNER:
13  Q. Do you know where this photo was taken?
14  **A. I do not know.**
15  Q. Do you see a 35W South sign in the
16  background?
17  **A. Yes.**
18  Q. And are these members of the State Patrol
19  in their turtle gear in this photo?
20  **A. Yes.**
21  Q. Do you see the blue smoke?
22  **A. Yes.**
23  Q. Do you recall blue smoke being deployed on
24  May 30, 2020 --
25  **A. Yes.**

149

1  Q. -- outside the Fifth Precinct?
2  **A. Yes. I mean I remember the blue smoke**
3  **being deployed that Saturday.**
4  Q. Sure.
5  **A. Okay.**
6  Q. Were you aware that the Fifth Precinct is
7  close to 35W South?
8  **A. No.**
9  Q. Possible this is a photo from May 30th,
10  though?
11  **A. Yes.**
12  MR. WEINER: Objection, calls for
13  speculation.
14  BY MS. WIESSNER:
15  Q. Why is this photo the cover photo? What
16  makes it special or unique?
17  MR. WEINER: Objection, calls for
18  speculation.
19  THE WITNESS: From my understanding, that
20  it was taken by a member of the press and it was --
21  it looks cool.
22  BY MS. WIESSNER:
23  Q. I believe the kids would call this a bad
24  ass photo; right?
25  **A. That's accurate.**

38 (Pages 146 to 149)

Tesa Johnson (Vol. 1)
12/20/2023

150

1    MR. WEINER:  Go on record that neither my
2  15-year-old or 12-year-old would ever refer to this
3  as a bad ass photo.  Spoken like a true nonparent.
4    MS. WIESSNER:  Don't put it on the record
5  that I'm old.  I don't know what the kids say these
6  days.
7  BY MS. WIESSNER:
8    Q.  Let's turn now to Exhibit 3, which is that
9  packet of photos from the photo album or the group
10  album.  So let's take a look at the first three
11  photos, if you'd just look at them to identify the
12  area.
13    MR. WEINER:  Counsel, before, I'd asked
14  that we get the file names for these photos.  I was
15  under the impression you guys gave to get that
16  for us during the break.  Did that happen?
17    MR. NOEL:  I think if you have the -- I
18  mean, I know you asked for that, but if we have --
19  we can get you those later.  I feel like if you have
20  the same photos we're looking at now, that should be
21  sufficient.
22    MR. WEINER:  Well, the problem is there are
23  600 files that I'd have to go through to find that.
24  And so I prefer not to do that, particularly because
25  I'd like to be able to match up the metadata to the

151

1  photos that you guys have now put on this exhibit.
2    So I'm going to ask again, during the break --
3  I mean I know you guys have five attorneys on the
4  case, paralegals and whatnot, that you send an email
5  and you get the information for us because this is
6  something that you guys pulled together.  So please
7  do that for us.
8    MR. NOEL:  Yeah, I don't think we've agreed
9  to that, particularly during a break, so if that's
10  going to be an issue, we can deal with it.  I think
11  for the deposition, as long as you have copies of
12  the photographs that she's referring the witness to,
13  you're in good shape, unless there's a concern that
14  we've doctored the photos between the time we got
15  them and Exhibit 3.
16    MR. WEINER:  Ms. Johnson, just so you know,
17  they don't have this information, that may mean that
18  I need to keep open this deposition to have you come
19  back to answer these questions for me about the
20  metadata on this.  I'm doing this so that you don't
21  have to come back.  There's no guarantee that that's
22  what's going to happen here, but I want to make sure
23  that it's on the record that that's something that
24  may have to happen, depending on what questions are
25  asked and what information is provided on this.

152

1    THE WITNESS:  Okay.
2  BY MS. WIESSNER:
3    Q.  In these first three photos, do you
4  recognize this area from the George Floyd operation
5  period?
6    A.  Yes.
7    Q.  Is this the Arden Hills or Shoreview
8  staging area?
9    A.  It appears so.
10    Q.  Do you see in the first photo, there's
11  Metro Transit buses in the background?
12    A.  Yes.
13    Q.  So when we discussed before that sometimes
14  there were briefings at Arden Hills, Shoreview, is
15  this the area that briefings would be held?
16    A.  This is the location where they would have
17  been held, yes.
18    Q.  And if we look at the third photo, does
19  that look to you like a group briefing of some sort?
20    A.  Yes.
21    Q.  You don't know when this briefing took
22  place; right?
23    A.  No.
24    Q.  You don't know when this photo was taken?
25    A.  No.

153

1    Q.  Can you tell who is standing and leading
2  that briefing, either of those two folks standing
3  facing the group?
4    A.  It appears as though the person that is
5  speaking, the person who's standing further off to
6  the right, the furthest to the right, would be
7  Colonel Langer.
8    Q.  Can you tell who the person more to the
9  left with their back to the camera is?
10    A.  It appears to be -- you know, I can't
11  remember his name.  I think he's out of the
12  St. Cloud station, a lieutenant out of the St. Cloud
13  station.
14    Q.  Lieutenant Stricker?
15    A.  No.
16    Q.  Lieutenant Geiger?
17    A.  No.
18    Q.  He's a captain, anyway, so now I'm just
19  guessing.  I'll stop.
20    A.  I haven't seen his name listed on anything
21  yet, so --
22    Q.  Sure.  Let's take a look at photos 4 --
23  Let's just start with photo 4.  Do you see yourself
24  in the foreground on the left in this photo?
25    A.  Yes.

39 (Pages 150 to 153)

Tesa Johnson (Vol. 1)
12/20/2023

154

1  Q.  This is on one of the Metro Transit City or
2  MTC buses; right?
3  A.  Yes.
4  Q.  You said you took the buses multiple times;
5  right?
6  A.  Yes.
7  Q.  So do you know what day this photo was
8  taken or when this was?
9  A.  I don't.
10  Q.  Do you know the person sitting next to you?
11  A.  Yes.
12  Q.  Who is that?
13  A.  Karla Bearce.
14  Q.  Do you recall sitting next to Karla Bearce
15  on a Metro Transit City bus during the George Floyd
16  operation period?
17  A.  Yes.
18  Q.  Do you know if that was May 30, 2020 or a
19  different day?
20  A.  I don't.
21  Q.  The people in this bus are posing for a
22  photo; right?
23  A.  Yes.
24  Q.  You see people smiling for the camera;
25  right?

155

1  A.  Yes.
2  Q.  Do you recall what the mood or atmosphere
3  was like on this bus?
4  A.  Again, I would say it was probably focused.
5  I don't recall any -- anything on our buses that was
6  -- that would be particularly notable that occurred
7  or anything other than we were just getting ready to
8  go and work and not get injured or our partners get
9  injured or anything, so --
10  Q.  You mentioned some people were concerned
11  about things they said on these buses being captured
12  on camera.  Do you remember that?
13  A.  Yes.
14  Q.  Do you recall if anyone on this bus was
15  saying things that they wouldn't want to be captured
16  on camera or would be concerned about being captured
17  on camera?
18  A.  There -- there was -- and I don't even
19  understand what the significance of it, but Tyler
20  Millness, I always want to say Millsness, I don't
21  know why, but Millness, was a bit on the louder
22  side.  There was a lot of -- he -- tip of the spear,
23  I don't know what it means, but I know I was --
24  heard that several times and I didn't -- and it
25  sticks in my head because I'm like, what does that

156

1  even mean?  I don't know.  But other than that,
2  nothing -- nothing sticks out in my mind from these
3  folks.
4  Q.  Is Tyler Milless in this photo?
5  A.  He is.
6  Q.  Which person is he?
7  A.  He is the fourth person -- fifth person
8  from -- on the right side.  So one, two, three,
9  four, five (indicating).
10  Q.  This is going to be very hard for the
11  record.  Am I pointing to the right person?
12  A.  Indeed, yes, you are.
13  Q.  So starting at the front with the man on
14  the right in the sunglasses, count one, two, three,
15  four, five, and you'll see him by the aisle; is that
16  correct?
17  A.  Correct.
18  Q.  Is there anyone else in this photo that you
19  recognize from Squad 3 from your roster?
20  A.  Yes.
21  Q.  Who else?
22  A.  Travis Pearson is across from Karla.
23  Q.  Okay.
24  A.  Dave Johnston is behind Travis.  The person
25  behind Dave, I don't remember his name.  If I could

157

1  just kind of do this here (indicating).  Jason
2  Brown.
3  Q.  With the bald head, kind of leaning into
4  the aisle?
5  A.  Correct.
6  Q.  Okay, Jason Brown.
7  A.  I want to say this is Stricker.
8  Q.  Behind Miss Bearce?
9  A.  Correct.  Behind Stricker is Kendra Rock.
10  Q.  Kendra Rock is next to the bald man who we
11  identified as Brown?
12  A.  It appears so, yes.  And this is Chad Nigg.
13  Q.  Who is up and to the left, larger man
14  behind Kendra Rock?
15  A.  Yes.
16  Q.  Okay.
17  A.  I believe that's Brian VanDenEinde.
18  Q.  Who is next to --
19  A.  Off to the right of Chad.
20  Q.  Off to the right, further towards the back
21  of the bus?
22  A.  Correct, standing up.  And across here is
23  Steve Vanderport.
24  Q.  So he is on the other aisle-facing seat to
25  the left, further back on the bus?

40 (Pages 154 to 157)

Tesa Johnson (Vol. 1)
12/20/2023

158

1    A.  Standing up, yes.
2    Q.  Standing up, okay.  Do you recognize who's
3 next to him?
4    A.  Is that the Lockman kid?
5    Q.  I would ask you if that is Ben Lockman.
6    A.  I'm sorry.  I do -- I think I do know his
7 face now, yeah.
8    Q.  I'll represent I also believe that's Ben
9 Lockman.
10    A.  I apologize, sometimes I need to see a face
11 and then remember their name.  And John --
12    Q.  In the sunglasses is John?
13    A.  Yes.  I don't know why his last name is
14 escaping me right now.  I can't remember his last
15 name right now, but it might come to me.
16    Q.  Sure.  Does seeing Ben Lockman's face
17 refresh your recollection of any conversations or
18 interactions with him?
19    A.  No.  I think he was just -- I remember him
20 because he was a young trooper.  That's it.
21    Q.  If we turn to photo 6, is this a selfie
22 with you and Karla Bearce; right?
23    A.  Yes.
24    Q.  How were you feeling when this photo was
25 taken?

159

1    A.  Same thing.  Karla is a good friend of mine
2 and we have been on MRT together and we've taught
3 together quite a bit.  We were just getting ready to
4 go out and deal with a civil -- another civil
5 unrest.
6    Q.  Was there a sense of excitement about being
7 in a historic event?
8    A.  Yes.
9    Q.  And if we look at photo 7, is that Sara
10 DuPaul on the right?
11    A.  Yes.
12    Q.  Who's on the left?
13    A.  Brian VanDenEinde.
14    Q.  Brian VanDenEinde is giving a thumbs up;
15 right?
16    A.  Yes.
17    Q.  Sara DuPaul is smiling?
18    A.  Yes.
19    Q.  Do they look terrified or traumatized in
20 this photo?
21    A.  No.
22    Q.  Turn to photo 8.  Do you recognize this
23 photo?
24    A.  Yes.
25    Q.  Do you know who took it?

160

1    A.  I don't know who took it, no.
2    Q.  I'll represent that it is labeled in the
3 group as Tyler Millness or Milless.  Does that
4 refresh your recollection?
5    A.  I mean I know who it is, but it doesn't
6 refresh that --
7    Q.  Sure, if you don't know, you don't know.
8    A.  Yeah.
9    Q.  But Tyler Milless was on your squad on
10 May 30th; right?
11    A.  Yes.
12    Q.  So on this photo, it's labeled the morale
13 meter; right?
14    A.  Yes.
15    Q.  And it starts at sandwich bad; right?
16    A.  Yes.
17    Q.  And then it goes all the way up to shock
18 and awe; right?
19    A.  Yes.
20    Q.  Can you explain what this morale meter
21 means?
22        MR. WEINER:  Objection, calls for
23 speculation.
24        THE WITNESS:  The morale meter is -- it's
25 kind of, I would say -- when we would have the

161

1 debriefs, it was sort of something that we would say
2 kind of to light -- to, say, lighten the mood.
3     There was a trooper and he -- he was funny, and
4 he would get up and he would, you know -- like the
5 first couple days, or the first maybe 30 hours or
6 so, we didn't even have food.  We were working -- we
7 were working 20 plus hours.  And so with law
8 enforcement having, you know -- we're out there,
9 we're working, we're not stopping, so that's the
10 morale meter would be like low.  And they're
11 referring to it as sandwich bad.  Meh, not so good.
12     It was more of a morale sort of deal, of we
13 have been on our feet, we haven't eaten, we haven't
14 slept, and it continued.  You know, we were on five
15 hours of sleep for a long time, and so this was, I
16 would say, more of comedic relief, per se, I guess.
17     Shock and awe, on this, I don't -- I can't say
18 what it was referring to as -- meaning sandwich bad,
19 I mean it's not -- that's not we got a sandwich that
20 sucked.  It's just what he put at the lower one, I
21 guess, so I don't know how to interpret it.
22        MS. WIESSNER:  That's fine.
23 BY MS. WIESSNER:
24    Q.  So you said this is comedic relief; right?
25    A.  Yes.

41 (Pages 158 to 161)

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

162

1  Q.  This isn't an official order that's given
2  in a briefing; right?
3  **A.  No.  This is by a trooper as, you know --**
4  **not anything that was given by a admin.**
5  Q.  So shock and awe in this context is
6  different than how we were talking about shock and
7  awe being given at a briefing or ordered at a
8  briefing?
9  **A.  Correct.**
10  MR. WEINER:  Objection, misstates the
11  testimony and calls for speculation.
12  THE WITNESS:  Yes, correct, I would say
13  that, or agree to that.
14  BY MS. WIESSNER:
15  Q.  So this doesn't refer to using a lot of
16  force bringing up morale?
17  **A.  No.**
18  Q.  Let's take a look at photos 10 and 11.
19  What are these two photos depicting?
20  MR. WEINER:  Objection, calls for
21  speculation.
22  THE WITNESS:  10 and 11 are pictures of --
23  if you look closely, you can see the pull pin, and I
24  have a paper tape over my pull pin.  And if you look
25  at photo 11, you can see the tape on the other side.

163

1  So I had put that on there because if you pull the
2  pin, just like -- if you pull the pin, you can spray
3  this.  If you've ever been sprayed by anything,
4  pepper spray, OC, anything like that, you know that
5  this is not going back on your body until it's
6  repinned.
7  So what I was showing was let's tape it in and
8  then we're not -- it's not going to get pulled out
9  while we're working, and you're not going to lose it
10  and you can put it right back in.
11  BY MS. WIESSNER:
12  Q.  That's very helpful.  I'm going to walk
13  back a little bit just to confirm.  This is Mark 9;
14  correct?
15  **A.  Correct, yes.**
16  Q.  Or labeled MK-9; right?
17  **A.  Yes.**
18  Q.  It's Oleo-Resin Capsicum, OC spray; right?
19  **A.  I believe so, yes.**
20  Q.  Commonly referred to as pepper spray?
21  **A.  Yes.**
22  Q.  So what you're referring to is a system to
23  repin and keep your Mark 9 safe?
24  **A.  Correct.**
25  Q.  Okay.  As you sit here today, do you

164

1  understand that Mark 9 OC spray is what Carolyn and
2  Molly were sprayed in the face with?
3  **A.  Yes.**
4  MR. WEINER:  Objection, calls for
5  speculation.
6  THE WITNESS:  Yes, I do.
7  BY MS. WIESSNER:
8  Q.  It would be painful to be sprayed in the
9  face with OC spray?
10  **A.  Very much.**
11  Q.  It would make your eyes burn?
12  **A.  Yes.**
13  Q.  It would incapacitate you when it hits your
14  face?
15  MR. WEINER:  Objection, calls for
16  speculation.
17  THE WITNESS:  It's possible.
18  BY MS. WIESSNER:
19  Q.  It might make you fall down?
20  MR. WEINER:  Objection, calls for
21  speculation.
22  THE WITNESS:  It's possible.
23  BY MS. WIESSNER:
24  Q.  It would make it hard to see?
25  MR. WEINER:  Objection, calls for

165

1  speculation.
2  THE WITNESS:  Yes.
3  BY MS. WIESSNER:
4  Q.  Let's take a look at photos 14 and 15.  So
5  we'll start with 14.  Do you see that this is a
6  screen shot of several photos from the album?
7  **A.  Yes.**
8  Q.  Do you see a photo labeled Josh Monson with
9  a black man being arrested?
10  **A.  Yes.**
11  Q.  Do you see a photo labeled Joe Wressell
12  with what I believe to be a blonde white woman being
13  arrested?
14  **A.  Yes.**
15  Q.  Do you know why these arrests were worthy
16  of putting up in the group or relevant to put up in
17  the group?
18  MR. WEINER:  Objection, calls for
19  speculation.
20  THE WITNESS:  I don't know if there was a
21  particular reason why they were uploaded, other than
22  just being part of the George Floyd incident.
23  BY MS. WIESSNER:
24  Q.  You weren't present or don't recall being
25  present for either of these arrests?

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

166

1    **A. I was present for the arrest that you see**
2    **with the blonde white woman.**
3        Q. Okay. Was there something notable about
4    that arrest that would warrant putting up pictures
5    in the album of it?
6        MR. WEINER: Objection, calls for
7    speculation.
8        THE WITNESS: I don't know. I know that
9    these were taken, we were on the freeway and there
10   were -- it was -- they were given commands to
11   disperse, people didn't disperse, and I -- I
12   remember this, but nothing notable other than there
13   was photographers up above on those -- on the walls
14   that -- I think they were sound barrier walls or
15   something.
16       I'm not very familiar with the -- I'm not
17   familiar at all with the Twin Cities, or limited, I
18   guess. But they were taken by a photographer and
19   Joe must have screen grabbed them off of the
20   internet or something somewhere.
21   BY MS. WIESSNER:
22       Q. These photos depict their faces; right?
23   **A. These photos depict --**
24       Q. The face of the arrestee.
25   **A. Correct.**

167

1        Q. Is it appropriate to circulate photos of
2    someone being arrested?
3    **A. I would say no.**
4        Q. To the best of your knowledge, would that
5    violate any State Patrol policies?
6    **A. Well, according to the policies, I would**
7    **say yes.**
8        Q. Which policies are you referring to?
9    **A. Well, if she's arrested, I would think that**
10   **it's considered an active investigation. Granted,**
11   **it's taken by a professional photographer so I don't**
12   **know where -- without having general orders in front**
13   **of me, being able to look at them, but I'm sure it's**
14   **a violation of something.**
15       Q. And if we take a look at photo 15 on the
16   next page, would be a larger view of that one, do
17   you recognize this person?
18   **A. The 401?**
19       Q. Let's start with the man being arrested or
20   who appears to be arrested. Do you recognize the
21   person on the left being arrested?
22   **A. I do not.**
23       Q. Do you recognize a State Patrol officer
24   with helmet labeled 401?
25   **A. I do. His name is escaping me.**

168

1        Q. Sure. Do you recall this arrest happening?
2    **A. No.**
3        Q. Do you know anything about why this arrest
4    would be notable or included in the photo album?
5    **A. No.**
6        Q. Do you see something on this arrestee's
7    shirt collar, on the front of his shirt?
8    **A. Is it glasses or sunglasses hanging? Or**
9    **there's something hanging from his shirt.**
10       Q. But you don't know what that is?
11   **A. No.**
12       Q. Let's take a look at photo 16. Do you
13   recognize this photo?
14   **A. Mm-hmm (nodding head).**
15       Q. Do you know who posted this photo?
16   **A. I don't.**
17       Q. Do you see the caption says, "Capital has
18   us like"?
19   **A. Yeah.**
20       Q. Do you see that?
21   **A. Yeah.**
22       Q. Do you recognize what kind of caption this
23   is?
24   **A. Snapchat.**
25       Q. So this was a photo posted on the social

169

1    media app Snapchat?
2    **A. Originally, I would assume so, yes.**
3        Q. And are you familiar with Snapchat?
4    **A. Yes.**
5        Q. It allows you to send photos to your
6    friends and contacts; right?
7    **A. Yes.**
8        Q. You can add captions, you can edit or draw
9    on the photos; right?
10   **A. Yes.**
11       Q. You can send those photos to anyone on
12   Snapchat, whether they're your friend, in your phone
13   or just on the app; right?
14   **A. Correct.**
15       Q. So this photo could be sent not just to
16   troopers; right?
17   **A. Correct.**
18       Q. Were you aware that State Patrol troopers
19   were sending and sharing photos on Snapchat during
20   the George Floyd operation?
21   **A. Most likely, I'm sure I was.**
22       Q. Were you sending or sharing photos on
23   Snapchat?
24   **A. I don't -- I don't remember. It's**
25   **possible. I don't remember.**

Tesa Johnson (Vol. 1)
12/20/2023

170

1   Q.  Do you use Snapchat?
2   A.  Yes, I do.
3   Q.  Do you know if it violates the rules to use
4   Snapchat while you're on duty in uniform?
5   A.  I don't know.  Perhaps.
6   Q.  Do you think sharing or circulating the
7   photo you see in front of you on Snapchat is
8   appropriate?
9   A.  This particular photo, I -- I mean I don't
10  know.  I look at this photo a little differently in
11  what you would say like appropriateness, when it's
12  just like -- I don't know who took the photo -- or
13  did this on Snapchat initially.  But I remember
14  seeing the photo because it's funny because in this
15  particular situation they were in the capital for
16  hours and hours and hours and hours and hours and
17  hours.  But I mean I'm sure it's against general
18  orders.
19  Q.  And, you know, I understand the photo is
20  funny; right?
21  A.  Yeah, it is.
22  Q.  And I'm not saying it's inappropriate in
23  that it's not funny.
24  A.  Mm-hmm.
25  Q.  But you understand or your belief is that

171

1   circulating photos when you're on duty in uniform,
2   even if they're funny, is not appropriate; right?
3   MR. WEINER:  Objection, calls for
4   speculation.
5   THE WITNESS:  I suppose not.  Yeah, I mean,
6   yeah, that's -- it's probably not appropriate.
7   BY MS. WIESSNER:
8   Q.  But you were aware that State Patrol
9   troopers were sharing and sending photos on Snapchat
10  during the George Floyd operation?
11  A.  Yes.
12  MR. WEINER:  Objection, calls for
13  speculation.
14  BY MS. WIESSNER:
15  Q.  Was that common knowledge?
16  MR. WEINER:  Objection, calls for
17  speculation.
18  THE WITNESS:  I don't know if that was
19  common knowledge.
20  BY MS. WIESSNER:
21  Q.  Well, this person wasn't hiding it; right?
22  A.  No.
23  Q.  They put up a picture from their Snapchat
24  in a group album with hundreds of other people;
25  right?

172

1   A.  Right.
2   Q.  And you don't recall if you were sending or
3   sharing photos on Snapchat; right?
4   A.  I don't recall.  It is very possible.  I
5   won't deny that, because we were -- I mean we were
6   all taking photos and what have you, but I can't say
7   definitively if I was or not.
8   Q.  But it was common enough that you're not
9   sure either way?
10  A.  Correct.
11  Q.  Let's take a look at photos 19 and 20.  And
12  if you could take a moment to let me know if you
13  recognize anyone in these photos.
14  A.  Yes.
15  Q.  Okay, let's start with photo 19.  Who do
16  you recognize in photo 19?
17  A.  Do you want me to start from --
18  Q.  Let's go left to right.
19  A.  Okay.  First face is going to be Abigail
20  Burch.  Second is Elissa Schmidt.  Third is myself.
21  Fourth is Christina Bogojevic.  Fifth, I'll let you
22  know if I remember his name.  Sixth is Mason
23  Kraskey.  And the last is going to be Schaefer, Mark
24  Schaefer.
25  Q.  Bogojevic, she was one of the captains of

173

1   the MRT; right?
2   A.  Yes.
3   Q.  Let's take a look at photo 20.  Let's go
4   right to left this time, just since we've already
5   identified the three people whose backs are -- or
6   back of their heads are to the camera.
7   So starting with the maroon or red shirt on the
8   right, do you know who that is?
9   A.  Yes, Jason -- his last name I believe
10  starts with an S.  Next is number two from the right
11  is going to be Joe Dwyer.  Number three, his name
12  escapes me right now.
13  Q.  Do you know his rank?
14  A.  I believe trooper.  He's not a lieutenant
15  or a captain.
16  Q.  Sure.  Do you know when these photos were
17  taken?
18  A.  These would have been taken one of the
19  evenings of -- it would have been after -- it would
20  have been after the Saturday because we did not have
21  any time when we went back to the hotel other than
22  sleep, eat, go.
23  So once the -- I would say to the best of my
24  knowledge, this would have been post the 30th.  Not
25  that evening, because we were out all night.  This

Tesa Johnson (Vol. 1)
12/20/2023

---

174

1   would have been one of those days after.
2        Q.   Sure.  So some day after the 30th, before
3   the operation ended in June; right?
4        A.   Right.
5        Q.   Do you know how soon after the 30th or have
6   any sense of how soon after the 30th?
7        A.   Maybe three days after or so.
8        Q.   And this is in the hotel where the troopers
9   were staying?
10       A.   Correct.
11       Q.   Or where the MRT, MSP was staying?
12       A.   Yes.
13       Q.   In a conference or ballroom of some sort?
14       A.   Yes.
15       Q.   Do you see that there is a lot of beers on
16   the table?
17       A.   Yes.
18       Q.   Maybe two dozen or so beers on the table?
19       A.   There's several beer -- or quite a few
20   beers on the table.
21       Q.   In photo 20, do you see a bottle of some
22   type of liquor or alcohol on the table?
23       A.   I see a water bottle, Coors Light bottle --
24       Q.   Towards the left side of the table, near
25   the person's elbow, do you see, it looks like an

---

175

1   empty bottle of some type of liquor?
2        A.   Can you point, please?
3        Q.   I can, yeah.  Above his elbow, to the left
4   side.
5        A.   Oh, yeah, yeah.  Yep.
6        Q.   Do you recognize that as a bottle of
7   Captain Morgan?
8        A.   Yes.
9        Q.   And you see some what appears to be brown
10   booze in some cups?
11       A.   Correct.
12       Q.   So can you tell me about what was happening
13   in this photo, the context of it?
14            MR. WEINER:  Objection, foundation.
15   BY MS. WIESSNER:
16       Q.   Well, you were present; correct?
17       A.   I was, yes.
18       Q.   You're depicted in the photos.
19       A.   Yes.
20       Q.   So tell me about the context.
21       A.   This would have been off duty.  Before we
22   would have started that -- the next shift, we would
23   at times have time to go and just decompress.
24       Q.   And you're not in uniform; right?
25       A.   No.

---

176

1        Q.   You confirmed you were off duty.
2        A.   Correct.
3        Q.   Do you know who purchased all of the
4   alcohol?
5        A.   No.
6        Q.   Do you know if the State Patrol paid for
7   the alcohol?
8            MR. WEINER:  Objection, calls for
9   speculation.
10           THE WITNESS:  I don't believe they did.
11   BY MS. WIESSNER:
12       Q.   You don't know if anyone was reimbursed for
13   the alcohol by the State Patrol?
14           MR. WEINER:  Objection, calls for
15   speculation.
16           THE WITNESS:  I don't believe so, no.
17   BY MS. WIESSNER:
18       Q.   Were you given any rules or orders about
19   consuming alcohol during the George Floyd operation?
20       A.   We -- not that I recall.  During that
21   particular operation, especially, you know, those
22   first days, like I said, there was just -- there was
23   zero time.  We wouldn't have even been able to, nor
24   did we want to.  We wanted to sleep and maybe get
25   food.  But no, that -- that -- the alcohol would

---

177

1   have been brought by somebody or -- the State Patrol
2   wouldn't have provided with any alcohol as far as
3   I'm aware.
4        Q.   But later in the deployment there was
5   enough down time to have a night of drinks at the
6   hotel?
7        A.   Yes.
8        Q.   More than one night?
9        A.   Yeah.
10       Q.   How many nights?
11       A.   I don't know.
12       Q.   Did you ever feel hungover after a night of
13   drinking?
14       A.   No.
15       Q.   Do you recall any of the conversations
16   around the table, either in this setting or in other
17   times when you had down time to drink and hang out?
18       A.   I would say typically we wouldn't --
19   typically, my -- we don't want to talk shop when
20   we're drinking, and that's -- the group that is here
21   is just -- what comes to mind is the group that's
22   here is just legit, but that doesn't describe what
23   I'm trying to say.
24            This is not a group that would sit and become
25   inebriated or be wild or anything like that.  And

---

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

178

1  generally, we're just sitting BSing because, again,
2  when you start getting alcohol, we don't talk shop.
3      Q.  Sure.  I think we've established on the
4  record that I am cool and I know what legit means,
5  so this group of people is legit.
6      A.  I have adult children and they still tease
7  me about what I say, so it's fine.
8      Q.  All right, I'm going to turn back to the
9  email that you sent to Carolyn.  It's back in the
10  text of the email.  You wrote that, "During this
11  time there was several data requests from various
12  outlets.  We were instructed to delete the photos
13  and all emails with any connection to the riots or
14  related topics...for many reasons."  Did I read that
15  correctly?
16      A.  Yes.
17      Q.  So right after you mention requests from
18  various outlets, you write, "We were instructed to
19  delete photos and emails"; correct?
20      A.  Yes.
21      Q.  So were you aware of media requests at the
22  time you were directed to delete photos and emails?
23      A.  We as troopers never received those
24  requests directly.  But when I -- when I speak on
25  this, it's -- there were -- and the colonel

179

1  discussed this as well.  There were requests, data
2  requests, coming in for any kind of CAD messages, so
3  messages in between troopers or anybody that would
4  be operating on the computer system, any emails.
5      Apparently they were getting data requests from
6  everywhere, so we were instructed like just delete
7  it all, delete -- you know, delete your emails,
8  delete your -- the photos, if you have text
9  messages, because they were -- they were receiving
10  the data requests and either they -- either they
11  suspected or knew that they were going to have many
12  more, is what my interpretation was, is that they
13  were getting data requests from all angles, and we
14  were instructed to get rid of anything that we had
15  on our phones or emails or anything like that, for
16  -- or for many reasons.  For reasons of that it's --
17  I don't know if you would say like private
18  information with the patrol, like training things in
19  regards to MRT or if you had some ding dong that
20  sent a text or an email that, you know, said
21  something that could be misinterpreted by somebody
22  who made a data request.
23      Q.  So the instruction to delete photos was
24  related to those media requests?
25      A.  Yeah.  Yes.

180

1      Q.  Was it your understanding that the
2  instruction to delete was to prevent the media from
3  getting those emails, photos and data?
4      A.  Yes.
5      Q.  I want to dig in a little bit on these
6  various outlets.  You're referring there to requests
7  by media; right?  Media outlets?
8      A.  In this here?
9      Q.  Yes, when you say requests from various
10  outlets, I just want to confirm.  You're talking
11  about media outlets?
12      A.  Media outlets or anybody that has the
13  ability to make a data request, which is, I think,
14  everybody.
15      Q.  Okay, so the general public too?
16      A.  Yeah.
17      Q.  And you said you don't receive the requests
18  directly; right?
19      A.  Correct.
20      Q.  So how did you know about them?
21      A.  That we were told that the requests were
22  already coming in, right when all of this was going
23  on, and so we knew that.  Is that -- I mean, can you
24  -- I'm sorry, can you ask me the question again?
25      Q.  Sure.  So you said, "We knew that" --

181

1      A.  Yes.
2      Q.  -- "media requests were coming in"; right?
3      A.  Yes.
4      Q.  Who is we in that sentence?
5      A.  All of the troopers and everybody involved
6  with the George Floyd incident.
7      Q.  And who told you that media requests were
8  coming in?
9      A.  I do remember Colonel Langer saying -- and
10  I don't know if that's the only place that I got
11  this, the information from this, but I remember
12  specifically when he was saying that, whether it was
13  during a debrief or if it was in a -- you know, a
14  smaller meeting or something, you know, outside,
15  that there was -- there was requests coming in, and
16  people were able to -- whether it was media or
17  people, they could do a request on a keyword.  So he
18  said they could request I want every single CAD
19  message that involves this word, and he said then
20  they'll get all of -- those will have to be provided
21  to people.
22      So it was more of a being mindful of this is --
23  this -- all of this is a very big deal and don't --
24  you know, don't share things that shouldn't --
25  especially like training, operation wise.

46 (Pages 178 to 181)

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

182

1    Q.  There's a distinction between don't share
2  things and delete things; right?
3    A.  Correct.
4    Q.  And you were told to delete things?
5    A.  Yes.  Yep.  The -- if there were emails
6  that, you know, had any -- I mean there could be
7  many, many, many different reasons why a particular
8  email -- whether it being not nefarious or -- I
9  can't imagine anybody -- Let me back that up.
10    I would hope that nobody would send something
11  on their work email that would be nefarious, but
12  delete emails because those could be requested and
13  then, you know, you can have people gain insight on
14  things that you don't want them to -- you don't --
15  if you're dealing with a civil unrest, you don't
16  want people anticipating or knowing what you're
17  going to do.  You can't fix that situation then.
18    Q.  Was the order to delete limited to deleting
19  confidential things about training or was it broader
20  than that?
21    A.  I would -- my interpretation of it was
22  anything in regards to the riots or, like I said
23  here, related topics.
24    Q.  To the best of your knowledge, was the
25  State Patrol responding to the media requests that

183

1  they received during this period?
2    MR. WEINER:  Objection, calls for
3  speculation.
4    THE WITNESS:  I don't know.  I assume they
5  were.
6  BY MS. WIESSNER:
7    Q.  Is receiving media requests unusual in your
8  experience as a trooper?
9    MR. WEINER:  Objection, calls for
10  speculation.
11    THE WITNESS:  I don't know.
12  BY MS. WIESSNER:
13    Q.  You know that the State Patrol has a public
14  information office?
15    A.  Yes.
16    Q.  You've heard of public information
17  officers; right?
18    A.  Yes.
19    Q.  You know the State Patrol has policies
20  about cooperating with the media?
21    A.  Yes.
22    Q.  About sharing information with the media?
23    A.  Yes.
24    Q.  Sharing information with the media is
25  important for the State Patrol to do its service, do

184

1  its job; right?
2    A.  Yes.
3    Q.  You have to share information about public
4  safety and accidents and highway closures; right?
5    A.  Correct.
6    Q.  Sharing information is good for
7  transparency; right?
8    A.  Yes.
9    Q.  And it improves public trust in the State
10  Patrol to share information with media and the
11  public; right?
12    A.  Yes.
13    MR. WEINER:  Objection, calls for
14  speculation.
15  BY MS. WIESSNER:
16    Q.  In your opinion, being told to delete
17  information when there are media requests, is that
18  being transparent with the public and the media?
19    A.  It could be perceived as not being
20  transparent.
21    Q.  In your opinion, is being told to delete
22  information that the public or media are asking for
23  in line with State Patrol policies?
24    MR. WEINER:  Objection, calls for
25  speculation.

