280

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

--------------------------------------------------------

Court File No. 21-cv-1282 (PJS/DLM)

Carolyn Cole and
Molly Hennessy-Fiske,

Plaintiffs,

vs.

Ben Lockman and Michael Eck,
acting in their individual capacities
as troopers or other sworn officers
of the Minnesota State Patrol; and
Joseph Dwyer and Jason Engeldinger,
acting in their individual capacities
as Captains of the Minnesota State Patrol,

Defendants.

--------------------------------------------------------

VIRTUAL AND VIDEOTAPED DEPOSITION OF

TESA JOHNSON

VOLUME 2

        The following is the videotaped deposition of
TESA JOHNSON, VOLUME 2, taken pursuant to Notice of
Taking Deposition, via videoconference, on January 10,
2024, commencing at approximately 2:00 p.m.


Reporter:  Rhonda Olynyk
Doby Professional Reporting, Inc.
DobyReporting.com
952.943.1587

Tesa Johnson (Vol. 2)
1/10/2024

**281**

APPEARANCES:

On Behalf of the Plaintiffs:

    Greta A. Wiessner, Attorney at Law
    Andrew J. Noel, Attorney at Law
    Robins Kaplan LLP
    800 LaSalle Avenue
    Suite 2800
    Minneapolis, Minnesota 55402

On Behalf of the Defendants:

    Joseph Weiner, Attorney at Law
    Minnesota Attorney General's Office
    445 Minnesota Street
    Suite 1400
    St. Paul, Minnesota 55101-2131

    Kim Parker
    Minnesota Department of Public Safety
    445 Minnesota Street
    Suite 1000
    St. Paul, Minnesota 55101

Videographer:  Jayme Hogan, Envision Video
    jaymehogan@outlook.com

NOTE:  The original transcript will be delivered
    to Robins Kaplan LLP, the noticing party.

**282**

I N D E X

EXAMINATION BY:                              PAGE
Mr. Weiner......................... 284-327, 339-342
Ms. Wiessner.................... 327-339, 343-344

OBJECTIONS BY:

Mr. Weiner... 329, 331, 335, 336, 339, 343, 344

DEPOSITION EXHIBITS:              PAGE
Number 11 - 10/25/18 Disciplinary Action -
    Notice of Suspension.............. 310

Number 12 - Formal Complaint of Alleged
    Employee Misconduct.............. 311
Number 13 - 5/28/19 Letter of Reprimand....... 312
Number 14 - 11/5/19 Formal Complaint of Alleged
    Employee Misconduct.............. 317

Number 15 - 2/20/20 Disciplinary Action -
    Notice of Suspension.............. 318
Number 16 - 11/2/21 Formal Complaint of Alleged
    Employee Misconduct.............. 321

Number 18 - Text messages................ 287, 336

REQUESTS:                              PAGE
Text message screenshot...................... 291

**283**

P R O C E E D I N G S
    VIDEOGRAPHER:  This is the continuation
of the deposition of Tesa Johnson.  Today's date is
January 10th, 2024, and the time is approximately
2:00 p.m.
    Would each attorney please state their name for
the record.
    MS. WIESSNER:  Greta Wiessner for the
plaintiffs.
    MR. NOEL:  And Andrew Noel for the
plaintiffs.
    MR. WEINER:  Joe Weiner, Assistant
Attorney General, on behalf of the defendants in this
matter.  And with us off camera and off mic is Kim
Parker, general counsel for DPS.
    VIDEOGRAPHER:  Is that everyone?
    MR. WEINER:  I believe so.
    VIDEOGRAPHER:  Would you please
administer the oath, Madam Court Reporter.
    (Oath administered.)
    THE WITNESS:  Yes.
    THE REPORTER:  Thank you.
    * * *

**284**

    TESA JOHNSON,
    being first duly sworn, was examined
    and testified as follows:
    EXAMINATION (Continued)
BY MR. WEINER:
Q.  Good afternoon, Ms. Johnson.  Thank you for coming
    back and being with us today.
A.  Sure.
Q.  We've done this before, but just so that the record is
    clear for this most recent deposition, my name is Joe
    Weiner.  I am an Assistant Attorney General.  I
    represent the defendants in this matter, this lawsuit
    brought by Carolyn Cole and Molly Hennessy-Fiske.
    I'm going to be asking you some questions, a
    continuation from the deposition back in December.  I
    hope it won't take very long.  And then I think
    Ms. Wiessner may have some questions for you after
    that.
    And as with our last deposition, do you
    understand that you're here today testifying under
    oath?
A.  Yes.
Q.  And you understand that means that you must testify
    truthfully, correct?
A.  Yes.

Tesa Johnson (Vol. 2)
1/10/2024

285

1  Q.  Okay.  Same rules as before.  We have our court
2      reporter here who is taking down my questions, your
3      answers.  So it's important that we speak one at a
4      time.  And I will try my best to wait for you to
5      finish any of your answers before asking a question,
6      and I'd ask that you wait for me to finish asking the
7      question before you answer.
8          Is that okay?
9  A.  Yes.
10 Q.  Also, because of the nature of a written transcript
11     for this, it's really important that we get verbal
12     responses.  So yeses and noes are what we're shooting
13     for instead of uh-huhs or huh-huhs or shakes of the
14     heads or nods of the heads because those don't
15     transcribe very well.  Okay?
16 A.  Okay.
17 Q.  If at any point I ask a question and you don't
18     understand it, please let me know, and I will rephrase
19     the question.  But if you ask the question that I
20     answer (sic), we can assume for purposes of this
21     deposition that you understood it.  Okay?
22 A.  Okay.
23 Q.  As I think we told you last time, if at any point you
24     need to take a break, please let us know, and we can
25     do that.  All that I'll ask is that if there's a

286

1      question pending that you answer the question before
2      we go on the break.  Okay?
3  A.  Okay.
4  Q.  And has there been any medical changes for you in the
5      last three weeks that would impair your ability to
6      testify truthfully in this matter?
7  A.  No.
8  Q.  Has there been any other reason that you would be
9      unable to testify truthfully in this matter today?
10 A.  No.
11 Q.  Okay.  Great.  So let's get started with some of the
12     substantive questions here.
13         During the last deposition counsel had asked you
14     to look for and to search for certain documents or
15     text messages or phone messages between you and Jason
16     Engeldinger, Mike Eck, Joe Dwyer, or Ben Lockman.  Did
17     you have an opportunity to do that search?
18 A.  Yes.
19 Q.  And I believe it was yesterday we received an email
20     from you with a text message chain that you provided.
21     Was that a result of the search that you conducted?
22 A.  Yes.
23 Q.  Were there any other documents or text messages or
24     phone messages that you were able to find other than
25     the text message chain that you sent to counsel last

287

1      night?
2  A.  No.
3  Q.  Okay.  So I want to ask you about those documents --
4      or that text message chain, if we could.  I just have
5      a few questions about it.
6          So what I'm going to do is try to share my screen
7      here and show you a document that I think, because of
8      how I premarked some exhibits, I think we're going to
9      mark this as Exhibit 18, one eight, then we're going to
10     go backwards for some.  And I apologize to
11     everybody for that, but that's kind of how it shook
12     out with this.
13         So, Ms. Johnson, can you see my screen now?
14 A.  Yes.
15 Q.  Okay.  So looking at this, I'll tell you what I did,
16     and I've shared this with counsel before the
17     deposition.  I took the actual screenshots that you
18     provided and copied them all into one document.  It
19     just kind of goes down so it's all one page so that we
20     could use it for purposes of this deposition.
21         So what I'm going to do just really quickly is,
22     I'm going to start here up at the top, and I want you
23     to take a look at this and let me know when you're
24     done reading it, and then I'm going to ask you if this
25     appears to be the same series of text messages that

288

1      you provided in the email to counsel last night.
2      Okay?
3  A.  Okay.
4  Q.  (Scrolling through exhibit.)
5  A.  All right.  Okay.  Okay.
6  Q.  So, Ms. Johnson, I've had now had an opportunity to go
7      through this entire text chain that you provided.  Is
8      this a true and accurate copy of the text chain that
9      you searched for and found and provided to counsel on
10     January 9th, 2024?
11 A.  Yes.
12 Q.  Okay.  Thank you.
13         So I wanted to start asking you first with who
14     this text message is from -- or is to.  So up here we
15     have an individual, Captain, and it's a German word,
16     and I'm sure I will butcher it in trying it, but
17     Gefalscht.  Is that close?  Do you know?
18 A.  Yes.
19 Q.  And I'm not aware of there being a Captain Gefälscht
20     in the State Patrol, so I'm assuming this is a name
21     that you've put in your phone to identify somebody
22     else.
23         Who is that individual who you're identifying
24     here?
25 A.  Jason Engeldinger.

3 (Pages 285 to 288)

Tesa Johnson (Vol. 2)
1/10/2024

289

1  Q.  So this text chain is a text chain between you and
2     Captain Engeldinger, correct?
3  A.  Yes.
4  Q.  All right.  And so the first text message here has to
5     do with -- it's on February 24th, 2022, at 9:49 in
6     the morning, and Captain Engeldinger states that he
7     hears that you were out of state in the last couple of
8     weeks and then asks you to report the days that you
9     were going to be out for purposes of when you weren't
10    available to report to work, and you responded after
11    that.
12        And then he asked you if there were reasons why
13    you didn't disclose the dates that you were going to
14    be out, and you wrote, "To be totally transparent, I
15    am feeling pretty depressed and crappy and just didn't
16    care.  It won't happen again.  If I get docked pay,
17    whatever."
18        Can you tell me what this whole exchange has to
19    do with?
20 A.  It was when I was on administrative leave and they
21    required that I be home and available Monday through
22    Friday.
23 Q.  Okay.
24 A.  He had the --
25 Q.  And this was when -- I'm sorry.  I didn't mean to

290

1     speak over you.
2         And this was when you were on administrative
3     leave in relation to the event that ultimately
4     resulted in your termination of employment, correct?
5  A.  Correct.
6  Q.  Okay.  And Captain Engeldinger responded, "Thank you.
7     Please use the resources available.  I'm always
8     available too.  I do care and want the best for you."
9         Do you know what resources he's referring to?
10    Had you had a discussion with him about these
11    resources?
12 A.  We might have had a discussion.  I don't know what he
13    meant.
14 Q.  Then on March 18th there is another message.  "You can
15    disregard court next week.  Thanks."
16        Do you have any recollection about what that
17    refers to?
18 A.  No.
19 Q.  Okay.  Then on April 8, 2022, you exchange a number of
20    text messages with Captain Engeldinger where he tells
21    you that he needs to deliver paperwork to you today,
22    and this essentially is he's delivering to you the
23    paperwork related to the result of the investigation
24    about the misconduct that the State Patrol identified
25    for that incident involving the accident and the

291

1     double fatality in September of the previous year.
2     Correct?
3  A.  Correct.
4  Q.  And you have a number of text messages about that, and
5     he tells you that "if you have an MSP property I can
6     grab it."
7         Do you recall having -- or receiving that letter
8     from Captain Engeldinger?
9  A.  When he delivered it to me?
10 Q.  Yes, ma'am.
11 A.  Yes.
12 Q.  And did you have any discussions at that time?
13 A.  No.
14 Q.  Okay.  I had one question for you.  So on the next
15    document there's this screen text here where it says,
16    "abducted by aliens or eaten by a grizzly," and it
17    looks like something is cut off here.
18        Do you know what is missing in this area?
19 A.  I do, and I see that I've made a mistake here, because
20    it was -- he was asking me if I was going to make the
21    Louder -- Louder -- Loudermill hearing.  If you would
22    like, I can -- I can get that screenshot and email it,
23    if you'd like me to do that.
24 Q.  Yeah.  When we're done today, if you could do that,
25    just so we have a complete record, that would be

292

1     great.
2  A.  Sure.  That was my response to him asking if I was
3     coming to the meeting.
4  Q.  Excellent.  Thank you.
5         And then after that there's an exchange that you
6     have about expense reports and mileage and meals.  I'm
7     assuming this relates to the Loudermill hearing and
8     showing up for that?
9  A.  Correct.
10 Q.  Okay.  And then he indicates that he was emailing the
11    documents to you, and you indicated you'd send it to
12    your attorney, and he gives you the thumbs-up.
13        Other than that, were you able to locate any
14    other communication between you and Captain
15    Engeldinger?
16 A.  This was the only communication from the list that was
17    emailed to me that existed on my phone.
18 Q.  Okay.  So to the extent that you thought that Captain
19    Engeldinger may have sent you a text message to inform
20    you about your deposition in February of 2023, you
21    don't -- it either never existed or you no longer have
22    a copy of that text message, correct?
23 A.  Correct.
24 Q.  Okay.  Thank you.  That's all that I have for this
25    document.

4 (Pages 289 to 292)

Tesa Johnson (Vol. 2)
1/10/2024

293

1   I also wanted to show you one of the exhibits
2   that we had looked at during the last -- your last
3   deposition in December, and that was what had been
4   identified previously as Exhibit 3. It was a series
5   of pictures. So I'm going to put that back up on my
6   screen as well. Okay?
7   A.   Okay.
8   Q.   All right. And, ma'am, can you see -- I know the
9   picture is not great right now, but let me see if I
10  can -- how's that? Can you see the picture okay?
11  A.   Yes.
12  Q.   All right. So what I'm going to do at this point is
13  I want to go through -- there's 20 pictures here, and
14  I just would like you to be able to tell me whether or
15  not you were the individual who provided -- or who
16  took or uploaded the picture or image that is in each
17  of these pictures. Okay?
18  A.   Okay.
19  Q.   And, I'm sorry, I'm going between a couple of
20  different things on my own side.
21       All right. So we have this first exhibit in
22  Exhibit 3, photo 1. Was this a photo that you took?
23  A.   And is this from the -- this is from the grouping of
24  photos that was sent to Carol?
25  Q.   Is that Carolyn Cole? Ms. Cole?

294

1   A.   Yes. Excuse me. I'm sorry. To Carolyn.
2   Q.   Yeah, this is -- this is one of the docs -- or one of
3   the photos that you sent to Ms. Cole. I think there
4   was something like 600-something files. This is one
5   of the ones that you sent.
6   A.   I don't know if I took it or not. I'd have to see if
7   it had my name on it or not. I don't remember or
8   recall the exact photos that I took.
9   Q.   And that's fair enough, and that's a fine answer for
10  this.
11       So I want to show you Exhibit 2 -- or, I'm sorry,
12  photo 2 of Exhibit 3. Same question as to this photo.
13  A.   Same answer. I don't know.
14  Q.   Okay. Photo 3?
15  A.   I don't know.
16  Q.   Photo 4?
17  A.   I assume since I'm in it I didn't take it.
18  Q.   Okay. Photo 5. And I can try to spin it. Give me a
19  second.
20  A.   I don't know.
21  Q.   Okay. Photo 6?
22  A.   I probably took that one. It looks like I'm holding
23  up to the -- or holding onto a phone.
24  Q.   Okay. Photo 7. And let me flip it for you again.
25  A.   I don't know.

