UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

────────────────────────────────────────────

CAROLYN COLE and MOLLY                          Case No. 21-CV-1282 (PJS/DLM)
HENNESSY-FISKE,

               Plaintiffs,

                                  ORDER

v.

BENJAMIN LOCKMAN and MICHAEL
ECK, acting in their individual capacities as
troopers or other sworn officers of the
Minnesota State Patrol; and JOSEPH
DWYER and JASON ENGELDINGER,
acting in their individual capacities as
Captains of the Minnesota State Patrol.

               Defendants.

────────────────────────────────────────────

      Greta Wiessner, ROBINS KAPLAN LLP, for plaintiffs.

      Joseph Weiner, MINNESOTA ATTORNEY GENERAL'S OFFICE, for
defendants.

      Plaintiffs Carolyn Cole and Molly Hennessy-Fiske are journalists who traveled to

Minnesota in May 2020 to report on the rioting that followed the murder of George

Floyd.  While observing the Minnesota State Patrol ("MSP") attempt to clear a street of

curfew violators, Cole and Hennessy-Fiske found themselves on the receiving end of

multiple blasts of pepper spray deployed by defendants Michael Eck and Benjamin

Lockman.  Eck and Lockman—and their supervisors, defendants Joseph Dwyer and

Jason Engeldinger—were members of the MSP's Mobile Response Team ("MRT"), a

unit of roughly 100 troopers and officers who were trained and deployed for crowd-control situations.

Cole and Hennessy-Fiske brought this action under 42 U.S.C. § 1983, seeking to recover for alleged violations of their constitutional rights. In Counts I and II of their second amended complaint, Cole and Hennessy-Fiske allege that Eck and Lockman used excessive force against them in violation of the Fourth Amendment and that Lockman breached a duty to prevent Eck's use of excessive force. In Count III, Cole and Hennessy-Fiske allege that Eck and Lockman retaliated against them for exercising their First Amendment rights. And in Counts IV and V, Cole and Hennessy-Fiske seek to hold Dwyer and Engeldinger liable for the actions of Eck and Lockman.

This matter is now before the Court on defendants' motion for summary judgment. For the reasons that follow, the Court mostly denies defendants' summary-judgment motion insofar as it seeks dismissal of the claims against Eck and Lockman, but grants the motion insofar as it seeks dismissal of the claims against Dwyer and Engeldinger.

## I. BACKGROUND

Cole and Hennessy-Fiske are journalists who were working for the *Los Angeles Times* in 2020—Cole as a photojournalist, and Hennessy-Fiske as a reporter. As noted, Eck, Lockman, Dwyer, and Engeldinger were members of the MRT. Dwyer joined the

MSP in 1997; as of 2020, he held the rank of Captain.  (He has since been promoted to Major.)  Engeldinger has been with the MSP since 1998, and has served as a Captain since 2019.  Eck has worked for the MSP since 1999, and attained the rank of Lieutenant in 2019.  Lockman joined the MSP in 2017, and holds the rank of Trooper.

All four defendants have received training focused on controlling crowds during protests and similar events.  This training has included instruction about the use of specialized crowd-control tools such as Mark-9 canisters, which are large containers that disperse oleoresin capsicum (more commonly known as "pepper spray").  This training has also included instruction about complying with the First and Fourth Amendments.

George Floyd was murdered by a Minneapolis police officer on May 25, 2020.  The days that followed were marred by unprecedented rioting, arson, looting, and civil unrest, which inflicted hundreds of millions of dollars in losses on the citizens of Minneapolis and surrounding communities.  The civil disorder was punctuated by rioters burning down the Minneapolis Police Department's ("MPD's") Third Precinct headquarters on the night of May 28.  This turmoil is what brought both the plaintiffs and the defendants to Minneapolis—plaintiffs for the purpose of reporting on the turmoil, and defendants for the purpose of stopping it.

The day after the Third Precinct headquarters was destroyed, Minnesota Governor Tim Walz and Minneapolis Mayor Jacob Frey issued orders imposing an 8:00 pm curfew in the city for the evenings of May 29 and May 30.  *See* Minn. Exec. Order No. 20-65 ¶ 1 (May 29, 2020), ECF No. 139-11; Am. Minneapolis Emergency Reg. No. 2020-2-1 ¶ 1 (May 29, 2020), ECF No. 139-11.  Under both orders, members of the media were exempt from the curfew.  *See* Minn. Exec. Order No. 20-65 ¶ 3; Am. Minneapolis Emergency Reg. No. 2020-2-1 ¶ 3.  Major Jeffrey Huettl, who oversaw the MRT at the time, testified that he was aware that members of the media were exempt from the Governor's curfew order, but he did not know how the details of that order had been disseminated down the chain of command.  *See* Huettl Dep. 107:8–14, 108:12–22, ECF No. 141-6.  Dwyer testified that he and the other MRT captains were made aware of the media exemption and communicated about it to their subordinates. *See* Dwyer Dep. 170:8–19, 181:7–22, ECF No. 141-1.  Engeldinger, however, testified that he was not made aware of the media exemption.  *See* Engeldinger Dep. 115:11–17, ECF No. 141.

In the early-morning hours of May 29, several MSP members arrested a group of CNN journalists on live television.  (Engeldinger was one of the MSP members involved in the arrest.  *See* Engeldinger Dep. 122:13–18.)  The incident drew swift condemnation from the Governor, and Huettl recalled having a discussion with some of the MRT

captains after the CNN arrest to ensure that the media would have a safe place from which to report.  *See* Huettl Dep. 97:14–98:4.  For his part, Engeldinger did not recall having any discussion with Huettl about the CNN arrest.  *See* Engeldinger Dep. 153:3–5. Dwyer, meanwhile, recalled having a conversation with Colonel Matthew Langer, the head of the MSP, about the importance of protecting the media, and Dwyer believed that he communicated a directive not to arrest media members to the other captains in the MRT.  *See* Dwyer Dep. 166:18–167:24.