185

1    THE WITNESS:  Maybe not.  In regards to the
2  general orders of the -- a public information
3  officer's duties or what they release or how they
4  operate with that, I don't know.
5  BY MS. WIESSNER:
6    Q.  Did the public information office tell you
7  to delete information or data?
8    A.  No.
9    Q.  Who specifically do you recall?  I know you
10  mentioned Colonel Langer.  Do you recall anyone else
11  specifically telling you to delete photos, emails or
12  data?
13    A.  I can't name who would have said that.  But
14  it was -- it was said and it was knowledge of people
15  that we had to delete anything that had to do with
16  the situation.
17    Q.  Were these instructions to delete
18  information ever in writing?
19    A.  I don't recall.
20    Q.  In an email?
21    A.  I don't recall.
22    Q.  You do recall receiving them verbally,
23  though?
24    A.  Yeah.  Yes.
25    Q.  Do you recall in what setting, meaning were

47 (Pages 182 to 185)

Tesa Johnson (Vol. 1)
12/20/2023

186

1  you with a large group, was it to you individually
2  that you were told?
3     A.  Not to me individually.  It would have been
4  at Arden Hills.
5     Q.  So that would have been during the George
6  Floyd operation period?
7     A.  Correct.
8     Q.  Did you ask why you were being asked to
9  delete information?
10    A.  No.
11    Q.  Did you wonder why?
12    A.  No.
13    Q.  Did you feel that it was appropriate to be
14  asked to delete information when there were media
15  requests?
16    A.  I didn't -- I don't think I gave it that
17  much thought at the time.  It wasn't -- again, that
18  particular subject wasn't high on my -- you know, to
19  question that instruction.
20    Q.  And so you started discussing some of
21  these, "for many reasons."  I'd like to go through,
22  what are the specific reasons that you were asked to
23  delete information?
24    A.  I can tell you what I assume the specific
25  reasons were.  There was nothing specifically

187

1  communicated to us about we need to delete all of
2  this because of X, Y and Z.  It was more of a
3  broader there are data requests coming in, you know,
4  anything that has to do with the riots, delete
5  those, delete those emails, text messages, dah, dah,
6  dah, dah, dah.
7     And my assumption was -- and quite honestly, my
8  assumption was a lot of it, I thought training,
9  muster points, things that would protect our privacy
10 and safety.  That was my initial.
11    There was a small portion in the back of my
12 head like, yeah, you know, you get -- you get people
13 who forget that they're on a work email and may say
14 something that would not be viewed as something that
15 should be put in a work email.  So mainly when he's
16 telling -- when we were being told this, that was my
17 thought.
18    Now, having -- not being in the midst of the
19 situation at the time, being outside of it, then I'd
20 say, you know, you have more opportunity to think
21 about it and, you know, I don't know for sure
22 exactly what they really were trying to hide.  But I
23 think that it does become expanded after the fact,
24 when you have time to sort of step back and think
25 about it, what do they -- what did they want

188

1  deleted.  I don't know.
2     Q.  So you said you're not sure what they're
3  trying to hide; right?
4     A.  No, I -- I don't know what they're trying
5  to hide.
6     Q.  But you --
7     A.  Or what they were.  Sorry.
8     Q.  No, my fault.
9     A.  I'm sure it covered a vast many topics.
10    Q.  But it was your impression they were trying
11 to hide something when they ordered you to delete
12 things?
13    MR. WEINER:  Objection, misstates her
14 testimony.
15    THE WITNESS:  You can -- I mean you can say
16 hide, yes, but like I said, at the time it was -- my
17 thought process at the time was more for safety
18 issues or technical issues -- not issues, but
19 technical things, things that were, you know,
20 communicated with other departments, other troopers,
21 other things like that.
22    And then, of course, in the back of my mind,
23 I'm like, and there's always somebody that sends
24 something or a CAD message, it happens all the time,
25 that they send something that, you know, you're

189

1  like, mm, no, that -- you know.  But at the time, it
2  was my thought was it was more so with keeping the
3  MRT plans private, safety things.
4  BY MS. WIESSNER:
5     Q.  So the media has a right to ask for
6  information; right?
7     A.  Right.
8     Q.  But the State Patrol has the right to tell
9  the media some information is private and can't be
10 shared; right?
11    A.  Correct.
12    MR. WEINER:  Objection, calls for
13 speculation.
14    THE WITNESS:  Correct.
15 BY MS. WIESSNER:
16    Q.  So have you ever heard of the phrase
17 throwing the baby out with the bath water?
18    A.  I have heard it, yes.
19    Q.  So wouldn't deleting lots of information,
20 only some of which is private, be throwing the baby
21 out with the bath water?
22    MR. WEINER:  Objection, calls for
23 speculation.
24    THE WITNESS:  It could be interpreted as
25 that, yes.

48 (Pages 186 to 189)

Tesa Johnson (Vol. 1)
12/20/2023

190

```
 1   BY MS. WIESSNER:
 2       Q.  And information that's private should be
 3   kept confidential; right?
 4       A.  Yes.
 5       Q.  But should it be deleted?
 6       A.  I don't know.  That's why I was never
 7   promoted.
 8       Q.  Was it your impression that the information
 9   you were deleting or instructed to delete was being
10   saved or backed up in some way?
11       A.  I don't know.  I can't answer that.
12       Q.  Were you told to delete photos on your
13   personal phone as well?
14       A.  I want to say yes.  I want to say yes, but
15   I cannot tell you definitively.  I am fairly
16   certain.
17       Q.  In your email you referred to the photos.
18   You said we were instructed to delete the photos and
19   all emails.  Do you see that?
20       A.  Yes.
21       Q.  Are you referring to the photo album when
22   you say the photos?
23       A.  I'm referring to photos that were taken
24   during this time.  I don't know if there was a
25   specific instruction to us or troopers to delete
```

191

```
 1   that particular album, but that would be -- that was
 2   my interpretation of, you know, we're deleting,
 3   deleting the photos from the riots and then any
 4   emails that have any connection.
 5       Q.  So you interpreted the instruction as
 6   including that photo album, that that should be
 7   deleted?
 8       A.  Yes.
 9       (Pause in proceedings for clock chiming.)
10   BY MS. WIESSNER:
11       Q.  So you said you're fairly certain you were
12   told to delete photos on your personal phone; right?
13       A.  Fairly certain, yeah.
14       Q.  What about your personal email?
15       A.  I don't recall anything being said about
16   personal email.
17       Q.  Was it unusual or would it be unusual to be
18   told to delete photos on a personal device?
19       A.  According to the general order, we're not
20   supposed to use our personal phones.
21       Q.  So then you generally aren't instructed to
22   delete things because nothing should be there?
23       A.  I've never been instructed prior to this to
24   do anything with my personal phone in regards of
25   deleting or anything like that.
```

192

```
 1       Q.  So this was the first time you ever
 2   received an order like this?
 3       A.  Yes.
 4       Q.  You're not aware of any written retention
 5   policy that you regularly had to delete emails
 6   pursuant to?
 7       A.  No.
 8       Q.  Were you regularly asked to delete things
 9   on your work email?
10       A.  No.
11       Q.  So you did not delete the photos,
12   obviously; right?
13       A.  Well, the -- no, I didn't because -- and a
14   little -- the email -- the email that this
15   particular Google folder was under, it's kind of
16   dumb, but it has my previously married name, and I
17   was going through a divorce, kind of around --
18   before -- well, I was divorced but it was, you know,
19   still kind of, not ongoing, but ongoing during this
20   time.
21       So that particular email that was used for this
22   Google folder was under that email that I don't use
23   anymore, so I don't know if my assumption was that
24   the -- that it was just going to go away, the
25   folder, or what, but like I said, that was a -- it's
```

193

```
 1   an email that I don't use anymore.  I don't even
 2   like looking at it.
 3       Q.  So it was just an accident that you saved
 4   them?
 5       A.  I didn't save.  They're there because I'm
 6   still on that folder.  So they still exist because
 7   the person who -- my assumption, because I don't
 8   know how this Google folder technicalities work, but
 9   my thought would be the moderator of that folder
10   could delete that folder.  That would be what I
11   would assume.  I don't -- I didn't delete the folder
12   from that Google account.
13       Q.  Sure.  And just to clarify or put a finer
14   point on this.  You weren't intentionally preserving
15   these photos for later; right?
16       A.  Not for any -- no.  When I had opened it up
17   a while ago, the folder was still there.  It's like,
18   oh, okay, here's the folder.  Had no idea.
19       Q.  And there were still lots of photos and
20   lots of members in this group; right?
21       A.  Correct.
22       Q.  So those people also didn't delete the
23   photos; right?
24       A.  Correct.
25       Q.  Did you keep any emails from the George
```

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

194

1  Floyd operation period?
2  **A.  Like on my personal email or --**
3  Q.  On your personal or work email.
4  **A.  I didn't have any on my personal email.**
5  **Work email, I wouldn't have had -- I don't recall**
6  **any emails that would have been -- fallen in under**
7  **that instruction, unless it was an email of a**
8  **question or instruction.  Nothing significant at**
9  **all.**
10  Q.  And fair to say you no longer have access
11  to your work email?
12  **A.  Correct.**
13  Q.  So you were told to delete photos and
14  emails with any connection to the riots or related
15  topics.  What topics did you consider to be related?
16  **A.  Anything that would name -- anything that**
17  **would be indicative of the riots.**
18  Q.  Were you aware of any lawsuits or
19  litigation at the time you were told to delete
20  photos and emails?
21  **A.  No.  Not that I recall.**
22  Q.  Were you aware at any point after the
23  George Floyd operation of a litigation hold or were
24  you given a litigation hold?
25  **A.  I don't recall being instructed on any**

195

1  **litigation holds while we were down there during**
2  **that time.  They did come after, but I don't recall**
3  **anything during that time.**
4  Q.  And just to be sure, you understand what a
5  litigation hold is?
6  **A.  They tell you what not to delete and what**
7  **not to do and what to do with particular media files**
8  **or phone or something.**
9  Q.  That's a great working definition.  You
10  said at some point after, but not while you were in
11  the George Floyd operation, you recall receiving a
12  litigation hold?
13  **A.  Correct.**
14  Q.  Was that after you had already been told to
15  delete data?
16  **A.  The litigation hold notices?**
17  Q.  Yes.  Was after you had been told to delete
18  information?
19  **A.  Correct.**
20  Q.  So you were ordered in that litigation hold
21  to preserve or keep photos and emails only after you
22  had already deleted the photos and emails that would
23  have been preserved?
24  **A.  Correct.**
25  Q.  Would you be surprised to hear that

196

1  Defendant Dwyer and Engeldinger testified that the
2  deleted emails and documents were backed up and
3  preserved?
4  **A.  I don't -- I don't know.**
5  Q.  Are you familiar with a lawsuit brought by
6  a group of journalists represented by the ACLU
7  against the State Patrol and other law enforcement
8  agencies that's called Goyette?
9  **A.  No.**
10  Q.  No knowledge of that lawsuit or the
11  settlement?
12  **A.  None.**
13  Q.  In addition to the photos that you produced
14  in that album, do you have any other photos on your
15  personal phone related to the George Floyd
16  operation?
17  **A.  There was a couple that were not in this**
18  **folder, but I can't describe them to you off the top**
19  **of my head.  They're nothing -- I'd have to look.**
20  Q.  Would you be willing to produce those to
21  the people present today?
22  **A.  Like pull it up on my phone?**
23  Q.  Send them to us after today.  Would you be
24  willing to send any other --
25  **A.  Sure.**

197

1  Q.  -- photos?
2  **A.  Well, they're all included in anything that**
3  **I sent Carolyn.**
4  Q.  Sure.
5  **A.  They're all in those photos.**
6  Q.  So there's no additional photos that you
7  did not send to Carolyn?
8  **A.  No.**
9  Q.  And you said you don't have any personal
10  emails related to the George Floyd operation?
11  **A.  No.**
12  Q.  Do you have any text messages on your phone
13  related to the George Floyd operation?
14  **A.  No.  They would be gone by now if there was**
15  **any.**
16  Q.  Would you be willing to check and make sure
17  that's the case?
18  **A.  Absolutely.**
19  Q.  You had mentioned there's a possibility
20  that Jason Engeldinger had texted you about your
21  last deposition?
22  **A.  Yes.**
23  Q.  Would you be willing to look for your text
24  messages with Jason Engeldinger to send to us?
25  **A.  Sure.**

50 (Pages 194 to 197)

Tesa Johnson (Vol. 1)
12/20/2023

198

1    Q.  If you wouldn't mind sending those after
2 today, that would be helpful.
3    **A.  Certainly.**
4    Q.  Did you preserve anything on any of your
5 social media accounts related to the George Floyd
6 operation?
7    **A.  No.**
8    Q.  No Facebook?
9    **A.  No.**
10    Q.  Snapchat?
11    **A.  No.**
12    Q.  Instagram?
13    **A.  No.**
14    Q.  The cooler apps that Joe's kids use?
15    **A.  I don't even --**
16    Q.  TikTok?
17    **A.  Nope.**
18    Q.  Any other messaging or sharing platforms
19 that you were using during the George Floyd
20 operation period?
21    **A.  No, I don't use anything but Facebook**
22 **because I'm old.**
23    Q.  So no WhatsApp?
24    **A.  No.**
25    Q.  No Slack?

199

1    **A.  No.**
2    Q.  No Discord?
3    **A.  No.**
4    Q.  No jib jab?
5    **A.  No.**
6    Q.  I made the last one up.
7    **A.  I was waiting for something.**
8    MS. WIESSNER:  All right, I only have one
9 last line of questioning, so if anyone needs a
10 break, we could take one or I could just get through
11 the rest.
12    MR. WEINER:  I think our court reporter's
13 been going for an hour and a half, so I suggest that
14 we take a break.
15    MS. WIESSNER:  Yeah, thank you.
16    VIDEOGRAPHER:  Going off the video record
17 at 3:09 p.m.
18    (A break was taken.)
19    VIDEOGRAPHER:  This is File 4, we're on the
20 record at 3:13 p.m.
21 BY MS. WIESSNER:
22    Q.  So Tesa, by May 30, 2020, we talked about
23 the rights of the media before; right?
24    **A.  Correct.**
25    Q.  And their right to be exempt from the

200

1 curfew; right?
2    **A.  Yes.**
3    Q.  So if there's a dispersal order given to a
4 crowd to please disperse because you're in violation
5 of the curfew, that does not apply to media; right?
6    MR. WEINER:  Objection, calls for a legal
7 conclusion.
8    THE WITNESS:  Our knowledge as troopers is
9 that it would not have applied to media.
10 BY MS. WIESSNER:
11    Q.  Press wouldn't have to leave based on a
12 dispersal order for the curfew?
13    **A.  Correct.**
14    Q.  And even if there are other people
15 disobeying that dispersal order or acting rowdy or
16 even rioting, the media still does not have to leave
17 that area; right?
18    **A.  From my understanding, that's correct.**
19    Q.  Because those would be newsworthy events;
20 right?
21    **A.  Correct.**
22    Q.  If someone is rioting or refusing to obey a
23 dispersal order, if the State Patrol is enacting a
24 mass arrest, those are newsworthy events; right?
25    **A.  Correct.**

201

1    Q.  So the media would have the right to stay
2 and cover those events.
3    **A.  Yes.**
4    Q.  You said that you recall being deposed on
5 Zoom in February in this case; right?
6    **A.  Yes.**
7    Q.  And Mr. Weiner represented you for purposes
8 of that deposition?
9    **A.  Yes.**
10    Q.  And we've confirmed and you understand that
11 he's not representing you today?
12    **A.  Correct.**
13    Q.  How did you prepare for that deposition in
14 February?
15    **A.  I watched the couple videos and may -- I**
16 **think that was it.  Maybe some -- not a lot of**
17 **preparation.**
18    Q.  Do you recall reading the Complaint in this
19 case?
20    **A.  Maybe.**
21    Q.  Do you recall reading anyone else's
22 deposition testimony?
23    **A.  I don't recall.**
24    Q.  Did you prepare with anyone else besides
25 Joe Weiner?

51 (Pages 198 to 201)

202

1    A.   No.
2    Q.   Not Melissa Eberhart?
3    A.   No.
4    Q.   No other attorney from the State Patrol?
5    A.   No.
6    Q.   From the Department of Public Safety?
7    A.   No.
8    Q.   No one from the union?
9    A.   No.
10   Q.   Did you ask Mr. Weiner to represent you at
11   your previous deposition?
12   A.   No.
13   Q.   What was your understanding of why he was
14   representing you?
15   A.   Because at the time I was employed by the
16   State Patrol.
17   Q.   When you say at the time, you were no
18   longer employed by the State Patrol at your
19   deposition; right?
20   A.   Correct.
21   Q.   You mean at the time of the events at issue
22   in this lawsuit; right?
23   A.   Yes.
24   Q.   By the time your deposition came around,
25   you had been terminated; right?

203

1    A.   Yes.
2    Q.   Did Mr. Weiner or anyone from the Attorney
3    General's Office provide you a written agreement
4    regarding the nature and scope of your
5    representation?
6    A.   I don't know.  I don't recall.
7    Q.   You don't recall signing any type of
8    engagement agreement or retainer agreeing to have
9    him represent you?
10   A.   I don't recall.  I have to admit, over the
11   past few years of dealing with my legal proceedings,
12   sometimes things get -- that recollection if I
13   signed anything would have -- is lost.  I don't know
14   if I did or not.
15   Q.   Would there be any way for you to look up
16   and find out if you signed a written agreement for
17   the Attorney General's Office to represent you?
18   A.   I could check in -- I have a filing cabinet
19   for it with all my papers that I've received, so I
20   can certainly look and I can see if I can pull
21   anything up off of my email.
22   Q.   Would you be willing to do that and produce
23   it to us?
24   A.   Yeah.
25   Q.   Even if there was no written agreement, do

204

1    you recall having just a verbal conversation about
2    the scope of your representation or your agreement
3    for Joe Weiner to represent you?
4        MR. WEINER:  Now, again, this all goes to
5    the attorney/client privilege, so you can testify
6    about it, but I just want to make sure that you
7    understand that you'll be waiving any privilege that
8    relates to those conversations.
9        THE WITNESS:  Right.  So if -- so what
10   you're saying is if I answer that, then if there's
11   any attorney/client privilege, that's gone or --
12       MR. WEINER:  (Nodding head).
13       THE WITNESS:  Okay.
14       MS. WIESSNER:  And Tesa, just to clarify
15   again, neither Joe nor I can give you advice or
16   influence you in any way on that.
17       THE WITNESS:  Right.
18       MS. WIESSNER:  It's up to you to decide
19   whether you'd like to answer the questions.
20       THE WITNESS:  And what was the question
21   again?
22   BY MS. WIESSNER:
23   Q.   Did you have any verbal conversation about
24   the scope of your representation by the Attorney
25   General's Office or by Mr. Weiner?

205

1    A.   I don't remember specifically any
2    conversations or paperwork or anything.  I don't
3    recall.
4    Q.   Do you recall if anyone at the State Patrol
5    or the Attorney General's Office told you that you
6    had the right to choose your own attorney to
7    represent you at the deposition?
8    A.   I don't recall what the conversation was
9    back and forth or anything, details of that would
10   be.
11   Q.   So you don't know one way or the other
12   whether someone told you you had the right to choose
13   your own attorney for your deposition?
14   A.   I -- I don't remember.  I didn't seek any
15   out.  I just recall that, saying that -- something
16   saying, if it was an email or something, again, I'd
17   have to look, that because I was employed, I was
18   being represented by the attorneys from the state --
19   or that were representing the State Patrol.
20   Q.   Would you have liked to have a different
21   attorney that wasn't representing the State Patrol?
22   A.   I mean ideally, I would have felt more
23   comfortable, but it's not something that's in my
24   budget.
25   Q.   Did you know that you had the right to be

Tesa Johnson (Vol. 1)
12/20/2023

206

1  deposed without an attorney there at all, in
2  February of 2023?
3      **A.  I -- I don't know.  I don't know if I ever**
4  **thought about it or -- I don't know.**
5      Q.  Would you have chosen not to be represented
6  if you knew you had that right?
7      **A.  No.  I don't know.**
8      Q.  You said you were aware that the Attorney
9  General's Office and Mr. Weiner represented the
10  State Patrol defendants in this case?
11      **A.  Yes.**
12      Q.  Do you know or were you told whether that
13  was a joint representation with the Attorney
14  General's representation of the defendants?
15      **A.  I -- I don't recall being concerned, so I**
16  **don't -- I don't remember.  I don't know.**
17      Q.  So it wouldn't have concerned you to be
18  jointly represented with the State Patrol defendants
19  in this case?
20      **A.  Well, at the time it was, like I said, I**
21  **was going -- I'm going -- I'm dealing with my own**
22  **stressful stuff and this deposition, like I said**
23  **previously, I'm just apprehensive of everything that**
24  **has to do with, you know, the State Patrol and**
25  **anything, so -- and I don't -- I mean there's -- I**

207

1  **don't have anything to hide, so I just was like,**
2  **okay, doing a deposition.  I don't know.  I just --**
3      Q.  Do you recall if Mr. Weiner or anyone at
4  the State Patrol or the Attorney General's Office
5  told you whether they would be sharing information
6  about your representation with the defendants in
7  this case?
8      **A.  I don't recall.  It was never something**
9  **that I was concerned about.  I mean, is that what**
10  **you're asking, if I was concerned or recall**
11  **paperwork or --**
12      Q.  First I'm just asking if you ever told or
13  knew whether information that you gave as part of
14  your representation, for example, preparing for your
15  deposition, could be shared with the defendants.
16  Was that your understanding of the agreement, that
17  anything you said or gave to Mr. Weiner could be
18  shared with or given to the defendants?
19      **A.  I would assume that that would be the case.**
20      Q.  And that didn't bother you?
21      **A.  No.**
22      Q.  Did Mr. Weiner or anyone from the Attorney
23  General's Office offer to share information about
24  the representation of the defendants with you?
25      MR. WEINER:  Objection.  What's the purpose

208

1  of that?  What's the purpose of that question?
2      MR. NOEL:  What's the objection?
3      MS. WIESSNER:  What's the objection?
4      MR. WEINER:  The objection is that it's
5  harassing and it's calling into question the -- it's
6  impugning a member of the Court and a member of the
7  Bar, and I want to know what potential relevance it
8  has to what this witness is talking about.
9      MS. WIESSNER:  It's harassing the witness
10  or you, Joe?  You are not being deposed and it's not
11  harassing the witness, who is being deposed.
12      MR. WEINER:  Okay, I just -- when I file
13  the Complaint, I just want to make sure it's on the
14  record.
15  BY MS. WIESSNER:
16      Q.  Did Mr. Weiner or anyone from the Attorney
17  General's Office speak to you about any conflicts of
18  interest or potential conflicts of interest in
19  representing both you and the defendants at the same
20  time?
21      **A.  Not that I recall.**
22      Q.  After the February deposition, Mr. Weiner
23  and the Attorney General's Office have ceased to
24  represent you; correct?
25      **A.  After the initial deposition?**

209

1      Q.  Yes.
2      **A.  I -- I don't know because I never thought**
3  **about it after I did the deposition again -- or**
4  **until I -- Once the deposition was done, I never**
5  **gave any of it a second thought of if I was still**
6  **represented or not.**
7      Q.  Until recently you received an email saying
8  that you're no longer represented; correct?
9      **A.  Correct.**
10      Q.  In between your February 2023 deposition
11  and that communication, did you have any contact
12  with anyone from the Attorney General's Office?
13      **A.  No.**
14      Q.  Have you been represented by any attorney
15  in this matter besides Mr. Weiner?
16      **A.  No.**
17      Q.  In preparing for your deposition, did you
18  tell anyone about the shared Google photos album?
19      **A.  In preparation for this particular --**
20      Q.  In preparation for your February 2023
21  deposition, did you tell anyone about the shared
22  Google photos album?
23      **A.  No.  I don't even recall when about that I**
24  **discovered it was still there.**
25      Q.  You don't recall telling Mr. Weiner about

53 (Pages 206 to 209)

Tesa Johnson (Vol. 1)
12/20/2023

210

1    the Google photos album?
2        A.   Then if I did -- I don't recall when I saw
3    that they existed, so I don't -- I don't recall any
4    of that.
5        Q.   You don't recall telling Mr. Weiner about
6    it or giving him access to those photos?
7        A.   Correct.
8        Q.   Do you recall talking to anyone else at the
9    State Patrol about your February 2023 deposition?
10       A.   No.
11       Q.   Did you discuss your deposition afterwards
12   with anyone from the State Patrol?
13       A.   Not from the State Patrol.
14       Q.   When you say not from the State Patrol, who
15   did you talk to about your deposition in February
16   besides Carolyn Cole?
17       A.   My therapist.
18       Q.   And I won't intrude on any of those
19   conversations.  Did anyone tell you what you should
20   or should not say at your February 2023 deposition?
21       A.   Not specifically, no.
22       Q.   What do you mean by not specifically?
23       A.   I was not instructed not to comment on any
24   particular subjects or anything like that.  I wasn't
25   told no, don't talk about this, and yes, talk about

211

1    this or anything like that.
2        Q.   Did anyone tell you that you should say I
3    don't remember or I don't recall to any details or
4    events?
5        A.   If I didn't recall or don't remember, then
6    it was just say that.
7        Q.   Sure.  Do you recall being told anything
8    about if you couldn't say it in a court of law, then
9    don't say it in your deposition?
10       A.   That was my -- that was -- that was my
11   understanding of if you -- you're not going to elude
12   to I heard -- like I was saying earlier, I know
13   there was conversations about X, Y or Z.  That
14   wasn't something that was going to be offered at
15   that deposition.  That was not something that I
16   would typically testify about in court if I couldn't
17   say definitively, it was this person, that person,
18   here, there or where.  So that wasn't going to be
19   talked about at the first deposition.
20       Q.   You said that was your understanding.  Was
21   that an instruction you were given?
22       A.   I wouldn't say necessarily an instruction.
23   That was the direction of how a deposition is given.
24   I had never given a deposition before, so I didn't
25   -- I wasn't sure.

212

1        Q.   And just to put a finer point on this, what
2    specifically was the instruction relating to a court
3    of law?  What was that instruction?
4        A.   It was most -- I would say, because I don't
5    remember verbatim, but I would say it was most
6    likely my questions on how the questioning proceeds
7    at a deposition.  Is it like when you're testifying
8    in court, is it different?  How -- how does it work?
9        And my recollection is that the -- I was not
10   instructed to answer in any particular ways, but
11   explanations of how things -- and there was no
12   concerns when I was told how a deposition works.  I
13   wasn't -- it wasn't questioned, I wasn't concerned
14   about this is what you're going to testify on and
15   this is what you're not going to testify on, so
16   that's -- that was my -- that was my understanding
17   of how to answer at a deposition.
18       Q.   Okay.  In preparing for your February
19   deposition, did you tell Mr. Weiner or anyone at the
20   Attorney General's Office that you had a pending
21   PTSD disability claim?
22       A.   I don't recall.
23       Q.   That claim is against the State Patrol;
24   right?
25       A.   Yes.

213

1        Q.   So obviously the State Patrol is aware that
2    you had a claim against them; right?
3        A.   Yes.
4        Q.   But you don't recall whether you personally
5    shared that with the Attorney General's Office or
6    Mr. Weiner?
7        A.   I don't recall, no.
8        Q.   Has anyone at the Attorney's General Office
9    communicated with you about any potential conflict
10   of interest if Mr. Weiner asks you questions at this
11   deposition today?
12       A.   No.
13       Q.   Has anyone explained to you what informed
14   consent confirmed in writing means under the
15   Minnesota Rules of Professional Conduct?
16       A.   No.
17       Q.   Is that a phrase you've heard before,
18   informed consent confirmed in writing?
19       A.   No.
20       Q.   Have you given Mr. Weiner or the Attorney
21   General's Office permission to ask questions that
22   might impugn your truthfulness?
23       A.   I haven't had any conversation with the
24   office at all, or correspondence or anything after
25   the first deposition in February.

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

214

1 Q. Right.
2 A. Is that what you're asking?
3 Q. That covers the answer, yeah.
4 A. Okay.
5 MS. WIESSNER: I have no further questions
6 for you, Tesa.
7 THE WITNESS: Okay.
8 MS. WIESSNER: Thank you for your time.
9 EXAMINATION
10 BY MR. WEINER:
11 Q. Ms. Johnson, thank you for being here with
12 us today. We've met before on Zoom. Never met
13 in-person before. You understand that I represent
14 the State defendants in this matter; correct?
15 A. Yes.
16 Q. And you understand that you're testifying
17 under oath; correct?
18 A. Yes.
19 Q. And you don't have any problem with me
20 asking you questions about the incidents that
21 happened in this deposition -- or I'm sorry, on May
22 the 30th or your employment with the State Patrol;
23 correct?
24 A. No.
25 Q. Now, if I ask a question, as Greta

215

1 indicated earlier, and you don't understand, please
2 let me know; okay? And I will rephrase it.
3 A. Okay.
4 Q. But if you answer, we'll assume that you
5 understood the question.
6 Now, I believe you testified that you found out
7 about this deposition because Jason Engeldinger
8 reached out to you; correct?
9 A. Not this one.
10 Q. I'm sorry. The February deposition;
11 correct?
12 A. Correct.
13 Q. And at that time Mr. Engel -- or Captain
14 Engeldinger gave you my phone number so that you
15 could call me; correct?
16 A. If that's what happened. I don't remember.
17 Q. Okay. If I were to testify -- or if I were
18 to state that I spoke with you because you reached
19 out to me via phone call, no reason to dispute that;
20 correct?
21 A. Correct.
22 Q. And what, if anything, do you remember
23 specifically about that conversation?
24 A. Yours and mine?
25 Q. Yes.

216

1 A. Nothing specifically.
2 Q. Okay. So you don't recall whether or not I
3 spoke with you about who my client was; correct?
4 A. I don't recall any specifics or verbatim.
5 I can't -- I can't tell you this is what -- we spoke
6 about X, Y and Z on that particular phone call.
7 Q. Okay, and that's fine. That's all that I'm
8 looking for on this.
9 A. Okay.
10 Q. So to the extent that I have a recollection
11 of that that is more specific than yours, you have
12 no reason to dispute that recollection; correct?
13 A. Not right now, no.
14 Q. Okay. Now, who did you speak about your
15 deposition testimony today, who did you speak with
16 about that?
17 A. I spoke -- I mean about like coming here?
18 Q. Yes, ma'am.
19 A. I think all -- nope, not -- it was Marc and
20 yourself (gesturing toward Ms. Wiessner), and we had
21 a call about the deposition.
22 Q. Okay. And when was that call?
23 A. Earlier this month.
24 Q. And where were you when that phone call
25 happened?

217

1 A. I was at my farm.
2 Q. And how long was the phone call,
3 approximately?
4 A. Five minutes. It wasn't -- I mean I -- I
5 don't know.
6 Q. Okay. And what did you discuss with Marc
7 and Greta?
8 A. My plans before or after Christmas and if I
9 was able to make it on the 20th.
10 Q. Anything else that you discussed?
11 A. That the judge was specific on a very small
12 window and I needed to figure out whether or not we
13 were going on vacation before or after Christmas,
14 and if we could make this work.
15 Q. And did you have any other communication
16 with lawyers for the plaintiff other than that phone
17 call? Email or text messages?
18 A. There was, I think, two or three emails.
19 Q. Do you still have copies of those emails?
20 A. Mm-hmm (nodding head).
21 Q. Okay.
22 A. Yes.
23 Q. And is that something you could provide to
24 us?
25 A. Sure.

55 (Pages 214 to 217)

Tesa Johnson (Vol. 1)
12/20/2023

218

1    Q.   Now, you're appearing here today
2    voluntarily; correct?
3         A.   Yes.
4         Q.   So there was no subpoena issued for your
5    attendance today?
6         A.   No.
7         Q.   Did counsel speak with you about that?
8         A.   We -- I -- we didn't speak about it, but it
9    was -- it is a possibility that a subpoena could
10   be issued if I couldn't make or -- make things work.
11   It wasn't -- it wasn't like a strong arm thing.  It
12   was a sort of like, we need to have this deposition
13   on the 20th and, you know, what's the plan?  What's
14   your plan?  I have a vacation -- or we're in the
15   middle of trying to figure out a vacation before or
16   after Christmas.
17        Q.   Did they tell you that if they subpoenaed
18   you, they'd have to pay you money to attend?
19        A.   There wasn't -- no.
20        Q.   Okay.  Now, during any of those
21   conversations, did counsel ever tell you that they
22   attempted to sue you as part of this lawsuit?
23        A.   No.
24        Q.   I want to show you what's been marked as
25   Exhibit 9.

219

1         (Exhibit Number 9 marked.)
2    BY MR. WEINER:
3         Q.   So Ms. Johnson, I'm showing to you what has
4    been marked as Exhibit 9.  This is a court file
5    document.  This is Document Number 37 in this
6    lawsuit.  I'll represent to you that this was the
7    attempted Amendment Complaint that plaintiffs tried
8    to serve after the case was thrown out the first
9    time.  Any reason to dispute that?
10        A.   No.
11        Q.   Okay.  And if you could look at the second
12   page of this document, and the caption, which is the
13   parties that we're talking about here, and about
14   midway down through here, do you see a name -- or a
15   name there that is T. Johnson?
16        A.   Yes.
17        Q.   And that's between Nigg and Roseberry, do
18   you see that?
19        A.   Yes.
20        Q.   And if I were to represent to you that that
21   was -- that individual was you, based on the
22   documentation that they had received in discovery,
23   you have no reason to dispute that: correct?
24        A.   Correct.
25        Q.   All right.  And if you could turn to

220

1    paragraph 18 in this document, where they're
2    identifying various defendants in this case, and do
3    you see about one, two, three, four, fifth line
4    down, you're there again, T. Johnson?
5         A.   Yes.
6         Q.   All right.  And then after the semicolon in
7    the last sentence, it indicates that, "they are sued
8    in their individual capacities for misconduct
9    occurring under color of state law."  Do you see
10   that?
11        A.   Yes.
12        Q.   And reading that, do you understand that
13   Miss Cole and Miss Hennessy-Fiske were suing you, or
14   attempting to sue you individually for the incidents
15   that occurred outside of the Fifth Precinct?
16        A.   I -- that's what this -- these papers
17   represent, so --
18        Q.   Okay.  Did counsel or plaintiffs ever tell
19   you that they attempted to sue you?
20        A.   No.
21        Q.   Okay.  If you could turn to page -- I'm
22   sorry, paragraph 73.
23        A.   73 in red or 73 in blue?
24        Q.   I'm sorry, 73 in blue, it should be page 21
25   of the document.

221

1         A.   Okay.
2         Q.   And if you could just take a moment and
3    read through paragraph 73 to 76 by yourself -- or to
4    yourself.
5         A.   (Reviewing document).  Okay.
6         Q.   And in reading this, do you understand that
7    you were identified as either an assaulter trooper
8    or a cover trooper, as identified by the plaintiffs
9    in this matter?
10        A.   I see that assaulter troopers are -- I see
11   that.
12        Q.   Okay.  And did counsel at any point tell
13   you that they had tried to bring you in as either an
14   assaulter trooper or a cover trooper in this
15   lawsuit?
16        A.   No.
17        Q.   And if you could turn to blue paragraph
18   116, it's on page 34.
19        A.   116?
20        Q.   116, yes, ma'am.
21        A.   Okay.
22        Q.   And it states that, "None of the Cover
23   Troopers or Supervisor Defendants did anything to
24   stop the Assaulter Troopers from advancing on the
25   clearly identified press group, nor did any of the

Doby Professional Reporting, Inc.
952-943-1587

222

1 Cover Troopers or Supervisor Defendants stop the
2 Assaulter Troopers from targeting the press group
3 with direct impact rounds or other chemical agents."
4 Do you see that?
5 **A. Yes.**
6 Q. And do you understand that that's referring
7 to you as one of the defendants in this lawsuit?
8 **A. Yes.**
9 Q. Or potential defendants in this lawsuit.
10 **A. Yes.**
11 Q. And was that ever discussed with you when
12 you had your conversations with plaintiffs' counsel?
13 **A. No.**
14 Q. Now, did the plaintiffs' counsel ever tell
15 you that your interests might be adverse to those of
16 the plaintiffs in this case?
17 **A. That my interests might be adverse to the**
18 **plaintiff. The plaintiff being?**
19 Q. Molly and -- I'm sorry, Miss Cole and
20 Miss Hennessy-Fiske.
21 **A. And you're asking if they had --**
22 Q. I'm asking if either Miss Wiessner or
23 Mr. Betinsky had a conversation and told you that
24 your interests might be adverse -- were or may be
25 adverse to their clients'.