295

1   Q.   Okay. Photo 8?
2   A.   I don't know.
3   Q.   Photo 9 appears to be somebody else's photo. Do you
4   know if you're the one who posted this to the
5   Google -- Google photo album?
6   A.   I don't know if I was or not.
7   Q.   Okay. Photo 10. Do you need me to flip this, or are
8   you okay?
9   A.   I'm fine. I can see.
10  Q.   Okay.
11  A.   That was my photo that I did upload.
12  Q.   Okay. And then photo 11, same question.
13  A.   Correct.
14  Q.   All right. And so "correct" means this is one of your
15  photos?
16  A.   Yes.
17  Q.   Okay. Photo 12?
18  A.   I believe this might have been one of my photos.
19  Again, without seeing the files with my name on it, I
20  can't be a hundred percent sure.
21  Q.   Okay. And I'll tell you that -- I'll represent to you
22  that in your last deposition looking at this photo it
23  had your name on it and you indicated that it was
24  likely you who loaded it to the Google drive. So I'm
25  just telling you that because I'm not trying to trick

296

1   you. I'm just trying to be thorough.
2   A.   That's good.
3   Q.   So this one, this appears to be kind of a screenshot
4   that you took that would indicate who uploaded any of
5   the photos, correct?
6   A.   Yes.
7   Q.   All right. And so to the extent on this photo 13
8   it's got your name down here with that photo that we
9   just looked at in photo 12, that would mean that
10  you're the one who posted it, correct?
11  A.   Yes.
12  Q.   All right. Thank you.
13       Photo 14 is also a screenshot that you took to
14  show the names?
15  A.   Can you scroll further, please?
16       And which one -- what -- what picture or image
17  are you referencing right now?
18  Q.   Just this entire screenshot that we have here that
19  says photo 14.
20  A.   Uh-huh.
21  Q.   I just want to confirm that this is a picture that
22  would identify for these individual photos who the
23  person was who took those photos. Is that correct?
24  A.   It indicates who uploaded the photos to the Google
25  drive.

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 2)
1/10/2024

297

1  Q.  That's a better answer than my bad question.  Thank
2  you.  Yes, who uploaded the photos to the Google
3  drive.
4       So, again, this photo, I'll represent to you that
5  you weren't the individual who uploaded it in the
6  photo above.  So do you believe that this is a photo
7  or an image that you took or that you uploaded?
8  A.  I know I didn't take it.  I don't know if I uploaded
9  it or not.
10 Q.  Okay.  Fair enough.
11      Photo 16.  Do you know if this is an image that
12 you uploaded?
13 A.  I don't know if I uploaded that.  I know I didn't take
14 it.
15 Q.  Photo 17.  Do you know if you took this photo?
16 A.  I am in the photo, so...
17 Q.  So the answer to that is no?
18 A.  Correct.
19 Q.  Okay.  Photo 18.  Do you know if this is a photo that
20 you took?
21 A.  I do not.
22 Q.  Okay.  Photo 19.  Do you know if this is a photo that
23 you took?
24 A.  I did not take it.
25 Q.  Okay.  And photo 20.  Do you know if this is a photo

298

1  that you took?
2  A.  It could be.  I don't know.  My phone is on the table.
3  Q.  So probably not.
4  A.  Probably not, no.
5  Q.  Okay.  Now, based on my review, it does not appear
6  that any of the pictures that were loaded onto the
7  album that you either -- that were indicated that they
8  were uploaded by you were pictures that were taken
9  that night of May the 30th, 2020, outside of the Fifth
10 Precinct.  Would you say it's fair to say that you did
11 not take any photos that evening while you were
12 deployed outside the Fifth Precinct in Minneapolis on
13 that date?
14 A.  Correct.
15 Q.  And the reason for that is you were on duty, you were
16 holding your baton and other things, and you were more
17 prepared about the mission at that time as opposed to
18 taking pictures, correct?
19 A.  Yes.
20 Q.  And you wanted to focus on your own safety and the
21 safety of the other individuals around you, correct?
22 A.  Yes.
23 Q.  And taking pictures during that time would not allow
24 you to ensure the safety of yourself and others,
25 correct?

299

1  A.  I don't know.  I think it's situational.
2  Q.  Okay.  Fair enough.
3       As you sit here today, do you recall ever
4  deleting any photos from that deployment outside the
5  Fifth Precinct on May the 30th of 2020?
6  A.  I don't recall either way.
7  Q.  Okay.  Ms. Johnson, what is the State Patrol policy
8  regarding the retention -- data retention of photos?
9  A.  For evidence photos?
10 Q.  Well, so let's start there.  Is there a retention
11 policy for evidence photos?
12 A.  I assume so.  What my recollection is, is even if it's
13 blurry, it doesn't turn out, it stays, you don't
14 delete anything.
15 Q.  Okay.  Now, what about other photos, non-evidence
16 photos?  Is there -- does the MS -- or the State
17 Patrol policy regarding data retention or photo
18 retention, does it apply to non-investigation
19 photographs?
20 A.  I don't know.
21 Q.  I want to ask you also:  So the data retention policy,
22 what is that data retention policy as it relates to
23 emails that you send or receive from your State Patrol
24 account?
25 A.  What is the policy of what I would have done within

300

1  email?
2  Q.  Yeah, the retention of that, what you're supposed to
3  retain and what you're allowed to get rid of.
4  A.  I don't know.
5  Q.  Okay.  And I believe you testified that you did not at
6  the time have a State-issued cell phone.  Correct?
7  A.  Correct.
8  Q.  Now, did anyone ever give you any -- or do you know
9  if the policy applies to personal phones, as to any
10 information that is included in text messages on a
11 personal phone, whether you need to keep those for
12 purposes of data retention?
13 A.  I don't know.
14 Q.  Okay.  Do you know how long documents need to be
15 retained if they do fall under that retention policy?
16 A.  I don't know.
17 Q.  Okay.  Where would troopers keep documents or pictures
18 that related to a law enforcement matter?
19 A.  I don't know.  I can say where I would.
20 Q.  Okay.  Where did you keep them?  Yeah.
21 A.  Where would I keep evidentiary photos that would have
22 been taken?
23 Q.  Yes, ma'am.
24 A.  They either would have been kept on a disk, a
25 State-issued computer, a flash drive in the camera, a

6 (Pages 297 to 300)

Tesa Johnson (Vol. 2)
1/10/2024

301

1    flash drive -- you can -- it could have been put on a
2    flash -- a flash drive off of a computer too.
3    Q. Is there a drive or a shared drive on the State Patrol
4       network where it's expected that investigation
5       documents or pictures are kept?
6    A. Like the -- like a cloud or --
7    Q. Yes, ma'am. Like, for example, in our office I have
8       an in-drive that multiple people in my division can
9       all access documents. Is there a similar type of
10      drive or a location at the State Patrol that you can
11      recall where troopers were expected to keep
12      investigatory documents?
13   A. Yes.
14   Q. And where was that?
15   A. That would be the L:drive.
16   Q. Okay. As you sit here today, do you have any emails,
17      pictures, or documents related to a law enforcement
18      investigation that are -- that is in your possession?
19   A. No.
20   Q. Now --
21   A. You're speaking of criminal, correct?
22   Q. Correct, ma'am. Correct, criminal.
23   A. Nothing. No.
24   Q. Now, what about non-investigatory documents related to
25      your time at the State Patrol? Do you have any of

302

1    those documents in your possession?
2    A. For example, from my personal -- like the workers' --
3       my workers' comp case? Is that what you're talking
4       of?
5    Q. I would say documents -- what I'm referring to are
6       documents that you either created or received as part
7       of your official duties as a trooper with the
8       Minnesota State Patrol.
9    A. Do I still retain any of those documents on email or
10      text message?
11   Q. Correct, ma'am.
12   A. No.
13   Q. Okay. How did you make a determination about whether
14      you needed to retain a document for investigatory
15      purposes?
16   A. I -- our documents would have been uploaded and then
17      sent to the office, and it would have been taken care
18      of by the administrative support staff.
19   Q. So if you did not load a document or an email or a
20      picture in that manner, then you had made a
21      determination that that document was not related to a
22      law enforcement matter; is that correct?
23   A. No.
24   Q. Okay. So what did you make that determination based
25      on?

303

1    A. Well, there's -- there's, you know, possibilities that
2       I could have forgotten to upload something or I
3       discovered something that needed to be uploaded or
4       added to a file. It's human error. So I would say
5       that there are times that I probably didn't in a
6       timely fashion upload something or maybe perhaps
7       completely forgot.
8    Q. Okay. But never intentionally --
9    A. I don't know.
10   Q. But never intentionally withheld a document that was
11      investigatory from being loaded as part of a file,
12      correct?
13   A. No. Excuse me. Correct. Yes.
14   Q. Correct.
15      And just so that I'm clear, there could also be
16      situations where you are on duty where you're taking
17      photos of things that are non-investigatory, correct?
18   A. Like flowers with my --
19   Q. Like flowers.
20   A. Maybe. I -- I don't know. It's possible.
21   Q. So I will tell you that one of the documents that I've
22      seen in this photo album is a picture of a rainbow
23      kind of going over one of the cars that had been
24      burned out as part of all of this that was going on.
25      Would you consider that to be an investigatory photo?

304

1    A. Yes.
2    Q. Okay. And so that's something that you believe should
3       have been loaded to what file? Where would that have
4       gone for purposes of an investigation?
5    A. They would have been put into the L:drive, a
6       particular folder, whatever folder that it would have
7       gone into, whether it was a case file or something
8       else.
9    Q. And what would -- to your mind, what would be the law
10      enforcement purpose of taking and saving that photo?
11   A. The car with the rainbow?
12   Q. Yes, ma'am.
13   A. Well, I would think that if it was taken for evidence,
14      I mean, it shows a car burned up.
15   Q. Now, that's dependent on whether or not it was taken
16      for purposes of evidence, correct?
17   A. Yes.
18   Q. If there wasn't a formal investigation going on and
19      someone took that photo, there could be other reasons
20      that somebody took that photo, correct?
21   A. Yes.
22   Q. And if that were the case, if there were other reasons
23      why somebody took that photo, do you also think that
24      it should have been -- or it would need to be loaded
25      into the investigatory file?

Doby Professional Reporting, Inc.
952-943-1587

305

1  A. I don't know.
2  Q. Okay. Fair enough.
3      Ms. Johnson, did you ever delete, destroy --
4  delete or destroy any email, picture, or document that
5  was related to a law enforcement action?
6  A. I'm sure I did. Yes, I could say that.
7  Q. And that was before something was loaded into the
8  shared drive?
9  A. I don't know. I just mean as your first question
10 generally had I deleted something after it was
11 uploaded or put in, I mean, I'm assuming, yes, I would
12 have done that.
13 Q. Okay. To your knowledge, did you ever delete or
14 destroy something before it had been loaded to a
15 formal investigatory file?
16 A. When it should have been loaded to said file?
17 Q. Yes, ma'am, when it was expected per policy that it be
18 loaded to file.
19 A. I don't recall if I ever did. If I did, it would have
20 been certainly a mistake.
21 Q. So at least intentionally you haven't done that?
22 A. Correct.
23 Q. Okay. Now, ma'am, I want to ask you about some of
24 your employment history and performance history in
25 here, and I don't want to belabor the point. I just

306

1  want to try to get some facts down for the record so
2  that there wouldn't be a point somewhere in the future
3  we'd have to ask you to come back, because I know
4  you've spent three days with us now at this point and
5  I'd try to -- I'd like to make this try to be the last
6  time that we do that with you. Okay?
7  A. Okay.
8  Q. So, Ms. Johnson, it's my understanding that you were
9  disciplined in September of 2018 for executing a
10 dangerous PIT maneuver. Do you recall that situation?
11 A. That's when I was disciplined? That was the date I
12 was disciplined, not the date of the event?
13 Q. Yes, ma'am, that was the date that you were
14 disciplined.
15 A. Okay. Yeah, I do believe I remember that. With the
16 Winnebago?
17 Q. Yes, ma'am. That was going to be my next question.
18     So, first of all, actually, I was going to ask a
19 clarifying question. So I mentioned a PIT maneuver.
20 A. Um-hmm.
21 Q. Just so the record is clear, can you explain what a
22 PIT maneuver is?
23 A. It's a pursuit intervention technique.
24 Q. Okay. And what does that -- what does that entail or
25 what does that mean for a layperson who's not familiar

307

1  with State Patrol policies and procedures?
2  A. It is a maneuver that you would perform where you
3  would -- the left front quarter panel of your squad,
4  so the driver's side front quarter panel, lines up
5  with the rear right quarter panel of whatever vehicle
6  you're in pursuit with. You gently touch it, turn
7  your wheel a quarter turn, accelerate. It causes the
8  vehicle to spin, the fuel pump disengages, and it
9  can't go anymore.
10 Q. Thank you.
11     So this incident involved a Winnebago that you
12 were pursuing at the time. Do you recall that?
13 A. Yes.
14 Q. Okay. And my understanding is that the discipline
15 was related to the fact that you engaged in this PIT
16 maneuver at a speed in excess of 40 miles per hour.
17 Is that your recollection?
18 A. That's what the Internal Affairs investigator
19 determined, I guess you could say.
20 Q. Okay. Do you think that you were going less than
21 40 miles per hour at the time?
22 A. Not less than 40 miles an hour, no. I did not look at
23 my speedometer.
24 Q. Okay.
25 A. So I didn't know, if that was the question.

308

1  Q. And you had been spoken to at least once before in
2  2015 for also engaging in a PIT maneuver in excess of
3  40 miles per hour: is that correct?
4  A. That one was above 40 miles an hour, yeah.
5  Q. As you sit here today, do you still think that it's
6  possible that you weren't going above 40 miles an hour
7  when you PIT'ed the Winnebago?
8  A. Well, the policy -- if you're getting at if I was out
9  of policy, the policy doesn't state that if you're
10 above 40 miles an hour that you're -- that that is a
11 policy violation.
12     So I don't know how fast I was going when I
13 was -- when I PIT the Winnebago. That -- again, that
14 was the -- that was what was in question for the
15 Internal Affairs. So I don't know what -- what speed
16 I was going at because I didn't look at my
17 speedometer.
18 Q. Now, in your last deposition you had mentioned a
19 situation about speaking up and being told that you
20 shouldn't speak up during an Internal Affairs
21 investigation. Was this that investigation where that
22 was what you were told?
23 A. Um-hmm. Well, I was -- I told that I probably
24 shouldn't speak my mind after the -- after the
25 investigation meeting or however -- whatever it's

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 2)
1/10/2024

309

1     called.
2     Q.  Okay.  And what was it about speaking your mind was
3          your understanding that was being criticized in that
4          situation?
5     A.  Well, after the fact I was told that it was
6          insubordinate and unprofessional.  So that's what
7          their view was.
8     Q.  Now, per policy you were found that your use of force
9          in this situation -- well, just so that I'm clear,
10         what happened when you PIT'ed the Winnebago?
11    A.  The -- I PIT the Winnebago.  It was -- from what I
12         recall, the Winnebago spun, which is normal, and my --
13         my guess would be that he overcorrected, causing
14         his -- causing the -- or something caused it to roll,
15         whether he overcorrected or it drove into the ditch
16         and it rolled.
17    Q.  And was he ejected from the Winnebago as part of that
18         crash?
19    A.  That's a fair way to describe it.
20    Q.  Okay.  And as part of this, it was determined that
21         engaging in a PIT maneuver above 40 miles per hour in
22         this situation could have been identified as a use of
23         deadly force because of how this could have impacted
24         the driver, correct?
25    A.  I think that's what I was told.