Around midday on May 30, Dwyer and Engeldinger attended a meeting with a number of other law-enforcement leaders at the Multi-Agency Command Center on the campus of the University of Minnesota.  Accounts of the meeting vary, but the consensus among the attendees seems to be that the meeting ended with a decision that law enforcement would adopt a more aggressive approach to dealing with violent demonstrators.  In addition, phrases such as "shock and awe" and "spectacular display of force" were uttered by attendees in connection with a plan for the MSP to enforce the 8:00 pm curfew via mass arrests of protestors who refused to disperse from the streets. *See, e.g.*, Huettl Dep. 116:7–12; Engeldinger Dep. 133:17–135:4, 139:4–15; Dwyer Dep. 198:24–200:2.  Engeldinger did not believe that the MRT was trained to use shock-and-awe tactics.  *See* Engeldinger Dep. 141:11–19.

Later in the day, Dwyer and Engeldinger attended a general briefing of MRT members at which the plan to go on the offensive and employ mass arrests was relayed to the larger group. *See, e.g.*, Engeldinger Dep. 144:18–146:5; Dwyer Dep. 203:7–206:4. Eck attended the meeting, and he understood the overall message to be that the MSP would attempt to take control of the ongoing civil unrest "using any means necessary," including force. Eck Dep. 39:10–40:19, ECF No. 141-3. Another trooper who attended the briefing understood that the MSP's directive was to "fucking end" the rioting, but did not recall any specifics from the briefing itself. Johnson Dep. 66:2–8, ECF No. 139-16. Lockman had no recollection of the meeting. *See* Lockman Dep. 115:3–23, ECF No. 141-2. No attendee recalls any specific mention of the media exemption to the curfew.

On the evening of May 30, the MRT was deployed near the Fifth Precinct headquarters in Minneapolis, in response to reports of a mass gathering of protestors and riotous behavior. The Fifth Precinct sits at the southeast corner of Nicollet Avenue (which runs north-south) and 31st Street (which runs east-west). Across Nicollet Avenue from the Fifth Precinct is a Metro Transit garage that takes up the entire block. One block north of the Fifth Precinct, Nicollet Avenue terminates into the parking lot of an abandoned K-Mart. There is no dispute that the MRT arrived at the Fifth Precinct intending to execute a mass arrest of protestors who defied the curfew by pushing them northward up Nicollet into the K-Mart parking lot, surrounding the lot on all sides with

the help of the MPD, and arresting those who had been herded into the lot.  *See, e.g.,*
Huettl Dep. 118:25–119:3; Engeldinger Dep. 145:25–147:23; Dwyer Dep. 199:22–200:9.

As soon as they arrived at the Fifth Precinct, the members of the MRT formed a
north-facing line across the width of Nicollet Avenue, just south of the Fifth Precinct
headquarters.  Dwyer and Engeldinger (the supervisors) stayed behind the line in order
to assess the crowd and direct the troopers on the line.  *See* Engeldinger Dep. 164:13–18;
Dwyer Dep. 215:16–23.  Eck and Lockman were near the front of the line, roughly on the
middle-left (west) side of it.  *See* Lockman Dep. 126:18–20; Eck Dep. 125:8–15.  Eck was
the Lieutenant in charge of Lockman's squad.  *See* Lockman Dep. 10:24–11:2.  Like all of
those on the line, Eck and Lockman were clad in riot gear—helmets, gas masks, and
protective padding—and equipped with riot batons and Mark 9 pepper-spray canisters.
*See, e.g., id.* at 11:24–12:5; Eck Dep. 110:9–23.

At the time that the MRT formed its line across Nicollet Avenue, Cole and
Hennessy-Fiske were across the street from the Fifth Precinct, near the tall cinder-block
wall of the Metro Transit garage that runs the length of the block on the west side of
Nicollet.  Cole carried her camera and camera bag, and she was wearing her press
credential, a bike helmet, a respirator, a pair of goggles, and a protective vest labeled
"TV" in large white letters.  *See* Cole Dep. 104:12–105:19, ECF No. 139-8.  Hennessy-
Fiske carried a stenographer's notebook and wore her press credential.  *See* Hennsessy-

Fiske Dep. 92:7–14, ECF No. 141-5.  Plaintiffs were standing in a group that included other members of the media carrying shoulder-mounted television cameras, boom microphones, and professional photography equipment; some also wore helmets, goggles, and masks, and some marked their clothing with the word "Press."  *See, e.g.*, Wiessner Decl. Ex. W at 1:38–2:24, ECF No. 139-19.  Video evidence shows that a few non-media members were also near the media group, but it is not clear how close they were to the media group, or if they were mixed in with the members of that group.  *See, e.g.*, Wiessner Decl. Ex. V at 0:49–0:56, ECF No. 139-18.  None of the defendants recall seeing any members of the media from their positions along the MRT line.