223

1 **A. No.**
2 MS. WIESSNER: I'd like to put an objection
3 here and let the record reflect that I did state
4 that at the beginning of this deposition, it was on
5 the record, and the response was that she did
6 understand that.
7 THE WITNESS: Okay, I apologize.
8 MR. WEINER: You see, but sorry, we've got
9 our answer, this is what we have here, thank you.
10 MS. WIESSNER: Well, we have a full record
11 luckily then.
12 MR. WEINER: That would be great to get,
13 wouldn't it?
14 BY MR. WEINER:
15 Q. Did anybody ever tell you that you were a
16 potential defendant in this lawsuit?
17 **A. I don't know.**
18 Q. Did plaintiffs' counsel ever tell you that
19 you were a potential defendant in this lawsuit?
20 **A. I don't think so, but I mean I don't -- I**
21 **mean I think it's -- no, I don't know.**
22 Q. Okay.
23 **A. I don't know.**
24 Q. Did anyone tell you that the plaintiffs
25 wouldn't sue you because you were providing them

224

1 with information in this lawsuit?
2 **A. No.**
3 Q. I want to go back to some of the testimony
4 that you gave earlier --
5 **A. Okay.**
6 Q. -- specifically about the documents and
7 what was -- what you were told about deletion and
8 data management.
9 **A. Mm-hmm.**
10 Q. So I want to start again with, to the best
11 of your recollection, tell me what was said, what
12 somebody said, what words were used about emails,
13 photos, information that might exist related to the
14 riots.
15 **A. That -- and I -- again, I can't tell you**
16 **verbatim.**
17 Q. Okay.
18 **A. I can only tell you what -- what I recall,**
19 **and what I recall is we were instructed to delete**
20 **the emails, photos, anything that had to do with the**
21 **riots.**
22 Q. And so let's go with all the good
23 journalism questions. Who gave you that
24 instruction?
25 **A. Specifically the instruction, I recall the**

225

1 colonel explaining to us what was happening. I
2 don't -- I mean he said that these things are -- or,
3 you know, we need to delete the emails that have
4 anything to do with that because they can -- there
5 was the data requests, they were coming in, and they
6 were -- and I remember him saying about they can
7 send in a data request and have, you know, a
8 keyword, and then it has to -- they have to pull
9 every single thing with that keyword in.
10 Q. So just so that I'm clear, it's your
11 testimony today under oath that the colonel for the
12 Minnesota State Patrol instructed you and a number
13 of other troopers to delete emails?
14 **A. I recall that that was something that we**
15 **were told. I cannot tell you if it was in a**
16 **briefing or not in a briefing or -- I remember that**
17 **about the keywords and the emails and being said.**
18 Q. And you remember that the person who said
19 that was Colonel Langer?
20 **A. That is my recollection.**
21 Q. And when was this?
22 **A. It would have been during the riots, when**
23 **we were down in Arden Hills.**
24 Q. Okay. So if you came down to the riots on
25 the 26th, went home, came back on the 27th.

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

226

1      A.   Correct.
2      Q.   Left on June 7th.
3      A.   Yes.
4      Q.   Where in that time frame did you have this
5   conversation -- or did you hear this instruction
6   from Colonel Langer?
7      A.   I don't recall.
8      Q.   Was this before May the 30th?
9      A.   I don't recall.
10      Q.   Was it before the I-35W bridge -- or I-35W
11   where the tanker plowed into the group of
12   protesters?
13      A.   I don't know.
14      Q.   Was it, to the best of your recollection,
15   the beginning, the middle or the end of that time
16   frame?
17      A.   I -- I don't know.
18      Q.   Who else was present when you heard this?
19      A.   I don't know.
20      Q.   You don't recall anybody else being present
21   when this occurred?
22      A.   No.
23      Q.   So there's nobody else that we could talk
24   to that could corroborate your version of this
25   conversation?

227

1      A.   No.  I don't -- I don't remember if it was
2   at a briefing or if it was at a debriefing or if it
3   was -- I don't remember, so no.
4      Q.   How many times do you recall Colonel Langer
5   being at the briefings at Arden Hills?
6      A.   Maybe two or three times.  I can't tell you
7   specifically the amount.
8      Q.   Okay.  Do you recall anything else that he
9   said during those briefings?
10      A.   Good job.
11      Q.   So the only things that you recall from the
12   briefings is good job and you need to delete emails
13   and photos?
14      A.   I can't tell you anything else
15   specifically, no.
16      Q.   And the word that you specifically recall
17   him using is delete: is that correct?
18      A.   I said I couldn't -- I can't tell you
19   verbatim, but I can tell you what my recollection of
20   it is or what -- how I'm recalling it.
21      Q.   Okay.  And I understand that, but it's
22   important that we get our words right here.  So I
23   just want to make sure that you're saying your
24   recollection, the best of your recollection as you
25   sit here today is that Colonel Langer used the word

228

1   delete in reference to emails and other data as he
2   was talking to you about data requests?
3      A.   I don't recall if he said delete, but it is
4   my understanding that it was to delete emails and
5   things that had anything to do with the riots.
6      Q.   And just so that we're clear, you don't
7   have any other recollection of specific words that
8   he used; correct?  You remember keywords?
9      A.   That they can do a keyword search.
10      Q.   Okay.  Anything else?
11      A.   Nothing specifically.  I can't tell you
12   anything verbatim.
13      Q.   Okay.  And you don't recall who else was
14   there; correct?
15      A.   No.
16      Q.   You don't recall when this was?
17      A.   No.
18      Q.   Now, if you could turn for me, please, to
19   -- I think we marked it as Exhibit 6, which is the
20   email that you sent.
21      A.   Okay.
22      Q.   And this is from your Acorn & Oak email
23   address; correct?
24      A.   Yes.
25      Q.   And what is Acorn & Oak?

229

1      A.   That's my LLC.
2      Q.   And what does that do?
3      A.   It's a LLC.
4      Q.   But what is it?  It's a business; correct?
5      A.   It is -- it's my LLC for my business, yeah.
6      Q.   And what is your business?
7      A.   I have a commercial pesticide spraying
8   business.
9      Q.   And so I'll represent to you that you
10   registered your business with the Secretary of State
11   in February -- I'm sorry, in May of 2021.  Any
12   reason --
13      A.   Sounds about right.
14      Q.   Okay.  And you were still a trooper at the
15   time; correct?
16      A.   No.
17      Q.   In May of 2021?
18      A.   Oh, I'm sorry.  I misunder -- or I misheard
19   you.  This was not started or me having anything to
20   do with that while I was still a trooper, because I
21   started it last spring.
22      Q.   Okay.  So why is it incorporated with the
23   Minnesota Secretary of State in May of 2021?
24      A.   That was -- I have a freeze dryer that I
25   made freeze dried candy.

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

230

1    Q.  Okay.  And was that a business that you
2  registered with the Secretary of State?
3    A.  I'm guessing, yeah.
4    Q.  And did you inform State Patrol about that
5  outside employment or outside business?
6    A.  It wasn't employment.
7    Q.  Did you inform them about the outside
8  business?
9    A.  I don't think so, no.
10   Q.  And you were required to do that; correct?
11   A.  Probably.
12   Q.  And you had done that before, when you had
13  outside employment teaching; correct?
14   A.  I had full permission and they were aware
15  of that.
16   Q.  Now, in the email you describe this event
17  as an assault, but I just want to make sure.  You
18  don't have any personal knowledge about what
19  occurred that day; correct?
20   A.  Correct.
21   Q.  You were there, but you don't recall seeing
22  anything?
23   A.  Correct.
24   Q.  You don't recall as you sit here today that
25  there was -- specifically that there was any media

231

1  present; correct?  I think you testified that you
2  assumed there was media present, but you don't
3  recall seeing anybody.
4    A.  I don't -- there's nothing that I can see
5  that, oh, yeah, the media was here.
6    Q.  Okay.  Now, so when you are now referring
7  to the term assault, that is based on your review of
8  the video; is that correct?
9    A.  No, that's based on when I was looking for
10  Carolyn's email address and Googling the State
11  Patrol and -- because I didn't know what her name
12  was, and what you have when you Google that and it
13  pops up is the headlines about assault.
14   Q.  Okay.  So you were parroting back to her
15  the media headlines that she had been assaulted --
16   A.  Yes.
17   Q.  -- as part of this?
18   A.  Yes.
19   Q.  Okay.  So it wasn't your opinion at the
20  time that you sent this email that she actually was
21  assaulted?
22   A.  I -- to be honest, I didn't -- I didn't
23  really know much about this other than what my
24  deposition was in February.  I didn't look into it
25  or read up on it.  I knew that there was the

232

1  reporters' and whatever allegations, and I wasn't
2  even sure what -- a hundred percent what the
3  allegations were.
4    Q.  Okay.  But as you sit here today, you
5  believe that Miss Cole and Miss Hennessy-Fiske were
6  assaulted by members of the State Patrol?
7    A.  It -- if -- They are stating that they were
8  pepper sprayed; correct?
9    Q.  That's one of the allegations, that is
10  correct.
11   A.  Okay, so if that was the allegation, unless
12  there is something that, you know, legally would --
13  that there was some sort of law being broken or
14  something along the lines to justify the use of
15  force of pepper spray, it would be not justified.
16   Q.  And that's your opinion; correct?
17   A.  That is my opinion, yes.
18   Q.  All right.  But you don't know what the
19  individual troopers who were using the pepper spray,
20  you don't know what they were perceiving at the
21  time; correct?
22   A.  No, I don't.
23   Q.  And you don't know who else was there in
24  that group of individuals with the plaintiffs;
25  correct?

233

1    A.  Correct.
2    Q.  And you don't know whether or not the
3  plaintiffs were in a group solely of media or if
4  there was a group mixed with media and other members
5  of the crowd; correct?
6    A.  Correct.
7    Q.  And would it change your answer as to
8  whether or not pepper spray was appropriate if the
9  individuals that it was used against were not
10  members of the media?
11   A.  Would it change -- I'm just making sure
12  that I am following.
13   Q.  Yep, please do.
14   A.  Would it change my opinion if it was
15  civilians that were pepper sprayed as opposed to the
16  media?
17   Q.  Correct.
18   A.  It is -- that's dependent on what was
19  happening with those said civilians.
20   Q.  Okay.  Now, I believe you testified earlier
21  that you had received instructions to treat the
22  media differently; correct?
23   A.  Yes.
24   Q.  And who gave you that instruction?
25   A.  I don't recall.

Tesa Johnson (Vol. 1)
12/20/2023

234

1    Q.   Where were you when that instruction was
2  given?
3    **A.  I don't recall.**
4    Q.   Who else was present when that instruction
5  was given?
6    **A.  Specifically, like around me, I don't**
7  **recall.**
8    Q.   Would it surprise you that nobody else
9  recalls that instruction being given?
10   **A.  They -- yeah, that would be.**
11   Q.   Okay.  So you're the only witness who's
12 testified to that.  Are you aware of that?
13   **A.  No, I'm not aware of anything.**
14   Q.   Okay.  So you don't know who told you that;
15 correct?
16   **A.  Right.**
17   Q.   You don't know where it happened; correct?
18   **A.  Not the specific location, right.**
19   Q.   You don't know when it happened; correct?
20   **A.  Not during the time of the -- of the George**
21 **Floyd incident, no.**
22   Q.   Okay.  Now, what, to the best of your
23 recollection, was said about treatment of the media
24 during this instruction that you were given?
25   **A.  They were exempt from the curfew, they were**

235

1    **-- they had the right to be behind and where they**
2  **needed to be to report what was going on.**
3    Q.   You were a member of the MRT for six years?
4    **A.  Approximately.**
5    Q.   Approximately.
6    **A.  Yes.**
7    Q.   Can you recall another situation where
8  members of the media were allowed to pass through a
9  line of police officers or troopers?
10   **A.  No.**
11   Q.   Is there anything in your training that
12 would allow members of the public, including media,
13 to go through a police line?
14   **A.  No.**
15   Q.   It's dangerous; correct?
16   **A.  Yeah.**
17   Q.   And that's the reason why when someone goes
18 through the line, you're supposed to arrest them;
19 correct?  Or not you, but somebody on the arrest
20 team; correct?
21   **A.  When a person would go through the line, it**
22 **would be because the troopers had pulled them**
23 **through the line.**
24   Q.   Okay.
25   **A.  And that would be an arrest.**

236

1    Q.   And in all of your time in law enforcement,
2  can you ever think of a time where members of the
3  media were allowed to pass through a police line?
4    **A.  Nobody is allowed to pass through the**
5  **police line.**
6    Q.   Okay.  So if there is nowhere for a member
7  of the public to go, if there's a line of -- if
8  we're in this room, all right --
9    **A.  Okay.**
10   Q.   -- and there's a line of police officers or
11 troopers from one wall to the other wall, is there
12 any world in which a member of the public could pass
13 through that police line?
14   **A.  Not to my knowledge, no.**
15   Q.   Okay.  But it's your testimony that in this
16 situation, it was allowed?
17   **A.  My testimony was they weren't allowed to go**
18 **through the troopers.  They would have to go around.**
19 **They couldn't -- you can't -- any time that a person**
20 **would go through that line, that, you know, that we**
21 **were presenting, it -- that was an arrest.  If**
22 **somebody went in between troopers, that would be**
23 **because we pulled them through and brought them**
24 **behind us, and then an arrest team would take care**
25 **of that.  But media would -- had -- was exempt from**

237

1    **the curfew and what have you and had the right to be**
2  **there and report.**
3    Q.   And so they could go through that line?
4    **A.  No.**
5    Q.   Okay.  So what were troopers supposed to do
6  when they come across members of the media in that
7  situation?
8    **A.  I don't know.**
9    Q.   Okay.  Now, you wrote in your email, we're
10 back to Exhibit 6, "and all emails with any
11 connection to the riots or related topics...for many
12 reasons."  And you were asked some questions about
13 that; correct?
14   **A.  Yes.**
15   Q.   Did anybody at the State Patrol tell you
16 any specific reason why you needed to delete emails
17 or other documents?
18   **A.  Not that I recall.**
19   Q.   Okay.  So the many reasons that you refer
20 to here are your assumptions; correct?
21   **A.  Yes.**
22   **(Pause in proceedings for clock chiming.)**
23 BY MR. WEINER:
24   Q.   So you don't know, as you sit here today,
25 why that instruction was given to you; correct?

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

238

1    A.  No.
2    Q.  And you don't even recall specifically what
3  the instruction was; correct?
4    A.  Not verbatim.
5    Q.  Right.  You just have a general sense to
6  the best of your recollection two and a half years
7  later; correct?
8    A.  Yes.
9    Q.  Now, looking at this email again, you
10  signed this, "Tesa Johnson, Retired MSP Trooper,
11  SP508."  508, was that your badge number?
12    A.  Correct.
13    Q.  And you identify yourself as a retired
14  trooper; correct?
15    A.  Yes.
16    Q.  But in fact, you were terminated as a
17  trooper; correct?
18    A.  But collecting my retirement.
19    Q.  I understand that you're collecting your
20  retirement, but you were fired from your role;
21  correct?
22    A.  I was, but then I just received a
23  correspondence that said resigned, so I don't know.
24  But yeah, I was terminated.
25    Q.  So you sent this letter to Miss Cole, it

239

1  looks like, 2:20 p.m. on November the 27th.
2    A.  Yes.
3    Q.  And obviously, she responded to you.
4    A.  Yes.
5    Q.  Explain to me how she responded to you.
6    A.  She -- I believe it was first it was a
7  phone call.
8    Q.  And was it the same day, within a couple
9  days?
10    A.  Within a couple days.
11    Q.  And tell me about that first phone call.
12    A.  We FaceTimed and it wasn't a very long
13  phone call.  It was more so she had explained to me
14  who she was, that she, you know, had worked for the
15  LA Times, that Molly was no longer with the
16  LA Times, and she had told me then that -- or at
17  some point in time in the conversation, that this
18  was not completed, and I discussed with her, you
19  know, a brief kind of rundown of why I was no longer
20  with the patrol, and yeah, I -- any other -- I mean
21  it was a pretty benign conversation.  She said that
22  she was going to contact her attorneys in regards to
23  the photos and things like that.
24    Q.  And how long was the phone call?
25    A.  Not very long.  I don't know how long

240

1  specifically.
2    Q.  Was anybody else with you when you took
3  that phone call?
4    A.  No.
5    Q.  Was anybody else that you could see in the
6  room with Miss Cole when she spoke with you?
7    A.  No.
8    Q.  And what did you tell her about your
9  experience with no longer being with the State
10  Patrol?
11    A.  Like what I experienced after not being
12  with the State Patrol?
13    Q.  I believe you said that you told her -- you
14  gave her some information about how you weren't with
15  the State Patrol anymore.
16    A.  Yes.
17    Q.  And what did you tell her?
18    A.  That we had a crash that involved a partner
19  of mine who was killed and we had -- that was in
20  May 24th of 2021, and we contacted the county
21  because we didn't -- something -- it was just a
22  strange situation where Sarah was hit -- or it was a
23  strange situation about Sarah running the stop sign,
24  and there was discussion about this is -- this
25  intersection is not a good intersection.  One of my

241

1  partners saw a vehicle blow through the stop signs
2  after when she had gone to go leave items at the
3  memorial.  So then after that, we contacted the
4  county, the highway engineer, and said -- asked if
5  we could just get extra signage or something out
6  until we could figure out what was going on.
7    Nothing happened, and on June 8th, there was
8  another fatal crash that involved another friend of
9  mine -- two other friends of mine and colleagues,
10  and a 17-year-old patient who was also killed.  And
11  after taking the driver's statement, I went back and
12  I drove her route to see what was happening and I
13  observed that the stop ahead sign was covered, that
14  the stop sign was in a place that a stop sign
15  normally would not have been, and I took pictures of
16  the intersection and I said that this is -- the
17  county's not maintaining the intersection.
18    Q.  And this is all what you told Miss Cole
19  during that first phone call?
20    A.  I don't know if it was that detailed.  I'm
21  not sure.
22    Q.  Did you ask her if she had any interest in
23  writing a story about that?
24    A.  No.
25    Q.  So you had this first conversation with

61 (Pages 238 to 241)

242

1   Miss Cole, and then when was the next contact that
2   you had with her?
3       **A.  It was close to maybe a day or two after.**
4   **I don't know specifically.**
5       Q.  Okay.  And, well, let's go back to the
6   first conversation.  Did you talk about the photos
7   at all during the conversation?
8       **A.  I told her that they -- I mean she knew**
9   **that they had existed with the email.**
10      Q.  And what did she say about that?
11      **A.  It sounded like she was interested in**
12  **seeing them.**
13      Q.  And did you talk to her or did she ask you
14  about anything else that was in this email?
15      **A.  I don't recall.  I don't know.**
16      Q.  Did she ask you about your claim that you
17  were instructed to delete the photos and emails?
18      **A.  I don't believe that we spoke about that.**
19      Q.  Okay.  So you then had a second
20  conversation with her; correct?
21      **A.  Yes.**
22      Q.  And was that also by FaceTime?
23      **A.  Yes.**
24      Q.  And when was that?
25      **A.  It was a few days after this.  I don't -- I**

243

1   **don't remember how many days after.**
2       Q.  Tell me about that conversation.  What did
3   you say, what did she say?
4       **A.  It was a quick one.  Honestly, there's**
5   **nothing that is really popping into my head that I**
6   **recall.  I'm sure we spoke about the photos again**
7   **and I think perhaps she may have spoken with her**
8   **attorney.**
9       **At some point in time there was a conversation**
10  **of save the photos, just, you know, was concern of**
11  **if they were -- if that folder was going to**
12  **disappear, just, you know, make sure that the photos**
13  **were saved.  But that's really all I can recall of**
14  **notable.**
15      Q.  Okay.  So the only thing from that second
16  phone call was make sure that the photos are
17  maintained?
18      **A.  That I recall.  I -- there could have been.**
19  **It's not -- it's not that I'm not trying to answer**
20  **your question.  I -- things that are involved with**
21  **work and things like my previous job and things like**
22  **this, I mean like because of what I have going on, I**
23  **get really nervous and it just -- it makes me -- it**
24  **makes -- I don't know how else to describe the**
25  **feeling, but so things can -- if it's not sticking**

244

1   **in my brain about that conversation, you know, if**
2   **there's not anything like insanely notable -- not**
3   **insanely notable, but just notable.**
4       **So the second conversation in regards to like**
5   **the photos and things like that, I can tell you that**
6   **it was that we discussed, you know, I -- the Google**
7   **folder is on my -- on my Google Drive, and I know**
8   **that there -- she had expressed concern about making**
9   **sure that they got saved.**
10      Q.  Now, the stress and the physical effects
11  that this talking about work has on you --
12      **A.  Mm-hmm.**
13      Q.  -- does that include talking about the
14  events from the time that you were in the Twin
15  Cities for the George Floyd riot period?
16      **A.  I don't know.  I remember what I remember**
17  **and I can't explain to you why I don't remember**
18  **something, if it's -- that's just normal or if**
19  **that's something that is created by memory loss from**
20  **PTSD.  I don't -- I'm not educated in that.**
21      Q.  Okay.  So you had the second conversation
22  with Miss Cole.  Then what was the next conversation
23  or contact that you had with her?
24      **A.  It was she had explained to me how**
25  **WeTransfer works, and that's how I had transferred**

245

1   **the files, but initially it didn't work.  I live**
2   **very rurally and my internet is at times not great,**
3   **so I had transferred the photos and it didn't -- it**
4   **didn't transfer.  I don't even know if any of them**
5   **popped up.  So I had to redo it, so we had a**
6   **conversation on maybe sending smaller batches rather**
7   **than everything in one.**
8       Q.  And did you receive written instructions
9   about the WeTransfer?
10      **A.  I -- in regards to say email or text**
11  **messages or --**
12      Q.  Any type of conversation, or any type of
13  written communication that would explain to you how
14  you would go about transferring these photos to
15  Miss Cole.
16      **A.  I don't recall.**
17      Q.  So how did you learn how to use the
18  WeTransfer application?
19      **A.  Either on a phone call or a text message.**
20      Q.  Not right now, but if you could check for
21  that text message to just see if there's something
22  there, and if you have it, if you could produce it
23  to everybody, that would be great.
24      **A.  Certainly.**
25      Q.  So you had a second conversation about the

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

---

246

1    WeTransfer -- or I'm sorry.  You had another
2    conversation with Miss Cole specifically to talk
3    about maybe sending the WeTransfer stuff in smaller
4    batches; correct?
5        **A.  Yes.**
6        Q.  And just so that I understand how you did
7    this, can you explain to me the process of taking
8    the photos that you had access to and putting them
9    in the WeTransfer site?
10       **A.  It's an app and it's fairly simple.  It**
11   **says -- or there's an indicator somewhere on there**
12   **that says upload and you just upload photos or**
13   **whatever files that you're uploading.**
14       Q.  Now, do you know, did the photos that you
15   were uploading, did you need to have copies of them
16   on your computer or could you transfer them directly
17   from your Google account?
18       **A.  I transferred them from my camera roll to**
19   **the WeTransfer.**
20       Q.  Okay.  So your camera roll located where?
21       **A.  On my phone.**
22       Q.  Okay, so as we sit here today, the Google
23   photos are still on your phone?
24       **A.  Yes.**
25       Q.  And they are a part of the Google photo

---

247

1    app?  Is that where you have them?
2        **A.  Well, then you have the Google photo app**
3    **and that's where the original exists, on Kristie's,**
4    **the original exists on the owner of that file.**
5        Q.  Okay.
6        **A.  And if I go into my email, my old email,**
7    **it's still on my Google folder.**
8        Q.  So you took the photos directly, a
9    basically drag and drop of the photos or maybe
10   copied them and put them in from your Google photos
11   into the WeTransfer site?
12       **A.  It was that or I know a lot of them were**
13   **screen shot where you see the collection and the**
14   **names.  Somehow it was either screen shot or saved**
15   **to -- saved to an album.**
16       Q.  Okay.  Now, other than your photos that you
17   took yourself, do you have any knowledge of whether
18   where it says -- So maybe there's a better way to
19   ask this question.  If we could pull out the exhibit
20   that is --
21       MS. WIESSNER:  3.
22       MR. WEINER:  Yes, 3.
23       MS. WIESSNER:  Up here.
24       MR. WEINER:  Nope, actually, 7 is what I'm
25   looking for.  No, you're right, 3 is going to be

---

248

1    better.
2        MS. WIESSNER:  I usually am, Jeff.
3    BY MR. WEINER:
4        Q.  So if you could turn to photo 13 in
5    Exhibit 3.
6        **A.  13, all right.**
7        Q.  All right.  And so with each of these
8    photos, it identifies the individual -- it
9    identifies an individual with it; correct?
10       **A.  Yes.**
11       Q.  All right.  And to my understanding, that's
12   the individual who loaded this picture into the
13   Google Drive, or the share folder; correct?
14       **A.  Correct.**
15       Q.  But you don't have any personal knowledge,
16   other than your own photos, whether or not the
17   person who loaded this photo actually took a photo
18   or was taking a screen shot of something or is
19   passing on a photo taken from somebody else;
20   correct?
21       **A.  Correct.**
22       Q.  All right.  So you have no knowledge
23   whatsoever that could provide any foundation for
24   where those photos came from, except for the photos
25   that were your own; correct?

---

249

1        **A.  Correct.**
2        Q.  All right.  You wouldn't go in to court as
3    a trooper and try to admit some of these photos
4    based on your knowledge of what was there because
5    you don't have that knowledge; correct?
6        MS. WIESSNER:  Objection, calls for a legal
7    conclusion, incomplete hypothetical.
8        THE WITNESS:  Meaning that -- say of this
9    picture that is from Tyler Milless, that I would not
10   submit this into court as I don't know if he took it
11   or if it was sent to him and he posted it?
12   BY MR. WEINER:
13       Q.  Correct.
14       **A.  Correct, yes.**
15       MR. WEINER:  Since we have the room until
16   five, I think I'm going to suggest that we take a
17   break right now.  I'm going to try to narrow down my
18   questions so that we can get everything in so that
19   there's not any kind of requirement that you'd have
20   to come back for anything, Ms. Johnson.  So if we
21   could take five, that would be great, and come back.
22       VIDEOGRAPHER:  Going off the video record
23   at 4:15 p.m.
24       (A break was taken.)
25       VIDEOGRAPHER:  This is File 5, we're on the

---

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

250

1  record at 4:20 p.m.
2  BY MR. WEINER:
3  Q.  So Ms. Johnson, I want to talk to you a
4  little bit about your experience in the Twin Cities
5  during the George Floyd riot period.
6  **A.  Okay.**
7  Q.  Now, my understanding is that you have
8  identified that as one of the incidents that has
9  contributed to your current PTSD --
10  **A.  Yes.**
11  Q.  -- diagnosis; correct?
12  **A.  Yes.**
13  Q.  And as part of that, do you recall
14  providing a statement to describe your experience on
15  that -- during that time frame?
16  **A.  Providing a statement to my attorney?**
17  Q.  Yes, that was eventually provided as part
18  of that lawsuit.
19  **A.  Yes.**
20  Q.  All right.  And I want to ask you about a
21  little bit in there.  So you wrote that when you
22  first got down there, you rushed to the Third
23  Precinct to guard it from rioters and looters.
24  **A.  Yes.**
25  Q.  And you said, "We sat and watched as the

251

1  people broke every window, looted, destroyed and
2  burnt down nearly every building in a five-block
3  area."  Do you recall that?
4  **A.  Yes.**
5  Q.  And you stated that you were hit with rocks
6  and other debris.
7  **A.  Yes.**
8  Q.  Do you recall that?  You were hit with
9  empty liquor bottles from looted stores?
10  **A.  Yes.**
11  Q.  Screamed at?
12  **A.  Oh, yeah.**
13  Q.  Threatened?
14  **A.  Yes.**
15  Q.  And accosted verbally?
16  **A.  Yes.**
17  Q.  And that while this was happening, you
18  watched the city burn; correct?
19  **A.  Yes.**
20  Q.  And I think you said that you watched these
21  citizens with pure hatred in their eyes laugh as
22  they ruined their city.  Do you recall that?
23  **A.  Yes.**
24  Q.  All right.  It says you were struck with an
25  empty Hennessy bottle.

252

1  **A.  Yes.**
2  Q.  Rocks?
3  **A.  Yes.**
4  Q.  Rotten food?
5  **A.  Yes.**
6  Q.  Garbage?
7  **A.  Yes.**
8  Q.  You said that you were shot at several
9  times?
10  **A.  Not specifically me, but there were
11  gunshots on two different occasions, yeah.**
12  Q.  And when was that?
13  **A.  The first night, and I -- the second, I --
14  right now, I don't -- I don't remember where or
15  when.**
16  **The first shooting was pretty -- or the first
17  gunshots was the first night, it was pretty
18  significant because everybody hit the deck.**
19  Q.  Jumped behind jersey barriers; correct?
20  **A.  Yes.**
21  Q.  If they could.
22  **A.  Correct.**
23  Q.  Some people couldn't get behind the jersey
24  barriers; correct?
25  **A.  Yes.**

253

1  Q.  And you wrote that, "The people rioting
2  knew we couldn't or wouldn't do a thing and they
3  took full advantage of it."
4  **A.  Yes.**
5  Q.  What did you mean by that?
6  **A.  Well, it was pretty apparent with all of
7  us, we were with -- on guarding that precinct, and
8  as the burning and looting and breaking of the
9  buildings, it was pretty obvious at that point that
10  nobody was arresting anybody.  It was just
11  happening.**
12  Q.  Now, you wrote that you were terrified; is
13  that correct?
14  **A.  Yeah.  Scary.**
15  Q.  And was that pretty much the entire time
16  that you were in the cities or did that come and go?
17  Or explain that to us.
18  **A.  Well, explaining -- so the best way I can
19  describe it is when something is happening, you have
20  to do your job.  You have a job to do.  It wasn't
21  that -- it wasn't a situation anything off of my
22  critical incident list, as you can read and see on
23  there that it wasn't -- there's nothing on there
24  that caused me to collapse fearfully or anything
25  like that.  Because of, you know, we had to deal**

64 (Pages 250 to 253)

Tesa Johnson (Vol. 1)
12/20/2023

254

1  with it, we had to fix whatever was happening. But
2  yeah, after, it is -- when you stop and think about
3  being shot at, it's scary.
4      Q. I don't think there's anybody in the room
5  who would disagree with you --
6      A. Right.
7      Q. -- that it was scary or that the events
8  from that time frame were terrifying.
9      A. Right.
10     Q. You wrote that your partner was nearly
11 crushed by a telephone pole that had fallen just
12 feet from him.
13     A. Yes.
14     Q. Which partner was that?
15     A. Jason Brown.
16     Q. And do you recall when over the course of
17 the deployment that was?
18     A. It would have been the first -- the first
19 day that we -- not the day that we got sent home,
20 but it was on that first day.
21     Q. After you were called back?
22     A. Correct.
23     Q. I think you said that it was a literal war
24 zone.
25     A. Yes.

255

1      Q. And then about two days later, you were
2  told to end it and a plan was devised to move the
3  riot out and disperse all these people.
4      A. Yes.
5      Q. What did you think about that plan?
6      A. At the time?
7      Q. At the time, yes, ma'am.
8      A. That's what we were going to do.
9      Q. Did you think it was a good course of
10 action based on what you'd seen from the previous
11 three nights?
12     A. I don't recall forming an opinion on it.
13 It wasn't a choice that we had. I couldn't just go
14 to a supervisor and say I can't do this.
15     Q. Now, you write that, "During the shift,
16 after it was devised to move people out, a person
17 attempted to physically attack me, forcing me to
18 send him to the ground." Can you tell me about that
19 incident?
20     A. Yes. He tried to physically attack me and
21 ran at me full tilt, and he -- I had my riot baton
22 and he locked eyes with me and he was coming after
23 me, and I had to use force to protect myself and put
24 him onto the ground.
25     Q. And where was this?

256

1      A. That was -- I believe it was in the
2  vicinity of like the Nicollet Mall.
3      Q. Okay. So the Nicollet Mall would be that
4  area that was in front of the Fifth Precinct. So
5  was it in front of the Fifth Precinct or close to?
6      A. I wish I could tell you, but I don't -- I'm
7  not as familiar with that to be able to tell you the
8  exact place.
9      Q. Fair enough. What happened after you sent
10 him to the ground?
11     A. The Minneapolis officer then -- the man was
12 pepper sprayed.
13     Q. And then what did you do after that?
14     A. I don't know.
15     Q. Don't have any recollection?
16     A. Not at this moment, no. Probably just
17 continued on with the work.
18     Q. You indicated that, "A car was driven
19 towards us with a clothing dummy at the driver's
20 seat and an item that held the gas pedal down."
21     A. Yes.
22     Q. Do you recall that?
23     A. Yes.
24     Q. And that actually you observed that;
25 correct?

257

1      A. Yes.
2      Q. And a knife was thrown into a group of you;
3  is that correct?
4      A. Yes.
5      Q. I think you wrote that you were hit with
6  large firework mortars.
7      A. Yes.
8      Q. And your own gas, "was sent back to us."
9      A. Yes.
10     Q. What do you mean by that?
11     A. They had a tennis racquet or -- and they
12 were sending them back to us.
13     Q. And I think you wrote that one of your
14 partners' pants caught fire and he was pulled from
15 the line.
16     A. Yes.
17     Q. And this was all that evening; correct?
18     A. I -- I don't know if it was all that
19 evening. I'm not sure if it was all on the same
20 evening or not. I know it was not on the same
21 evening because the -- when the knife was thrown,
22 that was a different evening, so I can say at least
23 that.
24     Q. Okay. And I think you indicated that you
25 were sprayed with pepper spray so many times that

65 (Pages 254 to 257)

Tesa Johnson (Vol. 1)
12/20/2023

258

1  you stopped counting?
2  **A. Yeah.**
3  Q.  Because it was basically all over the air;
4  correct?
5  **A.  It was -- if you were nearby somebody, that**
6  **was -- the Mark 9s are pretty powerful.**
7  Q.  And do you know if there was pepper spray
8  coming from members of the crowd?
9  **A.  I don't know.**
10  Q.  I think you indicated that so much is a
11  blur from fear, hunger, exhaustion and misery.  Is
12  that true as you sit here today?
13  **A.  Yes.**
14  Q.  And that you've not been back to the area
15  of the metro since.
16  **A.  At the time of that being written, I had**
17  **not been back to the metro.**
18  Q.  Have you since then?
19  **A.  Pretty sure.**
20  Q.  Okay.  You wrote, "I've never felt like
21  such an enemy and a bad guy while trying to protect
22  in my entire life."
23  **A.  Correct.**
24  Q.  What do you mean by that?
25  **A.  Because we were trying to protect people**

259

1  **and property and it was sort of -- compare it to**
2  **like swimming upstream in whitewater rapids.  It was**
3  **-- it felt as though our efforts that were positive,**
4  **or what we felt, we were trying to protect person**
5  **and property, that it was -- this is what we were**
6  **trying to do for the people who were so angry, so it**
7  **was just -- it was a very difficult situation.**
8  Q.  And I think you testified in your last
9  deposition that you basically were just trying not
10  to get killed; correct?
11  **A.  Yeah.**
12  Q.  You also wrote that you had a
13  disappointment about -- a disappointment in the
14  complete ignorance of the mayor, the governor and
15  police chief.  And when you say police chief, is
16  that Colonel Langer or is that the police chief of
17  Minneapolis?
18  **A.  I believe I was referring to the police**
19  **chief of Minneapolis.**
20  Q.  And their actions to exacerbate the actions
21  of the riot.  Can you tell me what you meant by
22  that?
23  **A.  The precinct that we had spent the first**
24  **evening defending, it was given up days later to be**
25  **burned down with the expectation that it would make**

260

1  **everything go away and people would be happy.**
2  Q.  And you stated that this is an event that
3  will shape your fears forever.  Is that still true?
4  **A.  Yes.**
5  Q.  And in addition to this, you've had other
6  experiences responding to riots; correct?
7  **A.  There has been smaller situations.  I don't**
8  **know -- I mean it wasn't as large as this, but there**
9  **was civil unrest that I responded to, yes.**
10  Q.  All right.  And you did respond to --
11  during the Yadas trial; correct?
12  **A.  Yes.**
13  Q.  And that was responding on the freeway for
14  that matter; correct?
15  **A.  Yes.**
16  Q.  And do you recall, was there a law
17  enforcement line during that deployment?
18  **A.  I arrived a little bit later for -- Was it**
19  **that one?  I want to say it was that one, so I was**
20  **there at the tail end.  At some point we did have a**
21  **line, but it wasn't across the highway.  It was on**
22  **the hill going up.  So we were pushing civilians off**
23  **away from the highway rather than pushing them down**
24  **the highway, if that makes sense.**
25  Q.  It does.