310

1     Q.  Okay.  And the result of this investigation resulted
2          in a five-day suspension.  Does that refresh your
3          recollection, or does that sound correct to you?
4     A.  I think so.
5     Q.  Okay.  And I want to show you -- that's really odd.
6          I want to show you what's been marked as
7          Exhibit 11.  Ms. Johnson, can you see this document?
8     A.  Yes.
9     Q.  Okay.  And this looks to be a letter dated
10         October 25th, 2018, to you from Lieutenant Colonel
11         Rochelle Schrofer; is that correct?
12    A.  Yes.
13    Q.  And this is informing you that as a result of the
14         investigation you were receiving a five-day unpaid
15         suspension for various General Order violations,
16         correct?
17    A.  Yes.
18    Q.  Now, it gives you the opportunity or it gave you the
19         opportunity to appeal this or to grieve it pursuant to
20         your collective bargaining agreement.  Did you do so
21         in this case?
22    A.  No.
23    Q.  Okay.  And so you served the five-day suspension?
24    A.  Yes.
25    Q.  All right.  Now, also I believe there was a situation

311

1     in -- let me get my dates correct -- March of 2019
2          where you received a letter of reprimand arising out
3          of an incident where a member of the public complained
4          that you were unprofessional with them when you gave
5          them a ticket, specifically that you were rude to them
6          and that you flipped them off, gave them the double
7          birds after they were leaving.  Do you recall this
8          incident?
9     A.  Yes.
10    Q.  Okay.
11    A.  It was like this (gesturing).
12    Q.  Okay.  And I want to show you what's been marked as
13         Exhibit 12.  Let me know if you can see it.
14         Do you see it now?
15    A.  Um-hmm.
16    Q.  I'm sorry.  Is that a yes?
17    A.  Yes.  Sorry.
18    Q.  Okay.  And so this is a Formal Complaint of Alleged
19         Employee Misconduct.  The name of the complainant is
20         Captain Jason Engeldinger.
21         Do you know why Captain Engeldinger would have
22         been the complainant in this matter?
23    A.  No.
24    Q.  Okay.  And so it's talking about this incident that
25         occurred on 3/16/2019, and just so that I'm clear,

312

1     take a look at this and just let me know if this is
2          your understanding of what the allegations against you
3          were.  And when you're done with this page, let me
4          know because it goes into the next page.
5     A.  Okay.
6     Q.  Oh, I'm sorry.
7     A.  You can keep going.
8          Okay.
9     Q.  And then we've got some information, the types of
10         employee conduct, and then the complaint is signed by
11         Captain Engeldinger.  Do you see that?
12    A.  Yes.
13    Q.  Okay.  And you would have received a copy of this
14         document at the time, correct?
15    A.  I -- I don't know.
16    Q.  Okay.
17    A.  I don't recall ever seeing the letter from the person,
18         but I might have.
19    Q.  Okay.  So then as a result of this, you received a
20         letter of reprimand, correct?
21    A.  I think so.
22    Q.  Okay.  And just so that we have our record clear, can
23         you see the document here?
24    A.  Um-hmm.  Yes.
25    Q.  Okay.  And this is -- we've marked as Exhibit 13.

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 2)
1/10/2024

313

1     It's dated May 28, 2019. It's from Captain Jason
2 Engeldinger, and it states that -- it's a written
3 memorandum for violations of the General Orders
4 outlined in the statement of charges dated May 20th,
5 2019.
6     Does this refresh your recollection about whether
7 you received a written reprimand -- or a letter of
8 reprimand?
9 A. Yes.
10 Q. And you're told that a copy of this will be placed in
11 your human resources personnel file and then provided
12 no further disciplinary action is taken against you
13 for a period of two years from the date of the letter
14 you may make a written request to human resources that
15 it be removed from your file.
16     Did I read that correctly?
17 A. Yes.
18 Q. Okay. But it stayed in your file because in fact you
19 had more discipline that occurred in 2020, correct?
20 A. Oh, I'm sure I have --
21 Q. Okay.
22 A. -- several letters and disciplinary action.
23 Q. Now, in October of 2019 there was another complaint
24 that was filed against you related to a traffic stop
25 and your use of force. Do you recall that situation?

314

1 A. Which one is that?
2 Q. The incident where you pulled the woman out of the
3 squad by her hair?
4 A. I remember that.
5 Q. Okay. Can you tell us what happened in that
6 situation?
7 A. The -- it was a traffic stop initiated as she failed
8 to move over when I was on another traffic stop and
9 she almost rear-ended me. So I located the vehicle,
10 stopped her. She didn't stop. She continued to
11 drive. She pulled back into
12 traffic. She continued to drive, finally stopping.
13     It was clear that she was impaired. She refused
14 to get out of the vehicle, she didn't comply, and I
15 removed her from the vehicle.
16 Q. Now, my understanding is that when you first pulled
17 her over you told her -- or you stated to her, "What's
18 the issue with paying attention today?" Does that
19 sound correct?
20 A. Maybe.
21 Q. Okay. And is that the proper way to initiate a stop?
22 A. Are you asking me or --
23 Q. Yes, ma'am, I'm asking you. Is that an appropriate
24 way to initiate a stop?
25 A. I think that's -- I think that's subjective.

315

1 Q. Okay. To the extent that leadership and Internal
2 Affairs investigators found that this led to the
3 escalation in the stop, you don't have any reason to
4 dispute that, correct?
5 A. No.
6 Q. And, in fact, the motorist took offense with it and
7 started to complain to you about the way that you were
8 speaking to her, correct?
9 A. Possibly. I don't remember verbatim how it went. I
10 mean, this is years ago.
11 Q. Fair enough.
12     Do you recall opening the door and yelling at the
13 driver to get out of the fucking car?
14 A. At one point, yes, I do.
15 Q. Okay. And do you remember grabbing the motorist by
16 her hair and her arm and attempting to pull her out of
17 the car?
18 A. Yes.
19 Q. Do you recall threatening the driver with using your
20 Taser on her?
21 A. I remember telling her, "I don't want to Tase you.
22 Get out of the car," and displaying my Taser, as
23 that's going to be a minimal level of force with the
24 Taser, just showing it, not threatening. I think that
25 verbiage is wrong.

316

1 Q. Now, do -- you arrested this individual, correct?
2 A. Yes.
3 Q. And according to the report, you never told this
4 individual why you were placing her under arrest. Why
5 was -- why did you not tell her that you didn't -- why
6 did you not tell her the reasons you were placing her
7 under arrest?
8 A. I don't know.
9 Q. Now, it also states that you forced a blood test on
10 this individual when the arrestee consented to a urine
11 test. Why did you do that?
12 A. There was -- without reading my report, I don't recall
13 where this DWI fell in with the change of the laws
14 with the warrants and the blood draws and what have
15 you. So it had -- they had changed the laws. At
16 first it was you could get -- you had a warrant, you
17 could draw blood. Then it changed. I don't know if
18 that had something to do with it or if just because
19 they say they want a urine test doesn't mean they get
20 a urine test.
21 Q. Okay.
22 A. Different drugs are -- are detected differently
23 dependent on what type of test you're doing and what
24 have you. So there's many different reasons why it
25 could have been like that.

Tesa Johnson (Vol. 2)
1/10/2024

317

1  Q.  Okay.  I want to show you what's been marked as
2  Exhibit 14, and I'll represent to you that this is the
3  formal complaint related to this incident, this
4  traffic stop on October the 28th, 2019, at 1700 hours,
5  and I'm going to ask the same thing as I asked the
6  last time.  Just take a look and read through what's
7  here and just confirm for me that this is the incident
8  that we were speaking about and let me know when I
9  need to scroll.
10 A.  Okay.  Okay.  Okay.  Okay.
11 Q.  And it appears to be signed by Captain Engeldinger on
12 November 5th, 2019.
13     Do you recall what the result of this
14 investigation was?  Were you found in violation of
15 anything?
16 A.  I'm sure I was found in violation of all the GOs that
17 are listed there, but I was put in the office while
18 the Internal Affairs investigation went on.
19 Q.  Okay.  So you were found in violation of the
20 use-of-force policy?
21 A.  Is that what's -- is that -- is that listed on there?
22 Q.  Sure.  I can show you.  Sure.  If you -- if it will be
23 helpful, I can show you again.
24     So here are the policy violations that they were
25 looking into.

318

1  A.  Okay.  Yeah.
2  Q.  Use of force, the core values, conduct-sworn members.
3  Driving while impaired.  Do you know if that was
4  substantiated as far as --
5  A.  I don't know.
6  Q.  Okay.
7  A.  I don't know.  Honestly, I mean, we -- we can go
8  through my whole entire file.  It's obvious I got
9  myself jammed up a few times.
10 Q.  Okay.  And then just to close the loop on some of
11 this, I want to show you what's been marked as
12 Exhibit 15, and this is a Disciplinary Action - Notice
13 of Suspension from February 20th, 2020, from
14 Lieutenant Colonel Rochelle Schrofer.  Do you recall
15 receiving this?
16 A.  Yes.
17 Q.  And it looks like you got a couple things here.  One
18 is a two-day suspension -- unpaid suspension that
19 would be served on February 24th and 25th.  Do you
20 recall that?
21 A.  Yes.
22 Q.  And then there was five days held in abeyance provided
23 no same or similar conduct occurs for a period of two
24 years from this date.
25     Do you recall, did you ever serve those five days

319

1  that were held in abeyance?
2  A.  I don't believe I did.
3  Q.  Okay.  Now, it also states that you would be required
4  to complete a professional development curriculum
5  which would be coordinated by the agency.  Do you
6  recall completing a professional development
7  curriculum?
8  A.  Yes.
9  Q.  And it says that you will also be restricted from
10 performing DT -- is that defensive tactics?
11 A.  Correct.
12 Q.  -- instructor duties for a period of two years from
13 this date.  And did that occur?
14 A.  I quit doing DT at that time, yes.
15 Q.  Okay.  Now, who did you do the professional
16 development training with?
17 A.  Some lady in the Cities.
18 Q.  Okay.
19 A.  I don't know who.
20 Q.  Does the name Dr. Laura Pendergast -- does that ring a
21 bell for you?
22 A.  Yeah.
23 Q.  And was some of that to help with stresses that you
24 were dealing with as a trooper and in your personal
25 life?

320

1  A.  Yeah, I think so.
2  Q.  Okay.  And around that time you wrote a letter to
3  Captain Engeldinger and asked him if you could
4  transfer out of your location, correct?
5  A.  Maybe.  Honestly, I -- I think so, yeah.
6  Q.  Okay.  This was about the time that you were going
7  through a divorce with your ex-husband, correct?
8  A.  Yes.
9  Q.  And he is an Itasca County sheriff?
10 A.  No.
11 Q.  Oh, he was at the time?
12 A.  Correct.
13 Q.  Okay.  He was at the time.  And there was -- it was
14 stressful for you because you would work with local
15 law enforcement in your role as State Patrol, correct?
16 A.  Well, that's not why it was stressful, but --
17 Q.  Okay.
18 A.  He was at the time.
19 Q.  I imagine that the divorce in general was stressful,
20 but I would -- correct me if I'm wrong, but part of
21 the concern was, if you don't have to deal with your
22 ex-husband, it would be great to not have to deal with
23 him in any way, shape, or form.  Is that fair?
24 A.  Yes.
25 Q.  Okay.  And you talked with the State Patrol about

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 2)
1/10/2024

321

1  this, correct?
2  A.  About transferring out?
3  Q.  About transferring out and just kind of the general
4     challenges that you were having in your personal life
5     at this time.
6  A.  Yes.
7  Q.  And how did they respond to that?
8  A.  I don't recall specifically, but I believe they were
9     empathetic to it.
10 Q.  Okay.  So the last incident that I'd like to talk
11    about is the one that we've mentioned before, so I
12    don't think we need to spend a lot of time on it, but
13    it's the incident that involved your ultimate
14    termination from employment with the State Patrol.
15        And so I think you testified earlier that this
16    whole incident started when you responded to the scene
17    of a fatal accident, correct?
18 A.  Yes.
19 Q.  Now, I want to show you what's been marked as
20    Exhibit 16.  So give me just a second to pull that one
21    up.
22        And this is a formal complaint that is dated
23    November 1st, 2021; July 19th, 2021; and July 12th of
24    2021.  And specifically it relates to a number of
25    occasions where you failed to report to court notices

322

1  by the Itasca County Attorney Matti Adam.
2      Do you recall that?
3  A.  No.
4  Q.  Okay.
5  A.  But if it's there, it happened.
6  Q.  Do you happen to remember why it was that you were not
7     showing up for court as requested?
8  A.  Honestly, I am looking at --
9  Q.  I can go down further, if that's helpful for you.
10 A.  Okay.  Yeah.
11        Honestly, I have no idea what this is.  I don't
12    recall missing court.
13 Q.  So you don't recall --
14 A.  I don't know if there's -- I mean, if I had to be
15    verbally reprimanded for missing court, because
16    missing court is a big deal, you'd think that that
17    would be in my file too.
18 Q.  So do you recall ever appearing in court as it related
19    to the fatal accident that occurred in July of 2021?
20 A.  Are you talking June?
21 Q.  I'm sorry.  June of 2021.  I'm sorry, ma'am.  June of
22    2021.
23 A.  So you're wondering if I -- June of 2021, so June 8th,
24    the crash involving the ambulance?
25 Q.  Yes, ma'am.