After establishing the line across Nicollet, the MRT issued three dispersal orders in the space of a minute, each following roughly the same script:  "This is the Minnesota State Patrol.  You are in violation of Minneapolis city ordinance for curfew violation.  Please disperse or you will be arrested."  *See id.* at 0:07–1:05.  After the three warnings went unheeded, the MRT deployed flashbangs, smoke, and tear gas ahead of the police line, and the line started moving forward.  *See, e.g., id.* at 1:05–1:34; Lockman Dep. 153:9–20.  According to Lockman and another trooper, the plan was that, as the MRT line moved forward and cleared the street, any protestor who refused to move would be pulled behind the line and arrested by an "arrest team" that followed closely behind the line.  *See, e.g.*, Lockman Dep. 165:18–24, 167:23–168:3; Johnson Dep. 67:10–25.

As the flashbangs went off and the MRT line started to move forward, Cole,
Hennessy-Fiske, and other media members moved backward and against the wall of
the Metro Transit garage, eventually settling into a V-shaped alcove in the wall from
which the media members continued to record video and take photographs.  *See, e.g.*,
Wiessner Decl. Ex. V at 1:10–1:40; *id.* Ex. W at 1:57–2:27.  From their prior experience
and knowledge of how journalists typically cover clashes between police and rioters,
Cole and Hennessy-Fiske expected that the police line would walk past the media
group in the alcove as it cleared the street of curfew violators.  *See* Cole Dep. 189:9–16;
Hennessy-Fiske Dep. 119:12–120:1, 185:6–18, 237:3–8.  Neither of the journalists
understood themselves to be subject to the dispersal orders, as those orders were
addressed to curfew violators, and reporters were exempt from the curfew.  *See* Cole
Dep. 128:20–25; Hennessy-Fiske Dep. 97:7–98:8.

As the police line neared the alcove, several officers began shouting at the group
huddled within the alcove to "get down" and, as the officers gathered around the
alcove, they reinforced their verbal commands by gesturing at the ground.  *See*
Wiessner Decl. Ex. V at 1:42–1:43; *id.* Ex. W at 2:32–2:36.  As these commands were being
given, Eck made his way toward the alcove from his position in the street near the
middle of the police line, crossed the sidewalk separating the alcove from the street, and
shot a stream of pepper spray into the alcove where Cole, Hennessy-Fiske, and others

were gathered.  *See id.* Ex. W at 2:31–2:37.  Video of the incident suggests that Eck

deployed pepper spray only two to four seconds after his targets had been ordered to

"get down."  *See id.* Ex. V at 1:41–1:44; *id.* Ex. W at 2:32–2:36.  As he continued to deploy

pepper spray in a sweeping motion across the alcove, Eck and the troopers around him

began telling the group to "move."  *See id.* Ex. V at 1:46–1:48; *id.* Ex. W at 2:39–2:43.

After standing in front of the alcove for approximately five seconds, Lockman pulled

his Mark 9 canister from its holster, pulled the pin, and deployed his pepper spray from

close range at roughly a perpendicular angle into the alcove.  *See id.* Ex. V at 1:44–1:58;

*id.* Ex. X at 00:17, ECF No. 139-20.  A third trooper (who has not been identified) added

another stream of pepper spray into the alcove from the south.  *See id.* Ex. V at 1:51–1:54.

Cole was hit directly in the face, eyes, and ear with pepper spray, *see* Cole Dep.

15:21–25, while Hennessy-Fiske was hit with enough pepper spray to burn her eyes and

skin.  *See* Hennessy-Fiske Dep. 312:3–8.  As the group in the alcove was being hit with

pepper spray, someone in the group yelled that they were media.  *See* Wiessner Decl.

Ex. V at 1:51–1:54; *id.* Ex. W at 2:42–2:48.  Once the pepper spraying stopped, Cole and

Hennessy-Fiske made their way north along the Metro Transit wall with the others

from the alcove.  *See* Cole Dep. 145:18–25; Hennessy-Fiske Dep. 189:9–19.  As they

moved north, Hennessy-Fiske was struck in the leg with a cannister that was spewing

some kind of smoke, *see* Hennessy-Fiske Dep. 193:15–23, but there is no evidence that any of the defendants fired the cannister or saw who did.

Cole and Hennessy-Fiske eventually reached a low wall that separated them from 31st Street.  Hennessy-Fiske climbed over the wall and took shelter in the vestibule of a nearby building.  *See* Hennessy-Fiske Dep. 189:9–190:7.  Cole struggled to get over the wall until an unidentified law-enforcement officer helped her.  *See* Cole Dep. 146:11–147:11.  A stranger rinsed Cole's face and eyes with water, and another stranger gave her a ride to a hospital, where she had her eyes irrigated and where she received treatment for chemical burns and a corneal abrasion.  *See* Cole Dep. 149:2–150:21; Wiessner Decl. Ex. Y, ECF No. 143-1.  Hennessy-Fiske used the first-aid kit at her hotel to treat cuts and bruises on her leg caused by the cannister strike.  *See* Hennessy-Fiske Dep. 249:15–24.  Meanwhile, the mass-arrest plan fell apart when the MPD failed to close off one end of the K-Mart parking lot.  *See* Dwyer Dep. 270:10–21.

Cole did not return to covering the unrest, but instead received treatment in the Twin Cities for her eye injuries before returning to California.  *See* Cole Dep. 297:24–298:4.  Hennessy-Fiske continued to cover the protests, but out of fear of law enforcement, she chose not to stay out past curfew.  *See* Hennessy-Fiske Dep. 322:11–16.

## II. ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the lawsuit under the governing substantive law.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255.

### B.  Excessive Force (Count I)

Cole and Hennessy-Fiske allege in Count I that Eck and Lockman used excessive

force against them.  Excessive-force claims are governed by the Fourth Amendment,

which protects the "right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "To

establish a Fourth Amendment violation, 'the claimant must demonstrate a seizure

occurred and the seizure was unreasonable.'"  *Quraishi v. St. Charles Cnty.*, 986 F.3d 831,

839 (8th Cir. 2021) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)).