261

1  **A.  Okay.**
2  Q.  And in that experience, did you allow
3  anybody to go through the police line?
4  **A.  I don't recall.**
5  Q.  Would have been unusual?
6  **A.  Correct.**
7  Q.  And then you also responded in 2016 on the
8  I-94 riots; correct?
9  **A.  Yes.**
10  Q.  Similar experience there?
11  **A.  You know -- essentially, yeah, I mean --**
12  Q.  I want to change gears for -- switch gears
13  for just a second, and go back to some testimony
14  that you gave about video cameras on the Metro
15  Transit buses.
16  **A.  Mm-hmm.**
17  Q.  So I haven't heard any testimony about that
18  from anybody else, and so I'm just trying to nail
19  down exactly what occurred.  So can you tell me what
20  -- what was your understanding about video on the
21  Metro Transit buses?
22  **A.  I didn't have any understanding of any**
23  **video or -- it was -- that was just something that**
24  **was one of the things that you -- one of the things**
25  **that I had heard as we were down there, was that**

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

262

1    they had cameras and they were running.
2         Q.  Do you recall who you heard that from?
3         A.  No.
4         Q.  Do you recall when you heard that?
5         A.  No, I don't.
6         Q.  Do you know if it's true that they had
7    video cameras in the Metro Transit buses?
8         A.  I don't.
9         Q.  And if they had video cameras, do you know
10   if it's true if they were recording?
11        A.  I don't, no.
12        Q.  And do you know, if there were recordings,
13   whether or not audio was part of that?
14        A.  No.
15        Q.  Do you know whether the State Patrol has
16   access or any control over the data or the -- any
17   potential video that may exist from a Metro Transit?
18        A.  I do not.
19        Q.  Do you recall why -- or what someone said
20   about why there was a concern about video on the
21   Metro Transit buses?
22        A.  No.
23        Q.  Do you recall any statements on Metro
24   Transit buses when you were there that you found
25   problematic?

263

1         A.  No.
2         Q.  Another thing that I believe you testified
3    to was that at some point troopers were laughing
4    about the treatment of members of the media.  Do you
5    recall testifying to that?
6         A.  Yes.
7         Q.  Tell me specifically what you can recall.
8         A.  Nothing verbatim.  No -- there was sort of
9    a flippant disregard.  From who, I cannot tell you,
10   I don't know.  When you're surrounded with hundreds
11   of people and there's conversations and what have
12   you going on, you know, you hear things, but there
13   was -- there was a -- not from everybody, but like
14   about just the kind of a flippant sort of attitude
15   towards it.
16        Q.  And what do you mean by that?  What do you
17   mean by a flippant attitude towards it?
18        A.  They -- perhaps like we have things to do
19   so they weren't concerned about having the -- the
20   curfew and being exempt, like they weren't concerned
21   about it, not either way, but just didn't like -- it
22   was like, oh, whatever, or laughing about injuries
23   like, well, people -- it was an overall like, well,
24   you know, it's dangerous, it's -- you know, people
25   just being flippant or huhaha, you know, dumb asses,

264

1    sort of deal.
2         Q.  So do you recall any specific statement
3    that anybody made as it related to the press?
4         A.  No.
5         Q.  So when you said, I think before, you just
6    kind of laughed a little bit and said something like
7    dumb asses, that's --
8         A.  Not verbatim.
9         Q.  That's just your impression as you sit here
10   today?
11        A.  Correct.
12        Q.  But you don't recall any specific thing
13   that was said; correct?
14        A.  No.
15        Q.  And you don't recall any specific
16   individual who said anything?
17        A.  No.
18        Q.  And you also mentioned that there were
19   individuals who laughed; correct?
20        A.  I couldn't tell you who.  I couldn't tell
21   you where.  I couldn't tell you anything specific
22   about that.  I know it seems weird, but I can tell
23   you that was the impression I got from some folks
24   that I don't know who they -- that it would have
25   came from.

265

1         Like I said, I was going through a divorce or
2    had finished a divorce and it was a mess and I half
3    kept to myself.  I was a lot less social than what I
4    used to be.
5         Q.  And your husband's new wife was a member of
6    the MRT at the time; correct?
7         A.  Yeah.
8         Q.  And she was there at the same time as you?
9         A.  Yes.
10        Q.  Just want to be clear that I circle and
11   make sure that I dot all the I's and cross all the
12   T's on this.
13        A.  Yes.
14        Q.  How many people do you recall laughing
15   about injuries that --
16        A.  I have no idea.
17        Q.  One?
18        A.  I have no idea.
19        Q.  So it could be any number between one and
20   630 troopers that were there?
21        A.  I wish I could give you a better answer.
22        Q.  Now, you mentioned the arrest of the CNN
23   reporter, Omar Jimenez.
24        A.  (Nodding head.)
25        Q.  And I believe one of the things that you

Tesa Johnson (Vol. 1)
12/20/2023

266

1   mentioned was that the arrest was improper because
2   media was exempt from the curfew; correct?
3       A.  Media is exempt from the curfew or being --
4   they're allowed to be there.
5       Q.  Okay.  So I want to drill down on that a
6   little bit.
7       A.  Okay.
8       Q.  So first of all, I'll represent to you that
9   Omar Jimenez was arrested early in the morning on
10  May the 29th, and the first curfew went into effect
11  at 7:00 p.m. on May the 29th.  So there was no
12  curfew in effect.
13      A.  Okay.
14      Q.  So you would agree with me, based on that,
15  that there was no issue with arresting Omar Jimenez
16  for a curfew violation or exemption to the curfew
17  because there was no curfew in place; correct?
18      A.  I don't -- I -- when I say that they were
19  exempt from the curfew, that's not the only reason
20  why.
21      Q.  And that's fair.  That's what I'm trying to
22  circle down on.  So when you say they're exempt from
23  the curfew, you're not talking about a physical --
24  or I'm sorry, a legal exemption in the curfew
25  document that was issued by the governor or the

267

1   mayor of Minneapolis; correct?
2           MS. WIESSNER:  Objection, calls for a legal
3   conclusion, misstates her testimony.
4           THE WITNESS:  I -- the media was allowed to
5   be there.
6           MR. WEINER:  Okay.
7   BY MR. WEINER:
8       Q.  And what are you basing that on?
9       A.  My understanding of what we were told was
10  they were allowed to be there.
11      Q.  Okay.  And you were told that prior to Omar
12  Jimenez being arrested on -- in the early morning of
13  May the 29th?
14      A.  No, and if I gave that impression, I
15  apologize.  That was not my intention.  I just know
16  that the -- we were told that the media was exempt.
17      Q.  Okay.
18      A.  When he was arrested, I couldn't tell you
19  if that was May 27th or May 31st.  And if I --
20  again, if I made that -- if I eluded towards that,
21  that was not correct.
22      Q.  So then again, let's -- So you were
23  told at some point the media was exempt.
24      A.  Yes.
25      Q.  Who told you that?

268

1       A.  I don't know.  It could have been any of
2   the supervisors.  Could have been during a brief or
3   a debrief, I don't know.
4       Q.  Could it have been on a bus?
5       A.  Could have been.
6       Q.  Could it have been as you were out on the
7   streets?
8       A.  There wasn't a lot of communication in the
9   regard of do or don't, other than instruction, and
10  when we were out on the street, we were a lot more
11  focused on who was in front of us.
12      Q.  Okay.  So just trying to narrow things down
13  a little bit in terms of time frame.  You don't
14  recall who told you that the media was exempt;
15  correct?
16      A.  Correct.
17      Q.  You don't know when this occurred; is that
18  correct?
19      A.  Correct.
20      Q.  What you can say is that it was after the
21  arrest of Omar Jimenez?
22      A.  Now that I'm -- yes, because when they
23  arrested him, and then it was like that was sort of
24  the catalyst of the knowledge of now we know we're
25  not supposed to -- the press is exempt.  Does that

269

1   make sense?
2       Q.  And again, I'm trying to get the
3   understanding of where this idea that the press was
4   exempt, where this came from.  Do you have
5   recollection of any supervisor specifically telling
6   you that?
7       A.  No.
8       Q.  Do you have any recollection of where you
9   were when you were told that?
10      A.  No.  But I wish I did.  I -- we -- there
11  was -- I had conversations, and again, I don't know
12  with who.  This was days of 20-hour workdays, no
13  food, on our feet, we were tired.  I was -- I would
14  have rather eaten glass.  If I could tell you
15  exactly, I would love to, but we -- we had
16  conversations of, well, how the fuck are we supposed
17  to be able to tell the difference between somebody
18  who is going to shoot us and somebody who's press?
19  We don't know.
20      Q.  That's fair.
21      A.  And those conversations happened.  How am I
22  supposed to tell if this person is press because
23  they have press written on them?  I don't know and I
24  wish I could give you those answers, but again, I
25  don't recall.

68 (Pages 266 to 269)

Tesa Johnson (Vol. 1)
12/20/2023

270

1    Q.  I want to show you --
2         MR. WEINER:  I think we'll mark this as
3    Exhibit 10.  And to make things super confusing for
4    all of us, it's a compendium of exhibits from
5    Miss Cole's deposition.  So the first exhibit
6    sticker that you'll see on this is Exhibit 10, but
7    it's a bunch of different exhibits that were
8    included in there.
9         So I'm going to ask that it's marked as
10   Exhibit 10 for your deposition.  I imagine that
11   given the time constraints that we have, this will
12   probably be the last questions that we can get to
13   today and then we'll kind of figure out about next
14   steps?
15        (Exhibit Number 10 marked.)
16   BY MR. WEINER:
17        Q.  MS. Johnson, I'm going to represent to you
18   that this is a set of photos that are taken from the
19   video that was given -- or that was provided to us
20   as part of the discovery in this case.
21        A.  Okay.
22        Q.  And I want to start on this first page that
23   says -- and it has a number -- has various
24   individuals and numbers 1 through 7.
25        A.  Okay.

271

1    Q.  And in looking at this video, I would like
2    you to tell me which of these individuals are
3    members of the press.
4         A.  It's very difficult to make out anything
5    other than a color of top or if they have a backpack
6    on.  It would be difficult for me to tell you based
7    on the still.
8         Q.  Okay.  If we could turn to the next page.
9         A.  (Complies.)
10        Q.  We've got a number of individuals here, 1,
11   2, 3 and 4, that are identified.  Any of those
12   individuals that you believe are members of the
13   press?
14        A.  Again, I couldn't tell you.
15        Q.  Okay.  If we could turn to the next page.
16        A.  (Complies.)
17        Q.  We have some individuals, 1, 2 and 3.  Can
18   you tell me if those individuals, if any of them are
19   members of the press?
20        A.  Somebody's got a boom.
21        Q.  So that's a possibility.
22        A.  It's possible.
23        Q.  Okay.  So of the three, you can maybe
24   identify one who might be a member of the press?
25        A.  I see the boom there, so I -- that would be

272

1    an indicator to me that somebody would be.
2         Q.  Okay.  Turning to the next page, there are
3    two individuals here, 1 and 2.  Any belief, based on
4    what you see here, that these are members of the
5    press?
6         A.  Based on seeing them from behind, I don't
7    see anything on their backside that indicates to me
8    that they are press.
9         Q.  Okay.  If we could turn to the next page,
10   we've got four individuals here.  Any of these
11   individuals appear to be members of the press to
12   you?
13        A.  Looks like 1, 2, and it's difficult to make
14   out if 3 or 4 would be.
15        Q.  Okay.  And 1, what are you basing the idea
16   that that might be a member of the press?
17        A.  It appears as though they have a -- a --
18   like a larger camera with a lens on it, is what I --
19   is what it appears to be, with the lighting and the
20   focus.
21        Q.  Yep.
22        A.  The second, it appears as though -- or
23   number 2, excuse me, appears as though he has
24   possibly a camera.
25        Q.  Okay.  And turn to the next page, that

273

1    might help a little bit.  Is that the camera that
2    you think you saw in number 2?
3         A.  He's holding a camera, yes, so that --
4         Q.  So he could be a member of the press?
5         A.  Correct.
6         Q.  What about 3 and 4 in this photo?
7         A.  4, it's -- I don't see -- his hands are
8    blurry so I don't know.  3 has got his -- has got a
9    iPhone or a Samsung or Smart phone, holding that up.
10   Without being able to see the front of him with any
11   indicators, if he would be press, I don't know.
12        Q.  Would just an individual with an iPhone
13   without any other indication, would that be a member
14   of the press to you?
15        A.  Without any other indication, just holding
16   up an iPhone, no.
17        Q.  Okay.  If you can turn to the next page.
18   Nice thing here is the lighting's a little bit
19   better.  Of 1, 2, 3, 4 and 5, any of these
20   individuals here that you believe are members of the
21   press?
22        A.  The -- 4 -- okay, 1, 2, 3, 4, 5.  5 appears
23   as though, if I'm just, you know, looking from this
24   still, he appears that he's got a larger camera.  3
25   has got a high vis vest.  I don't know if that would

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

274

1  be indicative of press, it's -- maybe 1, with the
2  way that it looks like he's got a larger backpack or
3  something, the straps on his back, but I don't know.
4      Q.  And the last page here.
5      A.  Who looks like they would be part of the
6  press?
7      Q.  Who would be press, yes, ma'am.
8      A.  1, possibly 3.  That's -- those are what I
9  would -- I would say from looking from behind.
10     Q.  And number 2 there seems to be the same
11 individual with the Adidas jacket that was in some
12 of the earlier pictures; correct?  With the iPhone
13 or some type of Smart phone.  And you can go back
14 and look if you --
15     A.  Yeah, because I don't remember what his
16 clothing was.  (Reviewing document).  Looks pretty
17 similar, yeah.
18     Q.  So in the event there are members of the
19 press interspersed with members of the general
20 public and there's a dispersal order, how are
21 members of the State Patrol supposed to address the
22 situation when people are supposed to move and
23 there's a mixed group of individuals?
24     A.  I don't know.
25     Q.  You don't have an opinion about that?

275

1      A.  Do you mean -- You want to know what my
2  opinion is?
3      Q.  Yeah, if you -- I mean if you have an
4  opinion on it, I would love to hear it.
5      A.  I don't know.  It would be -- it was
6  difficult to be able to differentiate if there
7  wasn't something that was very clearly marking them
8  or if they weren't carrying something that would be
9  to a reasonable person interpreted as professional
10 or some sort of camera equipment, video equipment.
11     MR. WEINER:  Okay.  I think, given the
12 technological needs that we have, now is probably a
13 good time to break since I don't have anything else
14 on this topic.
15     THE WITNESS:  Okay.
16     MR. WEINER:  So I don't know if there's
17 anything that you wanted to state on the record
18 before we go off the record or if we should just go
19 off the record at this point.
20     MS. WIESSNER:  Well, you're done with
21 questions for the day or are you saying you'd like
22 to continue the deposition on another day?
23     MR. WEINER:  Oh, I'm definitely continuing
24 the deposition.  The deposition's remaining open at
25 this point because I still have questions and there

276

1  are things that we have to do.  So the question
2  becomes at this point -- and I need the information
3  that I'd asked you guys for on those exhibits.
4      So I guess my question is, do you have anything
5  else that you would like to get on the record before
6  we go off so that Jayme can pack up?
7      MS. WIESSNER:  I have a few further
8  questions, but I can wait until your testimony is
9  done if we're coming back, anyways, or -- it's about
10 three minutes of questions.
11     MR. WEINER:  I think we'd have to wait
12 until all of my questioning is done before you have
13 the opportunity.
14     MS. WIESSNER:  Yeah.
15     MR. WEINER:  So I think we'd have to come
16 back for that.
17     VIDEOGRAPHER:  I'm going to go off the
18 video record.  It's 4:52 p.m.
19     (Discussion off the record.)
20     (The following discussion was held off the
21 video record.)
22     MS. WIESSNER:  It's your deposition, so if
23 you want to instruct her about reading and signing,
24 that would be great.
25     MR. NOEL:  Ms. Johnson, my name is Andy

277

1  Noel, I'm one of the lawyers for the plaintiffs in
2  this matter.  And at the end of the deposition, we
3  instruct witnesses who we don't represent that they
4  have a right to receive a copy of the deposition
5  transcript, read it over, and determine whether or
6  not things were taken down accurately or whether
7  you'd like to make changes to the deposition.
8      So you have to tell us today whether you would
9  like to exercise that right to read and sign your
10 deposition or whether you would waive the right to
11 read and sign this portion of your deposition.  And
12 neither side can give you any input on that.
13     THE WITNESS:  I'd like my portion -- is it
14 portion of the deposition, to read and sign.
15     MR. NOEL:  Understood.
16     (The deposition concluded at 4:58 p.m.)
17
18
19
20
21                 *****
22
23
24
25

70 (Pages 274 to 277)

Doby Professional Reporting, Inc.
952-943-1587

278

1        REPORTER'S CERTIFICATE
2
3        I hereby certify that I reported the videotaped
4   deposition of TESA JOHNSON, VOLUME I, on the 20th
5   day of December 2023, in Crosby, Minnesota;
6        That I was then and there a Notary Public in
7   and for the County of Carlton and the State of
8   Minnesota, and as such I was duly authorized to
9   administer an oath;
10        That the witness before testifying was by me
11   first duly sworn to testify to the whole truth and
12   nothing but the truth relative to said cause;
13        That the foregoing testimony was recorded in
14   shorthand by me and transcribed into typewriting
15   under my direction, and is true and correct to the
16   best of my ability;
17        That I am not related to any of the parties
18   hereto nor interested in the outcome of the action.
19        WITNESS MY HAND AND SEAL this 28th day of
20   December 2023.
21
22        ------------------------
          Amanda K. Grover
23        Notary Public
24
25   My commission expires:  01/31/2025

279

1            SIGNATURE PAGE
2        I, TESA JOHNSON, swear I have read the
3   foregoing pages of my deposition, and I have noted
4   the changes or corrections, if any, below:
5   Page:   Line:   Change:
6   _____  _____  _____
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20
21        _____
              TESA JOHNSON
22
     Sworn and subscribed to before me
23   this ____ day of _____ 2024.
24   _____
          NOTARY PUBLIC          AKG
25

Doby Professional Reporting, Inc.
952-943-1587

**A**

**a.m** 1:21 4:5 64:19,22
**Aaron** 138:4,8,18,22
**abiding** 59:4 113:18
**Abigail** 18:21 19:18
172:19
**Abigail's** 21:20
**abilities** 32:3
**ability** 58:6 96:22 120:7
180:13 278:16
**able** 9:22 96:14 97:19
102:21 104:7,8,18,19
109:22,23 110:20 113:2
115:19 117:5 120:12
131:18 135:20 150:25
167:13 176:23 181:16
217:9 256:7 269:17
273:10 275:6
**absolutely** 51:3 74:18
145:10 197:18
**access** 194:10 210:6
246:8 262:16
**accessing** 119:2
**accident** 193:3
**accidents** 184:4
**accomplished** 25:14,15
**accosted** 251:15
**account** 115:2 193:12
246:17
**accounts** 198:5
**accurate** 28:24 102:11
149:25
**accurately** 96:23 277:6
**ACLU** 196:6
**Acorn** 228:22,25
**acting** 1:8,10 200:15
**action** 94:16 255:10
278:18
**actions** 259:20,20
**active** 167:10
**Adam** 138:1,18 139:1
**add** 117:1 119:17 169:8
**added** 49:18,21 117:25
118:6 133:2 134:14
144:3
**adding** 117:18
**addition** 196:13 260:5
**additional** 197:6
**address** 85:23 119:7,10
119:11 228:23 231:10
274:21
**addressed** 77:21
**addresses** 141:2
**adhere** 32:12
**Adidas** 274:11
**admin** 100:21 119:23
162:4
**administer** 4:15 278:9
**administered** 4:16
**administrative** 21:11
88:18
**admit** 203:10 249:3
**adult** 178:6
**advancing** 221:24
**advantage** 253:3
**adverse** 7:12 222:15,17
222:24,25
**advice** 7:9 103:22 204:15
**advised** 8:8
**affairs** 78:12 88:11 89:9
89:19,23 92:21 94:7,11
94:15,19,21
**affect** 95:2 96:22 99:25
105:19
**affirmative** 94:16
**afraid** 99:5

**AG** 3:18
**agencies** 196:8
**agents** 222:3
**aggressive** 62:9
**ago** 55:10 142:4 193:17
**agree** 64:5 74:4,14,25
75:1,17,21 162:13
266:14
**agreed** 151:8
**agreeing** 203:8
**agreement** 3:18 203:3,8
203:16,25 204:2 207:16
**Ah** 136:6,19
**ahead** 36:9 46:10 54:17
71:25 73:11 74:10
78:10 112:25 241:13
**air** 258:3
**aisle** 156:15 157:4
**aisle-facing** 157:24
**AKG** 279:24
**AI** 19:18 145:12
**album** 3:4,8 11:17 47:20
48:7 49:19 62:23 115:8
115:11 116:8,10,11,12
116:18,21,25 117:1,9
117:13,18 118:15,19,24
119:2,17 120:3,5,15,22
121:5,13,15,17 129:6
129:21 131:10,13,15
133:3 135:11,11 137:9
143:13,16,19 146:1,4,7
146:10,18 150:9,10
165:6 166:5 168:4
171:24 190:21 191:1,6
196:14 209:18,22 210:1
247:15
**albums** 121:23,25
**alcohol** 174:22 176:4,7,13
176:19,25 177:2 178:2
**allegation** 232:11
**allegations** 232:1,3,9
**alleged** 52:12,24
**allow** 56:9,11 235:12
261:2
**allowed** 32:11 55:20 66:10
66:12,23 235:8 236:3,4
236:16,17 266:4 267:4
267:10
**allows** 169:5
**Amanda** 1:23 278:22
**ambulance** 87:24
**Amended** 3:10
**Amendment** 16:12 114:7
219:7
**amount** 227:7
**amused** 95:8,16 100:10
104:25
**amusement** 97:23,24
105:17
**Andrew** 2:3 4:10
**Andy** 5:8 6:21 64:13
276:25
**angles** 179:13
**angry** 47:13 259:6
**answer** 8:25 10:7,14,19
44:10,17 65:13 67:21
74:10 92:3 93:4 96:5
97:2,9 99:18 102:21
104:1,2,3,8,18 105:7,8
108:25 151:19 190:11
204:10,19 212:10,17
214:3 215:4 223:9
233:7 243:19 265:21
**answered** 81:9 96:3
112:24 123:7,12 130:7
145:17

**answers** 9:23 26:18
102:10 105:13 269:24
**Anthony** 132:1,7
**anticipating** 182:16
**anybody** 46:3 51:19 54:19
66:19,24 67:12,14,19
67:25 99:3 137:15
179:3 180:12 182:9
223:15 226:20 231:3
237:15 240:2,5 253:10
254:4 261:3,18 264:3
**anymore** 77:4 82:4 192:23
193:1 240:15
**anyone's** 144:15
**anyway** 153:18
**anyways** 276:9
**apologies** 94:13
**apologize** 28:6,12 105:23
158:10 223:7 267:15
**app** 169:1,13 246:10 247:1
247:2
**apparent** 253:6
**Apparently** 72:10 179:5
**appeal** 76:25 77:2
**appear** 6:15 272:11
**APPEARANCES** 2:1
**appeared** 39:20
**appearing** 218:1
**appears** 38:9 78:11 81:5
152:9 153:4,10 157:12
167:20 175:9 272:17,19
272:22,23 273:22,24
**applicable** 66:22
**application** 245:18
**applied** 200:9
**apply** 200:5
**apprehensive** 99:4 206:23
**appropriate** 18:7 23:16
55:15 56:4 63:2,10,19
64:9 67:3 104:11 167:1
170:8 171:2,6 186:13
233:8
**appropriateness** 170:11
**approximately** 1:21 4:5
217:3 235:4,5
**apps** 198:14
**April** 12:12 77:25
**Arden** 26:3 30:19 56:23
152:7,14 186:4 225:23
227:5
**area** 31:15 38:15 39:4
75:9 150:12 152:4,8,15
200:17 251:3 256:4
258:14
**areas** 36:21 50:22,24
**argument** 73:22
**arm** 218:11
**Armstrong** 133:19
**arrest** 28:2 31:15 33:23
35:7,10 39:11 46:19,21
47:5,20 49:7 50:12,14
60:20 63:2,15 64:7,24
67:5,16 68:3 108:8
112:16 166:1,4 168:1,3
200:24 235:18,19,25
236:21,24 265:22 266:1
268:21
**arrested** 32:13,24 33:13
35:4 46:2,17,24 47:8
48:23 59:5,15 62:22
67:18 68:11 108:17,24
165:9,13 167:2,9,19,20
167:21 266:9 267:12,18
268:23
**arrestee** 166:24
**arrestee's** 168:6

**arresting** 50:3 60:13 63:9
253:10 266:15
**arrests** 29:19 30:5,12
33:15,19,22 34:22
165:15,25
**arrive** 27:9
**arrived** 36:18 37:3 260:18
**asked** 37:1 70:6 81:9
95:12 112:24 123:7,12
150:13,18 151:25 186:8
186:14,22 192:8 237:12
241:4 276:3
**asking** 9:23 19:24 26:17
26:19 36:13 70:16 82:2
184:22 207:10,12 214:2
214:20 222:21,22
**asks** 213:10
**ass** 149:24 150:3
**assault** 106:5,5,9,16,19,21
107:8 108:5,8,10,15,18
108:20,25 109:4,7,15
230:17 231:7,13
**assaulted** 231:15,21
232:6
**assaulter** 221:7,10,14,24
222:2
**asses** 263:25 264:7
**assistant** 72:23,24
**assume** 10:14 34:4,12,15
67:11 107:4 119:21
121:2,12 134:23 138:25
145:2 169:2 183:4
186:24 193:11 207:19
215:4
**assumed** 231:2
**assumes** 52:6 54:16
**assuming** 107:7
**assumption** 40:7,22,23
59:11 67:17 71:3 144:4
187:7,8 192:23 193:7
**assumptions** 237:20
**atmosphere** 147:22 155:2
**attached** 71:1
**attack** 255:17,20
**attempted** 218:22 219:7
220:19 255:17
**attempting** 220:14
**attend** 218:18
**attendance** 218:5
**attention** 63:6
**attitude** 263:14,17
**attorney** 2:7 4:6 6:12,15
6:23 8:3 9:3,15 22:14
72:24 73:24,25 76:18
111:24 202:4 203:2,17
204:20 205:5,6,13,21
206:1,8,13 207:4,22
208:16,23 209:12,14
212:20 213:5,20 243:8
250:16
**Attorney's** 213:8
**attorney/client** 103:11
204:5,11
**attorneys** 6:21 151:3
205:18 239:22
**audio** 262:13
**August** 77:6
**authority** 145:5
**authorized** 278:8
**automatically** 68:3
**available** 86:4
**Avenue** 2:4
**avoid** 8:25
**avoids** 75:9
**aware** 32:6,8,16,17 33:2,6
33:23 34:1 46:3 52:11

52:15 53:20,23,24 54:8
61:9 66:5,6 70:15,19
71:15,18 82:11,13,14
84:6 100:9 121:9
137:10 149:6 169:18
171:8 177:3 178:21
192:4 194:18,22 206:8
213:1 230:14 234:12,13
**awe** 57:18,23 58:1,17,19
59:7,12,20 160:18
161:17 162:5,7
**awkward** 102:21 104:17

**B**

**baby** 189:17,20
**back** 23:10,11 28:9 29:2
35:12 62:3 76:8 87:5
89:13 99:6 104:19
107:2 111:14 114:23
146:12 147:7 151:19,21
153:9 157:20,25 163:5
163:10,13 173:6,21
178:8,9 182:9 187:11
187:24 188:22 205:9
224:3 225:25 231:14
237:10 241:1 242:5
249:20,21 254:21 257:8
257:12 258:14,17
261:13 274:3,13 276:9
276:16
**backed** 190:10 196:2
**background** 37:19 148:16
152:11
**backlash** 90:13,23 91:2
**backpack** 271:5 274:2
**backs** 173:5
**backside** 272:7
**bad** 23:18 105:25 149:23
150:3 160:15 161:11,18
258:21
**badge** 142:22,23 238:11
**bag** 40:11
**bald** 157:3,10
**ballroom** 174:13
**Bar** 208:7
**barrier** 166:14
**barriers** 252:19,24
**base** 51:4,5
**based** 16:7 55:13 56:1
67:21 75:3,18,21 94:24
100:3 106:11 200:11
219:21 231:7,9 249:4
255:10 266:14 271:6
272:3,6
**baseline** 58:15
**basically** 247:9 258:3
259:9
**basing** 267:8 272:15
**batches** 245:6 246:4
**Bates** 122:16
**bath** 189:17,21
**baton** 51:12 255:21
**battle** 87:21 88:15
**Bearce** 154:13,14 157:8
158:22
**bed** 111:12
**beer** 174:19
**beers** 174:15,18,20
**beginning** 14:4,5 27:12
32:5,20 42:11 78:5 84:1
223:4 226:15
**behalf** 2:2,6 70:20 71:16
**behaving** 45:8
**beings** 45:7
**belief** 170:25 272:3
**believe** 7:23 12:12 14:18

14:18 16:15,22 19:20
21:7,7 28:16 29:20
30:25,25 31:4 32:18
35:5 36:10 43:17,18
46:2,11,15 60:1 78:9,20
78:20,25 80:9,9,12,23
83:6 88:5,6 89:21 90:9
91:16 92:8 93:5 94:2
96:25 97:25 98:1 102:2
102:10 110:15 114:24
116:13,24 117:11 119:9
125:22 126:10,11 129:8
133:4,9 134:15 145:21
149:23 157:17 158:8
163:19 165:12 173:9,14
176:10,16 215:6 232:5
233:20 239:6 240:13
242:18 256:1 259:18
263:2 265:25 271:12
273:20
**believed** 114:20
**believes** 73:22
**Ben** 1:8 5:13 26:5 52:25
127:5 146:9 158:5,8,16
**beneficial** 87:4
**benefits** 7:20
**benign** 239:21
**best** 19:23 26:19 32:2
44:25 54:13 79:6 81:7
83:2,5 104:6 123:4
124:3 126:13 136:9,11
137:8 167:4 173:23
182:24 224:10 226:14
227:24 234:22 238:6
253:18 278:16
**Betinsky** 9:6 222:23
**betrayed** 82:18
**better** 31:13 86:16 91:14
93:1 96:23 247:18
248:1 265:21 273:19
**biased** 61:25 62:14
**big** 68:23 111:17 120:7,8
140:9 181:23
**bit** 28:13 125:9 155:21
159:3 163:13 180:5
250:4,21 260:18 264:6
266:6 268:13 273:1,18
**bite** 99:6
**BJ** 142:20
**black** 165:9
**blank** 13:12 79:1
**block** 131:21
**blonde** 165:12 166:2
**blood** 23:18 111:7
**blow** 241:1
**blowback** 34:21 35:4
**blue** 91:7,17 92:1 148:21
148:23 149:2 220:23,24
221:17
**blur** 258:11
**blurry** 273:8
**body** 163:5
**bogged** 94:17
**Bogojevic** 172:21,25
**boom** 271:20,25
**booze** 175:10
**Bordwell** 16:23
**bother** 207:20
**bottle** 64:5 174:21,23,23
175:1,6 251:25
**bottles** 251:9
**bottom** 48:10 49:1,11 81:5
83:9,10 130:23
**box** 124:10
**brain** 27:1 28:6 244:1
**brass** 91:15

**break** 10:17,19 48:16
64:13,16,20 92:12
106:2 112:7,11 150:16
151:2,9 199:10,14,18
249:17,24 275:13
**breaking** 64:1 253:8
**breaks** 10:18
**Brian** 128:15 157:17
159:13,14
**bridge** 226:10
**brief** 21:20 239:19 268:2
**briefed** 107:9
**briefing** 24:21 30:17 47:1
56:20 57:2 60:3,5
152:19,21 153:2 162:2
162:7,8 225:16,16
227:2
**briefings** 24:24 25:3,5,11
25:24 26:2 30:18 34:19
65:7 152:14,15 227:5,9
227:12
**briefly** 5:5 63:1 76:15
**bring** 76:8 221:13
**bringing** 162:16
**broader** 90:22 182:19
187:3
**Brod** 16:22
**broke** 251:1
**broken** 36:21 232:13
**brought** 63:6 177:1 196:5
236:23
**brown** 126:19,21,25 157:2
157:6,11 175:9 254:15
**Brynell** 133:24 134:1
**BSing** 178:1
**budget** 205:24
**building** 31:3 251:2
**buildings** 253:9
**bunch** 270:7
**Burch** 18:21 172:20
**Burch-Dumont** 19:19
**burn** 61:14 164:11 251:18
**burned** 259:25
**burning** 61:17 253:8
**burnt** 251:2
**bus** 35:15,22 37:18,21
154:15,21 155:3,14
157:21,25 268:4
**buses** 35:16 59:14,14
100:16,17,19,22 152:11
154:2,4 155:5,11
261:15,21 262:7,21,24
**business** 85:15,17 229:4
229:5,6,8,10 230:1,5,8
**button** 118:10 129:18

---
**C**
---

**C** 4:1
**cabinet** 203:18
**CAD** 179:2 181:18 188:24
**call** 4:25 23:10 106:8
108:4 109:14 149:23
215:15,19 216:6,21,22
216:24 217:2,17 239:7
239:11,13,24 240:3
241:19 243:16 245:19
**called** 13:13 22:13 80:12
94:12 98:23 106:19
196:8 254:21
**calling** 22:15 208:5
**calls** 22:9 34:10,23 35:8
39:25 55:16 58:23
59:22 60:25 61:18
63:11 69:21 79:9,19
81:10 94:10 108:22
113:11,22 117:2,20

118:1 119:19 120:17,24
121:7 130:16 131:4
137:23 139:2 145:17,17
145:18 148:10 149:12
149:17 160:22 162:11
162:20 164:4,15,20,25
165:18 166:6 171:3,12
171:16 176:8,14 183:2
183:9 184:13,24 189:12
189:22 200:6 249:6
267:2
**calm** 59:16
**camera** 40:5,11 46:17,24
153:9 154:24 155:12,16
155:17 173:6 246:18,20
272:18,24 273:1,3,24
275:10
**cameras** 40:10 100:18
261:14 262:1,7,9
**candy** 229:25
**capacities** 1:8,10 220:8
**capital** 168:17 170:15
**Capsicum** 163:18
**captain** 14:9,11,13,14
19:20 20:1,15,23 21:18
23:13 24:22 50:13
80:20,25 81:4,25 82:11
82:22 83:2 89:14 99:9
123:3,5 144:21 145:25
146:3 153:18 173:15
157:7 215:13
**captains** 1:11 144:8
172:25
**caption** 168:17,22 219:12
**captions** 169:8
**captured** 155:11,15,16
**car** 123:3 256:18
**card** 39:18
**cards** 41:9
**care** 14:4 236:24
**career** 13:25
**careful** 8:20
**Carlton** 278:7
**Carol** 44:18 69:10
**Carolyn** 1:5 3:7 7:4 11:22
38:5,8,12,14,24 39:6
44:13 48:7 68:15 69:2
70:11 85:1,6,20 86:11
106:8,25 109:15 110:4
110:6,11 111:14 114:24
115:17 129:6 164:1
178:9 197:3,7 210:16
**Carolyn's** 85:23 231:10
**carrying** 25:8
**carve-outs** 112:20,23
**case** 1:4 5:5,14 7:6 9:7
11:3,7 22:15 72:7,12
76:4 82:23 87:5 93:7
105:20 127:6 151:4
197:17 201:5,19 206:10
206:19 207:7,19 219:8
220:2 222:16 270:20
**cases** 76:23,23
**catalyst** 21:25 268:24
**catch** 109:24
**caught** 257:14
**cause** 8:23 76:9 278:12
**caused** 253:24
**caveats** 112:17,20,23
113:9
**cc** 81:5
**ceased** 81:25 208:23
**Center** 38:8,17 41:24 42:4
69:3