323

1  A.  I don't think I was ever in court for that.
2  Q.  Okay.  Do you recall ever receiving a request from the
3     Itasca County Attorney to attend court as it related
4     to that?
5  A.  No.  I have no reason to not be there.  And, in fact,
6     this surprises me quite a bit because I -- I'd like
7     to get a copy of that.  Is that something that I can
8     contact them, or is it something I can get with you?
9  Q.  We can get you a copy of this when we're done today.
10    That's no problem.
11 A.  That would be nice.  Thank you.
12 Q.  So with the termination situation, you arrived at the
13    scene on June the 8th, you took photos of the scene
14    using a State-issued camera, correct?
15 A.  On the 8th.
16 Q.  When you first got there.  On the 8th, yes, ma'am.
17 A.  When I first got there.
18 Q.  And then you went to the -- you left the scene, and
19    you went to the hospital to interview the driver,
20    correct?
21 A.  Correct.
22 Q.  And then you returned to the scene afterwards, and at
23    the time you did not have a State Patrol camera, and
24    instead you took pictures of the location with your
25    personal phone, correct?

324

1  A.  I didn't have my State-issued camera as I had lent it
2     to the crash reconstructionist on scene, and that is
3     why I used my personal phone.
4  Q.  Okay.  And so you believe -- you were taking these
5     photos for purposes of gathering evidence for the
6     investigation, correct?
7  A.  Correct.
8  Q.  All right.  But for whatever reason, maybe an
9     oversight, whatever it happened to be, you didn't load
10    this into the L:drive at that time, correct?
11 A.  My -- three days after that crash my cousin was killed
12    in a skydiving accident and the bottom was falling out
13    of my world, and I failed to upload those photos to
14    the folder.
15 Q.  Okay.
16 A.  I'm sure a reasonable person -- a reasonable person
17    can see why.
18 Q.  Yeah.
19        Now, in June or July of that year, you also
20    shared some of those photos with the wife of the
21    victim of the crash, correct?
22 A.  No, not the wife.  Husband.
23 Q.  With the husband of the victim.  Okay.  And --
24 A.  Which victim are -- let's -- I'm sorry.  Let's back
25    up.  Which victim are you -- are you referring to?

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 2)
1/10/2024

325

1   Q.  So -- that's fair.
2       So there were two victims, correct?
3   **A.  There were two deceased and one pretty significantly**
4       **injured.  So the driver was significantly injured, and**
5       **the paramedic and the patient in the back were killed.**
6   Q.  Okay.  So for our record, who did you share the
7       information -- or the photos with?
8   **A.  With the husband of the driver.**
9   Q.  Okay.
10  **A.  And with the mother of the driver.**
11  Q.  And this was while the investigation was pending,
12      correct?
13  **A.  Yes.**
14  Q.  And you knew at this time that this was a violation of
15      policy, correct?
16  **A.  If you asked me at the time, I would say yes.**
17  Q.  And also these are the same photos that had not yet
18      been loaded to the investigatory file, correct?
19  **A.  Correct.**
20  Q.  And it was determined that you violated the policy
21      about information gathered during an investigation,
22      correct?
23  **A.  If that's what it says there, then that's the General**
24      **Order I violated.**
25  Q.  Okay.  And no reason to dispute that you were found to

326

1       have violated the policy about criminal investigative
2       data?
3   **A.  No reason to dispute that, no.**
4   Q.  No reason to dispute that you used a personal --
5       that they found a violation of the General Order
6       prohibiting the use of a personal phone to document a
7       crime scene?
8   **A.  Yes.**
9   Q.  And no dispute that they found that you violated the
10      policy regarding a claim against the State of
11      Minnesota or its agencies when you said that the
12      photos would have benefited the driver's defense?
13  **A.  Are you -- you're asking that there's no dispute with**
14      **that statement?**
15  Q.  Dispute that that's what they found.
16  **A.  Correct.**
17  Q.  And finally, no dispute that they found that you
18      violated the duty about integrity and impartiality for
19      troopers?
20  **A.  Correct.**
21      MR. WEINER:  Okay.  We've been going
22      about an hour.  I don't know that I have anything else
23      for you, but let's take a five-minute break or so.
24      I'll see if there's anything else that I want to ask.
25      And if not, then I'll stop asking questions, and I'll

327

1       turn it over to Greta at this point.
2       Does that sound okay?
3       THE WITNESS:  Very good.  Yes.
4       MR. WEINER:  All right.  Sounds good.
5       VIDEOGRAPHER:  Going off the video
6   record.  It is 3:00 p.m.
7       (From 3:00 p.m. to 3:07 p.m. a recess was taken.)
8       VIDEOGRAPHER:  This is File 7.  We're
9   back on the record.  It is 3:07 p.m.
10      MR. WEINER:  Hello, Ms. Johnson.  Thank
11  you again for your time today.  I don't have any more
12  questions at this time.  I may have a couple
13  follow-ups after Ms. Wiessner is done with you, but
14  other than that, thank you.  I appreciate all of your
15  answers and your time with us today.
16      THE WITNESS:  You're welcome.
17      FURTHER EXAMINATION
18  BY MS. WIESSNER:
19  Q.  Okay.  Ms. Johnson, I have a few follow-up questions.
20      Thank you again for your time and for being here
21      today.
22      Do you recall in the last session of your
23      deposition in December Mr. Weiner asking you questions
24      about a statement that you gave that formed the basis
25      of your PTSD disability claim?

328

1   **A.  Can you -- can you tell me -- or ask me that one more**
2       **time?**
3   Q.  Sure.  Do you recall when we were together in
4       December --
5   **A.  Yes.**
6   Q.  -- Mr. Weiner asking you questions and reading from a
7       document that was a statement from you that formed the
8       basis of your PTSD disability claim?
9   **A.  Yes.**
10  Q.  And that document was filed as part of a workers'
11      compensation proceeding, correct?
12  **A.  Yes.**
13  Q.  And we discussed in your last deposition that you're
14      represented for purposes of that proceeding, correct?
15  **A.  Yes.**
16  Q.  And is that claim or proceeding still ongoing as of
17      today?
18  **A.  Yes.**
19  Q.  To the best of your knowledge, did your PTSD attorney
20      consent to Mr. Weiner asking you questions about your
21      ongoing PTSD claim outside of his presence?
22  **A.  Your question is, is did my attorney say -- like give**
23      **the thumbs-up for any questioning about my PTSD case.**
24  Q.  Yes.
25  **A.  He didn't give me any advice or anything in reference**

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 2)
1/10/2024

---

**329**

1  to this case, but recommended that it -- because it's
2  an ongoing case, that it -- I don't answer questions
3  about it.
4  Q.  So your attorney for purposes of your PTSD claim
5  recommended that you not answer questions about your
6  PTSD disability proceeding.  Is that what I'm to
7  understand?
8  A.  That -- that would be a fair statement, yeah.
9  Q.  Is it fair to infer then that he did not give anyone
10  permission to ask you questions about that proceeding
11  without him here, right?
12       MR. WEINER:  Objection, calls for
13  speculation.
14  A.  He -- well, I mean, I guess the conversation was
15  pretty -- it was very brief as he was pretty adamant
16  about this was not his area of expertise and he wasn't
17  representing me within this case, but, again, just
18  recommended that I don't answer any questions in
19  regards to that current case.
20  BY MS. WIESSNER:
21  Q.  Did you give Mr. Weiner access to your disciplinary
22  file and history, including the documents he asked you
23  about today?
24  A.  I don't believe so.
25  Q.  Did you give him permission to ask you questions about

---

**330**

1  your disciplinary history and your disciplinary file
2  from the State Patrol?
3  A.  No.
4  Q.  You witnessed a lot of violence during the George
5  Floyd operation as a state trooper, right?
6  A.  Yes.
7  Q.  And you discussed some of those experiences in your
8  deposition in December.  Do you remember that?
9  A.  Yes.
10  Q.  You also mentioned that you saw a lot of reporters or
11  journalists during the George Floyd operation, right?
12  A.  Yes.
13  Q.  Did you ever see a journalist or member of the media
14  behaving violently during the George Floyd operation?
15  A.  Not that I recall.
16  Q.  Did you recall seeing a reporter or journalist
17  throwing things?
18  A.  Not that I recall.
19  Q.  Do you recall seeing a reporter or a journalist
20  rioting?
21  A.  Not that I recall.
22  Q.  Do you recall seeing a -- or being threatened by a
23  journalist?
24  A.  Not that I recall.
25  Q.  Do you recall being accosted by a member of the media?

---

**331**

1       MR. WEINER:  Objection, vague.
2  She can answer.
3  A.  Not that I recall.
4  BY MS. WIESSNER:
5  Q.  Were you ever afraid of a journalist or a member of
6  the media during the George Floyd operation period?
7  A.  Not that I recall.
8  Q.  To the best of your knowledge, was anyone injured or
9  assaulted by a journalist or a member of the media
10  during the George Floyd operation period?
11  A.  Not that I recall.
12  Q.  To the best of your knowledge, no members of the State
13  Patrol were injured by journalists?
14  A.  Correct.
15  Q.  You told Mr. Weiner during the last session that you
16  can't recall if Colonel Langer used the word "delete"
17  when he was directing members of the State Patrol to
18  delete data from the George Floyd operation period.
19  Do you recall that testimony?
20       MR. WEINER:  Objection, misstates the
21  testimony.  And I don't know how you could have a
22  statement that says that she didn't use the word -- he
23  didn't use the word "delete" when he was telling
24  people to delete things --
25       MS. WIESSNER:  Mr. Weiner, if you

---

**332**

1  wouldn't mind --
2       MR. WEINER:  -- but that's okay.
3       MS. WIESSNER:  If you wouldn't mind
4  waiting for the rest of the questioning, I think it
5  will become clear.
6       MR. WEINER:  I'm just making my objection
7  clear for the record.
8  BY MS. WIESSNER:
9  Q.  So, Ms. Johnson, I'll ask the question again.
10       Do you recall testifying that you don't remember
11  if Colonel Langer used the word "delete" when he was
12  directing members of the State Patrol to delete data
13  from the George Floyd operation?
14  A.  I don't -- ask me that -- I'm -- things are just
15  getting a lot of -- there's a lot jumbled in my head
16  because I thought I was understanding but I wasn't.
17  What was the question again?
18  Q.  That's totally fine.  Always ask for clarification.  I
19  can try to ask it in a better manner.
20       Do you recall testifying that you don't recall
21  whether Colonel Langer used the word "delete" when he
22  was telling members of the State Patrol to get rid of
23  data from the George Floyd operation period?
24  A.  Yes.
25  Q.  So could he have used the word "destroy"?

---

Doby Professional Reporting, Inc.
952-943-1587

333

1  A. I -- I suppose.
2  Q. Could it have been "get rid of"?
3  A. It could have been.
4  Q. But you understood the message was to destroy, delete,
5     or get rid of emails, photos, and data from the George
6     Floyd operation response, right?
7  A. Yes.
8  Q. You have been deployed with the MRT to civil unrest
9     and protest events before the George Floyd operation,
10    correct?
11 A. Yes.
12 Q. But you testified that these protests surrounding the
13    killing of George Floyd were historic, right?
14 A. Yes.
15 Q. They were like nothing else you had ever seen when you
16    were deployed with the MRT, correct?
17 A. Yes.
18 Q. In fact, these were unprecedented events, right?
19 A. Yes.
20 Q. Had you ever seen this many reporters or journalists
21    at any of your previous deployments?
22 A. No.
23 Q. So did it surprise you that there would be unique or
24    special instructions related to the presence of media
25    at these protests?

334

1  A. Again, what was the question?
2  Q. Sure. Did it surprise you that there were special or
3     unique instructions for the MRT related to handling
4     media at these protests?
5  A. I wouldn't use the word "surprised" necessarily, but
6     it made sense that there -- that there were -- once we
7     were informed of what the protocol was, it made sense.
8  Q. It made sense that there were special instructions for
9     handling the media, right?
10 A. Yes.
11 Q. Were you deployed at the protests following the
12    killing of Daunte Wright by Officer Kim Potter in
13    Brooklyn Park, Minnesota, with the MRT?
14 A. No.
15 Q. In December we also discussed the arrest of Omar
16    Jimenez by the State Patrol. Do you recall that?
17 A. What -- what is the date and what is -- what incident
18    is that?
19 Q. So Omar Jimenez is the CNN reporter that we
20    discussed --
21 A. Okay.
22 Q. -- the MRT arresting in the early hours of the morning
23    on Friday, May 29th. Do you recall discussing that
24    incident?
25 A. Yes.

335

1  Q. And this was a memorable event for the State Patrol
2     and the MRT, right?
3        MR. WEINER: Objection, calls for
4     speculation.
5  A. It was -- it was -- it was -- I would say yes.
6  BY MS. WIESSNER:
7  Q. It was being discussed widely amongst the troopers
8     after it happened?
9        MR. WEINER: Objection, calls for
10    speculation.
11 A. I don't recall specifically --
12 BY MS. WIESSNER:
13 Q. It was --
14 A. -- that.
15 Q. Excuse me. Go ahead.
16 A. I just -- I don't recall specifically.
17 Q. It was used as a teaching moment for the MRT or the
18    State Patrol about the media, though, right?
19 A. Correct. Yes.
20       MR. WEINER: Objection, calls for
21    speculation.
22 BY MS. WIESSNER:
23 Q. So the MRT started talking about the media and
24    journalists in meetings and briefings after that
25    arrest, correct?

336

1  A. Yes.
2  Q. You also testified that by May 30th, the next evening,
3     you clearly understood that the media were off-limits,
4     correct?
5  A. Yes.
6        MR. WEINER: Objection, misstates the
7     testimony.
8  BY MS. WIESSNER:
9  Q. And you understood that journalists were allowed to
10    stay and report on events, including police uses of
11    force and arrests, correct?
12 A. Yes.
13 Q. And you testified that by May 30th the consensus was
14    that if the media are out of the way or to the side of
15    the MRT line, the MRT can go around them, right?
16 A. Yes.
17 Q. So if the media was not bothering you as a member of
18    the MRT, you could pass by them, right?
19 A. Correct. That was my understanding.
20 Q. I want to follow up just briefly on the text messages
21    in Exhibit 18 that we discussed between you and we
22    established that it's Captain Engeldinger.
23    He is saved in your phone as Captain Gefälscht;
24    is that correct?
25 A. Yes.

15 (Pages 333 to 336)

Tesa Johnson (Vol. 2)
1/10/2024

337

1  Q.  Why?
2  A.  Do you speak German?
3  Q.  I -- well, you would think Greta Wiessner would speak
4      some German.  I speak very little German.  So, nein.
5  A.  Fair.  Captain Fake, Imposter.  That's what the
6      translation is in German.
7  Q.  Why did you change his name to Captain Fake or Captain
8      Imposter?
9  A.  It seemed fitting at the time.
10 Q.  When was at the time?  When did you make this change?
11 A.  I don't recall, but it was -- it would have been
12     after -- it probably would have been after I was
13     terminated, I would guess.  Not guess.
14 Q.  After --
15 A.  I would say yes.  After I was terminated, yes.
16 Q.  And why did you decide to change it to Captain Fake or
17     Captain Imposter?
18 A.  I mean, there's a whole slew of reasons.  Just to poke
19     fun for my own amusement.
20 Q.  I'll refrain from asking if I'm saved as anything in
21     your phone.
22 A.  You're good.
23 Q.  You also testified today that those were the only text
24     messages that you had with Captain Engeldinger, Mike
25     Eck, Joe Dwyer, or Ben Lockman: is that correct?