Defendants argue that they are entitled to summary judgment, both because Eck's and

Lockman's deployments of pepper spray did not constitute a "seizure," and because any "seizure" was reasonable under the circumstances.  Eck and Lockman also argue that, in any event, they are entitled to qualified immunity, because it was not clearly established in May 2020 that using pepper spray against the group in the alcove violated the Fourth Amendment.

### 1. Seizure

A seizure of a citizen under the Fourth Amendment "occurs when either the citizen submits to an assertion of authority or physical force is applied, regardless of whether the citizen yields to that force." *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995) (emphasis omitted).  The latter type of seizure "requires the use of force with intent to restrain," *Torres v. Madrid*, 592 U.S. 306, 317 (2021) (emphasis omitted), and "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain." *Id.*  "While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain." *Id.*

Defendants argue that Eck and Lockman did not seize Cole, Hennessy-Fiske, or the other occupants of the alcove because the officers deployed pepper spray for the purpose of *dispersing* the occupants, not *restraining* them.  In support of their argument, defendants cite a number of excessive-force cases that have distinguished between force used to disperse (not a seizure) and force used to restrain (a seizure).  For example, in

*Black Lives Matter D.C. v. Trump*, a district court found that no seizure had occurred in violation of the Fourth Amendment because officers who cleared protestors from Lafayette Square "attempted to cause the protestors and fleeing crowd to leave their location, rather than cause them to remain there." 544 F. Supp. 3d 15, 48–49 (D.D.C. 2021). The Eighth Circuit appears to tacitly support this distinction, although it has avoided explicitly adopting it. *See, e.g.*, *Dundon v. Kirchmeier*, 85 F.4th 1250, 1256 (8th Cir. 2023) (stating that "[o]ur decisions . . . have recognized a potential distinction between force used with intent to apprehend and force used with intent to disperse or repel" in the course of deciding that officers were not on notice that force used to disperse crowd constituted seizure); *Martinez v. Sasse*, 37 F.4th 506, 509–10 (8th Cir. 2022) (affirming dismissal of Fourth Amendment claim based on qualified immunity because it was not clearly established that pushing lawyer to "repel" her from entering federal facility constituted seizure); *Quraishi*, 986 F.3d at 840 (granting qualified immunity on Fourth Amendment claim because it was not clearly established that deploying canister of tear gas at reporters constituted seizure where reporters were "dispersed" and their "freedom to move was not terminated or restricted").

The Court has reservations about the "legal black hole" created by distinguishing between protestors being "free to leave" and being "free to stay." Shawn E. Fields, *Protest Policing and the Fourth Amendment*, 55 U.C. Davis L. Rev. 347, 361, 364 (2021). For

example, defendants' theory would seem to empower police officers to use *any* level of force to disperse or repel a crowd—including fire hoses, police dogs, live ammunition, and even flame throwers. Because no "seizure" would occur, it *would not matter* for purposes of the Fourth Amendment whether the force applied was reasonable. In any event, the Court need not grapple with the implications of defendants' theory, because Cole and Hennessy-Fiske have submitted sufficient evidence to allow a reasonable jury to find that Eck's and Lockman's use of pepper spray did, in fact, objectively manifest an intent to restrain the plaintiffs. *Torres*, 592 U.S. at 317

Defendants claim that it is undisputed that Eck and Lockman used their pepper spray to disperse Cole, Hennessy-Fiske, and the others gathered in the alcove, but video of the incident suggests otherwise (or at least would allow a reasonable jury to conclude otherwise). For one thing, at the moment when Eck and Lockman deployed their pepper spray, plaintiffs were surrounded in the alcove by riot police, *see, e.g.*, Wiessner Decl. Ex. V. at 1:45; *id.* Ex. W at 2:36; in other words, plaintiffs had nowhere to *go*, or to be dispersed *to*. In this respect, this case resembles *Ludwig v. Anderson*, in which the Eighth Circuit found that police had seized the decedent when several officers "formed a semicircle" around him and maced[1] him in the face. 54 F.3d at 468, 471.

---

[1]The Court notes that the term "mace" has been used interchangeably with "pepper spray" throughout the record. *See, e.g.*, Lockman Dep. at 158:7–15; Eck Dep. at 111:16–112:2.

-15-

Moreover, the video shows Eck deploying his pepper spray at the same time that other officers were pointing to the ground and yelling "get down."  *See, e.g.*, Wiessner Decl. Ex. V. at 1:42–1:46; *id.* Ex. W at 2:31–2:38.  A reasonable jury could conclude that the objective intent behind Eck's use of pepper spray under those circumstances was to force those in the alcove to get to the ground—i.e., to *stay*, not to *go*.  Lockman, for his part, deployed his pepper spray only a few seconds later—seemingly head-on into the alcove, *see id.* Ex. X at 00:17—which a reasonable observer could infer manifested an objective intent to keep his targets in the alcove.  Particularly given the testimony in the record that the MSP's plan was for a team of officers to follow behind the skirmish line, a reasonable jury could conclude that Eck's and Lockman's use of pepper spray was an act of restraint rather than dispersal and thus that Cole and Hennessy-Fiske were seized for purposes of the Fourth Amendment.  *Cf. Laney v. City of St. Louis*, 56 F.4th 1153, 1155–57 (8th Cir. 2023) (assuming seizure occurred when officer pepper sprayed protestor, even where "intended effect" of force was to make plaintiff "retreat[] and move[] away from" police barricade).