**certain** 94:6 125:8 190:16
191:11,13
**certainly** 198:3 203:20
245:24
**CERTIFICATE** 278:1
**certify** 278:3
**Chad** 78:25 125:17 157:12
157:19
**chain** 24:13
**chair** 42:24
**change** 233:7,11,14
261:12 279:5
**changed** 125:5 145:2
**changes** 277:7 279:4
**channel** 62:9
**characterization** 24:14
74:4,14,25 75:17 96:24
**Chauvin** 15:3
**check** 22:22,23,25 27:9,12
197:16 203:18 245:20
**checking** 39:20,21
**checks** 27:10
**chemical** 222:3
**chief** 259:15,15,16,19
**children** 178:6
**chiming** 30:8 71:6 191:9
237:22
**choice** 255:13
**choose** 205:6,12
**chose** 109:14
**chosen** 6:17 8:14 25:7
206:5
**Chris** 140:23
**Christianson** 127:9,10,15
**Christina** 172:21
**Christmas** 217:8,13
218:16
**chyron** 49:10
**circle** 265:10 266:22
**circulate** 167:1
**circulating** 170:6 171:1
**cities** 75:9 166:17 244:15
250:4 253:16
**citizens** 251:21
**city** 61:14,17 154:1,15
251:18,22
**civil** 16:8,9 27:25 46:5
58:1,4 63:25 159:4,4
182:15 260:9
**civilians** 16:10 46:5 58:21
58:22 62:10 109:12
233:15,19 260:22
**claim** 7:19,22 8:1,3 76:12
88:16 92:25 93:17 94:2
94:24 212:21,23 213:2
242:16
**claimed** 75:2,2
**clarification** 64:4 85:16
144:25
**clarify** 10:11 12:19 17:12
29:2 59:20 69:14
103:21 124:9,15 193:13
204:14
**clarifying** 28:20 67:9
105:22 145:11
**clear** 10:10 103:16 225:10
228:6 265:10
**clearly** 221:25 275:7
**click** 118:15 131:17
**client** 85:1 216:3
**clients** 7:12 52:13 70:20
71:17
**clients'** 71:4 222:25
**clock** 30:8 71:6 191:9
237:22
**close** 149:7 242:3 256:5

**closed** 70:8
**closely** 162:23
**closures** 184:4
**clothing** 256:19 274:16
**Cloud** 153:12,12
**CM** 142:18
**CNN** 41:12 46:1,6 49:7
265:22
**co-commander** 21:16
123:11
**co-commanders** 20:5
**Cole** 1:5 3:7 7:5 11:23
38:12,15 44:13 48:7
68:15 85:1,7,20 114:24
129:6 210:16 220:13
222:19 232:5 235:25
240:6 241:18 242:1
244:22 245:15 246:2
**Cole's** 270:5
**collapse** 253:24
**collar** 168:7
**colleague** 9:6 106:17
**colleagues** 241:9
**collecting** 238:18,19
**collection** 48:6 247:13
**colonel** 77:23 79:13 80:5
80:22,22 94:11 153:7
178:25 181:9 185:10
225:1,11,19 226:6
227:4,25 259:16
**color** 220:9 271:5
**come** 8:14 42:2 54:22
76:24 98:2 99:6 127:12
145:18 151:18,21
158:15 195:2 237:6
249:20,21 253:16
276:15
**comedic** 161:16,24
**comes** 177:21
**comfortable** 44:21 98:6
105:13,18 205:23
**coming** 179:2 180:22
181:2,8,15 187:3
216:17 225:5 255:22
258:8 276:9
**command** 24:13
**commander** 23:25 122:23
123:1,2,5,11
**commanders** 24:7,8
**commands** 43:9,10
166:10
**commencing** 1:20
**comment** 31:7 117:8,14
210:23
**comments** 62:18
**commercial** 229:7
**commission** 278:25
**common** 41:8 120:22
121:1 171:15,19 172:8
**Commonly** 163:20
**communicated** 187:1
188:20 213:9
**communication** 209:11
217:15 245:13 268:8
**compare** 259:1
**compendium** 270:4
**compensation** 7:19
**complaint** 3:10 11:2 89:17
201:18 208:13 219:7
**complete** 259:14
**completed** 111:21 239:18
**completely** 43:7 65:12
**compliance** 108:5
**Complies** 74:21 80:3
271:9,16
**compound** 66:16 91:1

computer 179:4 246:16
concept 91:6
concern 95:2 100:14,21
101:7 151:13 243:10
244:8 262:20
concerned 94:23 101:9,16
117:4 155:10,16 206:15
206:17 207:9,10 212:13
263:19,20
concerns 212:12
concluded 277:16
conclusion 55:17 108:23
200:7 249:7 267:3
Conduct 213:15
conference 174:13
confidential 8:24 182:19
190:3
confidently 44:22
confirm 78:10 133:13
134:8 135:7 163:13
180:10
confirmed 116:7 132:24
176:1 201:10 213:14,18
conflict 213:9
conflicts 208:17,18
confused 28:21
confuses 28:25
confusing 37:2 146:16
270:3
confusion 82:19
connection 178:13 191:4
194:14 237:11
consent 213:14,18
consider 58:16 194:15
considered 98:16 167:10
constraints 270:11
consuming 176:19
contact 82:3 134:15
209:11 239:22 242:1
244:23
contacted 240:20 241:3
contacts 169:6
contents 116:23 117:17
context 75:10 142:8 162:5
175:13,20
continue 275:22
continued 161:14 256:17
continuing 275:23
continuum 58:11
contributed 250:9
control 16:9 262:16
convenient 92:24 93:3,6
93:11,14
conversation 33:20 44:20
54:19 62:2 69:9,9 80:10
80:11 99:19,19 110:21
204:1,23 205:8 213:23
215:23 222:23 226:5,25
239:17,21 241:25 242:6
242:7,20 243:2,9 244:1
244:4,21,22 245:6,12
245:25 246:2
conversations 8:21 12:3
42:16 43:22 44:6 45:5
62:1,17 89:4 110:19
158:17 177:15 204:8
205:2 210:19 211:13
218:21 222:12 263:11
269:11,16,21
cool 149:21 178:4
cooler 198:14
cooperating 183:20
Coors 174:23
copied 247:10
copies 151:11 217:19
246:15

copy 101:1 277:4
correct 6:19 7:1,3,17,20
7:21 8:2,7,19 11:24
12:1 13:18 15:15,19
16:4,5 17:1,21 19:4
20:4,7 21:13,14,17
24:15 25:23 26:4 28:15
30:3,20 49:16,19 52:2
52:17 55:1,5 56:15 57:3
57:5 60:15 64:11 65:10
68:9 71:9 76:14 77:13
78:2,8 82:4 84:10,13,16
84:19,20 85:1 86:3 87:7
87:10 88:17 92:21
93:12,15 97:7 107:11
108:9,12 110:24 112:21
113:21,24 114:5,9,14
115:3,14 116:9,20
119:1,12 125:24 130:1
130:11,13 131:23,25
135:17 136:20 137:19
137:22 138:17 145:6
146:18 147:10 156:16
156:17 157:5,9,22
162:9,12 163:14,15,24
166:25 169:14,17
172:10 174:10 175:11
175:16 176:2 178:19
180:19 182:3 184:5
186:7 189:11,14 193:21
193:24 194:12 195:13
195:19,24 199:24
200:13,18,21,25 201:12
202:20 208:24 209:8,9
210:7 214:14,17,23
215:8,11,12,15,20,21
216:3,12 218:2 219:23
219:24 226:1 227:17
228:8,14,23 229:4,15
230:10,13,19,20,23
231:1,8 232:8,10,16,21
232:25 233:1,5,6,17,22
234:15,17,19 235:15,19
235:20 237:13,20,25
238:3,7,12,14,17,21
242:20 246:4 248:9,13
248:14,20,21,25 249:1
249:5,13,14 250:11
251:18 252:19,22,24
253:13 254:22 256:25
257:3,17 258:4,23
259:10 260:6,11,14
261:6,8 264:11,13,19
265:6 266:2,17 267:1
267:21 268:15,16,18,19
273:5 274:12 278:15
corrected 28:22
corrections 279:4
correctly 29:20 75:11
83:15 145:13 178:15
correspondence 72:2
213:24 238:23
corroborate 226:24
counsel 4:12 5:4,9,10
6:18 48:11 150:13
218:7,21 220:18 221:12
222:12,14 223:18
count 156:14
counting 258:1
county 240:20 241:4
278:7
county's 241:17
couple 12:16 14:10 74:3
82:16 94:12 110:18
161:5 196:17 201:15
239:8,10

course 28:11 44:19 62:6
68:24 110:15 188:22
254:16 255:9
court 15:1 35:11 102:18
70:3,16 72:5 87:20
88:15,18 95:11 102:18
104:13,13 112:4 122:17
199:12 208:6 211:8,16
212:2,8 219:4 249:2,10
Court's 70:6
cover 115:9 148:5 149:15
201:2 221:8,14,22
222:1
coverage 61:24
covered 23:17 60:1 188:9
241:13
covering 37:12 75:8
covers 214:3
crash 240:18 241:8
create 121:22,23,25
created 120:2 244:19
crime 108:15
criminal 130:13,20 109:4
109:11 112:4
critical 124:12 253:22
criticizing 124:17
Crosby 1:19 278:5
cross 265:11
crowd 16:9 38:20 200:4
233:5 258:8
crushed 254:11
cups 175:10
curfew 29:19,23 30:2
31:14,18,21 32:12
33:24 50:9 59:4 60:13
63:8,9 113:3,19 114:3,8
200:1,5,12 234:25
237:1 263:20 266:2,3
266:10,12,16,16,17,19
266:23,24
current 46:15 84:2 88:20
250:9
currently 12:8

**D**

D 2:15 4:1 141:14
dad 136:18,19,19
dah 187:5,5,6,6,6
Dale 127:18
dangerous 89:20 235:15
263:24
Danielle 145:14
Darren 141:10,11
data 178:11 179:1,5,10,13
179:22 180:3,13 185:7
185:12 187:3 195:15
224:8 225:5,7 228:1,2
262:16
date 4:4 54:3 77:25 78:2
118:6
Dave 79:1,2 156:24,25
David 132:9,12
day 27:5 28:2,7,13 30:22
32:19 42:23,25 46:2,25
51:23,24 54:14 55:14
56:21 57:10 69:20
124:4 125:8 147:3,4,5,7
154:7,19 174:2 230:19
239:8 242:3 254:19,19
254:20 275:21,22 278:5
278:19 279:23
days 42:23,25 60:17
100:24 102:3 125:13
147:8 150:6 161:5
174:1,7 176:22 239:9
239:10 242:25 243:1

255:1 259:24 269:12
dead 87:24
deal 68:23 107:9 111:8,17
120:7,9 151:10 159:4
161:12 181:23 253:25
264:1
dealing 61:12 68:24
182:15 203:11 206:21
dear 87:23
debrief 181:13 268:3
debriefing 25:14 47:1
227:2
debriefings 34:19 65:7
debriefs 25:11 161:1
debris 251:6
December 1:20 4:4 278:5
278:20
decide 204:18
decided 93:8 100:2,11
decision 22:5 79:7,17
81:8 83:4
decisions 88:12
deck 252:18
decompress 175:23
deduce 135:18
defendant 127:6 196:1
223:16,19
defendants 1:12 2:6 4:11
4:13 5:10 70:21 82:22
96:9 206:10,14,18
207:6,15,18,24 208:19
209:4,10,17,21 210:9
210:11,15,20 211:9,15
211:19,23,24 212:7,12
212:17,19 213:11,25
214:21 215:7,10 216:15
216:21 218:12 223:4
231:24 259:9 270:5,10
275:22,24 276:22 277:2
277:4,7,10,11,14,16
278:4 279:5
deposition's 275:24
depositions 36:5 70:8
102:20 122:16
Derek 15:2
describe 24:3 66:18 104:6
177:22 196:18 230:16
243:24 250:14 253:19
description 63:23
descriptions 144:1
destroyed 251:1
detailed 241:20
details 12:21 107:4 205:9
211:3
determine 277:5
determined 136:2
device 191:18
devices 84:18
devised 255:2,16
diagnosed 75:7
diagnosis 250:11
difference 69:6 105:9
269:17
different 7:13 36:21 43:7
50:23,23 51:23 64:1
83:25 88:4,4,5 102:20
115:18 136:4 154:19
162:6 182:7 205:20
212:8 252:11 257:22
270:7
differentiate 255:6
differently 62:5 170:10
233:22
difficult 53:7 76:5 259:7
271:4,6 272:13 275:6
dig 180:5
digital 101:1
ding 179:19
direct 16:21 24:16 99:1,8

deploying 56:21
deployment 3:9 15:20
27:4,7,17 29:10,12
35:13 40:20 122:15,19
177:4 254:17 260:17
deponent 98:12
depose 70:4
deposed 8:11 9:6,7 92:9
92:13,15,25 201:4
206:1 208:10,11
deposing 73:2
deposition 1:14,16,18 3:1
3:2 4:3 5:6,17,25 6:8
8:18 9:9,16 10:23,25
11:10,14 12:4 22:12
23:14 26:18 36:7,11
42:12 44:20 55:3,12
69:7 70:17 75:10,13,16
75:18,23 78:6 87:5,12
87:19,25 88:15 92:16
92:18 93:6,18,22 94:25
95:23 98:24 102:14,19
103:1,2 105:9 107:10
112:15 114:11 151:11
151:18 197:21 201:8,13
201:22 202:11,19,24
207:15 208:22,25 209:3

104:2 222:3
directed 178:22
direction 24:7 211:23
278:15
directions 28:4 31:9 62:14
directly 17:13 23:25 24:4
93:24 95:12 178:24
180:18 246:16 247:8
disability 7:20 76:12
88:16 212:21
disagree 74:19 90:14,24
254:5
disappear 243:12
disappointment 259:13
259:13
discipline 88:13 145:6
disciplined 66:4
disclose 100:3,12
discomfort 76:10
Discord 199:2
discovered 209:24
discovery 70:7 219:22
270:20
discredited 74:23 75:3,4
discuss 40:18 42:21 45:22
61:24 76:5 103:14
210:11 217:6
discussed 61:21 103:10
103:14 110:13,16,22
152:13 179:1 217:10
222:11 239:18 244:6
discussing 20:19 28:14
44:3,19 45:8 46:22
61:23 81:13 186:20
discussion 240:24 276:19
276:20
discussions 60:2 62:13
disgruntled 73:16 74:5,15
98:17
dishonest 95:25 96:1
disobeying 200:15
dispatched 145:19
dispatcher 145:15,16
dispersal 200:3,12,15,23
274:20
disperse 166:11,11 200:4
255:3
dispute 215:19 216:12
219:9,23
disregard 263:9
distinct 51:13 143:4
distinction 182:1
distracted 74:12
district 1:1,2 13:14,23
19:5
districts 13:22
divorce 192:17 265:1,2
divorced 192:18
Doby 1:23
DobyReporting.com 1:24
Docket 3:5 72:7
doctored 151:14
document 3:10 5:22 6:2
36:10 72:20 73:9 74:9,9
77:19 78:11 79:20 80:2
81:4 83:8 85:3 98:10
120:7 144:24 219:5,5
219:12 220:1,25 221:5
266:25 274:16
documentation 219:22
documents 196:2 224:6
237:17
doing 31:10,11 64:3
114:20 151:20 207:2
dong 179:19
dot 265:11

dozen 174:18
drag 247:9
draw 169:8
drawing 13:12 79:1
dressed 147:14
dried 229:25
drill 266:5
drink 177:17
drinking 177:13,20
drinks 177:5
Drive 244:7 248:13
driven 256:18
driver 89:17
driver's 241:11 256:19
drop 247:9
drove 241:12
dryer 229:24
Duluth 46:14
duly 4:19 278:8,11
dumb 47:17 192:16
263:25 264:7
dummy 256:19
DuPaul 124:25 132:22
143:11 159:10,17
duress 92:9,23 96:6,22
97:14 101:23
duties 185:3
duty 147:14 170:4 171:1
175:21 176:1
Dwyer 1:10 5:12 23:20
24:18,19,22,22 83:3
123:3,5,5 146:1 173:11
196:1

**E**

E 2:15 4:1,1
eager 109:19,21
earlier 11:25 211:12 215:1
216:23 224:4 233:20
274:12
early 71:11 147:9,12,23
266:3 267:12
eat 173:22
eaten 161:13 269:14
Eberhart 202:2
Eck 1:8 5:13 16:22,24,25
17:2,7,14,23 19:20 52:3
52:12,18,22 53:15
82:10,21 99:9 123:24
124:1,12 131:3,9
135:16,19,21
edit 169:8
educated 244:20
effect 113:20 114:3
266:10,12
effects 244:10
effort 113:6
efforts 259:3
either 11:10 42:23 53:14
61:10 62:6 66:13 90:14
112:5 116:4 119:24
124:7 128:12 147:2,4,7
153:2 165:25 172:9
177:16 179:10,10 221:7
221:13 222:22 245:19
247:14 263:21
elaborate 104:9 105:2,6
105:11
elaborating 105:13
elbow 174:25 175:3
Elissa 172:20
else's 11:5 47:22 201:21
elude 99:20,20 211:11
eluded 267:20
email 3:7,20 8:9 71:1,1,8
71:10 72:1 85:4,6,12,14

85:15,17,20,23 86:8
87:8 92:7 106:4 109:15
109:18 114:23 115:6,9
119:7,10 131:24 137:18
141:2,10 142:25 143:21
146:16,17,18 148:6
151:4 178:9,10 179:20
182:8,11 185:20 187:13
187:15 190:17 191:14
191:16 192:9,14,14,21
192:22 193:1 194:2,3,4
194:5,7,11 203:21
205:16 209:7 217:17
228:20,22 230:16
231:10,20 237:9 238:9
242:9,14 245:10 247:6
247:6
emailed 84:25
emails 3:19 11:9 85:17
141:5 178:13,19,22
179:4,7,15 180:3 182:5
182:12 185:11 187:5
190:19 191:4 192:5
193:25 194:6,14,20
195:21,22 196:2 197:10
217:18,19 224:12,20
225:3,13,17 227:12
228:1,4 237:10,16
242:17
empathy 45:6,12
employed 110:23 202:15
202:18 205:17
employee 73:16 74:6,15
74:23 98:18
employment 12:11,22
214:22 230:5,6,13
empty 175:1 251:9,25
enacting 200:23
ended 174:3
enemy 258:21
enforcement 62:3,8
107:18 109:5,6 161:8
196:7 236:1 260:17
enforcing 30:2
engagement 203:2
Engel 215:13
Engeldinger 1:10 3:14,17
5:13 14:12 19:20 20:1
20:15,23 21:19 22:13
23:14 24:17 46:12
80:21,25 81:25 82:11
82:22 90:3,4 91:24
99:10 122:16,24 123:10
146:3 196:1 197:20,24
215:7,14
Engeldinger's 81:4
engineer 241:4
Englund 142:20
entire 13:19 25:19,20
68:21 253:15 258:22
Envision 2:13
equipment 39:23 83:14
275:10,10
Eric 133:10,11 136:5,6,7,9
Erickson 80:21
escapes 14:9 25:8 173:12
escaping 158:14 167:25
especially 176:21 181:25
essentially 261:11
established 60:16 178:3
evening 54:20 173:25
257:17,19,20,21,22
259:23
evenings 173:19
event 15:8 21:24 27:3
40:24 159:7 230:16

260:2 274:18
events 11:11 41:2 81:23
122:1 200:19,24 201:2
202:21 211:4 244:14
254:7
eventually 110:6 250:17
everybody 29:23 31:8
50:25 53:7 94:18
180:14 181:5 245:23
252:18 263:13
everyone's 72:7
evidence 52:7 54:17 56:1
exacerbate 259:20
exact 110:10 256:8
exactly 59:8 90:1 118:14
187:22 261:19 269:15
EXAMINATION 2:16 4:21
214:9
examined 4:19
example 19:10 40:4 45:3
94:8 95:11 96:15
104:12 207:14
exception 32:6,9
excitement 159:6
excuse 26:6 43:2 45:21
147:3 272:23
execute 28:1
exempt 33:24 34:13 50:8
50:8,9 63:7,17,24 64:3
113:2 199:25 234:25
236:25 263:20 266:2,3
266:19,22 267:16,23
268:14,25 269:4
exemption 31:25 32:17,24
33:3,7 34:8 113:14
114:8 266:16,24
exemptions 31:20,23
exercise 277:9
exhaustion 258:11
exhibit 5:18 35:25 36:1,2
36:5,6 48:2,2,3 72:6,14
72:15 77:14,17 84:22
84:23 98:13 114:25
122:4,9,15 128:23
129:2 146:12,15,17
150:8 151:1,15 218:25
219:1,4 228:19 237:10
247:19 248:5 270:3,5,6
270:10,15
exhibits 3:1 122:5 270:4,7
276:3
exist 193:6 224:13 262:17
existed 110:12 120:23
210:3 242:9
exists 247:3,4
expanded 187:23
expect 58:21,22 86:15
expectation 259:25
expecting 59:5
expense 94:18
experience 26:15 75:8
121:22 183:8 240:9
250:4,14 261:2,10
experienced 76:7 87:18
87:22 90:13,23 91:17
240:11
experiences 260:6
experiencing 120:9
expires 278:25
explain 21:6 32:1,2 160:20
239:5 244:17 245:13
246:7 253:17
explained 213:13 239:13
244:24
explaining 225:1 253:18
explanation 105:23

explanations 212:11
expressed 244:8
extent 73:11 216:10
extra 61:9 100:6,6 104:14
241:5
eye 21:8,9,24,24 43:18,25
82:1,1 109:24
eyeballs 69:17
eyes 164:11 251:21
255:22

**F**

F 1:18 132:9,12,12 140:23
140:23
face 53:5 158:7,10,16
164:2,9,14 166:24
172:19
Facebook 198:8,21
faces 166:22
FaceTime 242:22
FaceTimed 239:12
facing 38:20 153:3
fact 33:17 42:1 89:18
187:23 238:16
facts 52:6 54:16 65:13
fair 23:18 24:14 26:12
33:24 34:20 40:7 53:8
62:15,16 66:15 84:15
88:23 93:14 95:7,10
101:20 111:13 194:10
256:9 266:21 269:20
fairly 190:15 191:11,13
246:10
fall 46:4 164:19
fallen 194:6 254:11
familiar 31:17,20,23 33:6
38:15 83:17,19,22
84:14 91:6 107:21
129:2 166:16,17 169:3
196:5 256:7
family 137:11,13
far 117:4 120:19 177:2
farm 217:1
fatal 241:8
father 136:21
fault 188:8
favorable 90:15,24
fear 109:9 258:11
fearfully 253:24
fears 260:3
features 117:15
February 9:5 26:19 75:13
87:6 92:18 93:18,22
94:25 95:3 99:6,9,13
100:3 101:20 201:5,14
206:2 208:22 209:10,20
210:9,15,20 212:18
213:25 215:10 229:11
231:24
feel 28:22 29:1 44:21
61:15 73:25 82:18
95:22 96:14,19,19
97:14 98:6 99:3,23
105:12 137:7 150:19
177:12 186:13
feeling 97:13 98:21 148:2
158:24 243:25
feelings 60:23 61:4 74:18
76:8 100:4
feet 161:13 254:12 269:13
fellow 91:15
felt 56:10,12 89:12 92:24 93:1
94:4 96:6 97:17 104:20
105:17,18 205:22
258:20 259:3,4
field 108:2

fifth 26:23 27:20 28:8 29:5
  29:8,9,12 35:13,14
  36:16,18,22 37:12,22
  40:20 42:22 50:18,20
  52:4,13 53:1,21,25 54:4
  54:10,20,24 55:7 56:21
  113:18 149:1,6 156:7
  172:21 220:3,15 256:4
  256:5
figure 87:16 217:12
  218:15 241:6 270:13
file 48:11,12,13,14 64:21
  112:12 150:14 199:19
  208:12 219:4 247:4
  249:25
filed 70:16
files 150:23 195:7 245:1
  246:13
filing 3:5 72:5 203:18
filings 11:7 70:23 71:19
filtered 145:18
final 81:20
finalization 78:21
find 46:21 85:25 102:7
  150:23 203:16
fine 5:2 18:5 25:9 132:21
  136:13 139:21 161:22
  178:7 216:7
finer 193:13 212:1
fingers 27:13
finish 9:24
finished 76:4 109:20
  112:1 265:2
fire 257:14
fired 238:20
firework 257:6
first 1:19 4:19 9:21 16:11
  32:18 36:8,11 37:19
  38:9 42:11 55:11 79:1
  81:3 85:3 87:19,25
  102:3 106:14 114:7
  124:10 125:8 126:10,11
  126:18 127:10,14
  132:19 138:22 146:16
  147:3,4 150:10 152:3
  152:10 161:5,5 172:19
  176:22 192:1 207:12
  211:19 213:25 219:8
  239:6,11 241:19,25
  242:6 250:22 252:13,16
  252:16,17 254:18,18,20
  259:23 266:8,10 270:5
  270:22 278:11
Fischer 133:10,11,12
  135:22,24,25 136:3,4,5
  136:7,10 145:14
Fischers 133:14
five 138:12 151:3 156:9,15
  161:14 217:4 249:16,21
five-block 251:2
fives 98:22 99:22 110:25
fix 182:17 254:1
flip 119:24
flippant 263:9,14,17,25
Floyd 3:16 14:23 15:1,21
  15:21 16:20 17:17,20
  18:16,25 19:13,14 20:6
  20:12 21:12,15 23:24
  24:25 25:6 28:7 35:17
  41:3 60:24 61:5 77:12
  97:21 114:17 120:16
  124:7 136:25 141:24
  147:24 152:4 154:15
  165:22 169:20 171:10
  176:19 181:6 186:6
  194:1,23 195:11 196:15

197:10,13 198:5,19
  234:21 244:15 250:5
focus 272:20
focused 43:3 148:1 155:4
  268:11
folder 110:12 192:15,22
  192:25 193:6,8,9,10,11
  193:17,18 196:18
  243:11 244:7 247:7
  248:13
folks 137:4 153:2 156:3
  264:23
follow 41:19
followed 24:6
following 1:16 42:23,25
  69:23 233:12 276:20
follows 4:20
food 102:4 161:6 176:25
  252:4 269:13
force 41:23 42:3,7,18,22
  43:12,23 44:4,8,14
  45:13,19,23,25 50:17
  51:1,5,9 54:22 55:14
  56:2,11 58:9,11,12,14
  58:15,17,19 59:21
  60:13,19 62:22 63:19
  64:6,10 65:4,9,21 66:2
  66:4 68:11 106:23
  107:14,21,25 108:2,5,7
  108:11 113:9 162:16
  232:15 255:23
forcing 255:17
foregoing 278:13 279:3
foreground 153:24
forever 260:3
forget 187:13
form 37:4
formal 89:17
formed 37:7
forming 255:12
forth 62:3 205:9
forthcoming 95:23
Forty-one 12:7
fought 111:25
found 50:7 97:23,24
  100:23 105:16 215:6
  262:24
foundation 33:8 34:3,11
  95:18 175:14 248:23
four 110:9 156:9,15 220:3
  272:10
fourth 156:7 172:21
frame 226:4,16 250:15
  254:8 268:13
Fredrickson 139:22,24
free 28:22 29:1
freely 6:17
freeway 166:9 260:13
freeze 229:24,25
friend 87:23 159:1 169:12
  241:8
friendly 18:6,7
friends 20:25 21:2,4,10,16
  81:25 111:5,6 169:6
  241:9
front 51:7 67:1 81:3 116:5
  146:13 156:13 167:12
  168:7 170:7 256:4,5
  268:11 273:10
fuck 269:16
fucking 57:6,7,13,15
full 10:6 89:18 223:10
  230:14 253:3 255:21
fully 86:14

funny 50:12 161:3 170:14
  170:20,23 171:2
further 153:5 157:20,25
  214:5 276:7
furthest 153:6

---

## G

G 4:1
gain 182:13
gained 65:6
garage 38:8,17 41:24 42:4
  69:3 146:25
Garbage 252:6
gas 38:10 256:20 257:8
gathered 31:14 42:10
gear 147:20 148:19
gears 84:21 261:12,12
Geiger 153:16
general 4:12 31:8 47:7
  69:11 72:24 83:10,21
  83:23 84:3,5,8,11,17
  144:6 167:12 170:17
  180:15 185:2 191:19
  213:8 238:5 274:19
General's 2:7 9:15 22:14
  203:3,17 204:25 205:5
  206:9,14 207:4,23
  208:17,23 209:12
  212:20 213:5,21
generally 25:2 34:19
  35:18 36:13 45:10
  66:18,23 67:4,11 178:1
  191:21
generic 144:1
George 3:16 14:23 15:1
  15:21,21 16:20 17:17
  17:20 18:15,25 19:13
  19:14 20:6,11 21:12,15
  23:24 24:25 25:6 28:7
  35:17 41:3 60:24 61:5
  77:11 97:21 114:16
  124:15 124:7 136:25
  141:23 147:24 152:4
  154:15 165:22 169:20
  171:10 176:19 181:6
  186:5 193:25 194:23
  195:11 196:15 197:10
  197:13 198:5,19 234:20
  244:15 250:5
gestures 10:3
gesturing 216:20
getting 12:21 44:15 54:19
  59:15 61:16 155:7
  159:3 178:2 179:5,13
  180:3
give 25:13 87:15 90:15,24
  95:3 96:7 98:24 103:21
  118:7 122:5 145:23
  204:15 265:21 269:24
  277:12
given 24:11 34:18,18
  39:10 41:20 56:18 60:6
  69:24 94:22 105:6
  162:1,4,7 166:10
  176:18 194:24 200:3
  207:18 211:21,23,24
  213:20 234:2,5,9,24
  237:25 259:24 270:11
  270:19 275:11
gives 73:21 118:11
giving 44:20 93:6 159:14
  210:6
glass 269:14
glasses 168:8
gmail 119:11
go 9:19 10:19 19:14 27:13

35:12 36:9 46:10 54:17
  58:3 67:4,9,14,22 71:25
  73:11 74:10 78:10 83:9
  84:2 91:13,14 112:7,25
  128:22 135:13 146:14
  140:1,23 155:8 159:4
  172:18 173:3,22 175:23
  186:21 192:24 224:3,22
  235:13,21 236:7,17,18
  236:20 237:3 241:2
  242:5 245:14 247:6
  249:2 253:16 255:13
  260:1 261:3,13 274:13
  275:18,18 276:6,17
gobbledegook 118:13
goes 1:14,3 160:17 204:4
  235:17
going 8:20 14:22 19:16
  25:16 27:20 35:24 41:1
  48:1,15 58:12 59:12,12
  59:13,13,14,15,16
  64:15,18 68:2 73:7
  76:24 77:15 81:19 84:1
  84:21 86:15 88:1,2 93:8
  94:19 98:23 102:2,15
  103:14 105:2,6 110:5
  110:17 128:22,24
  142:13,13 150:15 151:2
  151:10,22 156:10 163:5
  163:8,9,12 172:19,23
  173:11 178:8 179:11
  180:22 182:17 192:17
  192:24 199:13,16
  206:21,21 211:11,14,18
  212:14,15 217:13 235:2
  239:22 241:6 243:11,22
  247:25 249:16,17,22
  255:8 260:22 263:12
  265:1 269:18 270:9,17
  276:17
Goman 78:17
good 4:23,24 10:20 13:16
  14:19 28:16 64:4,14
  66:17 73:21 85:16
  89:13,22 151:13 159:1
  161:11 184:6 224:22
  227:10,12 240:25 255:9
  275:13
Google 3:4,8 11:16 47:20
  48:6 62:23 110:12
  115:2 119:10 129:5
  143:16 192:15,22 193:8
  193:12 209:18,22 210:1
  231:12 244:6,7 246:17
  246:22,25 247:2,7,10
  248:13
Googling 231:10
GOs 84:11,15
gotcha 62:12
gotten 27:1 28:20 32:23
  46:1 111:24
governor 259:14 266:25
Goyette 196:8
grabbed 166:19
granted 88:2 167:10
gray 124:10
great 48:17 84:7 98:20
  195:9 223:12 245:2,23
  249:21 276:24
Greta 2:3 4:8 5:4 214:25
  217:7
ground 255:18,24 256:10
group 25:12,17,21 31:12
  38:7 39:8 49:23,25
  56:20 80:11 107:14
  119:8 128:25 137:3

144:9,12 150:9 152:19
  153:3 160:3 165:16,17
  171:24 177:20,21,24
  178:5 186:1 193:20
  196:6 221:25 222:2
  226:11 232:24 233:3,4
  257:2 274:23
Grover 1:23 278:22
guarantee 151:21
guard 27:22,23 100:25
  250:23
guarding 253:7
guess 13:16 36:15 66:17
  70:14 91:13 98:16
  107:1 120:8 161:16,21
  166:18 276:4
guessing 153:19 230:3
gunshots 252:11,17
gurney 87:23
guy 258:21
guys 150:15 151:1,3,6
  276:3

---

## H

H 132:15,15
hair 126:19
half 10:24 199:13 238:6
  265:2
halfway 141:1 142:14
Hallett 1:18
hand 10:2 43:4 278:19
handful 102:3 115:25
hands 273:7
hang 177:17
hanging 168:8,9
Hanson 46:12,13
happen 10:10 31:16 47:10
  47:16 52:16 88:1 93:9
  150:16 151:22,24
happened 27:14 43:20
  47:12 106:8,11 109:14
  214:21 215:16 216:25
  234:17,19 241:7 256:9
  269:21
happening 94:12 116:4
  120:10 168:1 175:12
  225:1 233:19 241:12
  251:17 253:11,19 254:1
happens 118:18 188:24
happy 93:2 260:1
harassing 208:5,9,11
hard 10:3 21:22,23 74:18
  106:1 156:10 164:24
Harrison 8:4,6,15,22 12:2
Hathaway 116:14 120:2
Hathaway's 116:13 129:9
hatred 251:21
Haugen 141:17,19
Hayes 132:18
Hayes' 132:19
head 19:16 29:22 43:25
  51:11 61:13 88:22
  133:16 142:12 155:25
  157:3 168:14 187:12
  196:19 204:12 217:20
  243:5 265:24
headlines 231:13,15
heads 173:6
hear 73:18 195:25 226:5
  263:12 275:4
heard 44:18 95:7 99:18
  100:18 105:15 142:6,8
  155:24 183:16 189:16
  189:18 211:12 213:17
  226:18 261:17,25 262:2
  262:4

Tesa Johnson (Vol. 1)
12/20/2023

hearing 57:17 80:17 81:18
held 34:16 81:16 152:15
  152:17 256:20 276:20
hello 18:17 21:20
helmet 38:10 167:24
help 19:8 39:23 40:5,11,15
  135:18 273:1
helpful 14:24 84:7 124:16
  144:19 163:12 198:2
Hennessy 251:25
Hennessy-Fiske 1:5 7:5
  106:17 220:13 222:20
  232:5
herd 30:7
herded 30:11 31:15
herding 28:5 50:22
hereto 278:18
hesitate 44:16
Hibbing 13:12
hide 187:22 188:3,5,11,16
  207:1
hiding 171:21
high 27:8 98:22 99:22
  110:25 186:18 273:25
highlighted 73:6 74:22
  75:6
highly 101:5
highway 184:4 241:4
  260:21,23,24
hill 135:14 260:22
Hills 26:3 30:19 56:24
  152:7,14 186:4 225:23
  227:5
hindsight 63:3,5
hired 13:3
historic 159:7
history 120:14
hit 43:17,25 240:22 251:5
  251:8 252:18 257:5
hits 164:13
Hogan 2:13
hold 136:23 145:2 194:23
  194:24 195:5,12,16,20
holder 103:25
holding 104:19 273:3,9,15
holds 195:1
home 19:9,11 20:2,9
  23:21 102:2 124:8
  147:5,6 225:25 254:19
homes 29:25
honest 47:22 95:23,25
  107:3,15 231:22
honestly 80:19 96:24
  187:7 243:4
hope 182:10
hopes 109:21
hotel 173:21 174:8 177:6
hour 199:13
hours 161:5,7,15 170:16
  170:16,16,16,16,17
huhaha 263:25
human 45:7
hundred 102:7 232:2
hundreds 171:24 263:10
hunger 258:11
hungover 177:12
hungry 62:8
husband 124:17
husband's 265:5
hypothetical 249:7