338

1  A.  Correct.  Yes.
2  Q.  Did you also look for emails with Captain Engeldinger
3      and the other defendants?
4  A.  Yes.  Nothing.  I searched all the names in the
5      emails, text messages.  Also, like with Engeldinger, I
6      had personal and work phone in my phone, along with
7      Eck; and the only text messages that remained out of
8      that whole list or email was the text messages that I
9      had sent, with the exception of the one screenshot
10     that I missed or didn't upload or what have you.
11 Q.  It's the one about the grizzly bears?  Is that the one
12     you're referring to?
13 A.  That would be it.
14 Q.  And you've agreed to send that later today or sometime
15     soon, correct?
16 A.  Yes.  I will send it once we are -- once we wrap this
17     up, I'll just do that immediately.
18 Q.  Thank you.
19         You had also agreed to look into whether you
20     could find any contact information or identification
21     information for the person named Mike in the shared
22     Google photo album.
23 A.  Correct.
24 Q.  Did you do so?
25 A.  No information.

339

1  Q.  So you weren't able to find any identifying
2      information?
3  A.  Correct.
4  Q.  Based on your review of the photos in the shared
5      Google photo album, should some or all of those photos
6      been uploaded to the State Patrol's L:drive and
7      preserved?
8          MR. WEINER:  Objection, calls for
9      speculation.
10 A.  I suppose it is dependent on how the General Order
11     is -- is written.  They could be considered -- they
12     could be considered to be investigative photos.
13 BY MS. WIESSNER:
14 Q.  So based on your understanding of the policy and what
15     you would consider investigative photo, should some of
16     those photos have been preserved and uploaded to the
17     L:drive?
18 A.  Yes.
19         MS. WIESSNER:  I have no more questions
20     for you, Ms. Johnson.
21             FURTHER EXAMINATION
22 BY MR. WEINER:
23 Q.  Thank you, Ms. Johnson.  I think I have three or four
24     follow-up questions.
25         The first is, Ms. Wiessner was asking you whether

340

1  Colonel Langer -- in discussing the data that existed,
2  whether he could have used the word "destroy" as part
3  of that conversation.  As you sit here today, do you
4  recall him using the word "destroy"?
5  A.  I don't recall verbatim what he said, no.
6  Q.  And same question.  Ms. Wiessner asked about the term
7      "get rid of."  Do you recall Colonel Langer using the
8      term "get rid of"?
9  A.  I don't recall the verbiage that he used.
10 Q.  And in your last deposition in December, you testified
11     that the only specific thing you remember Colonel
12     Langer saying or the words that he used were "key word
13     search."
14 A.  Yes.
15 Q.  Do you recall him using those words?
16 A.  Yes.
17 Q.  Do you recall any other specific words that Colonel
18     Langer used at the time?
19 A.  No.
20 Q.  Now, you were asked about your understanding that
21     State Patrol was to take a different tact with the
22     media and that had been communicated to you at some
23     point.  Do you recall answering questions about that?
24 A.  Yes.
25 Q.  Okay.  Now, in your last deposition back in December

16 (Pages 337 to 340)

Tesa Johnson (Vol. 2)
1/10/2024

341

1  when I asked you about that instruction, you told me
2  that you could not remember where you were when you
3  received that instruction.  Is that still true today?
4  A.  Correct.
5  Q.  You don't remember specifically when it was given,
6  correct?
7  A.  Correct.
8  Q.  And that would include, you don't know if it was given
9  before or after May the 30th of 2022, correct?
10 A.  I don't recall the specific date, but it was -- we
11 knew that prior to Saturday, which would be the 30th,
12 the -- the day, that day.
13 Q.  Okay.  So it's your testimony that you were aware of
14 it before that Saturday, May the 30th, but you don't
15 recall who told you that?
16 A.  About the media.
17 Q.  About the media, yes, ma'am.
18 A.  Correct.
19 Q.  You don't recall where you were when that happened?
20 A.  At -- I don't recall if it was at a briefing or a
21 debrief or somewhere, but it was at our muster point
22 or somewhere where we were gathered, I guess, yeah.
23 So, no, I don't remember.  Sorry.
24 Q.  I believe you testified in December that it could
25 have been on a bus that someone told you that.

342

1  Correct?
2  A.  It could have been, yes.
3  Q.  You don't have any recollection as you sit here today
4  where you were when you received this information,
5  correct?
6  A.  Correct.
7  Q.  And you also, I believe you testified last time, don't
8  recall who else was present when you --
9  A.  Correct.
10         MR. WEINER:  Okay.  I think that's all
11 the questions that I have for you.  Thank you very
12 much.
13         I don't know if Ms. Wiessner will have any
14 follow-up.
15         MS. WIESSNER:  If you wouldn't mind, we'd
16 like to just take a quick five minutes to gather with
17 Andy and reconvene.  Three minutes is probably fine,
18 so come back at 3:30, just to make sure we've got
19 everything covered.
20         VIDEOGRAPHER:  Off the video record at
21 3:27 p.m.
22         (From 3:27 p.m. to 3:30 p.m. a recess was taken.)
23         VIDEOGRAPHER:  This is File 8.  We are on
24 the record at 3:30 p.m.
25         MS. WIESSNER:  Ms. Johnson, I hate to

343

1  make promises I can't keep, so I'll say I think I have
2  just a couple more questions.
3         FURTHER EXAMINATION
4  BY MS. WIESSNER:
5  Q.  You testified that you're not sure specifically where
6  you were when you received orders about the media.  Is
7  that correct?
8  A.  Correct.
9  Q.  Do you recall if you were by yourself or in a group?
10 A.  I'm fairly certain that there were others present.  It
11 was -- I feel like it was -- we were informed, there
12 was a group of us or all of us or whoever was present
13 was informed.  It wasn't a conversation between myself
14 and -- it was not like a person-to-person
15 conversation.
16 Q.  Because an order is only effective if it's given to
17 the whole group, right?
18 A.  Correct.
19         MR. WEINER:  Objection, calls for
20 speculation.
21 BY MS. WIESSNER:
22 Q.  You weren't receiving orders on a one-to-one basis as
23 an MRT line trooper, right?
24 A.  Correct.
25 Q.  You were receiving orders and directions in a large

344

1  group with other troopers, correct?
2  A.  Correct.
3  Q.  So the media order that you received was received by
4  other troopers and members of your team, right?
5         MR. WEINER:  Objection, calls for
6  speculation.
7  A.  I would guess -- or I would say that, yes, there was
8  others present.
9         MS. WIESSNER:  I have no further
10 questions.
11         MR. WEINER:  Nothing from the State other
12 than thank you again, Ms. Johnson.  I imagine that
13 Ms. Wiessner will read you the read and sign
14 information that we gave you at the end of the last
15 deposition.
16         MS. WIESSNER:  Yes.  Ms. Johnson, as we
17 discussed at your last deposition, you will have the
18 right to see a copy of the transcript of your
19 deposition today to review.  You'll have an
20 opportunity to make any corrections to anything you
21 find that was incorrectly transcribed, and you'll have
22 the opportunity to sign that.
23         THE WITNESS:  Okay.
24         MS. WIESSNER:  And you would like to
25 receive and sign your deposition transcript,

17 (Pages 341 to 344)

Tesa Johnson (Vol. 2)
1/10/2024

345

1    Ms. Johnson?
2        THE WITNESS:  Yes.
3        MS. WIESSNER:  Okay.  We'll be in touch
4    about that.
5        VIDEOGRAPHER:  This concludes the video
6    deposition.  It is 3:32 p.m.
7        (The deposition concluded at 3:32 p.m.)
8                    *  *  *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

347

1            SIGNATURE PAGE
2        I, TESA JOHNSON, swear I have read the
3    foregoing pages of my deposition, and I have noted
4    the changes or corrections, if any, below:
5
6    Page: Line: Change:
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21
22        _____
23    TESA JOHNSON
24
25

346

1            REPORTER'S CERTIFICATE
2
3        I hereby certify that I reported the virtual and
4    videotaped deposition of TESA JOHNSON, VOLUME 2, on
5    the 10th day of January 2024;
6        That I was then and there a Notary Public in
7    and for the County of Scott and the State of
8    Minnesota, and as such I was duly authorized to
9    administer an oath;
10        That the witness before testifying was by me
11    first duly sworn to testify to the whole truth and
12    nothing but the truth relative to said cause;
13        That the foregoing testimony was recorded in
14    shorthand by me and transcribed into typewriting
15    under my direction, and is true and correct to the
16    best of my ability;
17        That I am not related to any of the parties
18    hereto nor interested in the outcome of the action.
19        WITNESS MY HAND AND SEAL this 15th day of
20    January 2024.
21
22    _____
23    Rhonda Olynyk
     Notary Public
24    Scott County, Minnesota
25

Tesa Johnson (Vol. 2)
1/10/2024

## A

abducted 291:16
abeyance 318:22 319:1
ability 286:5 346:16
able 286:24 292:13 293:14
    339:1
accelerate 307:7
access 301:9 329:21
accident 290:25 321:17
    322:19 324:12
accosted 330:25
account 299:24
accurate 288:8
acting 280:9,11
action 282:9,14 305:5
    313:12,22 318:12
    346:18
actual 287:17
Adam 322:1
adamant 329:21
added 303:4
administer 283:19 346:9
administered 283:20
administrative 289:20
    290:2 302:18
advice 328:25
Affairs 307:18 308:15,20
    315:2 317:18
afraid 331:5
afternoon 284:6
agencies 326:11
agency 319:5
ago 315:10
agreed 338:14,19
agreement 310:20
ahead 335:15
album 295:5 298:7 303:22
    338:22 339:5
aliens 291:16
allegations 312:2
Alleged 282:10,13,16
    311:18
allow 298:23
allowed 300:3 336:9
ambulance 322:24
amusement 337:19
Andrew 281:4 283:10
Andy 342:17
answer 285:7,20 286:1
    294:9,13 297:1,17
    329:2,5,18 331:2
answering 340:23
answers 285:3,5 327:15
anymore 307:9
apologize 287:10
appeal 310:19
appear 298:5
APPEARANCES 281:1
appearing 322:18
appears 287:25 295:3
    296:3 317:11
applies 300:9
apply 299:18
appreciate 327:14
appropriate 314:23
approximately 280:21
    283:4
April 290:19
area 291:18 329:16
arising 311:2
arm 315:16
arrest 316:4,7 334:15
    335:25
arrested 316:1
arrestee 316:10
arresting 334:22

## B

arrests 336:11
arrived 323:12
asked 286:13 289:12
    317:5 320:3 325:16
    329:22 340:6,20 341:1
asking 284:14 285:5,6
    288:13 291:20 292:2
    314:22,23 326:13,25
    327:23 328:6,20 337:20
    339:25
asks 289:8
assaulted 331:9
Assistant 283:12 284:11
assume 285:20 294:17
    299:12
assuming 288:20 292:7
    305:11
attempting 315:16
attend 323:3
attention 314:18
attorney 281:3,4,8,9 283:6
    283:13 284:11 292:12
    322:1 323:3 328:19,22
    329:4
authorized 346:9
available 289:10,21 290:7
    290:8
Avenue 281:5
aware 288:19 341:13

## B

back 284:7,15 293:5 306:3
    314:11 324:24 325:5
    327:9 340:25 342:18
backwards 287:10
bad 297:1
bargaining 310:20
based 298:5 302:24 339:4
    339:14
basis 327:24 328:8 343:22
baton 298:16
bears 338:11
behalf 281:2,7 283:13
behaving 330:14
belabor 305:25
believe 283:17 286:19
    295:18 297:6 300:5
    304:2 306:15 310:25
    319:2 321:8 324:4
    329:24 341:24 342:7
bell 319:21
Ben 280:8 286:16 337:25
benefited 326:12
best 285:4 290:8 328:19
    331:8,12 346:16
better 297:1 332:19
big 322:16
birds 311:7
bit 323:6
blood 316:9,14,17
blurry 299:13
bothering 336:17
bottom 324:12
break 285:24 286:2
    326:23
brief 329:15
briefing 341:20
briefings 335:24
briefly 336:20
Brooklyn 334:13
brought 284:13
burned 282:24 304:14
bus 341:25
butcher 288:16

## C

C 283:1
called 309:1
calls 329:12 335:3,9,20
    339:8 343:19 344:5
camera 283:14 300:25
    323:14,23 324:1
capacities 280:9,11
Captain 288:15,19 289:2,6
    290:6,20 291:8 292:14
    292:18 311:20,21
    312:11 313:1 317:11
    320:3 336:22,23 337:5
    337:7,7,16,17,24 338:2
Captains 288:17
car 304:11,14 315:13,17
    315:22
care 289:16 290:8 302:17
Carol 293:24
Carolyn 280:5 284:13
    293:25 294:1
cars 303:23
case 302:3 304:7,22
    310:21 328:23 329:1,2
    329:17,19
cause 346:12
caused 309:14
causes 307:7
causing 309:13,14
cell 300:6
certain 286:14 343:10
certainly 305:20
CERTIFICATE 346:1
certify 346:3
chain 286:20,25 287:4
    288:7,8 289:1,1
challenges 321:4
change 316:13 337:7,10
    337:16 347:6
changed 316:15,17
changes 286:4 347:4
charges 313:4
Cities 319:17
civil 333:8
claim 326:10 327:25 328:8
    328:16,21 329:4
clarification 332:18
clarifying 306:19
clear 284:10 303:15
    306:21 309:9 311:25
    312:22 314:13 332:5,7
clearly 336:3
close 288:17 318:10
cloud 301:6
CNN 334:19
Cole 280:5 284:13 293:25
    293:25 294:3
collective 310:24
Colonel 310:10 318:14
    331:16 332:11,21 340:1
    340:7,11,17
come 306:3 342:18
coming 284:6 292:3
commencing 280:21
communicated 340:22
communication 292:14
    292:16
comp 302:3
compensation 328:11
complain 315:7
complainant 311:19,22
complained 311:3
complaint 282:10,13,16
    311:18 312:10 313:23
    317:3 321:22
complete 291:25 319:4