Eck and Lockman have countered with declarations stating that they deployed pepper spray to get the group in the alcove to disperse.  *See* Eck Decl. ¶ 4, ECF No. 128; Lockman Decl. ¶ 3, ECF No. 131.  That may be true, but it is also irrelevant, as courts "rarely probe the subjective motivations of police officers in the Fourth Amendment

context." *Torres*, 592 U.S. at 317.  The only objective evidence to which defendants point is that Eck and possibly other riot police were yelling "move" while using their pepper spray.  The problem for defendants, though, is that the command to "move" cannot be heard on the video of the incident until two seconds *after* Eck initially deployed his pepper spray.  At the moment that Eck started deploying pepper spray, the only thing his targets had been told was to get down on the ground.

Finally, the fact that plaintiffs were not actually arrested and were allowed to move north *after* being pepper sprayed is not determinative.  The seizure may have been brief, but "brief seizures are seizures all the same."  *Id.* at 318.

## 2.  Excessive Force

Defendants argue that, even if Eck and Lockman briefly seized Cole and Hennessy-Fiske, the officers' use of force was not excessive.  Excessive-force claims are analyzed under the Fourth Amendment's "'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).  Evaluating the reasonableness of an officer's use of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quotations omitted). "[T]he question is whether the officers'

actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

A reasonableness inquiry requires consideration of the "totality of the circumstances," but particularly salient factors include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.").

According to defendants, Eck and Lockman had no idea that members of the news media were exempt from the curfew order, and did not realize that the group of people whom they pepper sprayed in the alcove included media members. Instead, defendants argue, what Eck and Lockman saw (and what any reasonable officer would have seen) was an offshoot group of potential rioters deliberately violating an order to disperse and hiding in an alcove. Those potential rioters would have posed a danger to

the officers if the skirmish line passed them, as the potential rioters could have attacked the officers from behind. Under the circumstances, defendants argue, it was reasonable for Eck and Lockman to deploy their pepper spray to disperse the people who had gathered in the alcove.

Of course, the problem with defendants' narrative is that it resolves a number of disputed facts in their own favor. On summary judgment, however, this Court must resolve disputed facts in plaintiffs' favor—and if a jury did likewise, the jury could find that Eck and Lockman acted unreasonably when they pepper sprayed Cole and Hennessy-Fiske.

For example, a jury could conclude from the evidence in the record that Eck and Lockman were indeed aware of the curfew exemption for press. Eck and Lockman have testified that they were never informed of the exemption, but Dwyer testified that he and the other co-captains of the MRT were aware of the media exemption and that a renewed emphasis on press protections was communicated to members of the MSP (presumably including Eck and Lockman) in the course of their briefings. Putting that aside, a reasonable jury may conclude that a reasonable law-enforcement officer would understand the laws that he is enforcing. *See Heien v. North Carolina*, 547 U.S. 54, 67 (2014) ("[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce."); *id.* at 69 (Kagan, J., concurring) ("[T]he

government cannot defend an officer's mistaken legal interpretation on the ground that the officer was unaware of or untrained in the law."). Both the Governor's and the Mayor's curfew orders expressly and unambiguously exempted members of the news media, so any mistake of law by Eck or Lockman could not be counted as reasonable. *See Heien*, 547 U.S. at 70 (Kagan, J., concurring) ("If the statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake. But if not, not.").

A jury could also decide that a reasonable officer in Eck's and Lockman's position would have readily identified Cole and Hennessy-Fiske as journalists. Defendants assert that the Cole and Hennessy-Fiske were moving in and out of the crowd of demonstrators, making it difficult for officers to know whether they were protestors or journalists. Again, though, defendants are resolving disputed facts in their favor. A video of the incident appears to show the press group bunched together on the sidewalk, with the nearest non-journalist in the middle of the street. More importantly, the video shows that the group was littered with telltale signs of media, including at least three shoulder-mounted news cameras, a range of professional photography equipment (such as telephoto lenses), at least one boom microphone, and attire clearly marked "TV" and "Press." It is difficult to believe that a reasonable officer in the

position of Eck and Lockman—standing just a few feet in front of the group they were

about to pepper spray—would not have known that the group included journalists.[2]

Similarly, a jury could find that a reasonable officer in Eck's and Lockman's

position would not have concluded that those huddled in the alcove posed a threat to

officer safety.  As discussed above, a jury could find that such an officer would have

known that the people in the alcove were journalists, not rioters, and defendants have

not claimed that journalists posed a threat to officer safety.  Indeed, one video of the

incident follows a journalist wandering around behind the police line, and nearby law-

enforcement officers seem utterly indifferent to the presence of the journalist.  *See*

Wiessner Decl. Ex. V at 3:44–5:10.  In short, defendants have not identified any specific,

actual threat that Cole or Hennessy-Fiske (or the people in their group) posed to any

officer.

Altogether, a jury could readily find that a reasonable officer in the position of

Eck and Lockman would have known (1) that Cole, Hennessy-Fiske, and the rest of the

group in the alcove were journalists, (2) that those journalists were not subject to the

---

[2]Defendants repeatedly protest that Eck and Lockman could not have known that the group they pepper sprayed included journalists, because neither Cole nor Hennessy-Fiske has been able to *name* any of the other members of the press group from viewing the videos.  That does not mean, however, that a reasonable officer would not have known that the group contained journalists.  Eck and Lockman could not confidently pick *themselves* out in the videos, *see* Eck Dep. 168:19–169:10; Lockman Dep. 179:24–180:1, yet onlookers would have had no difficulty identifying them as law-enforcement officers.

curfew or the curfew-based dispersal order (i.e., were not breaking any law), and

(3) that those journalists posed no threat to the officers or anyone else.  And based on

these findings, a reasonable jury could hold Eck and Lockman liable for pepper

spraying Cole and Hennessy-Fiske just a couple of seconds after they had been

commanded to get on the ground.  *See Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir.