**I**

I's 265:11
I-35W 226:10,10
I-94 261:8
ID 39:21

idea 118:21 193:18 265:16
  265:18 269:3 272:15
ideally 205:22
identifiable 113:17
identification 39:18 41:9
  41:10
identified 32:10 39:17
  143:10 157:11 173:5
  221:7,8,25 250:8
  271:11
identifies 248:8,9
identify 39:14,24 40:5,11
  40:15 41:11 113:7
  115:6 128:24 135:20
  144:20 145:8 150:11
  238:13 271:24
identifying 220:2
ignorance 259:14
ill 99:21,21 111:2
imagine 182:9 270:10
impact 222:3
implies 108:10
important 183:25 227:22
importantly 6:20
impression 150:15 188:10
  190:8 264:9,23 267:14
improper 266:1
improves 184:9
impugn 213:22
impugning 208:6
in-person 23:8 38:12,23
  214:13
inability 101:22
inadvertently 8:23
inappropriate 63:15
  170:22
incapacitate 164:13
incidences 91:20,21
incident 28:7 42:1 46:1
  50:2 55:3 82:6,8 90:5,6
  90:8 97:21 110:13
  165:22 181:6 234:21
  253:22 255:19
incidents 11:14 32:22
  45:22 77:5 87:22
  214:20 220:14 250:8
include 56:13 65:3 113:9
  244:13
included 60:12 73:5 115:5
  115:8 146:17 168:4
  197:2 270:8
includes 106:5
including 55:15 56:3
  90:20 191:6 235:12
incomplete 99:13,16,17
  249:7
incorporated 229:22
incredibly 20:20
indicate 41:13 65:23 66:1
  79:16 91:25 109:8
indicated 75:7 215:1
  256:18 257:24 258:10
indicates 220:7 272:7
indicating 156:9 157:1
indication 273:13,15
indicative 194:17 274:1
indicator 246:11 272:1
indicators 41:9 273:11
indirectly 24:1,5,10 93:25
individual 1:8,10 131:21
  219:21 220:8 232:19
  248:8,9,12 264:16
  273:12 274:11
individually 43:5 186:1,3
  220:14
individuals 27:24 59:4

140:8 232:24 233:9
  264:19 270:24 271:2,10
  271:12,17,18 272:3,10
  272:11 273:20 274:23
inebriated 177:25
influence 110:1 204:16
inform 230:4,7
information 8:24 25:13
  28:24 34:17 65:6 86:4
  96:2 100:6,7 104:14
  109:23 118:8,11,16
  131:18 151:5,17,25
  179:18 181:11 183:14
  183:16,22,24 184:3,6
  184:10,17,22 185:2,6,7
  185:18 186:9,14,23
  189:6,9,19 190:2,8
  195:18 207:5,13,23
  224:1,13 240:14 276:2
informed 41:1 47:2 66:21
  81:18 110:13 213:13,18
initial 27:14 78:17,18
  146:24 147:11 187:10
  208:25
initially 32:16 102:1
  170:13 245:1
initials 139:19
initiated 43:6
injure 109:8
injured 42:21 44:8,15
  45:12,19 65:21 97:25
  100:10 155:8,9
injuries 95:16 104:25,25
  263:22 265:15
injury 95:8 109:9
input 277:12
insanely 244:2,3
insight 182:13
Instagram 198:12
instances 41:7 125:8
instruct 67:4 276:23 277:3
instructed 29:14 35:6 43:8
  55:19 67:22 178:12,18
  179:6,14 190:9,18
  191:21,23 194:25
  210:23 212:10 224:19
  225:12 242:17
instruction 31:8 41:19
  69:24 179:23 180:2
  186:19 190:25 191:5
  194:7,8 211:21,22
  212:2,3 224:24,25
  226:5 233:24 234:1,4,9
  234:24 237:25 238:3
  268:9
instructions 56:9,13 60:7
  60:12 185:17 233:21
  245:8
intention 59:9 267:15
intentionally 193:14
intentions 71:3
interact 20:14 125:6
  128:14
interacted 20:17 125:9
interaction 125:7
interactions 158:18
interest 87:1 115:20,21,21
  208:18,18 213:10
  241:22
interested 65:24 66:2
  86:13 242:11 278:18
interests 7:11,12,16
  222:15,17,24
interfered 47:3
internal 78:12 84:11,12
  88:11 89:9,19,23 92:20

94:6,7,11,15,19,21
internet 166:20 245:2
interpose 73:8
interpret 161:21
interpretation 106:11
  113:8,14,25 179:12
  182:21 191:2
interpreted 189:24 191:5
  275:9
interrupt 9:25 37:1
intersection 82:12 240:25
  240:25 241:16,17
interspersed 274:19
interview 78:17,18,21
  89:11,19
interviewed 78:12,16,23
  79:4,5
interviewer 89:24
interviews 78:19
intimidate 93:20
introduce 35:24 48:1
intrude 8:21 210:18
investigation 78:13,24
  89:9,18 94:7,11,21
  102:9 167:10
invite 116:21
invited 116:18,22
invoke 109:9
involved 22:5 46:18 79:7
  79:16 81:8 83:3 94:15
  181:5 240:18 241:8
  243:20
involves 181:19
iPhone 118:11 273:9,12
  273:16 274:12
iPhones 119:23
issue 151:10 202:21
issued 218:4,10 266:25
issues 188:18,18,18
It'll 127:12
item 256:20
items 241:2

**J**

J 2:3 126:21,23 143:2
jab 199:4
jacket 274:11
January 7:23 13:3
Jason 1:10 5:12 14:12
  22:13 46:12,12,13 90:2
  90:4 91:24 122:24
  123:10 126:24,25 157:1
  157:6 173:9 197:20,24
  215:7 254:15
Jayme 2:13 276:6
Jeff 248:2
jersey 252:19,23
Jessie 1:18
jib 199:4
Jill 142:5
Jimenez 46:7 47:8 48:22
  60:20 62:24 63:2,10
  64:24 112:16 265:23
  266:9,15 267:12 268:21
job 41:19 56:11 63:22 64:3
  77:3 84:14 89:13,15,22
  94:16,17 98:19 99:3
  184:1 227:10,12 253:21
  253:20,20
Joe 4:11 5:10 6:23 9:15
  16:22 103:21 104:1
  123:3 136:14,17,19,21
  137:13 141:7 165:11
  166:19 173:11 201:25
  204:3,15 208:10

Joe's 198:14
John 139:13 158:11,12
Johnson 1:14,17 4:4,18
  4:23 5:1 6:4 49:1 74:22
  106:15 123:17,19
  129:15 136:14 151:16
  214:11 219:3,15 220:4
  238:10 249:20 250:3
  270:17 276:25 278:4
  279:2,21
Johnston 156:24
join 16:14 116:19 119:8
  120:5,23,23 137:20
joined 137:17
joint 206:13
jointly 206:18
Joseph 1:10 2:7 5:12
  23:20 24:17,18,19
  72:21
Josh 8:4 165:8
journalism 224:23
journalist 40:15 43:25
  54:1,9 86:2
journalists 38:7 39:7,8,11
  39:15 40:18 41:23 42:4
  42:19,21 44:4,14 45:12
  45:19 52:4,19,22,25
  53:9,12,22 54:14,23,23
  55:6,14 56:3,14,16
  60:13 61:5,16 62:22
  63:20 68:16,19 113:10
  114:2 196:6
judge 217:11
jumble 12:15
jumbled 27:1
Jumped 252:19
June 15:18 77:6,8,9 102:2
  174:3 226:2 241:7
justified 232:15
justify 232:14
Justin 140:2
JW 139:18

**K**

K 1:23 128:7 278:22
k-a-v-l-i-e 141:7
Kaplan 2:4
Karla 154:13,14 156:22
  158:22 159:1
keep 89:6,7 90:10 91:24
  128:23 142:13 151:18
  163:23 193:25 195:21
keeping 189:2
Kendra 128:7 139:8
  143:12 157:9,10,14
Kenny 137:13
kept 100:25 105:13 190:3
  265:3
Kevin 134:17,24,25
  135:10 140:16 145:12
keyword 181:17 225:8,9
  228:9
keywords 225:17 228:8
kid 158:4
kids 149:23 150:5 198:14
  259:10
Kim 2:10 4:12
kind 37:21 42:10 118:13
  157:1,3 160:25 161:2
  168:22 179:2 192:15,17
  192:19 239:19 249:19
  263:14 264:6 270:13
kinds 20:14
Kmart 28:5 30:12
knew 34:8 43:20 68:16,19

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 1)
12/20/2023

Page  286

68:22 69:2,15 121:13
179:11 180:23,25 206:6
207:13 231:25 242:8
253:2
**knife** 257:2,21
**know** 5:9 7:16 8:11,24
10:11 12:16 15:22 16:9
22:8,10,14,23 25:9 26:5
26:11 28:25 29:1 32:21
32:21 34:13 36:17,24
39:7 40:2 41:6,8,22
42:3,13,17 43:15,21
46:1,15 47:11,24 49:21
50:19 51:4,6,16 52:3,24
53:19 55:10 57:9 58:4,5
59:9,16,20,24 61:8,8
62:6,8,11,25 63:5 64:5
66:3,9 67:2 68:18,20,23
68:25 69:5,8,17,25
71:14 74:2 78:23 79:2,4
79:11 80:20 81:11 82:9
82:10 84:1,15 86:9,11
88:1,13,21,21 90:7
91:22 93:8,9 95:10
98:19,21,25 99:2,15
100:15,19,20 101:1,1,3
101:6,7,13,14 102:10
102:17 103:13 104:9,24
105:16 107:1,2,4
108:15 109:11 110:15
110:17,18,20 111:16,19
115:22 116:12,15 117:5
117:13 118:5,7,9,13,23
120:2,4,6,19 121:1
124:18 126:10 127:17
129:11,24 130:2,6,19
131:1,5,7 132:7,12,15
132:20 133:2,7,13,14
133:20,21 134:8,10,25
135:2 136:6,8 137:5,6
139:5,15,18,24 140:2,8
140:10,10,14,19,22
141:4,8,10,11,14,17,22
142:5,7,11,15,18,20,22
142:25 143:2,4 148:13
148:14 150:5,18 151:3
151:16 152:21,24
153:10 154:7,10,18
155:21,23,23 156:1
158:6,13 159:25 160:1
160:5,7,7 161:4,8,14,21
162:3 163:4 165:15,20
166:8,8 167:12 168:3
168:10,15 170:3,5,10
170:12,19 171:18
172:12,22 173:8,13,16
174:5 176:3,6,12,21
177:11 178:4 179:7,17
179:20 180:20 181:10
181:13,14,24 182:6,13
183:4,11,13,19 185:4,9
186:18 187:3,12,20,21
187:21 188:1,4,19,25
189:1 190:6,11,24
191:2 192:18,23 193:8
196:4 203:6,13 205:11
205:25 206:3,3,4,7,12
206:16,24 207:2 208:7
209:2 211:12 215:2
217:5 218:13 223:17,21
223:23 225:3,7 226:13
226:17,19 231:11,23
232:12,18,20,23 233:2
234:14,17,19 236:20
237:8,24 238:23 239:14
239:19,25 241:20 242:4

242:15 243:10,12,24
244:1,6,7,16 245:4
246:14 247:12 249:10
253:25 256:14 257:18
257:20 258:7,9 260:8
261:11 262:6,9,12,15
263:10,12,24,24,25
264:22,24 267:15 268:1
268:3,17,24 269:11,19
269:23 273:8,11,23,25
274:3,24 275:1,5,16
**knowing** 50:15 69:5
182:16
**knowledge** 54:13 69:10
69:11 79:6 81:7 83:2,5
95:7 96:16 97:19
106:12 120:22 121:2
126:3 136:9,11 137:8
137:14 167:4 171:15,19
173:24 182:24 185:14
196:10 200:8 230:18
236:14 247:17 248:15
248:22 249:4,5 268:24
**knowledgeable** 84:6
**known** 86:14 94:20 121:3
**Koski** 78:25 79:2
**Kraskey** 172:23
**Krause** 142:5
**Kristie** 116:13,14 120:2
129:9
**Kristie's** 247:3
**KSTP** 37:11
**Kucza** 78:25

**L**

**LA** 85:24 111:17 239:15
239:16
**labeled** 48:25 109:17
114:25 115:11,14 116:7
117:24 118:5 122:18
123:15 160:2,12 163:16
165:8,11 167:24
**lack** 31:13 91:13,14
**lacking** 45:11
**Langer** 77:23 79:14 153:7
181:9 185:10 225:19
226:6 227:4,25 259:16
**lanyard** 39:18
**large** 40:4 107:6 186:1
257:6 260:8
**larger** 49:6 157:13 167:16
272:18 273:24 274:2
**LaSalle** 2:4
**Lattimer** 80:13
**laugh** 44:7 251:21
**laughed** 264:6,19
**laughing** 44:14 45:2,3,11
47:4 65:16,20 100:10
263:3,22 265:14
**law** 62:2,8 64:1 107:18
108:13,20 109:4,5,6,11
113:18 161:7 196:7
211:8 212:3 220:9
232:13 236:1 260:16
**law-abiding** 64:9 113:10
**lawful** 108:8
**lawsuit** 42:13,14 52:11,25
73:10 90:11 110:1,3
196:5,10 202:22 218:22
219:6 221:15 222:7,9
223:16,19 224:1 250:18
**lawsuits** 194:18
**lawyers** 3:19 217:16 277:1
**layer** 68:1
**layers** 68:1
**lead** 102:8

**leader** 124:4,10,11
**leaders** 66:20,20
**leadership** 144:20
**leading** 24:22 41:20 97:2
153:1
**leaning** 157:3
**learn** 84:8 245:17
**leave** 21:11 98:21 110:25
113:19,25 114:3 118:18
118:23 129:18,21,25
200:11,16 241:2
**leaving** 99:19
**led** 24:25 77:5
**left** 38:21,25 39:4 145:2
146:21 153:9,24 157:13
157:25 159:12 167:21
172:18 173:4 174:24
175:3 226:2
**legal** 7:9 55:16 103:21
108:22 200:6 203:11
249:6 266:24 267:2
**legally** 232:12
**legit** 177:22 178:4,5
**lens** 272:18
**let's** 14:6 18:2 19:14 27:13
72:13 75:5 83:7 98:10
103:19 118:23 122:25
124:21 132:21 146:12
146:16 150:8,10 153:22
153:23 162:18 163:7
163:4 167:19 168:12
172:11,15,18 173:3,3
224:22 242:5 267:22
**lethal** 58:6 59:2
**letter** 70:25 138:15,22
238:25
**level** 51:5 58:17,19 144:23
**Library** 1:19
**lieutenant** 16:22 17:2
17:14,22 19:19 46:14
50:14 52:3,18,22 53:14
80:4,17 82:10,21 89:14
94:10 99:9 123:24
124:12,14 132:18,19
135:19 144:20 145:13
145:14,22,23 153:12,14
153:16 173:14
**lieutenants** 144:3
**life** 93:10 112:2 258:22
**light** 80:22 161:2 174:23
**lighten** 161:2
**lighting** 272:19
**lighting's** 273:18
**liked** 205:20
**limited** 166:17 182:18
**line** 36:19 37:4,6,15,16,24
38:2,19,24 66:8,10,11
66:12,13,14,19 67:2,3,5
67:9,14,15 68:8 85:10
106:4 113:3 184:23
199:9 220:3 235:9,13
235:18,21,23 236:3,5,7
236:10,13,20 237:3
257:15 260:17,21 261:3
279:5
**lined** 37:16 39:3 41:15
**lines** 32:11 50:24 55:20
56:11 138:13 232:14
**lining** 71:4
**liquor** 174:22 175:1 251:9
**list** 3:8 122:3 129:5 137:15
141:4,5 253:22
**listed** 122:23 123:17
129:13 132:4,9,22
133:11 134:9 135:14
138:1 139:9,18 153:20

**Listen** 10:6
**listing** 141:1
**lists** 72:25 83:9,10 125:10
139:12
**literal** 254:23
**litigation** 194:19,23,24
195:1,5,11,16 220:6
**little** 28:13 55:22 163:13
170:10 180:5 192:14
250:4,21 260:18 264:6
266:6 268:13 273:1,18
**live** 245:1
**LLC** 229:1,3,5
**LLP** 2:4
**local** 37:11
**located** 246:20
**location** 152:16 234:18
**locked** 255:22
**Lockman** 1:8 5:13 26:5,8
52:25 53:9,12,15 127:3
127:5 146:9 158:4,5,9
**Lockman's** 158:16
**long** 12:16 86:16 94:14,22
151:11 161:15 217:2
239:12,24,25,25
**longer** 21:4 70:12 82:1
105:24 110:23 194:10
202:18 209:8 239:15,19
240:9
**look** 11:9,13 12:18 37:6,21
39:21 47:17 72:4 73:4
75:5 77:15 78:10 80:1
85:24 101:24 113:6
122:3 129:2 140:25
143:8,9 144:17 146:16
150:10,11 152:18,19
153:22 159:9,19 162:18
162:23,24 165:4 167:13
167:15 168:12 170:10
172:11 173:3 196:19
197:23 203:15,20
205:17 219:11 231:24
274:14
**looking** 12:16 37:15 38:6
72:17 98:13 143:13
150:20 193:2 216:8
231:9 238:9 247:25
271:1 273:23 274:9
**looks** 149:21 174:25 239:1
272:13 274:2,5,16
**looted** 251:1,9
**looters** 250:23
**looting** 253:8
**lose** 163:9
**loss** 244:19
**lost** 203:13
**lot** 28:5 30:12 59:21 67:8
74:2 76:8,9 87:14 98:19
101:19 102:5,20 105:21
105:24 116:3 121:14
125:7 140:8 155:22
162:15 174:15 187:8
201:16 247:12 265:3
268:8,10
**lots** 189:19 193:19,20
**Loudemeer** 80:13
**louder** 155:21
**love** 269:15 275:4
**low** 161:10
**lower** 161:20
**loyalty** 91:10
**luckily** 223:11
**lunch** 112:7,11

**M**

**M** 142:11
**ma'am** 216:18 221:20
255:7 274:7
**maintained** 243:17
**maintaining** 241:17
**major** 23:20 24:22 80:21
83:3 89:14 123:5
144:21 145:25
**majors** 144:11
**making** 138:6 233:11
244:8
**Mall** 256:2,3
**man** 156:13 157:10,13
165:9 167:19 256:11
**management** 224:8
**maneuver** 67:6,16
**manner** 45:8
**manning** 27:10
**Marc** 9:6 72:2 216:19
217:6
**marched** 50:24
**mark** 5:20 36:1 51:14,16
51:21 52:1 53:20,22
72:6,10,13 163:13,23
164:1 172:23 258:6
270:2
**marked** 5:18 36:2,6 48:3
72:10,12,15 77:17
84:23 122:9 218:24
219:1,4 228:19 270:9
270:15
**marker** 14:20
**marking** 5:19 275:7
**maroon** 173:7
**married** 192:16
**mask** 38:10
**Mason** 172:22
**mass** 28:1 31:15 200:24
**material** 243:17
**matter** 9:3 95:24 209:15
214:14 221:9 260:14
277:2
**Matthew** 79:13
**mayor** 259:14 267:1
**McCarty** 141:14
**mean** 12:14 15:22 24:4
25:17 29:15 32:7 41:25
46:16 54:3,4 57:24
59:21 62:4 67:11 68:24
69:13 72:3 74:16
83:24 86:17,18 91:9,14
92:23 93:3 96:10 99:21
102:4,24 103:19 106:21
106:22 107:4 109:9
111:23 116:10 128:13
144:2 145:16 147:11
148:4 149:2 150:18
151:3,17 156:1 160:5
161:19 170:9,17 171:5
172:5 180:23 182:6
188:15 202:21 205:22
206:25 207:9 210:22
216:17 217:4 223:20,21
225:2 239:20 242:8
243:22 253:5 257:10
258:24 260:8 261:11
263:16,17 275:1,3
**meaning** 12:22 104:8
161:18 185:25 249:8
**means** 49:3 58:2,3,8
91:10 116:21 155:23
160:21 178:4 213:14
**meant** 37:3 59:7 69:15
92:15 259:21
**media** 11:13 32:22 33:12

34:22 35:4,7 39:11,14
40:14,18 41:23 42:3,19
43:12 44:4,7 45:23 47:2
50:8,8,9,14 53:22 54:9
54:14 55:7 60:3,7,19,23
61:5,16,24 62:12,14,19
63:6 64:9,25 65:9,20,24
66:2,5,7,22 67:9 68:7
69:1,3,16,18,20 95:9,17
97:25 100:10 101:11
106:13 107:6,9 113:7
113:18 114:3 116:2
169:1 178:21 179:24
180:2,7,7,11,12 181:2,7
181:16 182:25 183:7,20
183:22,24 184:10,17,18
184:22 186:14 189:5,9
195:7 198:5 199:23
200:5,9,16 201:1
230:25 231:2,5,15
233:3,4,10,16,22
234:23 235:8,12 236:3
236:25 237:6 263:4
266:2,3 267:4,16,23
268:14
**media's** 35:7 104:25
**medical** 99:2
**meeting** 80:13,18 81:13
81:16,20 181:14
**Megan** 133:23 134:1,9,12
134:15
**Megan's** 134:10
**Meh** 161:11
**Melissa** 202:2
**member** 26:15 40:8 50:14
54:8 98:17 116:14,16
116:25 131:9 137:13,21
146:1,4,10 149:20
208:6,6 235:3 236:6,12
265:5 271:24 272:16
273:4,13
**members** 3:8 35:21 41:22
42:7,8,18 45:24 60:18
60:19 62:19 101:6
104:24 121:20 124:6
128:25 129:5 137:3,9
137:11 143:12 148:18
193:20 232:6 233:4,10
235:8,12 236:2 237:6
258:8 263:4 271:3,12
271:19 272:4,11 273:20
274:18,19,21
**membership** 122:3
132:10 136:15 144:16
**memorial** 1:18 241:3
**memories** 121:23
**memory** 29:19 145:13
244:19
**mention** 89:20 178:17
**mentioned** 9:8 20:1 22:12
33:12 66:7 68:22 80:25
147:14 155:10 185:10
197:19 264:18 265:22
266:1
**mess** 61:11 265:2
**message** 23:4 131:22
181:19 188:24 245:19
245:21
**messages** 3:16,17 11:10
179:2,3,9 187:5 197:12
197:24 217:17 245:11
**messaging** 198:18
**met** 5:5,8,9 214:12,12
**metadata** 150:25 151:20
**meter** 160:13,20,24
161:10

**metro** 35:15 37:18 38:8,16
41:23 42:4 69:3 100:16
100:16 152:11 154:1,15
258:15,17 261:14,21
262:7,17,21,23
**Michael** 1:8 5:13 124:1
139:21
**middle** 87:20 93:7 99:1
132:2 218:15 226:15
**midst** 88:14 92:25 187:18
**midway** 219:14
**Mike** 16:25 17:14 52:3,12
130:23 131:1,3,9,19
135:14,16,18,19,21
**Milless** 126:6,8,9 143:11
143:11 145:21 156:4
160:3,9 249:9
**million** 88:3
**Millness** 155:20,21 160:3
**Millness** 126:9 155:20
**mind** 61:7 72:17 88:8,24
89:3,3,10 90:7 106:3
122:11 156:2 177:21
188:22 198:1
**mindful** 181:22
**mine** 159:1 215:24 240:19
241:9,9
**Minneapolis** 2:5 15:2,11
26:23 29:5 51:22 75:25
256:11 259:17,19 267:1
**Minnesota** 1:2,9,11,20 2:5
2:7,8,9,10,11,12 12:13
98:9 143:5 213:15
225:12 229:23 278:5,8
**minute** 28:19
**minutes** 217:4 276:10
**mischaracterizes** 74:8
**misconduct** 220:8
**misery** 258:11
**misheard** 229:18
**misinterpreted** 179:21
**misstates** 90:9 65:13 74:9
81:15 90:16 104:21
162:10 188:13 267:3
**misunder** 229:18
**MIT** 60:18
**mixed** 61:11 233:4 274:23
**MK-9** 163:16
**mm** 189:1
**Mm-hmm** 5:11,15 12:20
51:11 86:19 97:11
106:7 168:14 170:24
217:20 224:9 244:12
276:25
**mm-hmms** 10:3
**MnDOT** 31:3 146:25
**mnredneckbarbie** 143:5
**Mobile** 16:4
**mode** 63:22
**model** 118:12
**moderator** 193:9
**Molly** 1:5 7:5 38:6,25 39:6
106:17,24 109:15
110:14 164:2 222:19
239:15
**moment** 19:22 55:23
91:22 172:12 221:2
256:16
**money** 218:18
**Monson** 165:8
**month** 11:25 71:11 216:23
**months** 14:10 82:16 87:11
94:8,8
**mood** 155:2 161:2
**morale** 160:12,20,24
161:10,12 162:16

**Morgan** 175:7
**morning** 4:23,24 111:11
266:9 267:12
**mortars** 257:6
**motion** 70:16,20,24 71:16
71:20 73:5
**mouth** 89:6,7 90:10 91:25
**mouthful** 14:25
**move** 13:22 43:10 55:20
112:2 255:2,16 274:22
**MRT** 3:9 16:14,16,19 17:3
17:13,16 19:3,9,12,18
20:2,5 24:6 25:14,19,22
26:7,15 34:2,17 35:21
41:22 42:3,8,18 43:7,21
45:3,11,24 66:25 68:16
69:2,15 95:16 101:6
104:24 107:13 116:14
122:14,18,22 123:2,5
128:25 132:24 141:21
143:19 159:2 173:1
174:11 179:19 189:3
235:3 265:6
**MRTs** 114:2
**MSP** 123:15,21 142:25
143:9 145:18 174:11
238:10
**MTC** 154:2
**multiple** 24:24 68:1 78:19
125:12 154:4
**munitions** 58:6 59:2
**Murray** 14:8
**muster** 27:8,9 31:2 146:24
147:11 187:9

---

**N**

**N** 2:15 4:1
**nail** 261:18
**name** 4:6 6:2 14:9 19:19
27:10 46:7,8 48:12,14
79:1 81:4 85:9 106:15
126:10,11,13,18 127:10
127:14 129:19 131:17
131:21 132:19 133:17
133:19,24 134:10,10
135:3,9 138:22 139:21
140:9 141:8 142:6,8
144:15 153:11,20
156:25 158:11,13,15
167:25 172:22 173:9,11
185:13 192:16 194:16
219:14,15 231:11
276:25
**named** 127:15
**names** 45:10 124:6 141:4
142:14 143:7 150:14
247:14
**naming** 45:10
**nark** 91:13
**narrow** 249:17 268:12
**Nate** 140:12
**nature** 203:4
**near** 38:8,16 41:23 42:4
174:24
**nearby** 258:5
**nearly** 55:10 251:2 254:10
**necessarily** 29:21 47:1
95:13 96:13 99:16
211:22
**necessary** 96:12
**neck** 41:10
**need** 10:18 48:15 51:2
72:6,10 98:24 151:18
158:10 187:1 218:12
225:3 227:12 246:15
276:2

**needed** 50:25 56:10
217:12 235:2 237:16
**needs** 28:21 199:9 275:12
**nefarious** 182:8,11
**negative** 34:21 35:3 60:22
61:4,13,25 98:3 99:5
100:8,12
**negatively** 99:25
**neither** 6:21 103:21 104:1
136:7 150:1 204:15
277:12
**Nelson** 132:1,4,7
**nervous** 28:13 243:23
**network** 40:4
**never** 92:20 103:1 105:11
105:12 107:7 119:6
178:23 190:6 191:23
207:8 209:2,4 211:24
214:12 258:20
**new** 48:1 115:20 265:5
**news** 37:11,11 43:1,11,11
43:14,18,19,24 49:10
62:7
**newsworthy** 200:19,24
**Newton** 143:2
**Nice** 273:18
**Nicollet** 256:2,3
**Nigg** 125:16,16,17,17
157:12 219:17
**night** 173:25 177:5,8,12
252:13,17
**nights** 58:25 59:1 177:10
255:11
**nodding** 51:11 168:14
204:12 217:20 265:24
**Noel** 2:3 4:10,10 5:8 64:14
150:17 151:8 208:2
276:25 277:1,15
**noes** 10:2
**non-Catholic** 136:22
**non-State** 137:9,12
**nonparent** 150:3
**nope** 143:6 198:17 216:19
247:24
**normal** 63:22 110:18
244:18
**normally** 241:15
**notable** 155:6 166:3,12
168:4 243:14 244:2,3,3
**Notary** 278:6,23 279:24
**noted** 279:3
**notice** 1:17 3:2 5:16,24
78:7
**notices** 195:16
**November** 84:25 87:8
239:1
**numb** 74:3
**number** 3:2,3,4,5,6,7,8,9
3:10,11 5:18 18:13 36:2
48:3,12,13 72:15 77:17
84:23 110:10 142:22,23
173:10,11 215:14 219:1
219:5 225:12 238:11
265:19 270:15,23
271:10 272:23 273:2
274:10
**numbers** 48:10 122:9
270:24

---

**O**

**O** 4:1
**Oak** 228:22,25
**oath** 4:15,16 6:9 9:13
214:17 225:11 278:9
**obey** 200:22
**object** 104:1

**objection** 17:8,24 18:10
20:24 22:7 33:8 34:3,10
34:23 35:8 39:25 44:9
45:15 47:14 52:6 54:2
54:16 55:16 56:5 58:23
59:22 60:9,25 61:18
63:11 65:12,18 66:16
69:21 73:8 74:8 79:9,19
81:9,15 90:16 91:1,19
92:2 95:18 96:11 97:1
97:16 99:14 101:12
104:21 108:22 112:24
113:11,22 114:4 115:24
117:2,10,20 118:1,20
119:19 120:17,24 121:7
123:7,12 130:5,16
131:4 137:23 139:2
144:5 148:10 149:12,17
160:22 162:10,20 164:4
164:15,20,25 165:18
166:6 171:3,12,16
175:14 176:8,14 183:2
183:9 184:13,24 188:13
189:12,22 200:6 207:25
208:2,3,4 223:2 249:6
267:2
**OBJECTIONS** 2:18
**observe** 53:19
**observed** 241:13 256:24
**obvious** 69:19 91:3 253:9
**obviously** 135:16 192:12
213:1 239:3
**OC** 163:4,18 164:1,9
**Occasionally** 20:10,16
35:19 85:19
**occasions** 89:5 252:11
**occurred** 155:6 220:15
226:21 230:19 261:19
268:17
**occurring** 220:9
**offer** 95:13 99:18 104:14
105:2,14 207:23
**offered** 96:3 100:5 211:14
**offering** 105:18
**office** 2:7 9:16 22:14
183:14 185:6 203:3,17
204:25 205:5 206:9
207:4,23 208:17,23
209:12 212:20 213:5,8
213:21,24
**officer** 15:2 51:22 64:6
107:19 108:7 109:5,6
167:23 256:11
**officer's** 185:3
**officers** 1:9 91:11,15
183:17 235:9 236:10
**official** 162:1
**oh** 46:8 62:1 83:9 88:3
123:2 127:7 130:7
138:4 175:5 193:18
229:18 231:5 251:12
263:22 275:23
**okay** 5:3 7:16 8:5,25 9:1
9:25 10:4,5,8,13,15
11:2 13:1 15:24 18:3
19:25 23:2,3 25:11
26:16,20,21 28:18,23
29:2 36:14 37:14 44:24
48:8,15 49:15 61:8
64:17 68:6 72:7 73:2,3
82:19,20 92:12 97:2,3
103:5,12,17,18 115:1
122:13 127:7 129:1
130:14,23 144:22
146:12 149:5 152:1
156:23 157:6,16 158:2

Tesa Johnson (Vol. 1)
12/20/2023

163:25 166:3 172:15,19
180:15 193:18 204:13
207:2 208:12 212:18
214:4,7 215:2,3,17
216:2,7,9,14,22 217:6
217:21 218:20 219:11
220:18,21 221:1,5,12
221:21 223:7,22 224:5
224:17 225:24 227:8,21
228:10,13,21 229:14,22
230:1 231:6,14,19
232:4,11 233:20 234:11
234:14,22 235:24 236:6
236:9,15 237:5,9,19
242:5,19 243:15 244:21
246:20,22 247:5,16
250:6 256:3 257:24
258:20 261:1 266:5,7
266:13 267:6,11,17,22
268:12 270:21,25 271:8
271:15,23 272:2,9,15
272:25 273:17,22
275:11,15
**old** 12:6 150:5 198:22
247:6
**Oleo-Resin** 163:18
**Omar** 46:6 47:7 48:22
60:20 62:24 63:2,9
64:24 112:16 265:23
266:9,15 267:11 268:21
**once** 10:11 173:23 209:4
**one-on-one** 80:10
**ones** 143:10
**ongoing** 110:16 192:19,19
**online** 46:16
**Ooh** 28:16
**open** 85:3 151:18 275:24
**opened** 89:18 193:16
**operate** 94:7 185:4
**operating** 179:4
**operation** 3:16 14:23
15:21,22 16:20 17:17
17:20 18:16 19:1,15
20:6,12 21:13,15 23:24
24:25 35:17 36:16
39:11 41:4 50:17 53:15
60:24 61:6 77:12
114:17 120:16 124:7
137:1 141:24 147:12,24
152:4 154:16 169:20
171:10 174:3 176:19,21
181:25 186:6 194:1,23
195:11 196:16 197:10
197:13 198:6,20
**operations** 24:6
**opinion** 75:4 184:16,21
231:19 232:16,17
233:14 255:12 274:25
275:2,4
**opportunity** 80:15 81:20
89:10 187:20 276:13
**opposed** 70:19 71:16
233:15
**opposition** 72:4 73:2
**option** 131:22
**optional** 80:14
**order** 83:10,21,24 84:17
162:1 182:18 191:19
192:2 200:3,12,15,23
274:20
**ordered** 162:7 188:11
195:20
**orders** 24:11,16 27:16,18
28:1,4 39:10 56:12,17
57:12,12 64:25 84:3,5,8
84:11 114:11,15 167:12

170:18 176:18 185:2
**ordinary** 108:11
**original** 247:3,4
**Originally** 169:2
**others'** 75:4
**outcome** 278:18
**outlet** 107:6
**outlets** 116:2 178:12,18
180:6,7,10,11,12
**outside** 17:2,12,17 18:8
25:25 26:2,23 30:1
50:18,20 52:4,13 53:1
53:21,25 54:3,3,4,10,20
54:24 55:7 63:8 91:3
149:1 181:14 187:19
220:15 230:5,5,7,13
**overall** 69:11 263:23
**overheard** 96:16 97:18
**overhearing** 44:3 61:23
**overlooking** 124:14
**owner** 129:11,13 247:4

---

**P**

**P** 4:1
**p.m** 29:20 112:10,13
199:17,20 239:1 249:23
250:1 266:11 276:18
277:16
**pack** 276:6
**packet** 150:9
**page** 2:16 3:1,13 36:9
48:10 72:18,18,19 73:6
74:20 75:5 80:1 81:3
83:8 85:4 115:9 130:24
132:1,2,10,21 133:10
133:23,23 134:4,5,9,17
135:13,22 136:15 138:2
139:8,8,9,13 140:12,17
140:22,22,25 141:1
142:13 167:16 219:12
220:21,24 221:18
270:22 271:8,15 272:2
272:9,25 273:17 274:4
279:1,5
**pages** 279:3
**paid** 176:6
**painful** 164:8
**pandemic** 14:19,20
**pants** 257:14
**paper** 162:24
**papers** 3:6 77:16 78:8
203:19 220:16
**paperwork** 20:18 205:2
207:11
**paragraph** 83:9,10 220:1
220:22 221:3,17
**paralegals** 151:4
**Parker** 2:10 4:12,12
**parking** 28:5 30:12
**parroting** 231:14
**part** 27:24 29:10 31:12
42:14 50:21 52:11
57:12 66:25 78:13,24
84:8,14 97:25 105:5
120:14 137:15 165:22
207:13 218:22 231:17
246:25 250:13,17
262:13 270:20 274:5
**Partially** 76:1
**participating** 63:25
**particular** 36:20 82:12
165:21 170:9,15 176:21
182:7 186:18 191:1
192:15,21 195:7 209:19
210:24 212:10 216:6
**particularly** 150:24 151:9