## C

completely 303:7
completing 319:6
comply 314:14
computer 300:25 301:2
concern 320:21
concluded 345:7
concludes 345:5
conduct 312:10 318:23
conduct-sworn 318:2
conducted 286:21
confirm 296:21 317:7
consensus 336:13
consent 328:20
consented 316:10
consider 303:25 339:15
considered 339:11,12
contact 323:8 338:20
continuation 283:2
    284:15
continued 284:4 314:10
    314:12
conversation 329:14
    340:3 343:13,15
coordinated 319:5
copied 287:18
copy 288:8 292:22 312:13
    313:10 323:7,9 344:18
core 318:2
correct 284:24 289:2
    290:4,5 291:2,3 292:9
    292:22,23 295:13,14
    296:5,10,23 297:18
    298:14,18,21,25 300:6
    300:7 301:21,22,22
    302:11,22 303:12,13,14
    303:17 304:16,20
    305:22 308:3 309:24
    310:3,11,16 311:1
    312:14,20 313:19
    314:19 315:4,8 316:1
    319:11 320:4,7,12,15
    320:20 321:1,17 323:14
    323:20,21,25 324:6,7
    324:10,21 325:2,12,15
    325:18,19,22 326:16,20
    328:11,14 331:14
    333:10,16 335:19,25
    336:4,11,19,24 337:25
    338:1,15,23 339:3
    341:4,6,7,9,18 342:1,5
    342:6,9 343:7,8,18,24
    344:1,2 346:15
corrections 344:20 347:4
correctly 313:16
counsel 283:15 286:13,25
    287:16 288:1,9
County 320:9 322:1 323:3
    346:7,24
couple 289:7 293:19
    318:17 327:12 343:2
court 281:4 283:19
    285:1 290:15 321:25
    322:7,12,15,16,18
    323:1,3
cousin 324:11
covered 342:19
crappy 289:15
crash 309:18 322:24
    324:2,11,21
created 302:6
crime 326:7
criminal 301:21,22 326:1
criticized 309:3
current 329:19
curriculum 319:4,7
cut 291:17

## D

D 282:1 283:1
dangerous 306:10
data 299:8,17,21,22
    300:12 326:2 331:18
    332:12,23 333:5 340:1
date 283:3 298:13 306:11
    306:12,13 313:13
    318:24 319:13 334:17
    341:10
dated 310:9 313:1,4
    321:22
dates 289:13 311:1
Daunte 334:12
day 341:12,12 346:5,19
days 289:8 306:4 318:22
    323:25 324:11
deadly 309:23
deal 320:21,22 322:16
dealing 319:24
debrief 341:21
deceased 325:3
December 284:15 293:3
    327:23 328:4 330:8
    334:15 340:10,25
decide 337:16
defendants 280:12 281:7
    283:13 284:12 338:3
defense 326:12
defensive 319:10
delete 299:14 305:3,4,13
    331:16,18,23,24 332:11
    332:12,21 333:4
deleted 305:10
deleting 299:4
deliver 290:21
delivered 281:18 291:9
delivering 290:22
Department 281:12
dependent 304:15 316:23
    339:10
deployed 298:12 333:8,16
    334:11
deployment 299:4
deployments 333:21
deposition 280:14,18,20
    282:8 283:3 284:10,15
    284:19 285:21 286:13
    287:17,20 292:20 293:3
    295:22 308:18 327:23
    328:13 330:8 340:10,25
    344:15,17,19,25 345:6
    345:7 346:4 347:3
depressed 289:15
describe 309:19
destroy 305:3,4,14 332:25
    333:4 340:2,4
detected 316:22
determination 302:13,21
    302:24
determined 307:19
    309:20 325:20
development 319:4,6,16
differently 316:22
directing 331:17 332:12
direction 346:15
directions 343:25
disability 327:25 328:8
    329:6
disciplinary 282:9,14
    313:12,22 318:12
    329:21 330:1,1
discipline 307:14 313:19

disciplined 306:9,11,12
306:14
disclose 289:13
discovered 303:3
discussed 328:13 330:7
334:15,20 335:7 336:21
344:17
discussing 334:23 340:1
discussion 290:10,12
discussions 291:12
disengages 307:8
disk 300:24
displaying 315:22
dispute 315:4 325:25
326:3,4,9,13,15,17
disregard 290:15
DISTRICT 280:1,2
ditch 309:15
division 301:8
divorce 320:7,19
Doby 280:24
DobyReporting.com
280:24
docked 289:16
docs 294:2
document 287:7,18
291:15 292:25 302:14
302:19,21 303:10 305:4
310:7 312:14,23 326:6
328:7,10
documents 286:14,23
287:3 292:11 300:14,17
301:5,9,12,17,24 302:1
302:5,6,9,16 303:21
329:22
doing 316:23 319:14
door 315:12
double 291:1 311:6
DPS 283:15
Dr 319:20
draw 316:17
draws 316:14
drive 295:24 296:25 297:3
300:25 301:1,2,3,3,10
305:8 314:11,12
driver 309:24 315:13,19
323:19 325:4,8,10
driver's 307:4 326:12
Driving 318:3
drove 309:15
drugs 316:22
DT 319:10,14
duly 284:2 346:8,11
duties 302:7 319:12
duty 298:15 303:16
326:18
DWI 316:13
Dwyer 280:10 286:16
337:25

___ E ___

E 282:1 283:1,1
earlier 321:15
early 334:22
eaten 291:16
Eck 280:8 286:16 337:25
338:7
effective 343:16
eight 287:9
either 292:21 298:7 299:6
300:24 302:6
ejected 309:17
else's 295:3
email 286:19 288:1 291:22
300:1 302:9,19 305:4
338:8

emailed 292:17
emailing 292:10
emails 299:23 301:16
333:5 338:2,5
empathetic 321:9
employee 282:11,13,16
311:19 312:10
employment 290:4 305:24
321:14
enforcement 300:18
301:17 302:22 304:10
305:5 320:15
engaged 301:15
engaging 308:2 309:21
Engeldinger 280:10
286:16 288:25 289:2,6
290:6,20 291:8 292:15
292:19 311:20,21
312:11 313:2 317:11
320:3 336:22 337:24
338:2,5
ensure 298:24
entail 306:24
entire 288:7 296:18 318:8
Envision 281:15
error 303:4
escalation 315:3
essentially 290:22
established 336:22
evening 298:11 336:2
event 290:3 306:12 335:1
events 333:9,18 336:10
everybody 287:11
evidence 299:9,11 304:13
304:16 324:5
evidentiary 300:21
ex-husband 320:7,22
exact 294:8
EXAMINATION 282:2
284:4 327:17 339:21
343:3
examined 284:2
example 301:7 302:2
Excellent 292:4
exception 338:9
excess 307:16 308:2
exchange 289:18 290:19
292:5
Excuse 294:1 303:13
335:15
executing 306:9
exhibit 287:9 288:4 293:4
293:21,22 294:11,12
310:7 311:13 312:25
317:2 318:12 321:20
336:21
exhibits 282:8 287:8
293:1
existed 292:17,21 340:1
expected 301:4,11 305:17
expense 292:6
experiences 330:7
expertise 329:16
explain 306:21
extent 292:18 296:7 315:1

___ F ___

fact 307:15 309:5 313:18
315:6 323:5 333:18
facts 306:1
failed 314:7 321:25 324:13
fair 294:9 297:10 298:10
299:2 305:2 309:19
315:11 320:23 325:1
329:8,9 337:5
fairly 343:10

Fake 337:5,7,16
fall 300:15
falling 324:12
familiar 306:25
far 318:4
fashion 303:6
fast 308:12
fatal 321:17 322:19
fatality 291:1
February 289:5 292:20
318:13,19
feel 343:11
feeling 289:15
fell 316:13
Fifth 298:9,12 299:5
file 280:4 303:4,11 304:3,7
304:25 305:15,16,18
313:11,15,18 318:8
322:17 325:18 327:8
329:22 330:1 342:23
filed 313:24 328:10
files 294:4 295:19
finally 314:12 326:17
find 286:24 338:20 339:1
344:21
fine 294:9 295:9 332:18
342:17
finish 285:5,6
first 284:2 288:13 289:4
293:21 305:9 306:18
314:16 316:16 323:16
323:17 339:25 346:11
fitting 337:9
five 318:22,25 342:16
five-day 310:2,14,23
five-minute 326:23
flash 300:25 301:1,2,2
flip 294:24 295:7
flipped 311:6
flowers 303:18,19
Floyd 330:5,11,14 331:6
331:10,18 332:13,23
333:6,9,13
focus 298:20
folder 304:6,6 324:14
follow 336:20
follow-up 327:19 339:24
342:14
follow-ups 327:13
following 280:18 334:11
follows 284:3
force 309:8,23 313:25
315:23 318:2 336:11
forced 316:9
foregoing 346:13 347:3
forgot 303:7
forgotten 303:2
form 320:23
formal 282:10,13,16
304:18 305:15 311:18
317:3 321:22
formed 327:24 328:7
found 288:9 309:8 315:2
317:14,16,19 325:25
326:5,9,15,17
four 339:23
Friday 289:22 334:23
front 307:3,4
fucking 315:13
fuel 307:8
fun 337:19
further 296:15 313:12
323:9 327:17 339:21
343:3 344:9
future 306:2

___ G ___

G 283:1
gather 342:16
gathered 325:21 341:22
gathering 324:5
Gefalscht 288:17,19
336:23
general 283:13,15 284:11
310:15 313:3 320:19
321:3 325:23 326:5
339:10
General's 281:9
generally 305:10
gently 307:6
George 304:4,11,14 331:6
331:10,18 332:13,23
333:5,9,13
German 288:15 337:2,4,4
337:6
gesturing 311:11
getting 308:8 332:15
give 294:18 300:8 321:20
328:22,25 329:9,21,25
given 341:5,8 343:16
gives 292:12 310:18
go 286:2 287:10 288:6
293:13 307:9 318:7
322:9 335:15 336:15
goes 287:19 312:4
going 284:14 287:6,8,9,21
287:22,24 289:9,13
291:20 293:5,12,19
303:23,24 304:18
308:12,16 312:7 315:23
317:5 320:6 326:21
327:5
good 284:6 296:2 327:3,4
337:22
Google 295:5,5,24 296:24
297:2 338:22 339:5
GOs 317:16
grab 291:6
grabbing 315:15
great 286:11 292:1 293:9
320:22
Greta 281:3 283:8 327:1
337:3
grieve 310:19
grizzly 291:16 338:11
group 343:9,12,17 344:1
grouping 293:23
guess 307:19 309:13
329:14 337:13,13
341:22 344:7

___ H ___

hair 314:3 315:16
HAND 346:19
handling 334:3,9
happen 289:16 322:6
happened 309:10 314:5
322:5 324:9 335:8
341:19
hate 342:25
head 332:15
heads 285:14,14
hearing 291:21 292:7
hears 289:7
held 318:22 319:1
Hello 327:10
help 319:23
helpful 317:23 322:9
Hennessy-Fiske 280:5
284:13

hereto 346:18
historic 333:13
history 305:24,24 329:22
330:1
Hogan 281:15
holding 299:22,23 298:16
home 289:21
Honestly 318:7 320:5
322:8,11
hope 284:16
hospital 323:19
hour 307:16,21,22 308:3,4
308:6,10,17 334:21 326:22
hours 317:4 334:22
how's 293:10
huh-huhs 285:13
human 303:4 313:11,14
hundred 295:20
husband 324:22,23 325:8

___ I ___

idea 322:11
identification 338:20
identified 290:24 293:4
309:22
identify 288:21 296:22
identifying 288:23 339:1
image 293:16 296:16
297:7,11
imagine 320:19 344:12
immediately 338:17
impacted 309:23
impair 286:5
impaired 314:13 318:3
impartiality 326:18
important 285:3,11
Imposter 337:5,8,17
in-drive 301:8
incident 290:25 307:11
311:3,8,24 314:2 317:3
317:7 321:10,13,16
334:17,24
include 341:8
included 300:10
including 329:22 336:10
incorrectly 344:21
indicate 296:4
indicated 292:11 295:23
indicates 292:10 296:24
individual 280:9,11
288:15,23 293:15
296:22 297:5 316:1,4
316:10
individuals 298:21
infer 329:9
inform 292:19
information 300:10 312:9
325:7,21 338:20,21,25
339:2 342:4 344:14
informed 334:7 343:11,13
informing 310:13
initiate 314:21,24
initiated 314:7
injured 325:4,4 331:8,13
instruction 341:1,3
instructions 333:24 334:3
334:8
instructor 319:12
insubordinate 309:6
integrity 326:18
intentionally 303:8,10
305:21
interested 346:18
Internal 307:18 308:15,20
315:1 317:18

intervention 306:23
interview 323:19
investigation 290:23
301:4,18 304:4,18
308:21,21,25 310:1,14
317:14,18 324:6 325:11
325:21
investigative 326:1
339:12,15
investigator 307:18
investigators 315:2
investigatory 301:12
302:14 303:11,25
304:25 305:15 325:18
involved 307:11 321:13
involving 290:25 322:24
issue 314:18
Itasca 320:9 322:1 323:3

**J**

J 281:4
jammed 318:9
January 280:20 283:4
288:10 346:5,20
Jason 280:10 286:15
Jayme 281:15
jaymehogan@outlook.c...
281:15
Jimenez 334:16,19
Joe 283:12 284:10 286:16
337:25
Johnson 280:15,19 283:3
284:1,6 287:13 288:6
299:7 305:3 306:8
310:7 327:10,19 332:9
339:20,23 342:25
344:12,16 345:1 346:4
347:2,23
Joseph 280:10 281:8
journalist 330:13,16,19,23
331:5,9
journalists 331:11 331:13
333:20 335:24 336:9
July 321:23,23 322:19
324:19
jumbled 332:15
June 322:20,21,21,23,23
323:13 324:19

**K**

Kaplan 281:4,18
keep 300:11,17,20,21
301:11 312:7 343:1
kept 300:24 301:5
key 340:12
killed 324:11 325:5
killing 333:13 334:12
Kim 281:11 283:14 334:12
kind 287:11,19 296:3
303:23 321:3
knew 325:14 341:11
know 285:18,24 287:23
288:17 290:9,12 291:18
293:8 294:6,13,15,20
294:25 295:2,4,6 297:8
297:8,11,13,13,15,19
297:22,25 298:2 299:1
299:20 300:4,8,13,14
300:16,19 303:1,9,20
305:1,9 306:3 307:25
308:12,15 311:13,21
312:1,4,15 316:8,17
317:8 318:3,5,7 319:19
322:14 326:22 331:21