2017) (finding it unreasonable for officer to pepper spray plaintiff "14 seconds after he

encountered him").  That is particularly true given that Eck and Lockman were

surrounded by other officers and had lesser means of force at their disposal.  *See id.*

(noting that officer "was not alone" and had presented "no evidence he attempted to

use other force to secure compliance" in finding use of pepper spray unreasonable).

And that is also true given that the amount of force used against Cole was severe

enough to cause chemical burns to her eye, which required continuing medical

supervision.  *See Johnson v. Carroll*, 658 F.3d 819, 826 (8th Cir. 2011) ("The degree of

injury suffered in an excessive-force case is certainly relevant insofar as it tends to show

the amount and type of force used." (cleaned up)).

Put differently, if a reasonable jury resolved the disputes of fact in plaintiffs'

favor, that jury could conclude that not a single one of the *Graham* factors weighs in

favor of defendants—i.e., that plaintiffs were not violating any law, posed no immediate

threat to officer safety, and were not resisting or fleeing.  490 U.S. at 396.  The Court

therefore declines to hold that Eck's and Lockman's use of force was reasonable as a matter of law.[3]

### 3. Qualified Immunity

Finally, defendants fall back on the doctrine of qualified immunity, which "shields government officials from liability in their individual capacity so long as the official has not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Smith v. Conway Cnty.*, 759 F.3d 853, 858 (8th Cir. 2014) (cleaned up). The Court has already held that a reasonable jury could find that Eck and Lockman violated the Fourth Amendment rights of Cole and Hennessy-Fiske. Thus, the Court turns to the second issue: "whether the right in question was clearly established at the time of the violation." *Id.* (cleaned up).

---

[3]The Court does, however, agree with defendants that they are entitled to summary judgment on any claims predicated on the canister strike to Hennessy-Fiske's leg, as plaintiffs have not produced any evidence that any of the defendants was responsible for that canister. The Court therefore dismisses Counts I, II, and III insofar as they are predicated on the canister strike.

"A right is clearly established if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The inquiry into whether a right is clearly established is not done "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), as "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (cleaned up).  Although there need not "be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate." *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (per curiam) (cleaned up).

Defendants claim that they are entitled to qualified immunity because it was not clearly established that Eck's and Lockman's use of pepper spray under the circumstances amounted to either a seizure or an unreasonable use of force.  The Court disagrees.

As to the seizure:  Almost 30 years ago, the Eighth Circuit held that law-enforcement officers seize a person for Fourth Amendment purposes when they surround him and deploy pepper spray against him.  *See Ludwig*, 54 F.3d at 468, 471 (finding that "police may be said to have seized [the decedent] by twice applying mace" after "officers formed a semicircle around" him).  Unsurprisingly, then, defendants do

not often argue that plaintiffs who have been pepper sprayed have not been seized, and courts typically assume that seizures have occurred and focus instead on the reasonableness of those seizures. *See, e.g.*, *Johnson v. McCarver*, 942 F.3d 405, 411 (8th Cir. 2019) (evaluating reasonableness of pepper spraying plaintiff "to eject him from [night] club" without considering seizure); *Tatum*, 858 F.3d at 548–550 (evaluating reasonableness of pepper spray without addressing seizure); *see also Laney*, 56 F.4th at 1155–57 (considering reasonableness of use of pepper spray against protestor without considering whether seizure occurred, even where "intended effect" of pepper spray was to make plaintiff "retreat[] and move[] away from" police barricade).

As to the reasonableness of the force:  Long before May 2020, it was "clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Johnson*, 658 F.3d at 827–28 (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)).  A jury could very well find that Cole and Hennessy-Fiske—who were not even "misdemeanants," as they were exempt from the curfew—did not "flee or actively resist arrest" and "pose[d] little or no threat to the security of the officers or the public." *Id.*  In addition, the Eighth Circuit specifically applied this clearly established principle to the use of pepper spray in *Tatum*, decided in 2017.  *See* 858 F.3d at 550 ("[O]fficers justified in using 'some force' against

-25-

noncompliant suspects posing non-immediate safety threats may act unreasonably by pepper spraying them without warning . . . .").  The *Tatum* defendants were ultimately found to be immune, *see id.* at 551, but as one court aptly observed, "[a]fter *Tatum*, . . . a reasonable officer would know that pepper spaying a non-fleeing, non-resisting individual suspected or held for non-violent misdemeanors is unreasonable."  *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 914 n.6 (E.D. Mo. 2020), *aff'd* 23 F.4th 1065 (8th Cir. 2022).  Viewing the evidence in the light most favorable to the plaintiffs, then, the Court cannot conclude that the defendants are entitled to qualified immunity on the excessive-force claims.

### C. Failure to Intervene (Count II)

Plaintiffs have also produced sufficient evidence to allow a reasonable jury to return a verdict for them on their failure-to-intervene claim against Lockman.[4]  An officer may be held liable for failing to "intervene to prevent the use of excessive force when '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'"  *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015) (quoting *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009)).  The Court has already held that a reasonable jury could find that Eck used excessive force in violation of clearly

---

[4]Plaintiffs have voluntarily dismissed their failure-to-intervene claim against Eck. *See* Plfs.' Mem. Opp'n S.J. 37 n.12, ECF No. 137.

established law, and neither party disputes that Lockman observed Eck's use of force.