155:6
**parties** 219:13 278:17
**partner** 87:23 240:18
254:10,14
**partners** 155:8 241:1
**partners'** 257:14
**pass** 68:8 235:8 236:3,4
236:12
**passing** 248:19
**passively** 117:17
**patient** 241:10
**patiently** 101:2
**patrol** 1:9,11 7:19 12:9
13:2,3,20 14:1 15:14
16:1 18:23 25:18,20
45:23 46:13 60:18
62:19 70:20 73:16 74:6
74:15,17,23 76:16 79:7
90:15,25 91:4,18 95:16
96:9 98:17 100:13
110:23 111:3,5,14
115:12 116:16 117:14
133:15 135:2 136:23
137:4,9,11,12,16,21
139:5 142:9 148:18
167:5,23 169:18 171:8
176:6,13 177:1 179:18
182:25 183:13,19,25
184:10,23 189:8 196:7
200:23 202:4,16,18
205:4,19,21 206:10,18
206:24 207:4 210:9,12
210:13,14 212:23 213:1
214:22 225:12 230:4
231:11 232:6 237:15
239:20 240:10,12,15
262:15 274:21
**Patrol's** 14:23
**patrolling** 17:10 20:16
**patted** 89:13
**Paul** 2:9,12
**pause** 28:19 30:8 71:6
191:9 237:22
**pay** 218:18
**Pearson** 19:17 124:11,21
156:22
**pedal** 256:20
**pending** 7:18 10:19 76:11
76:23 93:17 212:20
**people** 19:9,11 28:5 30:7
30:11 34:1,19 40:25
41:17 44:7,14 45:2,5,11
50:22 51:1,12 59:13,16
61:9 65:16,20,23 66:1
68:1,3 88:5,11,12 93:1
95:15 100:14,20 101:2
107:14 111:6 116:21,22
117:14 120:20 125:7
137:11 154:21,24
155:10 166:11 171:24
173:5 178:5 181:16,17
181:21 182:13,16
185:14 187:12 193:22
196:21 200:14 251:1
252:23 253:1 255:3,16
258:25 259:6 260:1
263:11,23,24 265:14
274:22
**people's** 104:25
**pepper** 51:14,17,21 52:1,3
52:12,19,22,25 53:9,12
53:22,25 54:9,14,19,24
106:4,5,24 107:14
110:14 163:4,20 232:8
232:15,19 233:8,15

256:12 257:25 258:7
**perceived** 184:19
**perceiving** 232:20
**percent** 80:19 102:7 232:2
**perfectly** 47:22 107:3
**period** 15:20,22 19:13
23:24 25:6,6 41:4 43:9
120:16 124:8 141:24
147:24 152:5 154:16
183:1 186:6 194:1
198:20 244:15 250:5
**permission** 70:3,6,17
213:21 230:14
**person** 38:10 41:13,14
64:6 68:25 69:7 84:4
88:3 94:14 99:3 109:9
117:24 131:22 135:5
138:21 142:8 153:4,5,8
154:10 156:6,7,7,11,24
167:17,21 171:21 193:7
211:17,17 225:18
235:21 236:19 248:17
255:16 259:4 269:22
275:9
**person's** 174:25
**personal** 3:15 84:18 85:14
85:17 110:19 119:3,7
119:14,17,22 137:17
190:13 191:12,14,16,18
191:20,24 194:2,3,4
196:15 197:9 230:18
248:15
**personally** 75:1 213:4
**pertinent** 25:13
**pesticide** 229:7
**Pete** 78:10
**phone** 3:15 18:13,13
82:14 118:8,12 119:3,5
119:6,14,24 131:18
169:12 190:13 191:12
191:24 195:8 196:15,22
197:12 215:14,19 216:6
216:24 217:2,16 239:7
239:11,13,24 240:3
241:19 243:16 245:19
246:21,23 273:9 274:13
**phones** 119:17,22 179:15
191:20
**photo** 38:22 47:19,21,22
48:6,12,21,22 49:3,6,7
49:18,21,23 50:11
62:23,24 115:2 118:15
118:16 120:15 121:22
121:25 134:12,14 137:9
146:1,4,7,10,17,20,23
147:15,23 148:3,5,8,9
148:13,19 149:9,15,15
149:24 150:3,9 152:10
152:18,24 153:23,24
154:7,22 156:4,18
158:21,24 159:9,20,22
159:23 160:12 162:25
165:8,11 167:15 168:4
168:12,13,15,25 169:15
170:7,9,10,12,14,19
172:15,16 173:3 174:21
175:13 190:21 191:6
246:25 247:2 248:4,17
248:17,19 273:6
**photographer** 166:18
167:11
**photographers** 166:13
**photographs** 3:3,4,11,15
151:12
**photos** 11:16 36:7,11
37:19 38:7,9 48:6,9,19

49:24 62:22 82:11
83:14 84:18 86:18,23
115:3,5,16,18,23 116:1
117:1,6,8,24 118:24
119:16 120:6,12,20
121:17 129:24 133:2
135:11 143:21,24 144:4
146:13 150:9,11,14,20
151:1,14 152:3 153:22
162:18,19 165:4,6
166:22,23 167:1 169:5
169:9,11,19,22 171:1,9
172:3,6,11,13 173:16
175:18 178:12,19,22
179:8,23 180:3 185:11
190:12,17,18,22,23
191:3,12,18 192:11
193:15,19,23 194:13,20
195:21,22 196:13,14
197:1,5,6 209:18,22
210:1,6 224:13,20
227:13 239:23 242:6,17
243:6,10,12,16 244:5
245:3,14 246:8,12,14
246:23 247:8 249:16
248:8,16,24,24 249:3
270:18
**phrase** 189:16 213:17
**physical** 51:9 244:10
266:23
**physically** 54:4 255:17,20
249:9
**picture** 171:23 248:12
249:9
**pictures** 119:13 162:22
166:4 241:15 274:12
**piece** 81:21
**pin** 162:23,24 163:2,2
**pink** 38:10
**piqued** 115:20
**place** 25:12 29:18 77:6
111:10 152:22 181:10
241:14 256:8 266:17
**placed** 13:5,7 21:11 27:15
**plaintiff** 3:19 217:16
222:18,18
**plaintiffs** 1:6 2:2 4:9,10
5:5,9 7:6 219:7 220:18
221:8 222:16 223:24
232:24 233:3 277:1
**plaintiffs'** 222:12,14
223:18
**plan** 218:13,14 255:2,5
**plans** 189:3 217:8
**platforms** 198:18
**platoon** 41:21 66:20
122:25 123:10
**please** 4:7,15 9:24 73:11
97:4 151:6 175:2 200:4
215:1 228:18 233:13
**plowed** 226:11
**plus** 161:7
**point** 9:5 27:8,9 71:12
82:20 121:16 146:24
175:2 193:14 194:22
195:10 212:1 221:12
239:17 243:9 253:9
260:20 263:3 267:23
275:19,25 276:2
**pointing** 156:11
**points** 31:2 187:9
**pole** 254:11
**police** 15:2 26:23 29:5
107:21 108:4 235:9,13
236:3,5,10,13 259:15
259:15,16,18 261:3
**policies** 83:25 84:12

Tesa Johnson (Vol. 1)
12/20/2023

Page 289

107:22 108:5 167:5,6,8
183:19 184:23
**policy** 12:24 22:3 192:5
**popped** 245:5
**popping** 243:5
**pops** 61:7 118:10 131:20
231:13
**porches** 29:24
**portion** 25:16 94:16
187:11 277:11,13,14
**portrayed** 62:7
**posing** 154:21
**position** 16:1 46:15
136:21,22
**positive** 259:3
**possibility** 51:13 145:22
197:19 218:9 271:21
**possible** 12:13 37:16,17
44:11 53:5 130:4,14
131:3,6 139:4 144:8,10
144:11,13 149:9 164:17
164:22 169:25 172:4
271:22
**possibly** 33:20 56:23 71:3
101:11 138:20 272:24
274:8
**post** 173:24
**posted** 168:15,25 249:11
**posts** 11:13
**potential** 45:5 100:6 208:7
208:18 213:9 222:9
223:16,19 262:17
**potentially** 32:7 96:18
99:13 106:23
**power** 62:8
**powerful** 258:6
**precedence** 89:21
**precinct** 26:24 27:21 28:8
29:5,8,10,12 35:13,14
36:16,18,23,24 37:13
37:22 40:20 42:22
50:18,20 52:4,13 53:1
53:21,25 54:4,11,20,24
55:8 56:21 113:19
149:1,6 220:15 250:23
253:7 256:4,5 259:23
**precincts** 27:2
**precise** 31:9
**preface** 86:10
**prefer** 4:25 150:24
**preparation** 55:2 107:10
201:17 209:19,20
**prepare** 10:22 11:17,18
201:13,24
**preparing** 207:14 209:17
212:18
**presence** 51:4,10 58:12
58:14,16
**present** 8:6,15 39:8 40:19
68:16 81:17 106:16
107:7 113:18 143:23
165:24,25 166:1 175:16
196:21 226:18,20 231:1
231:2 234:4
**presenting** 236:21
**preserve** 195:21 198:4
**preserved** 22:21,22,24
23:1,4,5 195:23 196:3
**preserving** 193:14
**press** 21:23 31:24,25 32:9
32:11,17 33:2,6,23 34:8
34:13 39:17,20,21,22
39:24 40:6,9,12,14,16
40:22,25 41:2,6,12,14
41:17 42:7 43:12,23
46:4 56:9 63:13,16,17

107:5,6 112:17,20
113:1,7 149:20 200:11
221:25 222:2 264:3
268:25 269:3,18,22,23
271:3,13,19,24 272:5,8
272:11,16 273:4,11,14
273:21 274:1,6,7,19
**pressure** 93:20
**pretty** 27:8 43:2 74:3
147:25 239:21 252:16
252:17 253:6,9,15
258:6,19 274:16
**prevent** 180:2
**previous** 10:25 11:10
26:18 36:5 59:1,1 75:23
94:4,5 102:19 112:15
114:10 135:19 202:11
243:21 255:10
**previously** 68:22 69:6
122:15 192:16 206:23
**priest** 136:22
**prior** 42:11 46:3 55:11
57:9,10 111:6 147:5
191:23 267:11
**privacy** 187:9
**private** 179:17 189:3,9,20
190:2
**privilege** 103:11,15,25
204:5,7,11
**privileged** 8:23
**probably** 10:18,24 18:14
57:25 136:13 155:4
171:6 230:11 256:16
270:12 275:12
**problem** 114:12 127:9
150:22 214:19
**problematic** 262:25
**procedures** 29:18
**proceedings** 30:8 71:6
106:12 112:4 191:9
203:11 237:22
**proceeds** 212:6
**process** 83:4 188:17
246:7
**produce** 196:20 203:22
245:22
**produced** 196:13
**professional** 1:23 39:23
40:10 167:11 213:15
275:9
**professionalism** 45:6
**projectile** 43:17
**Prokosch** 127:17
**promoted** 14:12,14 190:7
**prompted** 86:7
**pronounced** 126:13
**proper** 87:16 95:10
107:24 108:11
**property** 259:1,5
**protect** 35:7 187:9 255:23
258:21,25 259:4
**protected** 65:1,3
**protecting** 65:24
**protest** 26:22
**protesters** 226:12
**protests** 14:23 15:11,15
61:24 75:25 77:12
**protocol** 67:13
**provide** 7:8 203:3 217:23
248:23
**provided** 151:25 177:2
181:20 250:17 270:19
**providing** 223:25 250:14
250:16
**PT** 99:2
**PTSD** 7:20 75:7 76:12

88:16 92:25 93:7 94:2
94:24 212:21 244:20
250:9
**public** 2:10 115:22 180:15
183:13,16 184:3,9,11
184:18,22 185:2,6
202:6 235:12 236:7,12
274:20 278:6,23 279:24
**publicly** 86:4
**pull** 67:3,5 162:23,24
163:1,2 196:22 203:20
225:8 247:19
**pulled** 37:11 66:7,9,13
67:20 68:2 82:17 116:1
151:6 163:8 235:22
236:23 257:14
**punish** 88:12 111:14
**punished** 89:25
**punishment** 89:23
**purchased** 176:3
**pure** 251:21
**purpose** 7:2 25:4,5 29:11
29:13 207:25 208:1
**purposely** 66:2
**purposes** 7:25 8:18 20:18
36:6 201:7
**pursuant** 1:17 192:6
**pursuit** 89:13,15
**push** 51:1,12
**pushed** 50:24
**pushing** 260:22,23
**put** 21:8 27:15 47:23 49:3
49:23,24 87:23 135:11
150:4 151:1 161:20
163:1,10 165:16 171:23
187:15 193:13 212:1
223:2 247:10 255:23
**putting** 47:19 50:11
165:16 166:4 246:8

---

### Q

**question** 9:23 10:6,9,19
28:10,16 30:10 37:2
41:25 54:6 55:23 69:12
74:10,11 82:4 90:22
104:4 105:25 109:1
130:8 180:24 186:19
194:8 204:20 208:1,5
214:25 215:5 243:20
247:19 276:1,4
**questioned** 28:8 212:13
**questioning** 114:13 199:9
212:6 276:12
**questions** 8:21 26:13,14
26:17 35:25 70:12
73:12 96:3 97:10 99:18
102:22 104:8,18 106:2
151:19,24 204:19 212:6
213:10,21 214:5,20
224:23 237:12 249:18
270:12 275:21,25 276:8
276:10
**quick** 64:16 243:4
**quickly** 144:18
**quit** 12:22
**quite** 105:7 125:9 159:3
174:19 187:7

---

### R

**R** 4:1
**racquet** 257:11
**ran** 255:21
**rank** 13:16 15:25 173:13
**ranking** 145:3
**rapids** 259:2

**reach** 86:7 111:13
**reached** 70:11 215:8,18
**reaction** 34:21 35:3 43:24
47:7
**read** 70:23,25 71:19,22
75:10 83:14 84:3
178:14 221:3 231:25
253:22 277:5,9,11,14
279:2
**reading** 201:18,21 220:12
221:6 276:23
**ready** 112:6,7 148:4 155:7
159:3
**real** 126:19
**realize** 28:20
**really** 28:12 84:7 86:9
87:19 125:5 187:22
231:23 243:5,13,23
**reason** 35:6 44:17 67:1
77:2 105:5 134:14
137:20 165:21 215:19
216:12 219:9,23 229:12
235:17 237:16 266:19
**reasonable** 41:13 68:25
99:3 108:4,7 275:9
**reasons** 75:15,22 87:1,2
178:14 179:16,16 182:7
186:21,22,25 237:12,19
**recall** 9:9 14:16 16:18
17:19 19:21 20:21
22:15,18,20 23:6,14,23
24:20,21,24 25:24 26:6
26:7,9,22 27:3 28:1,3,4
29:7 30:7,10,13,16,21
32:15 35:14,20 37:24
39:3,16,19 40:21 41:16
41:18 42:15,20,25
43:14,15,22 44:1,3,6,13
45:11,18,21 46:7,8,14
46:18 47:19 51:1,9,20
51:22 52:20,23 53:9,14
53:17 54:12,18 56:20
56:22 57:1,4,7,15,17,22
59:8 60:2,4,5,21 61:2
61:20,23 62:13,18,21
65:16,20 68:15 69:4
78:16 79:25 80:19 89:4
91:21 101:8,16,20,22
102:6,11,13,16,16,22
104:9,15 105:14 107:13
107:16 110:10 112:17
114:22 117:16 121:16
121:18,19,21 125:2,12
125:15,18,22,25 126:12
126:20 127:2,21 128:2
128:18 131:9,12 135:8
135:10 140:8 143:12,15
143:18,20 144:14,17
145:25 146:2,3,5,6,9,11
146:23 147:1 148:2,8
148:23 154:14 155:2,5
155:14 165:24 168:1
172:2,4 176:20 177:15
185:9,10,19,21,22,25
191:15 194:5,21,25
195:2,11 201:4,18,21
201:23 203:6,7,10
208:21 209:23,25 210:2
210:3,5,8 211:3,5,7
212:22 213:4,7 216:2,4
224:18,19,25 225:14
226:7,9,20 227:4,8,11
227:16 228:3,13,16
230:21,24 231:3 233:25

234:3,7 235:7 237:18
238:2 242:15 243:6,13
243:18 245:16 250:13
251:3,8,22 254:16
255:12 256:22 260:16
261:4 262:2,4,19,23
263:5,7 264:2,12,15
265:14 268:14 269:25
**recalling** 227:20
**recalls** 234:9
**receive** 24:16 71:10
114:15 180:17 245:8
277:4
**received** 70:3 94:10
114:11 178:23 183:1
192:2 203:19 209:7
219:22 233:21 238:22
**receiving** 179:9 183:7
185:22 195:11
**recognize** 5:22 36:7 53:3
53:5 77:19 85:4 124:6
124:19 142:22 144:15
152:4 156:19 158:2
159:22 167:17,20,23
168:13,22 172:13,16
175:6
**recollection** 19:23 26:20
45:1 50:16 123:4 124:3
158:17 160:4 203:12
212:9 216:10,12 224:11
225:20 226:14 227:9
227:24,24 228:7 234:23
238:6 256:15 269:5,8
**record** 4:7 64:18,22 69:15
98:12 103:16,20 112:8
112:9,13 150:1,4
151:23 156:11 178:4
199:16,20 208:14 223:3
223:5,10 249:22 250:1
275:17,18,19 276:5,18
276:19,21
**recorded** 278:13
**recording** 262:10
**recordings** 262:12
**red** 132:5 173:7 220:23
**redepose** 71:17
**redeposed** 73:23
**redo** 245:5
**refer** 15:20 16:10 24:9
99:16 101:4 123:19
124:1 150:2 162:15
237:19
**reference** 57:21 58:1,5,13
92:5 228:1
**referenced** 115:2
**referencing** 94:13
**referred** 73:15 147:17
163:20 190:17
**referring** 11:22 17:10
24:11 25:8,10,21 38:16
45:1,2 49:8,12 58:8
73:1 76:11 88:10,16
96:8 99:9 104:5,23
119:11 151:12 161:11
161:18 163:22 167:8
180:6 190:21,23 222:6
231:6 259:18
**reflect** 98:12 223:3
**refresh** 158:17 160:4,6
**refuse** 90:15,23
**refusing** 200:22
**regard** 268:9
**regarding** 203:4
**regardless** 126:13 127:14
**regards** 42:16 43:23 58:2
92:16 115:20 144:24

179:19 182:22 185:1
191:24 239:22 244:4
245:10
registered 229:10 230:2
regularly 192:5,8
reimbursed 176:12
related 51:24,24 70:24
71:19 76:19 78:8,13
81:24 93:17 101:22
136:10,13 178:14
179:24 182:23 194:14
194:15 196:15 197:10
197:13 198:5 224:13
237:11 264:3 278:17
relates 204:8
relating 212:2
relationship 17:22,25 18:2
18:4 20:22 21:25
relative 278:12
release 185:3
relevance 73:9 208:7
relevant 86:23 165:16
relief 161:16,24
remained 13:19
remaining 275:24
remember 5:3 19:8 47:21
80:22,24 102:13 125:6
125:6 126:18 127:4,7
127:12,14 128:11,12
141:23,25 149:2 153:11
155:12 156:25 158:11
158:14,19 166:12
169:24,25 170:13
172:22 181:9,11 205:1
205:14 206:16 211:3,5
212:5 215:16,22 225:6
225:16,18 227:1,3
228:8 243:1 244:16,16
244:17 252:14 274:15
remembering 120:13
Renee 133:17,21
rep 80:20
repeat 10:12 30:10 106:14
109:1 136:1
repeated 142:15
rephrase 54:5 215:2
repin 163:23
repinned 163:6
report 63:18 235:2 237:2
reported 62:5 278:3
reporter 1:23 4:15 9:22
43:16,17 46:1,6 50:3
64:5 86:22,24 111:17
122:7 265:23
reporter's 199:12 278:1
reporters' 232:1
reporting 1:23 63:23
113:4
represent 7:4 36:4 37:10
38:5,14,20 48:5 98:24
122:14,21 127:5 158:8
160:2 202:10 203:9,17
204:3 205:7 208:24
214:13 219:6,20 220:17
229:9 266:8 270:17
277:3
representation 203:5
204:2,24 206:13,14
207:6,14,24
represented 6:18 7:25 9:2
9:16 71:2,13 76:18
82:25 98:4,8 196:6
201:7 205:18 206:5,9
206:18 209:6,8,14
representing 6:25 8:17
103:7 201:11 202:14

205:19,21 208:19
represents 5:12
request 179:22 180:13
181:17,18 225:7
requested 182:12
requests 3:13 178:11,17
178:21,24 179:1,2,5,10
179:13,24 180:6,9,17
180:21 181:2,7,15
182:25 183:7 184:17
186:15 187:3 225:5
228:2
required 230:10
requirement 249:19
requires 54:17
Requiring 83:13
resigned 238:23
respect 90:5,6 113:7
respond 260:10
responded 16:14 239:3,5
260:9 261:7
responding 16:8 182:25
260:6,13
response 16:4 223:5
rest 35:2 93:9 199:11
resulted 12:24 22:4
retainer 203:8
retention 192:4
retire 12:22
retired 12:25 14:12 136:24
137:2,4,6,8 238:10,13
retirement 88:2 99:2
238:18,20
return 50:16
reveal 8:23
review 9:19 10:24 11:2,16
55:11 231:7
reviewed 11:19 80:15
reviewing 20:18 36:10
78:11 98:10 144:24
221:5 274:16
Richard 132:19
Rick 132:15,19
rid 179:14
right 5:25 6:11,14,18 8:1,6
8:8,9,12 9:9 10:22
11:25 15:6,7,12,18 20:3
20:6 30:2,5 31:6 32:14
32:20 33:13 35:4 38:7
39:12 42:15 46:17,24
49:4,11 50:10 51:10
53:4 54:25 55:4,8,21
60:14 63:17 64:7,10
65:1,17,21 66:8 67:10
68:8,12 70:4 77:1,7,12
77:21 78:2,5 79:14 81:1
82:1 84:12 85:21 86:2,5
87:6,9 88:19 99:10
103:9,23 107:19 108:8
108:11 110:23 113:20
114:7,8 115:6,12 116:4
116:8,19,23 117:25
121:23 122:5 123:1
124:4 128:7,16,22
129:9,13,16,22 132:5
132:25 134:23 135:16
136:3 137:18,21 138:5
138:23,24 139:11
146:21 149:24 152:22
153:6,6 154:2,5,22,25
156:8,11,14 157:19,20
158:14,15,22 159:10,15
160:10,13,15,18 161:24
162:2 163:10,16,18
166:22 169:6,9,13,16
170:20 171:2,21,25

172:1,3,18 173:1,4,8,10
173:12 174:3,4 175:24
178:8,17 180:7,18,22
181:2 182:2 183:13
184:1,4,7,11 188:3
189:5,6,7,8,10 190:3
191:12 192:12 193:15
193:20,23 199:8,23,25
200:1,5,17,20,24 201:1
201:5 202:19,22,25
204:9,17 205:6,12,25
206:6 212:24 213:2
214:1 216:13 219:25
220:6 227:22 229:13
232:18 234:16,18 235:1
236:8 237:1 238:5
245:20 247:25 248:6,7
248:11,22 249:2,17
250:20 251:24 252:14
254:6,9 260:10 277:4,9
277:10
rights 35:7 113:7 114:12
114:16,21 199:23
riot 147:20 244:15 250:5
255:3,21 259:21
rioters 250:23
rioting 29:16,17 31:5
62:11 200:16,22 253:1
riots 16:10 75:8,14,19,21
75:25 115:11 117:14
178:13 182:22 187:4
191:3 194:14,17 224:14
224:21 225:22,24 228:5
237:11 260:6 261:8
risk 94:3
road 13:5,7
Robins 2:4
Rochelle 80:5
Rock 128:7,7 139:8
143:12 157:9,10,14
rocks 251:5 252:2
role 82:7,9 238:20
roll 246:18,20
Ron 14:11,11
room 53:4 236:8 240:6
249:15 254:4
Roseberry 125:22 126:4
219:17
Rosenberry 125:23 126:1
roster 3:9 122:15,19,21
132:5 134:2,21 156:19
Rotten 252:4
round 59:13
rounding 59:3,4
rounds 222:3
route 241:12
rowdy 200:15
rug 82:17
ruined 251:22
rule 83:17,20
rules 9:18 84:12 170:3
176:18 213:15
run 109:23
rundown 239:19
running 100:18 240:23
262:1
rurally 245:2
rushed 250:22
Ryan 19:18 130:2,4 133:5
133:7,8,8 145:12

───────────────

                S

S 4:1 134:7 140:2,2
173:10
safe 59:17 96:20 138:25
163:23

safety 2:10 184:4 187:10
188:17 189:3 202:6
Samsung 273:9
sandwich 160:15 161:11
161:18,19
Sara 124:25 125:9 132:22
143:11 159:9,17
Sarah 240:22,23
sarcasm 93:4
sat 57:10 250:25
Saturday 28:15,17 149:3
173:20
save 23:1 193:5 243:10
saved 143:23 190:10
193:3 243:13 244:9
247:14,15
saw 41:16 43:11 107:7
210:2 241:1 273:2
saying 14:25 26:10 43:13
44:21 46:23 73:25
86:10 155:15 170:22
181:9,12 204:10 205:15
205:16 209:7 211:12
225:6 227:23 275:21
says 83:13 84:17 92:12
122:25 124:10 129:15
168:17 246:11,12
247:18 251:24 270:23
scared 87:20,25
scary 253:14 254:3,7
scenes 116:4
Schaefer 172:23,24
schedule 145:7
scheduling 145:3
Schmidt 138:1,5,5,7,8,15
138:18,18,23,25 139:1
172:20
Schmidts 139:5
Schrofer 80:5,17
scope 203:4 204:2,24
Scott 134:4,4 141:14
Screamed 251:11
screen 115:8 116:2 165:6
166:19 247:13,14
248:18
se 161:16
SEAL 278:19
search 3:18 228:9
seat 157:24 256:20
second 27:6 32:19 68:1
73:8 83:9 87:15 92:7
103:4 115:9 146:20
147:3 172:20 209:5
219:11 242:19 243:15
244:4,21 245:25 252:13
261:13 272:22
secret 121:5,10
Secretary 229:10,23 230:2
see 6:2 21:8,24 22:22,25
37:18 38:9 46:16 48:10
48:21,25 49:10 51:23
51:25 52:16 60:16,18
72:20 73:5,15,23 74:22
74:24 75:5 77:23,25
80:4 81:4 82:1 83:7,8
83:11 86:18,20 92:10
98:10 106:6,17 111:18
114:19 115:19 116:22
118:16 120:6 122:18,22
122:25 123:15,17,23,24
124:10 129:8,15,18
130:23 131:18 132:1,4
132:9,22 133:17,24
134:5,12,17,18 135:13
135:22,23 136:14 138:1
138:9,16,21 139:8,22

140:12,16,25 141:2
148:5,15,21 152:10
153:23 154:24 156:15
158:10 162:23,25
164:24 165:5,8,11
166:1 168:6,17,20
170:7 174:15,21,23,25
175:9 190:19 203:20
219:14,18 220:3,9
221:10,10 222:4 223:8
231:4 240:5 241:12
245:21 247:13 253:22
270:6 271:25 272:4,7
273:7,10
seeing 39:4 51:20 53:8
86:13 107:13 120:9,12
128:12 158:16 170:14
230:21 231:3 242:12
272:6
seek 205:14
seen 38:12 41:2 55:6 56:2
90:13,22 153:20 255:10
self 43:6 109:12
selfie 158:21
semicolon 220:6
send 86:8 87:12 151:4
169:5,11 182:10 188:25
196:23,24 197:7,24
225:7 255:18
sending 11:22 169:19,22
171:9 172:2 198:1
245:6 246:3 257:12
sends 188:23
sense 27:7 38:21 39:1
44:22,23 60:22 61:8
67:8 70:9 86:1 93:4
105:3,21 136:22 159:6
174:6 238:5 260:24
269:1
sent 5:24 11:20,21 22:19
28:14 48:7 70:25 71:21
72:1 85:6,20 87:2,8
114:24 129:6 147:5,6
169:15 178:9 179:20
197:3 228:20 231:20
238:25 249:11 254:19
256:9 257:8
sentence 92:8,8 106:14
181:4 220:7
separate 13:13 53:7 92:14
122:4
September 18:19
sergeant 144:15,20,25
145:12
sergeants 144:3,14,18
serve 219:8
served 18:22
serves 29:19 145:13
service 183:25
set 35:25 36:5 66:18 67:13
99:24 106:1 270:18
sets 89:20
setting 177:16 185:25
settlement 196:11
Shaking 88:22
shape 151:13 260:3
share 115:16 121:23
181:24 182:1 184:3,10
207:23 248:13
shared 11:17 47:20 48:6
49:18 62:23 82:15
115:14 116:7,10,21
117:9,13 118:18,24
121:15 129:6 143:13,19
143:23 189:10 207:15

Tesa Johnson (Vol. 1)
12/20/2023

Page 291

207:18 209:18,21 213:5
sharing 169:19,22 170:6
171:9 172:3 183:22,24
184:6 198:18 207:5
shift 175:22 255:15
Shipma 142:15
Shipman 142:15
shirt 41:12 168:7,7,9
173:7
shock 57:17,23 58:1,17,19
59:7,11,20 160:17
161:17 162:5,6
shocked 110:5
shoot 269:18
shooting 252:16
shop 177:19 178:2
Shoreview 26:3 30:19,21
31:4 56:23 152:7,14
short 97:15
shorthand 278:14
shortly 42:17
shot 115:8 165:6 247:13
247:14 248:18 252:8
254:3
shots 116:2
show 5:16 131:24 218:24
270:1
showed 55:9
showing 131:15 163:7
219:3
shown 36:11,12 101:5
shows 146:20
shut 89:6,7 90:10 91:25
sic 60:18 80:13
side 62:6 68:7,10 71:2
120:11 155:22 156:8
162:25 174:24 175:4
277:12
sides 62:3
sign 84:3 148:15 240:23
241:13,14,14 277:9,11
277:14
signage 241:5
SIGNATURE 279:1
signed 72:20 77:23 79:13
80:4 83:21,23 84:5,5
89:14 203:13,16 238:10
significance 155:19
significant 194:8 252:18
signing 203:7 276:23
signs 241:1
Silcox 14:11
silence 91:7,17 92:1
similar 261:10 274:17
similarly 112:19
simple 246:10
single 181:18 225:9
sit 42:2 71:15 163:25
177:24 227:25 230:24
232:4 237:24 246:22
258:12 264:9
site 246:9 247:11
sitting 154:10,14 178:1
situation 152:22 82:3
170:15 182:17 185:16
187:19 235:7 236:16
237:7 240:22,23 253:21
259:7 274:22
situations 58:7 94:5 260:7
six 235:3
Sixth 172:22
Skalsky 134:17,20,25
135:3,6,10 145:12
skinny 126:19
SL 124:10
Slack 198:25

Slagter 126:15
Slaughter 126:15
sleep 102:4 161:15 173:22
176:24
slept 161:14
slow 94:24
small 48:22 187:11 217:11
smaller 181:14 245:6
246:3 260:7
Smart 273:9 274:13
smiling 154:24 159:17
Smith 134:4,5,7
smoke 148:21,23 149:2
smoothly 9:20
Snapchat 168:24 169:1,3
169:12,19,23 170:1,4,7
170:13 171:9,23 172:3
198:10
snapping 27:13
social 11:13 168:25 198:5
265:3
solely 233:3
somebody 46:24 47:22
51:7 67:5 68:2 88:7
91:3 95:9 97:24 100:23
108:24 177:1 179:21
188:23 224:12 235:19
236:22 248:19 258:5
269:17,18 272:1
somebody's 114:12
271:20
someone's 114:16,21
somewhat 60:1
son 137:14
soon 174:5,6
Sorenson 142:11
sorry 25:7 28:6 30:25
42:24 46:9 55:22 65:18
71:24 123:2 158:6
180:24 188:7 214:21
215:10 220:22,24
222:19 223:8 229:11,18
246:1 266:24
sort 41:11 58:7 63:25
94:19 100:25 102:9
109:22 145:3,4 152:19
161:1,12 174:13 187:24
218:12 232:13 259:1
263:8,14 264:1 268:23
275:10
sound 10:20 15:6 166:14
sounded 242:11
sounds 15:7 23:16,17
229:13
South 148:15 149:7
Southeast 1:19
SPS08 238:11
speak 18:8 23:8 32:8 33:9
36:23 52:18,21 53:11
79:23 80:7 81:21 88:24
89:3,3 90:7 109:21,25
110:6 178:24 208:17
216:14,15 218:7,8
speaking 53:14 67:12
76:3 153:5
speaks 79:20 88:8
spear 155:22
special 149:16
specially 16:8
specialty 119:23
specific 21:24 27:19 35:12
36:15 42:15,16 43:14
43:22 44:6 45:18 53:18
60:2 61:21 62:17,20
70:15 82:9 89:4 91:20
91:21 93:16 141:25