341:8 342:13
knowledge 305:13 328:19
331:8,12

**L**

L:drive 301:15 304:5
324:10 339:6,17
lady 319:17
Langer 331:16 332:11,21
340:1,7,12,18
large 343:25
LaSalle 281:5
Laura 319:20
law 281:3,4,8 300:18
301:17 302:22 304:9
305:5 320:15
laws 316:13,15
lawsuit 284:12
layperson 306:25
leadership 315:1
leave 289:20 290:3
leaving 311:7
led 315:2
left 307:3 323:18
lent 324:1
let's 286:11 299:10 324:24
324:24 326:23
letter 282:12 291:7 310:9
311:2 312:17,20 313:7
313:13 320:2
letters 313:22
level 315:23
Lieutenant 310:10 318:14
life 319:25 321:4
line 336:15 343:23 347:6
lines 307:4
list 292:16 338:8
listed 317:17,21
little 337:4
LLP 281:4,18
load 302:19 324:9
loaded 295:24 298:6
303:11 304:3,24 305:7
305:14,16,18 325:18
local 320:14
locate 292:13
located 314:9
location 301:10 320:4
323:24
Lockman 280:8 286:16
337:25
long 284:16 300:14
longer 292:21
look 286:14 287:23 307:22
308:16 312:1 317:6
338:2,19
looked 293:2 296:9
looking 287:15 295:22
317:25 322:8
looks 291:17 294:22 310:9
318:17
loop 318:10
lot 321:12 330:4,10 332:15
332:15
Louder 291:21,21
Loudermill 291:21 292:7

**M**

ma'am 291:10 293:8
300:23 301:7,22 302:11
302:14 305:17,23
306:13,17 314:23
322:21,25 323:16
341:17
Madam 283:19

making 332:6
maneuver 306:10,19,22
307:2,16 308:2 309:21
manner 302:20 332:19
March 290:14 311:1
mark 287:9
marked 310:6 311:12
312:25 317:1 318:11
321:19
matter 283:14 284:12
286:6,9 300:18 302:22
311:22
Matti 322:1
meals 292:6
mean 289:25 296:9
304:14 305:9,11 306:25
315:10 316:19 318:7
322:14 329:14 337:18
means 284:23 295:14
meant 290:13
media 330:13,25 331:6,9
333:24 334:4,9 335:18
335:23 336:3,14,17
340:22 341:16,17 343:6
344:3
medical 286:4
meeting 293:2 308:25
meetings 335:24
member 311:3 330:13,25
331:5,9 336:17
members 318:2 331:12,17
332:12,22 344:4
memorable 335:1
memorandum 313:3
mentioned 306:19 308:18
321:11 330:10
message 282:20 286:20
286:25 287:4 288:14
289:4 290:14 292:19,22
302:10 333:4
messages 282:17 286:15
286:15,23,24 287:25
290:20 291:4 300:10
336:20 337:24 338:5,7
338:8
mic 283:14
Michael 280:8
Mike 286:16 337:24
338:21
mileage 292:6
miles 307:16,21,22 308:3
308:4,6,10 309:21
mind 304:9 308:24 309:2
332:1,3 342:15
minimal 315:23
Minneapolis 281:6 298:12
Minnesota 280:2,10,11
281:6,9,9,10,12,12,13
302:8 326:11 334:13
346:8,24
minutes 342:16,17
misconduct 282:11,13,16
290:24 311:19
missed 338:10
missing 291:18 322:12,15
322:16
mission 298:17
misstates 331:20 336:6
mistake 291:19 305:20
Molly 280:5 284:13
moment 335:17
Monday 289:21
morning 289:6 334:22
mother 325:10
motorist 315:6,15
move 314:8

MRT 333:8,16 334:3,13,22
335:2,17,23 336:15,15
336:18 343:23
MSP 291:5
multiple 301:8
muster 341:21

**N**

N 282:1 283:1
name 283:6 284:10
288:20 294:7 295:19,23
296:8 311:19 319:20
337:7
named 338:21
names 296:14 338:4
nature 285:10
necessarily 334:5
need 285:24 295:7 300:11
300:14 304:24 317:9
321:12
needed 302:14 303:3
needs 290:21
nein 337:4
network 301:4
never 292:21 303:8,10
316:3
nice 323:11
night 287:1 288:1 298:9
316:3
nods 285:14
Noel 281:4 283:10,10
noes 285:12
non-evidence 299:15
non-investigation 299:18
non-investigatory 301:24
303:17
normal 309:12
Notary 346:6,23
NOTE 281:18
noted 347:3
Notice 280:19 282:9,15
318:12
notices 321:25
noticing 281:18
November 317:12 321:23
number 282:9,10,12,13,14
282:16,17 290:19 291:4
321:24

**O**

O 283:1
oath 283:19,20 284:21
346:9
objection 329:12 331:1,20
332:6 335:3,3,20 336:6
339:8 343:19 344:5
OBJECTIONS 282:5
obvious 318:8
occasions 321:25
occur 319:13
occurred 311:25 313:19
322:19
occurs 318:23
October 310:10 313:23
317:4
odd 310:5
off-limits 336:3
offense 315:6
office 281:9 301:7 302:17
317:17
Officer 334:12
officers 280:9
official 302:7
Oh 312:6 313:20 320:11
okay 285:1,8,15,16,21,22
286:2,3,11 287:3,15

288:2,3,5,5,12 289:23
290:6,19 291:14 292:10
292:18,24 293:6,7,10
293:17,18 294:14,18,21
294:24 295:1,7,8,10,12
295:17,21 297:10,15,19
297:22,25 298:5 299:2
299:7,15 300:5,14,17
300:20 301:16 302:13
302:24 303:8 304:2
305:2,13,23 306:6,7,15
306:24 307:14,20,24
309:2,20 310:1,5,9,23
311:10,12,18,24 312:5
312:8,13,16,19,22,25
313:18,21 314:5,21
315:1,15 316:21 317:1
317:10,10,10,10,10,19
318:1,6,10 319:3,15,18
320:2,6,13,17,25
321:10 322:4,10 323:2
324:4,15,23 325:6,9,25
326:21 327:2,19 332:2
334:21 340:25 341:13
342:10 344:23 345:3
Olynyk 280:23 346:23
Omar 334:15,19
once 308:1 334:6 338:16
338:16
one-to-one 343:22
ones 294:5
ongoing 328:16,21 329:2
opening 315:12
operation 330:5,11,14
331:6,10,18 332:13,23
333:6,9
opportunity 286:17 288:6
310:18,19 344:20,22
opposed 298:17
order 310:15 325:24 326:5
339:10 343:16 344:3
orders 313:3 343:6,22,25
original 281:18
outcome 346:18
outlined 313:4
outside 298:9,12 299:4
328:21
overcorrected 309:13,15
oversight 324:9

**P**

P 283:1
p.m 280:21 283:5 327:6,7
327:7,9 342:21,22,22
342:24 345:6,7
page 282:2,8,19 287:19
312:3,4 347:1,6
pages 347:3
panel 307:3,4,5
paperwork 290:21,23
paramedic 325:5
Park 334:13
Parker 281:11 283:15
part 302:6 303:11,24
309:17,20 320:20
328:10 340:2
particular 304:6
parties 346:17
party 281:18
pass 336:18
patient 325:5
Patrol 280:10,11 288:20
290:24 299:7,17,23
301:3,10,25 302:8
307:1 320:15,25 321:14
323:23 330:2 331:13,17

Doby Professional Reporting, Inc.
952-943-1587

Tesa Johnson (Vol. 2)
1/10/2024

332:12,22 334:16 335:1
335:18 340:21
Patrol's 339:6
Paul 281:10,13
pay 289:16
paying 314:18
Pendergast 319:20
pending 286:1 325:11
people 301:8 331:24
percent 295:20
perform 307:2
performance 305:24
performing 319:10
period 313:13 318:23
319:12 331:6,10,18
332:23
permission 329:10,25
person 296:23 312:17
324:16,16 338:21
person-to-person 343:14
personal 300:9,11 302:2
319:24 321:4 323:25
324:3 326:4,6 338:6
personnel 313:11
phone 286:15,24 288:21
292:17 294:23 298:2
300:6,11 323:25 324:3
326:6 336:23 337:21
338:6,6
phones 300:9
photo 293:22,22 294:12
294:12,14,16,18,21,24
295:1,3,3,5,7,11,12,17
295:22 296:7,8,9,13,19
297:4,6,6,11,15,15,16
297:19,19,22,22,25,25
299:17 303:22,25
304:10,19,20,23 338:22
339:5,15
photographs 299:19
photos 293:24 294:3,8
295:15,18 296:5,22,23
296:24 297:2 298:11
299:4,8,9,11,15,16
300:21 303:17 323:13
324:5,13,20 325:7,17
326:12 333:5 339:4,5
339:12,16
picture 293:9,10,16
296:16,21 302:20
303:22 305:4
pictures 293:5,13,17
298:6,8,18,23 300:17
301:5,17 323:24
PIT 306:10,19,22 307:15
308:2,13 309:11,21
PITed 308:7 309:10
PJS/DLM 280:4
placed 313:10
placing 316:4,6
plaintiffs 280:6 281:2
283:9,11
please 283:6,18 285:18,24
290:7 296:15
point 285:17,23 293:12
305:25 306:2,4 315:14
327:1 340:23 341:21
poke 337:18
police 336:10
policies 307:1
policy 299:7,11,17,21,22
299:25 300:9,15 305:17
308:8,9,9,11 309:8
317:20,24 325:15,20
326:1,10 339:14
possession 301:18 302:1

possibilities 303:1
possible 303:20 308:6
Possibly 315:9
posted 295:4 296:10
Potter 334:12
Precinct 298:10,12 299:5
premarked 287:8
prepared 298:17
presence 328:21 333:24
present 342:8 343:10,12
344:8
preserved 339:7,16
pretty 289:15 325:3
329:15,15
previous 291:1 333:21
previously 293:4
prior 341:11
probably 294:22 298:3,4
303:5 308:23 337:12
342:17
problem 323:10
procedures 307:1
proceeding 328:11,14,16
329:6,10
professional 280:24 319:4
319:6,15
prohibiting 326:6
promises 343:1
proper 314:21
property 291:5
protest 333:9
protests 333:12,25 334:4
334:11
protocol 334:7
provided 286:20 287:18
288:1,7,9 293:15
313:11 318:22
PTSD 327:25 328:8,19,21
328:23 329:4,6
public 281:12 311:3 346:6
346:23
pull 315:16 321:20
pulled 314:2,11,11,16
pump 307:8
purpose 304:10
purposes 286:20 287:20
289:9 300:12 302:15
304:4,16 324:5 328:14
329:4
pursuant 280:19 310:19
pursuing 307:12
pursuit 306:23 307:6
put 288:21 293:5 301:1
304:5 305:11 317:17

Q

quarter 307:3,4,5,7
question 285:5,7,17,19,19
286:1,1 291:14 294:12
295:12 297:1 305:9
306:17,19 307:25
308:14 328:22 332:9,17
334:1 340:6
questioning 328:23 332:4
questions 284:14,17
285:2 286:12 287:5
326:25 327:12,19,23
328:6,20 329:2,5,10,18
329:25 339:19,24
340:23 342:11 343:2
344:10
quick 342:16
quickly 287:21
quit 319:14
quite 323:6

R

R 283:1
rainbow 303:22 304:11
read 313:16 317:6 344:13
344:13 347:2
reading 287:24 316:12
328:6
really 285:11 287:21 310:5
rear 307:5
rear-ended 314:9
reason 286:8 298:15
315:3 323:5 324:8
325:25 326:3,4
reasonable 324:16,16
reasons 289:12 304:19,22
316:6,24 337:18
recall 291:7 294:8 299:3,6
301:11 305:19 306:10
307:12 309:12 311:7
312:17 313:25 315:12
315:19 316:12 317:13
318:14,20,25 319:6
321:8 322:2,12,13,18
323:2 327:22 328:3
330:15,16,18,19,21,22
330:24,25 331:3,7,11
331:16,19 332:10,20,20
334:16,23 335:11,16
337:11 340:4,5,7,9,15
340:17,23 341:10,15,19
341:20 342:8 343:9
receive 299:23 344:25
received 286:19 302:6
311:2 312:13,19 313:7
341:3 342:4 343:6
344:3,3
receiving 291:7 310:14
318:15 323:2 343:22,25
recess 327:7 342:22
recollection 290:16
299:12 307:17 310:3
313:6 342:3
recommended 329:1,5,18
reconstructionist 324:2
reconvene 342:17
record 283:7 284:9 291:25
306:1,21 312:22 326:5
327:6,9 332:7 342:20
342:24
recorded 346:13
reference 328:25
referencing 296:17
referring 290:9 302:5
324:25 338:12
refers 290:17
refrain 337:20
refresh 310:2 313:6
refused 314:13
regarding 299:8,17
326:10
regards 329:19
related 290:23 300:18
301:17,24 302:21 305:5
307:15 313:24 317:3
322:18 323:3 333:24
334:3 346:17
relates 292:7 299:22
321:24
relation 290:3
relative 346:12
remained 338:7
remember 294:7 306:15
314:4 315:9,15,21
322:6 330:8 332:10
340:11 341:2,5,23
removed 313:15 314:15

rephrase 285:18
report 289:8,10 316:3,12
321:25 336:10
reported 346:3
reporter 280:23 283:19,22
282:3 330:16,19 334:19
REPORTER'S 346:1
reporters 330:10 333:20
Reporting 280:24
reports 292:6
represent 284:12 295:21
297:4 317:2
represented 328:14
representing 329:17
reprimand 282:12 311:2
312:20 313:7,8
reprimanded 322:15
request 313:14 323:2
requested 322:7
REQUESTS 282:19
required 289:21 319:3
resources 290:7,9,11
313:11,14
respond 321:7
responded 289:10 290:6
321:16
response 292:2 333:6
responses 285:12
rest 332:4
restricted 319:9
result 286:21 290:23
310:1,13 312:19 317:13
resulted 290:4 310:1
retain 300:3 302:9,14
retained 300:15
retention 299:8,8,10,17,18
299:21,22 300:2,12,15
returned 323:22
review 298:5 339:4 344:19
Rhonda 280:23 346:23
rid 300:3 332:22 333:2,5
340:7,8
right 288:5 289:4 293:8,9
293:12,21 295:14 296:7
296:12,17 307:5 310:25
324:8 327:4 329:11
330:5,11 333:6,11,18
334:9 335:2,18 336:15
336:18 343:17,23 344:4
344:18
ring 319:20
rioting 330:20
Robins 281:4,18
Rochelle 310:11 318:14
role 320:15
roll 309:14
rolled 309:16
rude 311:5
rules 285:1

S

S 283:1
safety 281:12 298:20,21
298:24
Saturday 341:11,14
saved 336:23 337:20
saving 304:10
saw 330:10
saying 340:12
says 291:15 296:19 319:9
325:23 331:22
scene 321:16 323:13,13
323:18,22 324:2 326:7
Schrofer 310:11 318:14
Scott 346:7,24
screen 287:6,13 291:15