*See* Lockman Dep. 159:20–24.  Given Lockman's apparent proximity to Eck, *see id.* at

157:4–11, a jury could also find that Lockman had an opportunity to prevent Eck from

pepper spraying the plaintiffs, but failed to do so.  For these reasons, the Court denies

defendants' motion for summary judgment on Count II.

### D.  First Amendment (Count III)

In Count III, plaintiffs allege that Lockman and Eck retaliated against them for

engaging in activity that is protected by the First Amendment—specifically, reporting

on the unrest in Minneapolis.  "To prevail on a First Amendment retaliation claim, the

reporters must show: (1) they engaged in protected activity; (2) [the defendants] caused

an injury to the reporters that would chill a person of ordinary firmness from

continuing the activity; (3) and a causal connection between the retaliatory animus and

injury."  *Quraishi*, 986 F.3d at 837.

The defendants wisely do not dispute that a jury could find the first two

elements met.  *See De Mian v. City of St. Louis*, 86 F.4th 1179, 1182 (8th Cir. 2023)

("Peacefully protesting and reporting are generally protected forms of First

Amendment expression.  And a person of ordinary firmness would be chilled from

continuing to report or protest after being pepper sprayed.").  Instead, they argue that

Cole and Hennessy-Fiske cannot establish the requisite causal connection because they

have not produced evidence that they "were 'singled out' because of their exercise of constitutional rights." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quoting *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)).  In other words, defendants argue that Cole and Hennessy-Fiske cannot prove that Eck and Lockman pepper sprayed them *because* they were journalists; instead, defendants insist that Eck and Lockman acted upon the belief that plaintiffs were part of a group of protestors who were disobeying the curfew order.  *See Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) ("If the [use of force] was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" (citing *Baribeau*, 596 F.3d at 481)).

Once again, however, defendants' "position depends on reinterpreting the facts in a 'light most favorable to' them," not to plaintiffs.  *Molina v. City of St. Louis*, 49 F.4th 334, 343 (8th Cir. 2023) (quoting *Engesser v. Fox*, 993 F.3d 626, 629 (8th Cir. 2021)).  As discussed above, a reasonable jury could find that Eck and Lockman knew that Cole and Hennessy-Fiske were not potential rioters, but instead were journalists who were exempt from the curfew.  Video evidence also supports the inference that Eck and Lockman went out of their way to pepper spray the group in the alcove.  Eck appears to have made a beeline toward the alcove from his position near the middle of the police line—and, once there, Eck deployed his pepper spray immediately, suggesting that he

had decided to use pepper spray before he arrived at the alcove. A reasonable jury could also interpret Lockman's decision to start pepper spraying journalists after watching Eck do so—and the fact that the journalists in the alcove were the only people against whom Eck and Lockman deployed pepper spray during the entire evening—as evidence of retaliatory animus.

Admittedly, the evidence supporting plaintiffs' First Amendment claim is pretty thin. The Court concludes, however, that the evidence is sufficient to allow a jury to conclude that Eck and Lockman targeted the group in the alcove because they were journalists.

Defendants also briefly suggest that it was not clearly established at the time that Cole and Hennessy-Fiske were not obligated to abide by the MSP's dispersal orders. The Court disagrees. Again, the dispersal orders were explicitly targeted at curfew violators, and the plaintiffs were not curfew violators (because they were exempt). In *Quraishi*, the Eighth Circuit found that, as of 2014, "[a] reasonable officer would have understood that deploying a tear-gas canister at law-abiding reporters is impermissible." 986 F.3d 831. Hence, it would have been equally clear to a reasonable officer in 2020 that "deploying [pepper spray] at law-abiding reporters is impermissible." *Id.*; *cf. Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014) (denying qualified immunity to officer on First Amendment retaliation claim given evidence

permitting jury conclusion that he pepper sprayed plaintiff because plaintiff lawfully asked for badge number).

### E.  Supervisory Liability (Counts IV and V)

Finally, defendants have moved for summary judgment on the supervisory-liability claims against Dwyer and Engeldinger.  The Court agrees that plaintiffs' evidence is not sufficient to support a verdict against Dwyer or Engeldinger on these claims.

Generally speaking, "the doctrine of respondeat superior does not apply to § 1983 cases."  *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014).  But "[s]upervisory officers who act with deliberate indifference toward [a constitutional] violation, . . . or, in other words, are aware that their subordinates' actions create a substantial risk of serious harm, may be liable if they fail to intervene to mitigate the risk of harm."  *Baude v. Leyshock*, 23 F.4th 1065, 1074 (8th Cir. 2022) (cleaned up).  Moreover, a supervisor may be held liable for his direct involvement in a constitutional violation if he ordered a specific violation or was "involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions."  *Jackson*, 747 F.3d at 543 (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).  Plaintiffs advance the *Baude* theory of liability against Dwyer and Engeldinger in Count IV, and the direct-involvement theory against Dwyer in Count V.