186:22,24 190:25
216:11 217:11 228:7
234:18 237:16 264:2,12
264:15,21
specifically 17:9 27:18
29:9 30:13 36:22 39:5
40:21 44:2 47:17 51:18
56:22 58:4 59:6 60:4
66:9 79:4 86:9 96:8
97:19 100:15 101:17,24
107:17 108:19 143:20
181:12 185:9,11 186:25
205:1 210:21,22 212:2
215:23 216:1 224:6,25
227:7,15,16 228:11
230:25 234:6 238:2
240:1 242:4 246:2
252:10 263:7 269:5
specifics 45:21 57:1 101:6
216:4
specify 44:17 96:17
speculation 22:9 34:11,24
35:9 40:1 54:17 58:24
59:23 61:1,19 63:12
69:22 79:10,20 81:10
95:19 113:12,23 117:3
117:21 118:2 119:20
120:18,25 121:8 130:17
131:5 137:24 139:3
148:11 149:13,18
160:23 162:11,21 164:5
164:16,21 165:1,19
166:7 171:4,13,17
176:9,15 183:3,10
184:14,25 189:13,23
spent 13:25 259:23
spoke 21:18 89:10 102:15
215:18 216:3,5,17
240:6 242:18 243:6
spoken 18:15 95:7 150:3
243:7
spray 51:14,17,21 52:1,12
52:19,22 53:9,12,22
106:5,5 163:2,4,18,20
164:1,9 232:15,19
233:8 257:25 258:7
sprayed 52:4,25 53:25
54:10,14,19,24 55:7,18
56:16 110:14 163:3
164:2,8 232:8 233:15
256:12 257:25
spraying 55:15 56:3,13
106:24 107:14 229:7
spread 15:9
spring 229:21
squad 16:21 26:7 31:10
31:11 35:20 38:3 41:20
50:21 66:20 123:15,17
123:21,23 124:4,7,9,11
124:18 125:2,11,12,15
125:18,25 126:12,20
127:2,15,21 128:2,11
128:18,25 130:15
132:18,24 133:7 134:1
134:7 136:17 138:4,8
138:11,12 139:11,15,25
140:14,19 143:9,13,16
156:19 160:9
squads 36:21 38:2 50:21
50:23 101:1 125:5
squeaking 42:24
St 2:9,12 153:12,12
stage 37:9
staged 30:21
staging 152:8
stamped 122:16

stand 50:1 139:19
standard 62:2 101:4
standing 34:16 38:24
153:1,2,5 157:22 158:1
158:2
stands 132:13,16 140:3
140:23
start 7:22 13:1 14:6 18:2
28:12 122:11 124:21
142:14 153:23 165:5
167:19 172:15,17 178:2
224:10 270:22
started 7:23 15:11 175:22
186:20 229:19,21
starting 25:2 156:13 173:7
starts 141:1,11 160:15
173:10
state 1:9,11 4:6 7:19 12:9
13:2,3,20,25 14:22
15:14 16:1 18:22 25:18
25:20 45:23 60:18
62:19 70:20 73:16 74:6
74:15,17,23 75:2 76:16
79:7 87:17,18 88:9
90:14,25 91:3,17 93:8
93:11 94:5,23 95:16
96:9 98:4,4,8,17 100:8
100:12 110:23 111:2,4
111:14 115:11 116:16
117:14 133:14 135:2
136:23 137:4,11,15,21
139:5 142:9 144:25
148:18 167:5,23 169:18
171:8 176:6,13 177:1
182:25 183:13,19,25
184:9,23 189:8 196:7
200:23 202:4,16,18
205:4,18,19,21 206:10
206:18,24 207:4 210:9
210:12,13,14 212:23
213:1 214:14,22 215:18
220:9 223:3 225:12
229:10,23 230:2,4
231:10 232:6 237:15
240:9,12,15 262:15
274:21 275:17 278:7
state-owned 83:14
stated 251:5 260:2
statement 92:9,13,16,17
92:20 241:11 250:14,16
264:2
statements 92:14 262:23
states 1:1 221:22
stating 232:7
station 13:10,11 19:5,7,9
19:12,17 20:2,9 23:21
124:8 153:12,13
stationed 13:6,11,17 17:5
stay 91:11 118:24 201:1
stayed 15:17
staying 174:9,11
step 187:24
steps 270:14
Steve 128:12 130:10
135:24,25 136:2,6,7,10
145:14 157:23
Steven 135:22
sticker 270:6
sticking 29:22 243:25
sticks 155:25 156:2
stills 37:11
stop 21:10 29:16,17 31:6
51:7 73:7 97:15 103:3
153:19 221:24 222:1
240:23 241:1,13,14,14
254:2

stopped 258:1
stopping 61:17 161:9
stores 251:9
stories 43:1,11,12,14
115:20
story 37:11,12 43:19,24
62:10 64:2 87:4 97:15
109:23 241:23
strange 240:22,23
straps 274:3
street 1:19 2:8,11 36:19
36:22 268:10
streets 268:7
stress 244:10
stressful 75:10,13,16,18
75:23,24 76:2 80:24
98:18 206:22
Stricker 153:14 157:7,9
strong 218:11
struck 251:24
stuff 27:13 206:22 246:3
subject 106:4 186:18
subjected 65:9,21
subjects 210:24
submit 249:10
subpoena 218:4,9
subpoenaed 218:17
subscribed 279:22
substantial 20:20
sucked 161:20
sudden 82:16,20 89:22
sue 218:22 220:14,19
223:25
sued 220:7
sufficient 150:21
suggest 199:13 249:16
suing 220:13
suit 147:18
Suite 2:5,8,11
suited 147:6
sunglasses 156:14
158:12 168:8
super 270:3
supervise 17:19
supervisor 24:7 221:23
222:1 255:14 269:5
supervisors 14:3,7,8
16:19 66:20 99:1,8
268:2
suppose 96:17 98:3 171:5
supposed 29:24,25 30:1
84:18 191:20 235:18
237:5 268:25 269:16,22
274:21,22
sure 5:20 10:10 19:23
20:22 26:12 27:20
29:11 30:14 31:17 32:4
34:20 35:23 39:23
41:15 42:17 46:6 47:4
47:15,25 48:18 54:5
56:1 59:19 60:6 61:10
62:1 64:4,14 67:8 72:13
72:19 73:13 74:20
76:17,25 79:3,6 85:16
86:1 91:16 92:17 93:11
97:5,6 101:5 102:7,12
102:19 103:16 105:21
109:2,14 110:22 113:15
124:13 127:9 128:15
135:5 137:8,17 139:6
141:7 142:5 145:8,20
149:4 151:22 153:22
158:16 160:7 167:13
168:1 169:21 170:17
172:9 173:16 174:2
178:3 180:25 187:21

Tesa Johnson (Vol. 1)
12/20/2023

188:2,9 193:13 195:4
196:25 197:4,16,25
204:6 208:13 211:7,25
217:25 227:23 230:17
232:2 233:11 241:21
243:6,12,16 244:9
257:19 258:19 265:11
surprise 234:8
surprised 73:18 98:7
195:25
surrounded 263:10
suspected 179:11
sway 111:22 112:4
swear 279:2
swimming 259:2
switch 62:9 84:21 261:12
sworn 1:9 4:19 278:11
279:22
system 163:22 179:4

**T**

T 123:17 219:15 220:4
T's 265:12
T-shirt 39:19
table 27:10 174:16,18,20
174:22,24 177:16
tail 260:20
take 5:24 35:16 64:15 70:7
70:17 72:4 73:4 75:5
77:15 78:10 83:14
84:18 94:8 106:2 112:6
119:13 150:10 153:22
162:18 165:4 167:15
168:12 172:11,12 173:3
199:10,14 221:2 236:24
249:16,21
taken 1:17 25:12 64:20
82:12 94:22 112:17
143:22 146:23 147:1,23
148:3,9,13 149:20
152:24 154:8 158:25
166:9,18 167:11 173:17
173:18 190:23 199:18
248:19 249:24 270:18
277:6
takes 86:16
talk 9:21 12:3 21:22 23:13
33:15,18 69:9 76:15
103:9 177:19 178:2
210:15,25,25 226:23
242:6,13 246:2 250:3
talked 199:22 211:19
talking 14:22 29:4 64:2
75:24 109:10 131:12
143:15,18 146:6 162:6
180:10 208:8 210:8
219:13 228:2 244:11,13
266:23
tall 126:19
tanker 226:11
tape 162:24,25 163:7
targeting 222:2
task 43:3
taught 159:2
TD 142:15
teaching 230:13
team 16:4,6,7 25:14,19
43:7,21 133:11,12
134:20 235:20 236:24
tease 178:6
technical 188:18,19
technicalities 193:8
technological 275:12
telephone 254:11
television 40:5
tell 12:2 16:6 21:22 25:2,3

47:17 55:23 57:20 62:4
85:24 88:3 102:12
110:11,20 114:2 153:1
153:8 175:12,20 185:6
186:24 189:8 190:15
195:20 209:18,21 210:19
211:2 212:19 216:5
218:17,21 220:18
221:12 222:14 223:15
223:18,24 224:11,15,18
225:15 227:6,14,18,19
228:11 237:15 239:11
240:8,17 243:2 244:5
255:18 256:6,7 259:21
261:19 263:7,9 264:20
264:20,21,22 267:18
269:14,17,22 271:2,6
271:14,18 277:8
telling 44:13 68:15 69:4
97:15 185:11 187:16
209:25 210:5 269:5
tells 27:11
ten 87:11
tendency 76:9
tennis 257:11
term 14:24 25:7 31:13
57:17,20 91:9,14 95:10
231:7
terminate 22:6 79:8,17
81:8 88:12
terminated 12:23,25
81:19 98:9,19 99:22
202:25 238:16,24
termination 3:6 22:4
76:16,19,22,25 77:3,6
77:15 78:8,14 79:24
80:8 81:14,24 83:3
111:25
terms 268:13
terrible 37:2
terrified 159:19 253:12
terrifying 254:8
Tesa 1:14,17 4:4,18,25 5:2
5:3,22 6:4 12:6 37:1
49:1 64:24 72:17
106:15 112:15 123:19
129:15 199:22 204:14
214:6 238:10 278:4
279:2,21
testified 4:20 39:6 81:23
101:13 112:16,19
114:10 131:5 196:1
215:6 231:1 233:20
234:12 259:8 263:2
testify 52:8 62:16 96:13
96:15,23 97:18 99:24
102:6,9 103:1 204:5
211:16 212:14,15
215:17 278:11
testifying 95:11 102:17
104:12,13 212:7 214:16
263:5 278:10
testimony 11:5 22:16
60:10 88:25 90:15,17
90:24 94:25 95:2,6,15
96:1,7,8 97:14 99:5,12
99:12 102:22 104:22
162:11 188:14 201:22
216:15 224:3 225:11
236:15,17 261:13,17
267:3 276:8 278:13
text 3:14,16,17,20 11:9
22:19 23:4,11,11
178:10 179:8,20 187:5
197:12,23 217:17
245:10,19,21

texted 22:13 197:20
thank 4:14 13:1,15 24:19
28:19 29:3 31:17
145:11 199:15 214:8,11
223:9
Thanks 67:8 105:21
therapist 210:17
they'd 218:18
thing 11:1 36:9 62:12
89:12 94:20 95:14
96:20 131:20 159:1
218:11 225:9 243:15
253:2 263:2 264:12
273:18
things 20:14 45:8 59:16
62:5 72:11 73:4 76:6,6
87:13 88:6 90:11 94:17
97:18 100:2 101:11,19
102:5,13 110:19 112:3
114:20 116:1 118:12
155:11,15 179:18
181:24 182:2,2,4,14,19
187:9 188:12,19,19,21
189:3 191:22 192:8
203:12 212:11 218:10
225:2 227:11 228:5
239:23 243:20,21,21,25
244:5 261:24,24 263:12
263:18 265:25 268:12
270:3 276:1 277:6
think 5:8 19:11 25:9 40:7
40:8 42:10 49:13 55:13
56:2 58:25 59:3 62:2,11
63:2 64:12,15 72:6,9
83:7 86:20 92:4 100:11
102:1 106:24 112:6
121:12 125:5 136:1,2,4
136:12 137:2 138:12
143:7 150:17 151:8,10
153:11 158:6,19 166:14
167:9 170:6 178:3
180:13 186:16 187:20
187:23,24 199:12
201:16 216:19 217:18
223:20,21 228:19 230:9
231:1 236:2 243:7
249:16 251:20 254:2,4
254:23 255:5,9 257:5
257:13,24 258:10 259:8
264:5 270:2 273:2
275:11 276:11,15
thinking 19:10 28:9
third 26:25 32:19 83:8
92:8 152:18 172:20
250:22
Thomas 141:17,19
Thompson 139:13,15
thought 26:25 47:16 50:12
86:12,12,12,17 109:20
110:3 114:15 186:17
187:8,17 188:17 189:2
193:9 206:4 209:2,5
threatened 93:24 251:13
three 110:9,17 112:25
150:10 152:3 156:8,14
173:5,11 174:7 217:18
220:3 227:6 255:11
271:23 276:10
throwing 189:17,20
thrown 219:8 257:2,21
throws 64:5
thumbs 159:14
Thursday 147:2
ticker 49:13,14
tied 43:21
TikTok 198:16

tilt 255:21
time 4:5 9:19 11:19 13:20
16:22 19:13 21:18 25:6
27:6 29:21,21,23 36:20
47:2 67:19 68:22 70:7
70:11 86:16 94:20,21
97:20 98:6 103:6
119:22 122:6 124:17
129:21 136:25 137:7
147:23 151:14 161:15
173:4,21 175:23 176:23
177:5,17 178:11,22
186:17 187:19,24
180:16,17,24 189:1
190:24 192:1,20 194:19
195:2,3 202:15,17,21
202:24 206:20 208:20
214:8 215:13 219:9
226:4,15 229:15 231:20
232:21 234:20 236:1,2
236:19 239:17 243:9
244:14 250:15 253:15
254:8 255:6,7 258:16
265:6,8 268:13 270:11
275:13
times 85:24 88:3 94:12
98:20 110:8 111:17
112:25 140:8 154:4
155:24 175:23 177:17
227:4,6 239:15,16
245:2 252:9 257:25
tip 155:22
tired 269:13
today 5:25 6:6,8,12,18,25
8:6,14 9:19 10:11,18
11:17,18 12:4 26:20
42:2 70:2,17 71:15,17
73:2 75:24 76:2 95:15
103:22 112:19 163:25
196:21,23 198:2 201:11
213:11 214:12 216:15
218:1,5 225:11 227:25
230:24 232:4 237:24
246:22 258:12 264:10
270:13 277:8
today's 4:4 10:22
told 24:8 29:17 30:4,7,11
30:14,15,17 31:5 39:14
42:6,9 50:7 57:4,7
65:14 69:2 89:2,5,7,8,8
89:13 90:2,4,10,21
91:24 98:23 100:23
105:11,12 180:21 181:7
182:4 184:16,21 186:2
187:16 190:12 191:12
191:18 194:13,19
195:14,17 205:5,12
206:12 207:5,12 210:25
211:7 212:12 222:23
224:7 225:15 234:14
239:16 240:13 241:18
242:8 255:2 267:9,11
267:16,23,25 268:14
269:9
top 75:6 85:9 87:21,21
122:18,22 123:23
124:21 129:8 133:16
142:12 196:18 271:5
topic 275:14
topics 8:25 178:14 182:23
188:9 194:15,15 237:11
total 44:23
totally 25:9 26:12 88:23
95:22 103:24 111:16
139:21
touch 43:2 118:10 131:21

touched 63:1
track 55:22
trained 16:8,11 58:3,7,11
68:4 107:18,24 108:13
training 13:4 51:8 67:21
84:2,9 109:5,6 179:18
181:25 182:19 187:8
235:11
trajectory 93:9
transcribe 10:4
transcribed 278:14
transcript 277:5
transcripts 101:25
transfer 43:6 245:4
246:16
transferred 142:3 244:25
245:3 246:18
transferring 245:14
Transit 35:15 37:18 38:8
38:16 41:23 42:4 69:3
100:16,16 152:11 154:1
154:15 261:15,21 262:7
262:17,21,24
transparency 184:7
transparent 184:18,20
transportation 35:18,20
trap 97:12
traumatic 121:25
traumatized 75:14 159:19
traumatizing 75:8
Travis 19:17 124:11,21
156:22,24
treat 233:21
treated 87:24 94:5
treatment 234:23 263:4
trial 105:10 260:11
trials 102:20
trick 59:19 97:12 140:5
tried 219:7 221:13 255:20
trigger 76:8
trooper 13:17,19 16:2
26:5,8 34:17 53:9,11,15
56:16 88:7,24 106:15
141:20 144:23 145:1
158:20 161:3 162:3
173:14 183:8 221:7,8
221:14,14 229:14,20
238:10,14,17 249:3
troopers 1:9 20:19 32:7
32:21 33:6,10,16 34:8
35:3 36:19 37:4,15,25
38:19,24 43:5 46:22,23
47:4,13,16 53:6 60:23
61:15 62:13,18 67:15
67:19,20 69:19 84:7
89:21 90:14,23 95:8
97:22 100:9,20 101:9
105:15,16 107:13
114:19 119:16,24 121:2
121:13,14 144:3 145:19
147:23 169:16,18 171:9
174:8 178:23 179:3
181:5 188:20 190:25
200:8 221:10,23,24
222:1,2 225:13 232:19
235:9,22 236:11,18,22
237:5 263:3 265:20
troopers/sergeants/lieu...
143:22 144:2
true 150:3 258:12 260:3
262:6,10 278:15
trust 184:9
truth 278:11,12
truthfully 86:11
truthfulness 213:22
try 8:25 9:24 10:2,18

Doby Professional Reporting, Inc.
952-943-1587

93:20 111:10 128:24
249:3,17
**trying** 9:21 59:19,20 61:13
78:25 87:15 97:12,13
102:8,8 140:5,7 177:23
187:22 188:3,4,10
218:15 243:19 258:21
258:25 259:4,6,9
261:18 266:21 268:12
269:2
**turn** 48:9,21 49:6 74:20
83:7 114:23 132:1,21
146:12 150:8 158:21
159:22 178:8 219:25
220:21 221:17 228:18
248:4 271:8,15 272:9
272:25 273:17
**turned** 29:1
**Turning** 272:2
**turtle** 147:18 148:19
**TV** 49:16
**Twin** 75:9 166:17 244:14
250:4
**two** 15:17 36:8 37:19 38:9
46:11,16,18 92:13 99:1
109:11 122:5 147:8
153:2 156:8,14 162:19
173:10 174:18 217:18
220:3 227:6 238:6
241:9 242:3 252:11
251:1 272:3
**Tyler** 126:10,11 143:11
145:21,22 155:19 156:4
160:3,9 249:9
**type** 118:8 174:22 175:1
203:7 245:12,12 274:13
**typewriting** 278:14
**typical** 37:8 102:17
**typically** 31:2 34:17 38:2
43:5 177:18,19 211:16

---

**U**

**uh-uhs** 10:3
**umbrella** 46:5 62:12
**unable** 97:17
**unaware** 32:23
**uncomfortable** 104:7
**underneath** 24:8
**understand** 6:6,11,14,20
7:4,8,11,18 8:5,17 9:13
10:9 15:1 16:3 32:3
42:3 54:22 57:23 69:13
70:2,13 82:21 97:7,10
97:13 103:23 105:8
140:7 155:19 164:1
170:19,25 195:4 201:10
204:7 214:13,16 215:1
220:12 221:6 222:6
223:6 227:21 238:19
246:6
**understanding** 32:10 33:5
34:7 39:19 56:12 57:11
64:25 68:13 71:13 82:7
91:12 104:12 111:21
149:19 180:1 200:18
202:13 207:16 211:11
211:20 212:16 228:4
248:11 250:7 261:20,22
267:9 269:3
**understood** 10:1,15 215:5
277:15
**undesirable** 88:6,23 89:2
**unfavorable** 96:8,9,13,18
**unfortunate** 44:2
**uniform** 51:6 170:4 171:1
175:24

**union** 80:20 202:8
**unique** 149:16
**UNITED** 1:1
**unknown** 42:8
**unraveling** 21:25
**unrelated** 89:12
**unrest** 16:8,9 27:25 46:5
58:1,4 64:1 159:5
182:15 260:9
**unsure** 23:4
**unusual** 183:7 191:17,17
261:5
**unwarranted** 107:5
**upload** 117:5 246:12,12
**uploaded** 119:13 165:21
**uploading** 120:20 246:13
246:15
**upstream** 259:2
**urgency** 27:7
**use** 10:2 50:17 51:12,14
51:16,25 53:9 56:11
58:11,14 63:19 64:6,10
83:13 85:17 106:22
107:21 108:11 109:8
170:1,3 191:20 192:22
193:1 198:14,21 232:14
245:17 255:23
**uses** 107:24 108:7
**usually** 248:2
**Uthe** 145:22
**utilize** 31:2

---

**V**

**V** 130:2,4
**vacation** 217:13 218:14
218:15
**vague** 17:8,24 18:10 20:24
44:9 45:15 47:14 54:2
65:18 91:19 92:2 96:11
97:1,16 99:14 115:24
118:20 120:17 144:5
**vaguely** 43:15
**VanDenEinde** 128:15
157:17 159:13,14
**Vanderport** 127:23,25
128:3 130:10,12 157:23
**various** 116:2 178:11,18
180:6,9 220:2 270:23
**vast** 188:9
**vehicle** 241:1
**verbal** 204:1,23
**verbally** 185:22 251:15
**verbatim** 110:20 212:5
216:4 224:16 227:19
228:12 238:4 263:8
264:8
**Vereeken** 130:14,19,20,21
**verify** 137:5
**version** 48:22 49:6 226:24
**vest** 273:25
**vicinity** 256:2
**video** 2:13 3:11 4:3 5:17
6:9 15:8 37:10 55:9
64:18 112:9 199:16
231:8 249:22 261:14,20
261:23 262:7,9,17,20
270:19 271:1 275:10
276:18,21
**Videographer** 2:13 4:3,14
64:18,21 112:9,12
199:16,19 249:22,25
276:17
**videos** 55:3,6,11,13 56:1
100:22,24,25 101:3,7
101:17 107:11,13,16,17
117:1 201:15

**videotaped** 1:14,16 278:3
**view** 115:18 117:17
167:16
**viewed** 187:14
**vindictive** 87:17,18 88:9
**violate** 114:16 167:5
**violated** 114:11,21
**violates** 170:3
**violating** 56:17
**violation** 12:24 22:3 31:14
167:14 200:4 266:16
**violence** 109:12
**viral** 15:8
**Virginia** 13:10,11
**vis** 273:25
**voicemail** 3:14 22:18 23:3
23:11
**VOLUME** 1:15,17 278:4
**voluntarily** 218:2
**volunteer** 16:7
**vs** 1:7

---

**W**

**wait** 9:24 43:9 71:5 111:15
276:8,11
**waiting** 101:2 199:7
**waive** 103:10 277:10
**waiving** 103:15 204:7
**wake** 111:11
**walk** 94:24 163:12
**wall** 38:8,17 91:7,17 92:1
236:11,11
**walls** 166:13,14
**Walton** 140:12,14
**want** 21:23 28:24 35:12
69:14 71:23 72:4 73:4
76:15 86:10 87:12 97:6
97:9 102:6 103:3,13,15
103:25 104:3 111:7,8,8
111:10,11 112:1,2
115:16 122:3 124:13
144:18 146:25 151:22
155:15,20 157:7 172:17
176:24 177:19 180:5,10
181:18 182:14,16
187:25 190:14,14 204:6
208:7,13 218:24 224:3
224:10 227:23 230:17
250:3,20 260:19 261:12
265:10 266:5 270:1,22
275:1 276:23
**wanted** 12:19 40:25
111:24 176:24 275:17
**war** 254:23
**warrant** 166:4
**warranted** 106:23,25
107:8
**wasn't** 26:10 29:9 31:7,8
36:25 43:19 51:23
66:25 71:2 82:20 95:24
95:24 97:19 105:1
109:24 110:1 111:16,20
111:21 121:5,9 125:7
171:21 186:17,18
205:21 210:24 211:14
211:18,25 212:13,13,13
217:4 218:11,11,19
230:6 231:19 232:1
239:12 253:20,21,23
255:13 260:8,21 268:8
275:7
**watch** 61:14 100:25
107:16
**watched** 55:3 107:11
201:15 250:25 251:18
251:20

**water** 174:23 189:17,21
**waves** 92:5
**way** 37:8 41:16,18 58:10
61:16 66:14,17 68:8,11
87:24 94:4 104:6
111:22 112:5 135:20
160:17 172:19 190:10
203:15 204:16 205:11
247:18 253:18 263:21
274:2
**ways** 94:6 212:10
**we'll** 6:8 8:25 10:18 12:18
23:1 35:25 77:14 122:4
122:4,11 135:13 140:25
165:5 215:4 270:2,13
**we're** 12:14 14:22 21:8
25:7 38:22 39:20,21
43:6 44:19 48:15 59:12
59:13,13,15 64:2,15,21
77:15 98:23 112:6,7,12
128:22,24 150:20 161:8
161:9,9 163:8,9 177:20
178:1 191:2,19 199:19
218:14 219:13 228:6
236:8 237:9 249:25
268:24 276:9
**we've** 9:18 23:17 36:6
58:6 60:1,16 110:22
136:2 138:7 143:10
151:8,14 159:2 173:4
178:3 201:10 214:12
223:8 271:10 272:10
**wedding** 18:17,18,20
19:10 21:20,21
**Wednesday** 46:3 147:2
**week** 8:9 27:6
**weeks** 15:17
**Weidell** 142:18
**Weiner** 2:7,17,19 4:11,11
5:10,19 9:15 17:8,24
18:10 20:24 22:7,9 33:8
34:3,10,23 35:8 39:25
44:9 45:15 47:14 48:11
48:15,19 52:6 54:2,16
55:16 56:5 58:23 59:22
60:9,25 61:18 63:11
65:12,18 66:16 69:21
70:19 71:8,13,16 72:9
72:21 73:5,7,15 74:8
79:9,19 81:9,15 82:25
90:16 91:1,19 92:2
95:18 96:11 97:1,16
99:14 101:12 103:3,6,9
103:13,18 104:21
108:22 112:24 113:11
113:22 114:4 115:24
117:2,10,20 118:1,20
119:19 120:17,24 121:7
123:7,12 130:5,16
131:4 137:23 138:12
139:2 144:5 148:10
149:12,17 150:1,13,22
151:16 160:22 162:10
162:20 164:4,15,20,25
165:18 166:6 171:3,12
171:16 175:14 176:8,14
183:2,9 184:13,24
188:13 189:12,22
199:12 200:6 201:7,25
202:10 203:2 204:3,4
204:12,25 206:9 207:3
207:17,22,25 208:4,12
208:16,22 209:15,25
210:5 212:19 213:6,10
213:20 214:10 219:2
223:8,12,14 237:23

247:22,24 248:3 249:12
249:15 250:2 267:6,7
270:2,16 275:11,16,23
276:11,15
**weird** 264:22
**Wellens** 140:16,19
**went** 13:4 15:8 67:19,20
80:14 113:20 144:15
147:4 173:21 225:25
236:22 241:11 266:10
**weren't** 32:5,16 65:24
66:14 137:21 165:24
193:14 236:17 240:14
263:19,20 275:8
**west** 38:6,21,25 39:4
**WeTransfer** 3:20 244:25
245:9,18 246:1,3,9,19
247:11
**whatnot** 151:4
**WhatsApp** 198:23
**whatsoever** 248:23
**white** 165:12 166:2
**whitewater** 259:2
**Wiessner** 2:3,17,25 4:8,8
4:22 5:4,20,21 17:11
18:1,12 21:1 22:11 30:9
33:11 34:6,14 35:1,11
35:24 36:3 40:3 44:12
45:17 47:18 48:1,4,13
48:18,20 52:10 54:5,7
54:21 55:25 56:7 59:18
59:25 60:11 61:3,22
63:14 64:12,15,23
65:15,19 67:7 70:1 71:5
71:7 72:5,13,16 73:13
73:14 74:13 77:14,18
79:12,22 81:12,22
84:21,24 90:19 91:5,23
92:6 95:21 96:21 97:5,8
98:11 100:1 101:15
103:20,24 104:16 105:4
109:2,3 112:6,14 113:5
113:15,16 114:1,6
116:6 117:7,12,23
118:4,22 120:1,21
121:4,11 122:8,10
123:9,14 130:7,9,18
131:8 137:25 138:14
139:6,7 144:7 148:12
149:14,22 150:4,7
152:2 161:22,23 162:14
163:11 164:7,18,23
165:3,23 166:21 171:7
171:14,20 175:15
176:11,17 183:6,12
184:15 185:5 189:4,15
190:1 191:10 199:8,15
199:21 200:10 204:14
204:18,22 208:3,9,15
214:5,8 216:20 222:22
223:2,10 247:21,23
248:2 249:6 267:2
275:20 276:7,14,22
**wife** 265:5
**wild** 177:25
**willing** 95:3 196:20,24
197:16,23 203:22
**window** 217:12 251:1
**wise** 181:25
**wish** 256:6 265:21 269:10
269:24
**witness** 4:17 17:9,25
18:11 20:25 22:8,10
33:9 34:4,12,25 35:10
40:2 44:11 45:16 47:15
52:8 54:18 55:18 56:6

---

Tesa Johnson (Vol. 1)
12/20/2023

Page 294

**X**

X 2:15 187:2 211:13 216:6

**Y**

Y 187:2 211:13 216:6
Yadas 260:11
yeah 12:15,18 14:6 19:14
  24:3 40:13 45:4 50:3
  58:13 64:14 67:24
  74:17 82:6 88:22 98:3
  109:16 127:7,16 135:10
  146:17 151:8 158:7
  160:8 168:19,21 170:21
  171:5,6 175:3,5,5 177:9
  179:25 180:16 185:24
  187:12 191:13 199:15
  203:24 214:3 229:5
  230:3 231:5 234:10
  235:16 238:24 239:20
  251:12 252:11 253:14
  254:2 258:2 259:11
  261:11 265:7 274:15,17
  275:3 276:14
year 14:16 18:19 55:10
  77:11 84:25 95:3
years 12:17 74:3 110:17
  142:4 203:11 235:3
  238:6
yep 90:6 114:24 175:5
  182:5 233:13 272:21
yeses 10:2
young 158:20

**Z**

Z 187:2 211:13 216:6
zero 73:8 176:23
zone 254:24
Zoom 5:6 9:11 201:5
  214:12

**0**

000106 122:17
01/31/2025 278:25

**1**

1 3:2 5:18,19,20 7:24 73:6
  132:18 136:17 138:4,8
  138:12 140:20 270:24
  271:10,17 272:3,13,15
  273:19,22,22 274:1,8
1:31 112:13
10 3:11 162:18,22 270:3,6
  270:10,15
10:30 1:21
10:31 4:5
10:50 9:10
1000 2:11
101 1:19 2:21
104 2:21
108 2:21
11 72:18,19 162:18,22,25
11:44 64:19
11:52 64:22
112 2:21
113 2:21
114 2:21
115 2:21
116 221:18,19,20
117 2:22
118 2:22
119 2:22
12 48:9 49:6
12-20-017 83:11
12-year-old 150:2

12:58 112:10
120 2:22
121 2:22
122 3:8,9
123 2:22
13 48:9,21 248:4,6
130 2:22
131 2:22
137 2:22
139 2:22
14 12:12 77:25 165:4,5
1400 2:8
144 2:22
148 2:22
149 2:22
14th 78:22
15 165:4 167:15
15-year-old 150:2
16 168:12
160 2:22
162 2:23
164 2:23
165 2:23
166 2:23
168 3:5 72:7
17 2:19
17-year-old 241:10
171 2:23
175 2:23
176 2:23
18 2:19 220:1
183 2:23
184 2:23
188 2:23
189 2:23
19 90:9 172:11,15,16
196 3:15
197 3:16,17

**2**

2 3:3 36:1,2,6 64:21 132:1
  134:1,7 139:25 271:11
  271:17 272:3,13,23
  273:2,19,22 274:10
2:20 239:1
20 1:20 2:19 4:4 161:7
  172:11 173:3 174:21
20-hour 269:12
200 2:23
2014 13:4,5 14:6,8
2015 16:15
2016 261:7
2018 90:9
2019 14:17
2020 11:11 15:3,5,18,25
  26:15,24 29:8 31:18
  39:4,8 41:24 52:5,14
  53:1 54:10,25 115:11
  117:13 122:22 123:21
  148:24 154:18 199:22
2021 12:13 77:6,8,9
  229:11,17,23 240:20
2022 7:23 12:12 77:25
  78:3
2023 1:20 4:4 9:6 12:14
  87:6,9 92:18 99:6 206:2
  209:10,20 210:9,20
  278:5,20
2024 279:23
203 3:18
207 2:23
208 2:23
20th 217:9 218:13 278:4
21 220:24
21-cv-1282(PJS/DLM) 1:4
214 2:17

217 3:19
219 3:10
22 3:14 9:5
223 2:25
249 2:25
24th 240:20
25 15:5 123:3
267 2:25
26th 225:25
27 122:15
27th 84:25 225:25 239:1
  267:19
2800 2:5
28th 278:19
29th 266:10,11 267:13

**3**

3 3:4 48:2,3 83:8 112:12
  123:15,21 132:21,24
  143:9 146:15 150:8
  151:15 156:19 247:21
  247:22,25 248:5 271:11
  271:17 272:14 273:6,8
  273:19,22,24 274:8
3:09 199:17
3:13 199:20
30 11:11 15:25 26:15,24
  29:8 31:18 39:3,8 41:24
  52:5,13 53:1 54:10,24
  100:24 122:22 123:21
  148:24 154:18 161:5
  199:22
30th 27:16,21 28:14 29:4
  30:22 32:25 33:2,18
  34:9,22 35:13 37:3,12
  37:16 40:19 41:15 42:5
  42:17,19 44:5,8,15
  45:19 50:17,18 51:25
  53:16,20 54:1 56:17
  57:10,11,22 60:3,6,17
  60:17 65:10 68:17
  69:16 92:21 113:17
  123:6 124:4 125:4,10
  149:9 160:10 173:24
  174:2,5,6 214:22 226:8
3100 13:8,9,13,17,22 14:1
  14:3 16:16 17:5,12 19:6
  20:9 23:21 124:23
  125:20 126:25 127:19
  128:5,9,20 142:2
31st 267:19
33 2:19
34 2:19 36:5 221:18
345 3:20
35 2:19
35W 148:15 149:7
36 3:3
37 3:10 219:5
39 2:19

**4**

4 2:17 3:5 72:14,15 98:14
  98:15 133:8,23 139:16
  140:14 153:22,23
  199:19 271:11 272:14
  273:6,7,19,22,22
4:15 249:23
4:20 250:1
4:52 276:18
4:58 277:16
401 167:18,24
44 2:19
445 2:8,11
45 2:20

47 2:20
48 3:4

**5**

5 3:2,6 77:14,17 80:2,2
  135:13 249:25 273:19
  273:22,22
508 238:11
52 2:20
534 115:3
54 2:20
55 2:20
55101 2:12
55101-2131 2:9
55402 2:5
56 2:20
573 142:22,23,25
58 2:20
59 2:20

**6**

6 3:7 84:22,23 122:6 139:8
  146:17 158:21 228:19
  237:10
60 2:20
600 53:6 150:23
61 2:20
63 2:20
630 265:20
65 2:20
66 2:20

**7**

7 3:8 122:6,7,8,9 129:2
  140:22 159:9 247:24
  270:24
7:00 266:11
72 3:5
73 2:20 220:22,23,23,24
  221:3
74 2:20
76 2:21,3
77 3:6
7th 102:2 226:2

**8**

8 3:9 74:20 122:7,8,9,12
  140:25 159:22
8:30 29:20
800 2:4
81 2:21
84 3:7
8th 18:19 241:7

**9**

9 3:10 51:14,16,21 52:1
  53:20,22 75:5 140:25
  163:13,23 164:1 218:25
  219:1,4
90 2:21 100:24
91 2:21
911 145:17
92 2:21
95 2:21
952.943.1587 1:24
96 2:21
97 2:21
99 2:21
9s 258:6

58:25 59:24 61:2,20
  63:13 64:17 65:14
  66:17 69:23 74:11
  79:11,21 81:11,17
  90:18 91:2,20 92:4
  95:20 96:12 97:3,6,17
  99:15 101:14 103:5,8
  103:12,17,19,23 104:5
  104:23 108:24 109:17
  113:1,13,24 114:5
  115:25 117:4,11,22
  118:3,21 119:21 120:19
  121:1,9 123:8,13 131:6
  139:4 144:6 149:19
  151:12 152:1 160:24
  162:12,22 164:6,17,22
  165:2,20 166:8 171:5
  171:18 176:10,16 183:4
  183:11 185:1 188:15
  189:14,24 200:8 204:9
  204:13,17,20 208:8,9
  208:11 214:7 223:7
  234:11 249:8 267:4
  275:15 277:13 278:10
  278:19
witnessed 43:20
witnesses 277:3
woman 165:12 166:2
wonder 186:11
word 108:10 181:19
  227:16,25
wording 87:16
words 224:12 227:22
  228:7
work 12:8 17:2,7,9,16
  18:8 19:7 20:8,15,17
  23:20 24:1,2,4 43:5
  119:5,6 124:23 125:20
  148:4 155:8 182:11
  187:13,15 192:9 193:8
  194:3,5,11 212:8
  217:14 218:10 243:21
  244:11 245:1 256:17
work-related 76:5
workdays 269:12
worked 24:10 98:5 239:14
workers' 7:19
working 13:2 17:13,25
  18:2,4 23:23 161:6,7,9
  163:9 195:9
works 212:12 244:25
world 15:9 63:8 236:12
world-changing 40:24
worry 124:16
worthy 165:15
wouldn't 53:3 58:21,22
  66:24 95:6 96:7 100:5
  104:10,13 105:17
  110:20 113:25 114:12
  155:15 176:23 177:2,18
  189:19 194:5 198:1
  200:11 206:17 211:22
  223:13,25 249:2 253:2
wrap 94:9
wrapped 76:4,13,21,22
  87:14
Wressell 165:11
write 145:7 178:18 255:15
writing 185:18 213:14,18
  241:23
written 3:18 192:4 203:3
  203:16,25 245:8,13
  258:16 269:23
wrote 92:7 178:10 237:9
  250:21 253:1,12 254:10
  257:5,13 258:20 259:12