293:6
screenshot 282:20 291:22
296:3,13,18 338:9
screenshots 287:17
scroll 296:15 317:9
Scrolling 288:4
SEAL 346:19
search 286:14,17,21
340:13
searched 288:9 338:4
second 294:19 321:20
see 287:13 291:19 293:8,9
293:10 294:6 295:9
310:7 311:13,14 312:11
312:23 324:17 326:24
330:13 344:18
seeing 295:19 312:17
330:16,19,22
seen 303:22 333:15,20
send 292:11 299:23
338:14,16
sense 334:6,7,8
sent 286:25 292:19 293:24
294:3,5 302:17 338:9
September 291:1 306:9
series 287:25 293:4
serve 318:25
served 310:23 318:19
session 327:22 331:15
shakes 285:13
shape 320:23
share 287:6 325:6
shared 287:16 301:3
305:8 324:20 338:21
339:4
sheriff 320:9
shook 287:11
shooting 285:12
shorthand 346:14
show 287:7 293:1 294:11
296:14 310:5,6 311:12
317:1,22,23 318:11
321:19
showing 292:8 315:24
322:7
shows 304:14
sic 285:20
side 293:20 307:4 336:14
sign 344:13,22,25
SIGNATURE 347:1
signed 312:10 317:11
significantly 325:3,4
similar 301:9 318:23
sit 299:3 301:16 308:5
340:3 342:3
situation 306:10 308:19
309:4,9,22 310:25
313:25 314:6 323:12
situational 299:1
situations 303:16
skydiving 299:1
slew 337:18
somebody 288:21 295:3
304:20,23
soon 338:15
sorry 289:25 293:19 294:1
294:11 311:16,17 312:6
322:21,21 324:24
341:23
sound 310:3 314:19 327:2
Sounds 327:4
speak 285:3 290:1 308:20
308:24 337:2,3,4
speaking 301:21 308:19
309:2 315:8 317:8
special 333:24 334:2,8

Tesa Johnson (Vol. 2)
1/10/2024

**specific** 340:11,17 341:10
**specifically** 311:5 321:8 321:24 335:11,16 341:5 343:5
**speculation** 329:13 335:4
**speculations** 329:11 339:9 343:20 344:6
**speed** 307:16 308:15
**speedometer** 307:23 308:17
**spend** 321:12
**spent** 306:4
**spin** 294:18 307:8
**spoken** 308:1
**spun** 309:12
**squad** 307:3 314:3
**St** 281:10,13
**staff** 302:18
**start** 287:22 288:13 299:10
**started** 286:11 315:7 321:16 335:23
**state** 280:10,11 283:6 288:20 289:7 290:24 299:7,16,23 301:3,10 301:25 302:8 307:1 308:9 320:15,25 321:14 323:23 326:10 330:2,5 331:12,17 332:12,22 334:16 335:1,18 339:6 340:21 344:11 346:7
**State-issued** 300:6,25 323:14 324:1
**stated** 314:17
**statement** 313:4 326:14 327:24 328:7 329:8 331:22
**states** 280:1 289:6 313:2 316:9 319:3
**stay** 336:10
**stayed** 313:18
**stays** 299:13
**stop** 313:24 314:7,8,10,21 314:24 315:3 317:4 326:25
**stopped** 314:10
**stopping** 314:12
**Street** 281:9,12
**stresses** 319:23
**stressful** 320:14,16,19
**subjective** 314:25
**substantiated** 318:4
**substantive** 286:12
**Suite** 281:5,10,13
**support** 302:18
**suppose** 333:1 339:10
**supposed** 300:2
**sure** 284:8 288:16 292:2 295:20 305:6 313:20 317:16,22,22 324:16 328:3 334:2 342:18 343:5
**surprise** 333:23 334:2
**surprised** 334:5
**surprises** 323:6
**surrounding** 333:12
**suspension** 282:9,15 310:2,15,23 318:13,18 318:18
**swear** 347:2
**sworn** 280:9 284:2 346:11

---

**T**

**table** 298:2
**tact** 340:21
**tactics** 319:10

**take** 284:16 285:24 287:23 294:17 297:8,13,24 298:11 312:1 317:6 326:23 340:21 342:16
**taken** 280:19 298:8 300:22 302:17 304:13,15 313:12 327:7 342:22
**talk** 321:10
**talked** 320:25
**talking** 302:3 311:24 322:20 335:23
**Tase** 315:21
**Taser** 315:20,22,24
**teaching** 335:17
**team** 344:4
**technique** 306:23
**tell** 287:15 289:18 293:14 295:21 303:21 314:5 316:5,6 328:1
**telling** 295:25 315:21 331:23 332:22
**tells** 290:20 291:5
**term** 340:6,8
**terminated** 337:13,15
**termination** 290:4 321:14 323:12
**Tesa** 280:15,19 283:3 284:1 346:4 347:2,23
**test** 316:9,11,19,20,23
**testified** 284:3 300:5 321:15 333:12 336:2,13 337:23 340:10 341:24 342:7 343:5
**testify** 284:23 286:6,9 346:11
**testifying** 284:20 332:10 332:20 346:10
**testimony** 331:19,21 336:7 341:13 346:13
**text** 282:17,20 286:15,20 286:23,25 287:4,25 288:7,8,14 289:1,1,4 290:20 291:4,15 292:19 292:22 300:10 302:10 336:20 337:23 338:5,7 338:8
**thank** 283:22 284:6
**thanks** 286:12 290:6 292:4,24 296:12 297:1 307:10 323:11 327:10,14,20 338:18 339:23 342:11 344:12
**Thanks** 290:15
**thing** 317:5 340:11
**things** 293:20 298:16 303:17 318:17 330:17 331:24 332:14
**think** 284:16 285:23 287:7 287:8 294:3 299:1 304:13,23 307:20 308:5 309:25 310:4 312:21 314:25,25 315:24 320:1 320:5 321:12,15 322:16 323:1 332:4 337:3 339:23 342:10 343:1
**thorough** 296:1
**thought** 292:18 332:16
**threatened** 330:22
**threatening** 315:19,24
**three** 286:5 306:4 324:11 339:23 342:17
**throwing** 330:17
**thumbs-up** 292:12 328:23
**ticket** 311:5
**time** 283:4 285:4,23 291:12 298:17,23 300:6

**301:25 306:6 307:12,21 312:14 317:6 319:14 320:2,6,11,13,18 321:5 321:12 323:23 324:10 325:14,16 327:11,12,15 327:20 328:2 337:9,10 340:18 342:7
**timely** 303:6
**times** 303:5 318:9
**today** 284:7,20 286:9 290:21 291:24 299:3 301:16 308:5 314:18 323:9 327:11,15,22 328:17 329:23 337:23 338:14 340:3 341:3 342:3 344:19
**Today's** 283:3
**told** 285:23 308:19,22,23 309:5,25 313:10 314:17 316:3 331:15 341:1,15 341:25
**top** 287:22
**totally** 284:14 332:18
**touch** 307:6 345:3
**traffic** 313:24 314:7,8,12 317:4
**training** 319:16
**transcribe** 285:15
**transcribed** 344:21 346:14
**transcript** 281:18 285:10 344:18,25
**transfer** 320:4
**transferring** 321:2,3
**translation** 337:6
**transparent** 289:14
**trick** 295:25
**trooper** 302:7 319:24 330:5 343:23
**troopers** 299:9 300:17 301:11 326:19 335:7 344:1,4
**true** 288:8 341:3 346:15
**truth** 346:11,12
**truthfully** 284:24 286:6,9 306:1,5,5 332:19
**try** 285:4 287:6 294:18 306:11,5,5 332:19
**trying** 288:16 295:25 296:1
**turn** 299:13 307:6,7 327:1
**two** 313:13 318:23 319:12 325:2,3
**two-day** 318:18
**type** 301:9 316:23
**types** 312:9
**typewriting** 346:14

---

**U**

**Uh-huh** 296:20
**uh-huhs** 285:13
**ultimate** 321:13
**ultimately** 290:3
**Um-hmm** 306:20 308:23 311:15 312:24
**unable** 286:9
**understand** 284:20,23 285:18 329:7
**understanding** 306:8 307:14 309:3 312:2 314:16 332:16 336:19 339:14 340:20
**understood** 285:21 333:4 336:3,9
**unique** 333:23 334:3
**UNITED** 280:1
**unpaid** 310:14 318:18

**unprecedented** 333:18
**unprofessional** 309:6 311:4
**unrest** 333:8
**upload** 295:11 303:2,6 324:13 338:10
**uploaded** 293:16 296:4,24 297:2,5,7,8,12,13 298:8 302:16 303:3 305:11 339:6,16
**urine** 316:10,19,20
**use** 287:20 290:7 309:8,22 313:25 318:2 326:6 331:22,23 334:5
**use-of-force** 317:20
**uses** 336:10

---

**V**

**vague** 331:1
**values** 318:2
**various** 310:15
**vehicle** 307:5,8 314:9,14 314:15
**verbal** 285:11
**verbally** 322:15
**verbatim** 315:9 340:5
**verbiage** 315:25 340:9
**victim** 324:21,23,24,25
**victims** 325:2
**video** 281:15 327:5 342:20 345:5
**videoconference** 280:20
**Videographer** 281:15 283:2,16,18 327:5,8 342:20,23 345:5
**videotaped** 280:14,18 346:4
**view** 309:7
**violated** 325:20,24 326:1 326:9,18
**violation** 308:11 317:14 317:16,19 325:14 326:5
**violations** 310:15 313:3 317:24
**violence** 330:14
**violently** 330:14
**virtual** 280:14 346:3
**VOLUME** 280:16,19 346:4
**vs** 280:7

---

**W**

**wait** 285:4,6
**waiting** 332:4
**want** 287:3,22 290:8 293:13 294:11 296:21 299:21 305:23,25 306:1 310:5,6 311:12 315:21 316:19 317:1 318:11 321:19 326:24 336:20
**wanted** 288:13 293:1 298:20
**warrant** 316:16
**warrants** 316:14
**wasn't** 304:18 329:16 332:16 343:13
**way** 299:6 309:19 314:21 314:24 315:7 320:23 336:14
**We'll** 345:3
**we're** 285:12 287:8,9 291:24 323:9 327:8
**we've** 284:9 312:9,25 321:11 326:21 342:18
**week** 290:15
**weeks** 286:5 289:8

**Weiner** 281:8 282:3,6 283:12,12,17 284:5,11 326:21 327:4,10,23 328:6,20 329:12,21 331:1,15,20,25 332:2,6 335:3,9,20 336:6 339:8 339:22 342:10 343:19 344:5,11
**welcome** 327:16
**went** 315:9 317:18 323:18 323:19
**weren't** 289:9 297:5 308:6 339:1 343:22
**wheel** 307:7
**widely** 335:7
**Wiessner** 281:3 282:4 283:8,8 284:17 327:13 327:18 329:20 331:4,25 332:3,8 335:6,12,22 336:8 337:3 339:13,19 339:25 340:6 342:13,15 342:25 343:4,21 344:9 344:13,16,24 345:3
**wife** 324:20,22
**Winnebago** 306:16 307:11 308:7,13 309:10,11,12 309:17
**withheld** 303:10
**witness** 283:21 327:3,16 344:23 345:2 346:10,19
**witnessed** 330:4
**woman** 314:2
**wondering** 322:23
**word** 288:15 331:16,22,23 332:11,21,25 334:5 340:2,4,12
**words** 340:12,15,17
**work** 289:10 302:14 338:6
**workers'** 302:2,3 328:10
**world** 324:13
**wouldn't** 306:2 332:1,3 334:5 342:15
**wrap** 338:16
**Wright** 334:12
**written** 285:10 313:2,7,14 339:11
**wrong** 315:25 320:20
**wrote** 289:14 320:2

---

**X**

**X** 282:1

---

**Y**

**yeah** 291:24 294:2 300:2 300:20 306:15 308:4 318:1 319:22 320:1,5 322:10 324:18 329:8 341:22
**year** 291:1 324:19
**years** 313:13 315:10 318:24 319:12
**yelling** 315:12
**yeses** 285:12
**yesterday** 286:19

---

**Z**

---

**0**

---

**1**

**1** 293:22
**10** 280:20 295:7
**10/25/18** 282:9
**1000** 281:13

---

Tesa Johnson (Vol. 2)
1/10/2024

Page 353

**10th** 283:4 346:5
**11** 282:9 295:12 310:7
**11/2/21** 282:16
**11/5/19** 282:13
**12** 282:10 295:17 296:9
    311:13
**12th** 321:23
**13** 282:12 296:7 312:25
**14** 282:13 296:13,19 317:2
**1400** 281:10
**15** 282:14 318:12
**15th** 346:19
**16** 282:16 297:11 321:20
**17** 297:15
**1700** 317:4
**18** 282:17 287:9 297:19
    336:21
**18th** 290:14
**19** 297:22
**19th** 321:23
**1st** 321:23

---

**2**

**2** 280:16,19 294:11,12
    346:4
**2/20/20** 282:14
**2:00** 280:21 283:5
**20** 293:13 297:25
**2015** 308:2
**2018** 306:9 310:10
**2019** 311:1 313:1,5,23
    317:4,12
**2020** 298:9 299:5 313:19
    318:13
**2021** 321:23,23,24 322:19
    322:21,22,23
**2022** 289:5 290:19 341:9
**2023** 292:20
**2024** 280:21 283:4 288:10
    346:5,20
**20th** 313:4 318:13
**21-cv-1282** 280:4
**24th** 289:5 318:19
**25th** 310:10 318:19
**28** 313:1
**2800** 281:5
**284-327** 282:3
**287** 282:17
**28th** 317:4
**291** 282:20
**29th** 334:23

---

**3**

**3** 293:4,22 294:12,14
**3/16/2019** 311:25
**3:00** 327:6,7
**3:07** 327:7,9
**3:27** 342:21,22
**3:30** 342:18,22,24
**3:32** 345:6,7
**30th** 298:9 299:5 336:2,13
    341:9,11,14
**310** 282:9
**311** 282:11
**312** 282:12
**317** 282:13
**318** 282:15
**321** 282:16
**327-339** 282:4
**329** 282:6
**331** 282:6
**335** 282:6
**336** 282:6,17
**339** 282:6
**339-342** 282:3

**343** 282:6
**343-344** 282:4
**344** 282:6

---

**4**

**4** 294:16
**40** 307:16,21,22 308:3,4,6
    308:10 309:21
**445** 281:9,12

---

**5**

**5** 294:18
**5/28/19** 282:12
**55101** 281:13
**55101-2131** 281:10
**55402** 281:6
**5th** 317:12

---

**6**

**6** 294:21
**600-something** 294:4

---

**7**

**7** 294:24 327:8

---

**8**

**8** 290:19 295:1 342:23
**800** 281:5
**8th** 322:23 323:13,15,16

---

**9**

**9** 295:3
**9:49** 289:5
**952.943.1587** 280:25
**9th** 288:10