To support their supervisory-liability claims, plaintiffs point to evidence (1) that Dwyer and Engeldinger attended planning meetings in which the MSP determined to take a more aggressive approach—i.e., a "shock and awe" strategy that would involve a "spectacular display of force"—to enforce the curfew orders and end the riots, despite not being specifically trained to implement this strategy, *see* Engeldinger Dep. 139:4–15, 141:11–19; (2) that the MRT's plan was to kettle and execute a mass arrest of everyone gathered in front of the Fifth Precinct who did not disperse when ordered to do so, *see, e.g.*, Dwyer Dep. 205:14–206:4; (3) that Eck understood from his briefing that he was to use "any means necessary" to end the rioting in the city, Eck, Dep. 39:10–19; (4) that one of Eck's fellow troopers understood her orders to be to "fucking end" the rioting, Johnson Dep. 66:2–8; (5) that on May 30 Dwyer and Engeldinger failed to point out media members to their subordinates or instruct them not to arrest or use force against those media members, *see, e.g.*, Dwyer Dep. 210:4–18; (6) that Dwyer and Engeldinger operated as on-scene overseers of coordinated movements by the MRT; and (7) that Dwyer admitted after watching a video of the incident that what he saw comported with his understanding of the operational plan outside the Fifth Precinct, *see id.* at 273:18–274:3.

Even taking this evidence in the light most favorable to plaintiffs, this evidence is not sufficient to support a jury verdict against Dwyer or Engeldinger.  At bottom,

plaintiffs point to evidence that law enforcement—including the MSP—planned to use more aggressive tactics *against those who were violating the law*.  This is hardly surprising; less aggressive tactics had left the Twin Cities littered with burned, looted, and vandalized buildings.  None of the evidence suggests that Dwyer or Engeldinger sanctioned or anticipated *illegal* tactics or the use of *any* tactics against those who were *not* violating the law (including the media).  For example, the plan to kettle and arrest those who broke the law by refusing to disperse was certainly aggressive, but nothing about the plan was facially illegal.  The Fourth Amendment allows state troopers to arrest people who are violating the law in front of them.

More specifically, none of the evidence suggests that Dwyer or Engeldinger directed Eck, Lockman, or any other officer to do *anything* with respect to members of the media.  Eck and Lockman had been trained not to infringe the constitutional rights of those participating in or witnessing demonstrations, and there is no evidence that, prior to the evening of May 30, Dwyer or Engeldinger were aware of a substantial risk that either Eck or Lockman would act contrary to that training by pepper spraying a group of law-abiding journalists.[5]

_____

[5]An expert retained by plaintiffs has opined that the "aggressive posturing" at the general briefing "provides evidence that disproportional force was authorized by the commanding officers of this event."  Ryan Report ¶ 369, ECF No. 139-24.  But the expert fails to connect the dots between unspecified law-enforcement officers encouraging those attending a general briefing to use more aggressive tactics against

(continued...)

Plaintiffs' assertion that Dwyer admitted that pepper spraying journalists was part of the plan that day reads far too much into Dwyer's one-word response to a single deposition question. Dwyer was shown an excerpt of what the parties have described as "the Ed Ou video"—a video of some of what happened outside the Fifth Precinct on May 30, including the police line forming; the protestors being ordered to disperse; the protestors defying the orders; the police deploying flashbangs, smoke, and tear gas; the police line beginning to move up Nicollet Avenue; three officers (including Eck and Lockman) veering away from the line, approaching the alcove, and pepper spraying the people in the alcove; and the aftermath of the spraying. Roughly a half hour after viewing the video—and immediately after returning from an 11-minute break—Dwyer was asked "[d]id what you see on the video comport with what you understood the plan was for the MRT outside the Fifth Precinct on May the 30th, 2020?," and he answered "yes." *See* Dwyer Dep. 273:18–274:3. Dwyer was obviously not saying that every single action of every single trooper shown on the video was planned in advance; he was saying that the general course of events shown on the video—the police forming

---

[5](...continued)

*rioters* who *were* breaking the law and Eck and Lockman using force against *journalists* who were *not* breaking the law. Moreover, the expert does not connect his conclusion to any facet of his expertise, but instead "merely tell[s] the jury what result to reach." *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010) (quoting Fed R. Evid. 704 advisory committee note). The expert's testimony on this point is not admissible, *id.*, and thus cannot preclude summary judgment. *See* Fed. R. Civ. P. 56(c).

a line, ordering the protestors to disperse, deploying munitions, moving north along Nicollet Avenue, and so on—had been planned in advance. Reading the deposition as a whole makes clear that Dwyer did not say, nor did anyone in the room understand him to say, that the MRT planned in advance to attack law-abiding journalists.

Again, to recover against Dwyer or Engeldinger for the acts of Eck and Lockman, plaintiffs must show that Dwyer or Engeldinger acted with "deliberate indifference toward" the risk that the troopers would use excessive force against journalists, *Baude*, 23 F.4th at 1074, or that Dwyer or Engeldinger knew that the troopers would likely use excessive force against journalists and facilitated, approved, condoned, or turned a blind eye to that conduct, *see Wagner v. Jones*, 64 F.3d 259, 275 (8th Cir. 2011). Plaintiffs have not met their burden. *See Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994) ("[M]ere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability under Section 1983"). Thus, Dwyer and Engeldinger cannot be held liable for Eck's and Lockman's decision to peel off from the police line and use pepper spray against a group of journalists.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that defendants' motion for summary judgment [ECF No. 124] is GRANTED IN PART and DENIED IN PART as follows:

1.  The motion is GRANTED as to Counts I, II, and III insofar as they assert claims predicated on the canister strike to plaintiff Hennessy-Fiske's leg. Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2.  The motion is GRANTED as to Count II insofar as it asserts claims against defendant Eck.  Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

3.  The motion is GRANTED as to Counts IV and V.  Counts IV and V are DISMISSED WITH PREJUDICE AND ON THE MERITS.

4.  The motion is DENIED in all other respects.

Dated:  January 29, 2024               s/Patrick J. Schiltz
                                       Patrick J. Schiltz, Chief Judge
                                       United States District Court